# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| B.W.P. DISTRIBUTORS, INC., | ) | The Honorable Kenneth M. Karas |
|  | ) |  |
| Plaintiff, | ) |  |
|  | ) |  |
| v. | ) | Civil Action No. 07-CV-3588 |
|  | ) |  |
| OE PLUS, LTD., | ) |  |
|  | ) |  |
| Defendant. | ) |  |
|  | ) |  |

## DEFENDANT/COUNTERCLAIM-PLAINTIFF OE PLUS LTD.'S OPPOSITION TO PLAINTIFF/COUNTERCLAIM-DEFENDANT'S MOTION TO DISMISS COUNTERCLAIM

Kevin J. Lesinski (Admitted *Pro Hac Vice*)
Kent D.B. Sinclair (Bar No. KS4877)
SEYFARTH SHAW LLP
World Trade Center East
Two Seaport Lane
Boston, MA 02210
(617) 946-4800

Counsel for Defendant / Counterclaim Plaintiff
OE Plus, Ltd.

## TABLE OF CONTENTS

Page

I.    BACKGROUND .................................................................................................2

II.   THERE IS NO BASIS TO DISMISS OE PLUS'
      COUNTERCLAIM.............................................................................................6

      A.    OE Plus Has Stated A Claim Upon Which Relief Can Be Granted ........................6

      B.    Massachusetts Law Governs This Case................................................................6

      C.    The Statute of Frauds Is Inapposite Because OE Plus  Has Not
            Alleged Any Breach Of An Oral Agreement..........................................................9

      D.    The UCC Does Not Bar OE Plus' Breach of Contract Claim ...............................10

            1.    The reasonableness of a rejection and/or revocation  of
                  acceptance under the UCC is a question of fact .......................................11

            2.    OE Plus rejected and/or revoked acceptance of the
                  nonconforming cores within a reasonable amount of time.........................12

      E.    BWP Fundamentally Misunderstands The Massachusetts Unfair
            And Deceptive Trade Practices Statute, Mass. Gen. Laws ch. 93A,
            § 11.......................................................................................................................14

            1.    New York's public policy does not bar enforcement of
                  Chapter 93A ................................................................................................15

            2.    OE Plus' Chapter 93A claim is cognizable under
                  Massachusetts law.......................................................................................16

                  a.    Chapter 93A is not a fraud statute and the facts
                        supporting a  claim arising thereunder need not be
                        plead with particularity .....................................................................19

                  b.    Chapter 93A is not solely a consumer protection
                        statute ................................................................................................20

                  c.    BWP's conduct falls squarely within the purview of
                        Chapter 93A.......................................................................................21

III.  BWP's Motion to Strike Pursuant to Federal  Rule of Civil
      Procedure 12(f) Should Be Denied......................................................................23

IV.   Conclusion ...........................................................................................................25

This action arises out of the egregious and anti-competitive conduct of Plaintiff/ Counterclaim-Defendant BWP Distributors, Inc. ("BWP") upon learning that Defendant/ Counterclaim-Plaintiff OE Plus, Ltd. ("OE Plus"), its long-time supplier of remanufactured automotive parts, was servicing one of its direct competitors. Specifically, BWP engaged in a retaliatory and malicious scheme to severely injure OE Plus economically, if not run it out of business, and went to great lengths to cover up the scheme, even making empty promises to OE Plus that it never intended to keep. To further this scheme, BWP dumped large amounts of worthless automotive parts on OE Plus and demanded credit for them under OE Plus' "core return" policy intended to protect OE Plus from precisely this type of abusive conduct. As the parts clearly did not conform with the terms of the policy, however, OE Plus refused to provide BWP with the credit it demanded, and itself demanded payment in full for parts that BWP had ordered and accepted.

Rather than owning up to its misdeeds, or at least attempting to resolve the matter in Massachusetts where the vast majority of the underlying transactions took place, BWP filed a declaratory judgment action in federal court in New York, a state with no interest in the dispute. In response, rather than wasting resources and fighting venue, OE Plus submitted to this Court's jurisdiction and filed the instant Counterclaim, seeking redress from BWP's conduct. Although BWP has moved to dismiss the Counterclaim pursuant to Federal Rule of Civil Procedure 12(b)(6), its motion fails for numerous reasons.

In short, BWP's motion must fail because OE Plus has easily met Federal Rule of Civil Procedure 8(a)'s liberal notice pleading requirement for both its breach of contract claim and its unfair and deceptive trade practices claim. Contrary to the assertions set forth in BWP's motion, the Statute of Frauds does not apply here, as there is no allegation that an oral agreement has been breached. In addition, although it is a factual determination not appropriately decided at this stage of the proceedings, the UCC does not bar the Counterclaim because OE Plus has

1

clearly plead facts sufficient to establish that it rejected and/or revoked the nonconforming parts

that BWP sought improperly to dump on it within a reasonable amount of time. Finally, it is

clear that BWP fundamentally misunderstands the Massachusetts Unfair and Deceptive Practice

statute, Mass. Gen. Laws ch. 93A, § 11 ("Chapter 93A"). Specifically, contrary to BWP's

assertions, Chapter 93A does not violate New York's public policy. Moreover, it is not a fraud

statute, and claims brought thereunder need not be plead with particularity. Nor is it solely a

consumer protection statute, as it explicitly applies to inter-business relationships. BWP's

egregious conduct here is precisely the type of conduct that Chapter 93A is intended to prevent.

Accordingly, OE Plus respectfully requests that this Court deny BWP's motion to dismiss

pursuant to Federal Rule of Civil Procedure 12(b)(6). In addition, OE Plus respectfully requests

that the Court deny BWP's motion to strike pursuant to Federal Rule of Civil Procedure 12(f).

## I.    BACKGROUND

The facts of this case are relatively simple and straightforward and are set forth clearly in

OE Plus' Counterclaim. OE Plus is a remanufacturer of automotive parts known as

remanufactured automotive starters and alternators. Counterclaim, ¶ 3. The remanufacturing

process requires that OE Plus first acquire a used, non-functioning starter or alternator, known as

a "core." *Id.* After obtaining a core, OE Plus completely disassembles the unit into its

component parts, cleans, refinishes, replaces and repairs all worn components, and then

reassembles the product into a "good as new" starter or alternator. *Id.* Approximately ninety

percent (90%) of all automotive starters and alternators sold in the United States are

remanufactured. *Id.*

When OE Plus sells the remanufactured starter or alternator to its customers, the price

includes two components: (1) the Exchange Price, which accounts for the value added in the

remanufacturing process by OE Plus; and (2) the Core Charge, which accounts for the value of

2

the core that was used to create the remanufactured unit. *Id.*, ¶ 4. If a customer returns a core to OE Plus within a specified amount of time after purchasing a remanufactured unit (usually within twelve months of the original sale), OE Plus will credit the customer for the Core Charge. *Id.* The value of cores fluctuates dramatically based upon supply and demand; i.e. the make and model of the car the core is from and the availability of cores from such cars. *Id.*, ¶ 5. Generally, the older the core, the lower its value. *Id.*, ¶ 6.

To protect itself from abuse by customers – i.e., dumping worthless old cores on OE Plus and seeking to be reimbursed for their original Core Charge – OE Plus implemented a Core Return Policy (the "Policy"), similar to others in the industry. *Id.*, ¶¶ 6,7,8. In relevant part, the Policy requires that in order for a customer to receive credit for the return of a core, it must (a) return the core only as a result of a purchase made from OE Plus of a specific part number; and (b) return the core within twelve months of the original purchase from OE Plus. *Id.*, ¶ 7. The Policy is printed in every OE Plus parts catalog distributed to its customers, which serve as the basis for all purchases and sales of remanufactured starters and alternators. *Id.*, ¶ 8. Indeed, each sale by OE Plus is explicitly made pursuant to the terms of the Policy. *Id.*

In or about June 2002, OE Plus began selling remanufactured starters and alternators to BWP. *Id.*, ¶ 9. Since that time, the vast majority of units sold by OE Plus to BWP were shipped from OE Plus' facilities in North Dighton, Massachusetts, to BWP's distribution center in Sutton, Massachusetts. *Id.* In May 2005, OE Plus also began shipping units to BWP's distribution center in Delran, New Jersey. *Id.*, ¶ 10. As part of the May 2005 deal with BWP to sell units to its New Jersey distribution center, OE Plus agreed to take off of BWP's hands a large amount of inventory that OE Plus would not otherwise have sought, in exchange for $600,000 in credit, to be paid over twenty-four months. *Id.* In accordance with the parties'

BOI 15920126.1

discussions and industry practice, BWP and OE Plus understood that BWP would give OE Plus all of the Delran business for at least the twenty-four month credit period. *Id.*

Since the mid-1990s, OE Plus has sold remanufactured starters and alternators to a competitor of BWP's, Autopart International ("AI"). *Id.*, ¶ 11. In April 2006, OE Plus expanded its sales to AI and became its exclusive supplier of remanufactured parts. *Id.* Upon learning of OE Plus' expanded relationship with AI, BWP commenced a scheme to retaliate against OE Plus for servicing its direct competitor, severely injure its economic interests, and potentially even run OE Plus out of business. *Id.*, ¶¶ 12, 13, 14. This scheme of retaliation included returning large numbers of nonconforming cores to OE Plus (i.e., cores that did not meet the requirements of the Core Return Policy and are essentially worthless), demanding full credit for them, and refusing to pay lawful debts it owed to OE Plus for remanufactured parts it had ordered and accepted, asserting that it was entitled to deduct credit for the nonconforming cores. *Id.* Upon information and belief, BWP knew that the cores were nonconforming, but nevertheless continued dumping them on OE Plus and demanding credit for them. *Id.*, ¶ 12.

During the last three months of 2006, BWP's conduct became increasingly egregious. *Id.*, ¶ 14. Specifically, BWP continued to order and accept remanufactured starters and alternators from OE Plus, but instead of paying for the parts, BWP flooded OE Plus with nonconforming cores and demanded credit therefor in order to offset the amount it lawfully owed to OE Plus for the parts it ordered and accepted. *Id.* During this same period of time, representatives from the two companies discussed the return of nonconforming cores and BWP's intentions for future business, and BWP provided OE Plus with misleading information designed to cause OE Plus to believe that the relationship would continue, so that it would keep sending parts to BWP. *Id.*

4

On or about January 11, 2007, ostensibly after dumping most or all of its nonconforming cores on OE Plus, BWP informed OE Plus that it would no longer purchase remanufactured starters and alternators from OE Plus for its New Jersey distribution center. *Id.*, ¶ 15. On or about February 16, 2007, BWP informed OE Plus that it would no longer purchase parts for its Sutton, Massachusetts distribution center, thereby effectively terminating the business relationship between the parties. *Id.*, ¶ 16. At that time, Neil Stockel, President of BWP, told Eric Roberts, President of OE Plus, that BWP would pay all amounts owing to OE Plus and "would not hurt OE Plus on the way out," which OE Plus relied upon in not acting more quickly to protect its interests. *Id.* As of that date, BWP owed OE Plus over one million dollars for remanufactured starters and alternators sold and delivered. *Id.*, ¶ 17. BWP has refused to pay OE Plus. *Id.*

On September 14, 2007, following numerous demands for payment, OE Plus sent a letter to BWP demanding payment of the sum of $1,019,106.17. *Id.* ¶ 18. OE Plus informed BWP that said amount was comprised of two components: (1) $264,410.77 for an accounts receivable balance above and beyond the value of any nonconforming credits BWP was claiming; and (2) $754,695.40 for the nonconforming cores returned during 2006. *Id.* OE Plus also asserted that if it were not paid in full within fourteen days, OE Plus would seek to enforce its rights in a Massachusetts court and would seek treble damages pursuant to Section 11 of the Massachusetts Unfair and Deceptive Trade Practices statute, Chapter 93A. *Id.* The parties spent the next several weeks discussing OE Plus' claims. *Id.*, ¶ 19, 20, 21. Rather than paying the amounts due, and without any notice to OE Plus, BWP filed this action for declaratory judgment in federal court in New York, in an attempt to forestall the filing of an action by OE Plus in Massachusetts and thereby avoid a Massachusetts court and Massachusetts law. *Id.*, ¶ 21. OE Plus answered BWP's complaint and filed this Counterclaim.

5

## II.     THERE IS NO BASIS TO DISMISS OE PLUS' COUNTERCLAIM

### A.     OE Plus Has Stated A Claim Upon Which Relief Can Be Granted

OE Plus has unquestionably met its burden of notice pleading under Federal Rule of Civil

Procedure 8(a), and easily defeats BWP's motion to dismiss pursuant to Rule 12(b)(6). "Federal

Rule of Civil Procedure 8(a)(2) requires only 'a short and plain statement of the claim showing

that the pleader is entitled to relief.' Specific facts are not necessary; the statement need only

give the defendant fair notice of what the . . . claim is and the grounds upon which it rests."

*Erickson v. Pardus*, 127 S.Ct. 2197, 2200 (2007) (overturning dismissal). "This simplified

notice pleading standard relies on liberal discovery rules and summary judgment motions to

define disputed facts and issues and to dispose of unmeritorious claims." *Swierkiewicz v*

*Sorema N.A.*, 534 U.S. 506, 512 (2002). "In addition, when ruling on a defendant's motion to

dismiss, a judge must accept as true all of the factual allegations contained in the complaint."

*Erickson*, 127 S.Ct. at 2200.

OE Plus has easily met its burden under Federal Rule of Civil Procedure 8(a) for each of

its claims, and its Counterclaim should not be dismissed pursuant to Rule 12(b)(6).

### B.     Massachusetts Law Governs This Case

BWP's rush to federal court in New York, while the parties were engaged in what BWP

itself describes as settlement negotiations, was nothing more than a transparent attempt to avoid

being sued by OE Plus in Massachusetts. That OE Plus did not challenge venue or file a separate

action in Massachusetts does not suggest that it thereby submitted itself to New York substantive

law.[1]  To the contrary, OE Plus was cognizant of the fact that whatever venue it found itself in,

Massachusetts law would provide it with the necessary protections and remedies.

---

[1]  Contrary to BWP's baseless assertion, OE Plus *does not* "readily concede that the Agreement between the parties
has an effect and impact on the state of New York." Memorandum of Law in Support of Motion to Dismiss, at 12.

A federal court sitting in diversity jurisdiction must apply the choice of law principles of the forum state. *See Guaranty Trust Co. of New York v. York*, 326 U.S. 99, 108-09 (1945). Nevertheless, choice of law determinations are largely fact intensive and thus not appropriately decided on motions to dismiss. *See, e.g., Comer v. Titan Tool, Inc.*, 875 F. Supp. 255, 260 (S.D.N.Y. 1995) ("A choice of governing law necessarily depends on factual determinations, not only as a matter of application of a state's choice-of-law formulation . . . but also as a constitutional matter."); *In re White Metal Rolling and Stamping Corp.*, 222 B.R. 417, 421 (Bankr. S.D.N.Y. 1998) ("Since the complaint pleads only violations of New York law, *and the choice of law issue raised by the defendants cannot be resolved on a motion to dismiss*, that portion of the motion has been withdrawn. (emphasis added)); *Gaetano Assocs. v. Artee Collections, Inc.*, 2006 WL 330322, *4 (S.D.N.Y. Feb. 14, 2006) ("The issues raised regarding the state common law claims in the motion to dismiss may be addressed at the summary judgment stage, when a more complete record can be presented to allow a reliable choice-of-law determination to be made."); *see also Nader v. General Motors Corp.*, 31 A.D.2d 392, 395 (N.Y. App. Div. 1969) ("[I]f there is any serious question as to the proper choice of law . . . such choice would be a matter to be determined by the court upon the trial proof and before submitting the basic issues framed by the pleadings to the jury as a question of law, not the subject of summary disposition here sought by way of a motion to dismiss for alleged insufficiency.").

Even if the Court were to make such a determination here, OE Plus' Counterclaim pleads _no nexus whatsoever_ with New York, and alleges numerous contacts in Massachusetts.[2] Under New York's "center of gravity" or "grouping of contacts" approach to choice-of-law issues,

---

[2] BWP effectively concedes that Massachusetts law applies here by applying it almost uniformly throughout its motion to dismiss. *See, e.g.*, Memorandum of Law in Support of Motion to Dismiss, at 12 n.7 ("For the purposes of this motion, [BWP] has applied Massachusetts' [sic] law.").

"courts may consider a spectrum of significant contacts, including the place of contracting, the places of negotiation and performance, the location of the subject matter, and the domicile or place of business of the contracting parties." *Lazard Freres & Co. v. Protective Life Ins. Co.*, 108 F.3d 1531, 1539 (2d Cir. 1997). "The traditional choice of law factors, the places of contracting and performance, are given the heaviest weight in this analysis." *Id.* Although a more fully developed record would leave no doubt that the center of gravity here is in Massachusetts, OE Plus' Counterclaim alone is sufficient to establish the same.[3] For instance, OE Plus is incorporated and has its principle place of business in Massachusetts. *See* Counterclaim, ¶ 2. Moreover, "the majority of goods sold by OE Plus to BWP were shipped from OE Plus' facilities in North Dighton, Massachusetts to BWP's Distribution Center in Sutton Massachusetts." *Id.*, ¶ 9. While there is an allegation that "BWP awarded OE Plus the starter and alternator business at BWP's Delran, New Jersey Distribution Center," *id.*, ¶ 10, nowhere does OE Plus allege – nor would a more fully developed record support – that any such activity occurred in New York. Indeed, the only reference to New York in the Counterclaim – and, as the facts will ultimately establish, the only relevant contact in New York whatsoever – is found in OE Plus' allegation, on information and belief, that BWP is headquartered there. *See id.*, ¶ 2. That clearly is insufficient to satisfy New York's "center of gravity" test. *See, e.g.*, *Bergeron v. Philip Morris, Inc.*, 100 F. Supp. 2d 164, 170-71 (E.D.N.Y. 2000) (applying Massachusetts law despite the fact that, among numerous other factors in favor of applying New York law, defendant Philip Morris, Inc. had its principal place of business in New York).

Accordingly, even if the Court were to decide the choice of law issue at this stage of the proceedings, the pleadings support only one conclusion: Massachusetts law governs this dispute.

---

[3] "[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint." *Erickson*, 127 S.Ct. at 2200

8

Not only would the Court have to look outside of the pleadings to find otherwise (although even a fully developed record would support the application of Massachusetts law), but BWP's Motion to Dismiss and OE Plus' Opposition would be of limited utility to the Court if it decided to apply New York law, as they both cite, almost exclusively, Massachusetts law.

### C.    The Statute of Frauds Is Inapposite Because OE Plus Has Not Alleged Any Breach Of An Oral Agreement

BWP either misunderstands or misrepresents OE Plus' claim for breach of contract; in either case, its Statute of Frauds argument is a red herring. OE Plus' breach of contract claim does not "rely upon" an oral twenty-four month distribution agreement, as BWP erroneously asserts. *See* Memorandum of Law in Support of Motion to Dismiss ("Memo"), at 13. Rather, OE Plus references the parties' agreement as background and for the purpose of illustrating BWP's pattern of unseemly conduct.

In fact, the contracts that OE Plus alleges were breached are numerous sales agreements that the parties entered into, the vast majority of which are in writing, and also, OE Plus' written Core Return Policy, which governs each of those agreements. OE Plus' customers, including BWP, order their parts from OE Plus' parts catalog, which contains OE Plus' Core Return Policy. *See* Counterclaim, ¶¶ 7, 8. The Policy explicitly requires that in order to receive credit for the return of a core, a customer must (a) return the core only as a result of a purchase made from OE Plus of a specific part number; and (b) return the core within twelve months of the original purchase from OE Plus. *Id* OE Plus alleges that BWP breached this Policy, which was incorporated into the sales agreements between OE Plus and BWP, and also breached its obligations to pay for auto parts received from OE Plus. *See, e g , id ,* ¶¶ 12, 13, 14, 17, 18, 22, 24.[4]

---

[4] Even if some of the agreements between OE Plus and BWP were oral, discovery will show that the parties confirmed their agreements in every case with purchase orders and invoices, which, even under the Uniform Commercial Code, as BWP urges the Court to apply here, would satisfy the Statute of Frauds. *See* UCC Section 2-

9

Finally, even putting aside the Core Return Policy, BWP does not dispute that it owes OE Plus $264,410.77 for remanufactured parts that OE Plus provided to it, over and above the value BWP wrongfully claimed for its return of nonconforming cores. Thus, even if OE Plus accepted and provided credit for every nonconforming core that BWP returned to it, BWP would still owe OE Plus $264,410.77 for remanufactured parts that it received, and its failure to pay that amount constitutes a breach of numerous sales contracts, none of which are barred by the Statute of Frauds.

### D.    The UCC Does Not Bar OE Plus' Breach of Contract Claim

Even if BWP's return of nonconforming cores to OE Plus were considered a sale of goods under the Uniform Commercial Code – a point that OE Plus certainly does not concede – the UCC does not bar OE Plus' breach of contract claim. First and foremost, as the relevant tests for rejection and revocation under the UCC are based on reasonableness – a classic question of fact for a jury – they are not properly addressed at the motion to dismiss stage. Moreover, even if the Court were to address the issue here, it is clear from OE Plus' Counterclaim that it rejected and/or revoked acceptance of the nonconforming cores within a reasonable period of time. Finally, to the extent OE Plus may have delayed rejection and/or revocation of its acceptance of the nonconforming cores, BWP lulled OE Plus into inaction with empty assurances that it would not harm OE Plus, thereby excusing OE Plus for not acting more quickly.

---

201(2), which provides that when an oral agreement is between merchants, a written confirmation of the contract will suffice against a party unless written notice of objection to its contents is given within 10 days after it is received  In addition, UCC Section 2-201(3) provides that a contract for the sale of goods is enforceable even if it would otherwise fail to satisfy the Statute of Frauds if the goods have been received and accepted  Here, OE Plus alleges, and BWP does not deny, that the parts OE Plus sold to BWP were received and accepted by BWP. Again, these issues are factual and should not be decided on a motion to dismiss  OE Plus has met its requirements under the standard of notice pleading, which applies here

1.    **The reasonableness of a rejection and/or revocation of acceptance under the UCC is a question of fact**

OE Plus clearly rejected and/or revoked acceptance of the nonconforming cores from

BWP, and did so within a reasonable amount of time. Nevertheless, rejection and revocation are

issues of fact to be determined at trial, not on a motion to dismiss. Rejection under the UCC

"must be made within a *reasonable time* after their delivery or tender." UCC § 2-602(1)

(emphasis added). Acceptance, on the other hand, occurs when a buyer "fails to make an

effective rejection under Section 2-602(1), but such acceptance does not occur until the buyer

has had a *reasonable opportunity* to inspect them." *Id.* § 2-606(1)(b) (emphasis added). Even

where a buyer accepts goods from a seller, it may revoke that acceptance "within a *reasonable*

*time* after the buyer discovers or should have discovered the ground for it and before any

substantial change in condition of the goods which is not caused by their own defects." *Id.* § 2-

608(2) (emphasis added).[5] This revocation may occur where acceptance was made "without

discovery of such non-conformity if [the] acceptance was *reasonably induced* either by the

difficulty of discovery before acceptance *or by the seller's assurances*." *Id* § 2-608(1) (emphasis

added). "What is a reasonable time for taking any action depends on the nature, purpose and

circumstances of such action." *Id.* § 1-204(2).

Reasonableness, among other factors to be considered in determining the effectiveness

of a buyer's rejection and/or revocation of acceptance, is a question of fact to be determined at

trial. *See, e.g., P & F Constr. Corp. v. Friend Lumber Corp. of Medford*, 31 Mass. App. Ct. 57

(1991) ("Generally, the timeliness of a notice of displeasure with the goods is a question to be

determined by the fact finder because whether notice is sufficiently prompt is a function of what

was reasonable in the commercial circumstances."); *Novacore Techs., Inc. v. GST Commc'ns*

---

[5]   A revocation need not be in writing. *See, e.g., Delano Growers' Co-op. Winery v. Supreme Wine Co.*, 393 Mass. 666, 675 (1985) (oral notice is sufficient)

*Corp*, 20 F. Supp. 2d 169, 184 (D. Mass. 1998) (same); *Flagship Cruises, Ltd. v. New England Merchants Nat'l Bank of Boston*, 569 F.2d 699, 702 (1st Cir. 1978) ("The reasonableness of a period of time except as to extremes would seem to be a classic issue for the trier of fact."). As the Massachusetts Supreme Judicial Court ("SJC") has long held:

> The issues of whether a revocation was effective, whether defects substantially impaired the value of goods, and whether notice of revocation was timely, are *all matters to be resolved by the fact finder.*

*Fortin v. Ox-Bow Marina, Inc*, 408 Mass. 310, 315 (1990) (emphasis added). As such, whether OE Plus effectively rejected and/or revoked acceptance of BWP's nonconforming cores is a question of fact to be determined at trial, and OE Plus' Counterclaim, therefore, cannot be dismissed pursuant to the UCC.

### 2. OE Plus rejected and/or revoked acceptance of the nonconforming cores within a reasonable amount of time

Even if the Court were inclined to determine the reasonableness of OE Plus' rejection and/or revocation at this stage of the proceedings, the only conclusion it could come to based upon the record before it – namely, the facts alleged in OE Plus' Counterclaim – is that OE Plus rejected and/or revoked acceptance of the nonconforming cores within a reasonable amount of time. Although OE Plus alleges that "during the last six months of 2006, BWP over returned large quantities of [nonconforming] cores," Counterclaim, ¶ 12, it also alleges that "[d]uring the last three months of 2006 . . . BWP engaged in a scheme to obtain product and credits from OE Plus under false pretenses" *id*, ¶ 14. During this same time period, the last three months of 2006, "representatives of OE Plus asked representatives of BWP about their intentions for future business and were given misleading information" intended to cause OE Plus to believe the parties' business relationship would continue and that the over returns would be handled accordingly. *Id* In addition, on or about February 16, 2007, "Neil Stockel, President of BWP,

told Eric Roberts, President of OE Plus, that BWP would pay all amounts owing to OE Plus and 'would not hurt OE Plus on the way out.'" *Id.*, ¶ 16.

Thus, at a minimum, OE Plus rejected and/or revoked acceptance immediately, and at the most, it did so within a few months. Either way, the nonconforming cores were rejected and/or revoked within a reasonable amount of time, particularly given the circumstances. Indeed, to the extent BWP argues that OE Plus did not reject and/or revoke acceptance of the nonconforming cores immediately, and waited too long, the only reason OE Plus did not do so immediately was because BWP lulled OE Plus into believing that the nonconformity would be cured.[6] As noted, revocation of acceptance may occur where acceptance was made "without discovery of such non-conformity if [the] acceptance was *reasonably induced* . . . *by the seller's assurances*." *Id.* § 2-608(1) (emphasis added). As the Massachusetts SJC has opined:

> Many courts have held that any delay on the part of the buyer in notification of revocation of acceptance is justified where the buyer is in constant communication with the seller regarding nonconformity of the goods, and the seller makes repeated assurances that the defect or nonconformity will be cured and attempts to do so. . . . It would be anomalous, given the UCC's purpose, to encourage buyers and sellers to reach reasonable accommodations to minimize losses . . . to penalize buyers . . . for their patience in giving sellers . . . the opportunity to rectify nonconformities before revoking acceptance of the goods.

*Fortin*, 408 Mass. at 318-19 ("Thus, the defendant errs when it looks solely at the length of time it took the [plaintiffs] to revoke acceptance – four months – in asserting that the notice of revocation was untimely."). Indeed, "[d]elays of longer than four months have been held to be reasonable, when regular complaints from the buyer and assurances and repair attempts from the seller filled the gap between acceptance and revocation." *Id.* at 319 (collecting cases holding

---

[6] A more fully developed record will show that the parties were in regular communication about the nonconforming cores since at least September 2006, and that BWP, in fact, took many of the nonconforming cores back. These facts are irrelevant on this motion to dismiss, as they are outside of the pleadings, but they evidence why factual determinations such as this are not appropriately made at this stage of the proceedings.

that revocation was timely after five months; six to eight months; eight months; nine months; fourteen months; fifteen months; one and one-half years; two years; and four years).

Here, the amount of time OE Plus took to reject and/or revoke acceptance of the nonconforming cores was eminently reasonable. Based on the OE Plus' Counterclaim, the parties discussed the issue throughout the last three months of 2006 – the very same time period that BWP was actively dumping nonconforming cores on OE Plus – and a mere two or three months thereafter, in February 2006, OE Plus' president spoke with the president of BWP about the issue, at which time the president of BWP assured OE Plus that it would not harm OE Plus' interests. Even if the Court were to determine that OE Plus's rejection and/or revocation was not effective until some time later, given the circumstances and BWP's assurances to OE Plus, such a delay would be reasonable. As discussed, however, making such a determination at this stage of the proceedings is premature, as a more fully developed record would certainly aid the Court in so doing.

**E.      BWP Fundamentally Misunderstands The Massachusetts Unfair And Deceptive Trade Practices Statute, Mass. Gen. Laws ch. 93A, § 11**

BWP fundamentally misunderstands the Massachusetts Unfair and Deceptive Trade Practices statute, Chapter 93A. First, New York's public policy does not bar enforcement of Chapter 93A; federal courts sitting in diversity jurisdiction in New York regularly enforce the statute. Second, Chapter 93A is not a fraud statute and plaintiffs are not required to plead the underlying facts with particularity. Finally, despite BWP's exhaustive attempts to frame it as such, Chapter 93A is not solely a "consumer protection statute." Although Section 9 of the statute protects consumers from the unfair and deceptive acts of merchants, Section 11 explicitly governs relationships between business entities. Accordingly, and because BWP's conduct falls squarely within the purview of the statute, there is no basis for dismissing OE Plus' Chapter 93A claim.

14

1.    **New York's public policy does not bar enforcement of Chapter 93A**

As a preliminary matter, BWP is wrong that New York public policy bars enforcement of

Chapter 93A. Indeed, BWP's own citation to New York authority interpreting Chapter 93A

completely belies such an argument. *See, e.g.*, Memo at 20 (citing *Southwick Clothing, LLC v.*

*GFT (USA) Corp.*, 2004 WL 2914093, *16 (S.D.N.Y. Dec. 15, 2004)). Indeed, no New York

court has ever refused to enforce Chapter 93A on the basis that it violates New York's public

policy. To the contrary, New York courts regularly enforce Chapter 93A. *See, e.g., Southwick*

*Clothing LLC*, 2004 WL 2914093, at *16; *Bergeron*, 100 F. Supp. 2d at 171-72 (denying motion

to dismiss Chapter 93A claim); *Maltz v. Union Carbide Chemicals & Plastics Co.*, 992 F. Supp.

286, 318-320 (S.D.N.Y. 1998) (same); *Volt Sys. Dev. Corp. v. Raytheon Co.*, 155 A.D.2d 309,

309-10 (N.Y. App. Div. 1989) (holding that "plaintiffs have, at the pleading state, . . . stated a

viable claim under Chapter 93A of the Massachusetts General Laws").

Moreover, BWP's argument that Chapter 93A is unenforceable because of its

discretionary treble damages provision defies logic and borders on the frivolous. *See* Memo at

18. First, treble damages are only awarded after trial if the Court -- rather than the jury --

determines that a violation of the statute was willful or knowing, and even then treble damages

are discretionary. *See* Mass. Gen. Laws ch. 93A § 11 ("If the court finds for the petitioner,

recovery shall be in the amount of actual damages; or up to three, but not less than two, times

such amount if the court finds that the use or employment of the method of competition or the act

or practice was . . . willful or knowing"). Indeed, if BWP were to tender a reasonable settlement

offer, OE Plus could not recover more than single damages. *Id.* ("The respondent may tender

with his answer in any such action a written offer of settlement for single damages. If such tender

or settlement is rejected by the petitioner, and if the court finds that the relief tendered was

reasonable in relation to the injury actually suffered by the petitioner, then the court shall not award more than single damages.").

Second, not only have no New York Courts refused to enforce Chapter 93A on policy grounds, but they have long held that the treble damages may be imposed pursuant to Chapter 93A. *See, e g , Volt Sys. Dev. Corp.*, 547 N.Y.S.2d at 309 ("Contrary to defendant's assertions, the court's determination, permitting plaintiffs to seek punitive damages and treble damages against the defendant under New York and Massachusetts law, (Massachusetts General Laws, Chapter 93A), was neither internally inconsistent nor inconsistent with New York conflict of law principles."); *cf. Primedia Enthusiast Publication Inc. v. Ashton Intern. Media, Inc.*, 2003 WL 22220375, *9 (S.D.N.Y. Sept. 25, 2003) (holding that defendant's conduct was not so "unscrupulous and unethical as to warrant enhanced damages and attorney's fees" under 93A, but implying that such damages could be imposed under different factual circumstances).

Finally, and most damaging to BWP's argument, New York's own deceptive trade practices statute provides for treble damages for willful and knowing violations thereof – the same standard Chapter 93A applies. *See* NY Gen. Bus. Law 349(h) ("The court may, in its discretion, increase the award of damages to an amount not to exceed three times the actual damages . . . , if the court finds the defendant willfully or knowingly violated this section. The court may award reasonable attorney's fees to a prevailing plaintiff."). Thus, BWP's argument that Chapter 93A violates New York's public policy because it provides for treble damages in certain circumstances borders on the frivolous.

**2.    OE Plus' Chapter 93A claim is cognizable under Massachusetts law**

Section 11 of Chapter 93A governs relationships between business entities and prohibits "unfair method[s] of competition or . . . unfair or deceptive act[s] or practice[s]." Mass. Gen. Laws ch. 93A, § 11. "Courts have deliberately avoided setting down a clear definition of

16

conduct constituting a violation of [Chapter] 93A." *Spence v. Boston Edison Co.*, 390 Mass.

604, 616 (1983). Rather, the Massachusetts SJC has held that "[a] practice is unfair if it is

'within ... the penumbra of some common-law, statutory, or other established concept of

unfairness; ... is immoral, unethical, oppressive, or unscrupulous ... ." *Linkage Corp. v.*

*Trustees of Boston Univ.*, 425 Mass. 1, 27 (quoting *PMP Assocs., Inc. v. Globe Newspaper Co.*,

366 Mass. 593, 596 (1975)). "[O]rdinarily the existence of unfair or deceptive acts and practices

must be determined from the circumstances of each case." *Spence*, 390 Mass. at 616; *see also*

*Provenzano v. Plymouth Rock Assur. Corp.*, 2008 WL 466395, *3 (Mass. App. Div. Feb. 19,

2008) ("What constitutes unreasonable conduct, or what is unfair or deceptive in the

circumstances of a particular case, is a question of fact for a trial court."). Further, while "mere

breaches of contract, without more, do not violate chapter 93A," *Whitinsville Plaza, Inc. v.*

*Kotseas*, 378 Mass. 85 (1979), the Massachusetts SJC has held that "conduct 'in disregard of

known contractual arrangements' and intended to secure benefits for the breaching party

constitutes an unfair act or practice for [Chapter] 93A purposes," *Blue Hills Office Park LLC v.*

*J.P. Morgan Chase Bank*, 477 F. Supp. 2d 366, 376 -377 (D. Mass. 2007) (quoting *Anthony's*

*Pier Four, Inc. v. HBC Assocs.*, 411 Mass. 451, 474 (1991)).

  Although BWP relies improperly on the formerly oft-cited "rascality" standard for

establishing Chapter 93A liability, that language is now disfavored in Massachusetts, and the

Massachusetts SJC has criticized it as "uninstructive." *See Massachusetts Employers Ins.*

*Exchange v. Propac-Mass, Inc.*, 420 Mass. 39, 42-43 (1995) ("We view as uninstructive phrases

such as 'level of rascality' and "rancid flavor of unfairness" in deciding questions of unfairness

under [Chapter] 93A.") (citations omitted); *Schwartz v. Travelers Indemnity Co.*, 50 Mass. App.

Ct. 672, 675 n.2 (2001) (same); *Stagecoach Transp., Inc. v. Shuttle, Inc.*, 50 Mass. App. Ct. 812,

867 (2001) (same); *see also Commercial Union Ins. Co. v. Seven Provinces Ins. Co., Ltd.*, 217

F.3d 33, 40 (1st Cir. 2000) ("These traditional formulations of the standard for 93A liability

[including rascality] are notably imprecise."); *NASCO, Inc. v. Public Storage, Inc.*, 127 F.3d 148,

152 (1st Cir. 1997) ("While the rubric of 'rascality' as the test of whether something is 'unfair or

deceptive' has been oft-recited, both the Supreme Judicial Court and this court have noted that

such rhetoric is 'uninstructive.'"). Instead, the court now focuses "on the nature of challenged

conduct and on the purpose and effect of that conduct as the crucial factors in making a

[Chapter] 93A fairness determination." *Propac-Mass, Inc.*, 420 Mass. at 42-43; *see also In re

Pharmaceutical Industry Average Wholesale Price Litigation*, 491 F. Supp. 2d 20, 94 (D. Mass.

2007) (applying new standard). Moreover, Chapter 93A "does not contemplate an overly

precious standard of ethical or moral behavior. It is the standard of the commercial market

place." *USM Corp. v. Arthur D. Little Systems, Inc.*, 28 Mass. App. Ct. 108, 124 (1989) (citation

omitted).

Finally, and perhaps most importantly, "a violation of [Chapter] 93A, [§] 11 need not be

premised on a violation of an independent common law or statutory duty." *Massachusetts Farm

Bureau Federation, Inc. v. Blue Cross of Massachusetts, Inc.*, 403 Mass. 722 (1989). Rather, the

statute "creates an independent statutory basis of liability. [Chapter] 93A creates broad new

rights, forbidding conduct not previously unlawful under the common law of contract and tort or

under any prior statute. A determination that conduct is unfair or deceptive is not dependent on

traditional tort or contract theories and represents a finding under a statute that creates new

substantive rights." *Linkage Corp.*, 425 Mass. at 27 (internal quotation marks and citations

omitted).[7]

---

[7] Thus, BWP's argument that Chapter 93A liability cannot stand absent a cognizable breach of contract claim is baseless. *See* Memo, at 22. "A party is not exonerated from chapter 93A liability because there has been no breach of contract." *NASCO, Inc. v. Public Storage, Inc.*, 127 F.3d 148, 152 (1st Cir. 1997) (citing *Jet Line Services, Inc. v. American Employers Ins. Co.*, 404 Mass. 706 (1989)).

> a.    **Chapter 93A is not a fraud statute and the facts supporting a
> claim arising thereunder need not be plead with particularity**

As a preliminary matter, BWP's argument that OE Plus' Chapter 93A claim should be

dismissed pursuant to Fed. R. Civ. P. 9(b) for failure to plead the underlying facts with

particularity misinterprets the nature and scope of Chapter 93A. Rule 9(b) only requires that

allegations of fraud and mistake be plead with particularity, neither of which is alleged here. *See*

Fed. R. Civ. P. 9(b); *Swierkiewicz*, 534 U.S. at 512 ("Rule 8(a)'s simplified pleading standard

applies to all civil actions, with limited exceptions. Rule 9(b), for example, provides for greater

particularity in all averments of fraud or mistake. This Court, however, has declined to extend

such exceptions to other contexts.").

Contrary to BWP's baseless assertion, Chapter 93A is not a fraud statute. *See*

*Massachusetts Farm Bureau Federation, Inc.*, 403 Mass. at 729 ("[Chapter] 93A, [Sections] 2

and 11 make unlawful 'unfair or deceptive acts or practices in the conduct of any trade or

commerce' between two businesses. An act or practice may be 'unfair' within the statutory

meaning without being deceptive or fraudulent."). As such, the facts underlying a cause of

action brought pursuant to Chapter 93A need not be plead with particularity. *See Li'l Peach of*

*Mass., Inc. v. Prendergast*, 1996 WL 1251389, at *2 n.4 (Mass. Super. Aug. 15, 1996) ("In its

brief, the plaintiff also argues that the [Chapter] 93A claim is subject to the requirements of rule

9(b), which requires that any allegation of fraud or deceit be pled with specificity.

Massachusetts courts do not impose this requirement on [Chapter] 93A claimants.") (citing *U.S.*

*Funding, Inc. of America v. Bank of Boston Corp.*, 28 Mass. App. Ct. 404, 407 (1990) ("While

Mass. R. Civ. P. 9(b) requires specification of circumstances in 'averments of fraud, mistake,

duress or undue influence,' the concept of 'unfair or deceptive acts or practices' made actionable

19

by [Chapter] 93A goes far beyond the scope of the common law action for fraud and deceit, and does not necessarily require similar pleading specificity.")).[8]

BWP's attempt to impose Fed. R. Civ. P. 9(b)'s heightened pleading requirements on Chapter 93A further exemplifies its lack of understanding of the nature of the statute and its applicability. It is clear, however, that claims brought pursuant to Chapter 93A need not be plead with particularity, and that notice pleading is sufficient.

### b.     Chapter 93A is not solely a consumer protection statute

Although Section 9 of Chapter 93A protects consumers against the unfair and deceptive acts of merchants, Section 11, upon which OE Plus relies here, explicitly governs relationships between business entities such as OE Plus and BWP. BWP's attempt to conflate the two sections is either completely disingenuous or demonstrates its ignorance of the statute; either way, its analysis is erroneous. *See Slaney v. Westwood Auto, Inc.*, 366 Mass. 688, 696-97 (1975) (distinguishing Sections 9 and 11 and noting that the remedies available under Section 11 are available to a "businessman . . . who suffers a loss . . . as a result of the employment by another businessman of either an unfair or deceptive act or practice or of an unfair method of competition"); *see also Manning v. Zuckerman*, 388 Mass. 8, 12 (1983) ("The Legislature originally enacted [Chapter] 93A to improve the commercial relationship between consumers and businessmen. . . . [T]hese protections were extended to persons engaged in trade or commerce in business transactions with other persons also engaged in trade or commerce. The

---

[8] Claims brought pursuant to Chapter 93A need only be plead with particularity where the underlying conduct is alleged to be fraudulent. *See, e.g.*, *Wayne Investment, Inc. v. Gulf Oil Corp.*, 739 F.2d 11, 14-5 (1st Cir. 1984) (alleging securities fraud); *Mear v. Sun Life Assur. Co. of Canada (U.S.)/ Keyport Life Ins. Co.*, 2008 WL 245217, *3, *6 (D. Mass. Jan. 24, 2008) (alleging fraud and negligent misrepresentation). Here, OE Plus has not alleged that BWP acted fraudulently, only that it acted unfairly and deceptively. *See Massachusetts Farm Bureau Federation, Inc.*, 403 Mass. at 722 ("An act or practice may be 'unfair' within the statutory meaning without being deceptive or fraudulent.")

development of the statute, therefore, suggests that the unfair or deceptive acts or practices prohibited are those that may arise in dealings between discrete, independent business entities.").

BWP's ignorance of Chapter 93A may be explained – although not excused – by the fact that New York's Deceptive Acts and Practices statute, NY Gen. Bus. Law 349, et seq., is limited to consumer protection actions, and does not apply to disputes between business entities, unless the defendant's acts affect the public at large. *See, e.g., Securitron Magnalock Corp. v. Schnabolk*, 65 F.3d 256, 264 (2d Cir. 1995) ("Section 349 does not expressly provide a right of action by one business competitor against another, but it does provide a right of action to any person who has been injured by reason of any violation of this section. It is clear that the gravamen of the complaint must be consumer injury or harm to the public interest.") (internal quotation marks and citations omitted); *Boule v. Hutton*, 320 F. Supp. 2d 132, 138 (S.D.N.Y. 2004) ("Courts generally find that competitors state a claim under § 349 only when they allege some harm to the public health or safety.").

Regardless of the reason, BWP is simply wrong that Chapter 93A is merely a consumer protection act like New York's Section 349. Chapter 93A explicitly applies to transactions between business entities such as OE Plus and BWP. As such, BWP's repeated attempts to frame Chapter 93A solely as a consumer protection statute fails.

### c.     BWP's conduct falls squarely within the purview of Chapter 93A

Not only does Chapter 93A not violate New York's public policy and explicitly apply to transactions between business entities, but BWP's conduct is precisely the type that the statute was intended to prevent – it was both unfair and deceptive – and OE Plus has easily met is burden of notice pleading under Fed. R. Civ. P. 8(a). Specifically, upon learning that OE Plus was servicing one of its direct competitors, AI, BWP commenced a scheme to dump large amounts of nonconforming cores on OE Plus and demanded credit therefor so as to avoid paying

21

its lawful debts for remanufactured parts that OE Plus continued to provide to BWP. This scheme was intended to cause OE Plus severe economic injury (even run it out of business) and was primarily retaliatory in nature. Although designed to be surreptitious – indeed, BWP's President even went so far as to assure OE Plus's president that OE Plus would not be harmed, so as to continue relations and conceal the scheme – BWP now argues that OE Plus is not entitled to any remedies because it did not uncover the scheme in a timely manner. Although this analysis is properly addressed on a more fully developed record, it is clear from OE Plus' Counterclaim that BWP's conduct falls within "the penumbra of some common-law, statutory, or other established concept of unfairness," and "is immoral, unethical, oppressive, or unscrupulous." *Linkage Corp.*, 425 Mass. at 27. At the very least, OE Plus has alleged sufficient facts to overcome a motion to dismiss.

Here, as just one example of why dismissal is not warranted, the Court could reasonably determine that BWP's conduct was in disregard of a known contractual arrangement; namely, OE Plus' Core Return Policy, yet it violated that Policy to secure benefits for itself and to harm OE Plus. *See Blue Hills Office Park LLC v. J.P. Morgan Chase Bank*, 477 F. Supp. 2d 366, 376 -377 (D. Mass. 2007) (quoting *Anthony's Pier Four, Inc. v HBC Assocs.*, 411 Mass. 451, 474 (1991)) (noting that "conduct 'in disregard of known contractual arrangements' and intended to secure benefits for the breaching party constitutes an unfair act or practice for [Chapter] 93A purposes."). Similarly, the Court could reasonably determine that BWP's conduct was undertaken with the intent of causing OE Plus to stop servicing its competitor, AI, which could constitute commercial extortion. *See, e.g., Pepsi-Cola Metropolitan Bottling Co., Inc. v. Checkers, Inc*, 754 F.2d 10, 18 (1st Cir. 1985) ("The court was entitled to believe that [defendants] had withheld monies which they legally owed as a form of extortion-to force [plaintiff] to do what otherwise it could not be legally required to do."). Indeed, there are myriad

22

theories under which BWP's conduct violates Chapter 93A, none of which need to be proven, or even plead with particularity, at this stage of the proceedings.

Accordingly, based upon the record before it, the Court should not dismiss OE Plus' Chapter 93A claim, as it has clearly met its burden of notice pleading under Fed. R. Civ. P. 8(a). OE Plus has plead sufficient facts to establish that BWP engaged in egregious conduct that is violative of Chapter 93A, and at the very least has plead facts sufficient to defeat BWP's motion to dismiss that claim.

## III.     BWP'S MOTION TO STRIKE PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 12(F) SHOULD BE DENIED

There is absolutely no reason to strike any allegations from OE Plus' Counterclaim, as none of them are "redundant, immaterial, impertinent, or scandalous." Fed. R. Civ. P. 12(f). "In deciding whether to strike a Rule 12(f) motion on the ground that the matter is impertinent and immaterial, it is settled that the motion will be denied, unless it can be shown that no evidence in support of the allegation would be admissible." *Lipsky v. Commonwealth United Corp.*, 551 F.2d 887, 893 (2d Cir. 1976) (noting that "the courts should not tamper with the pleadings unless there is a strong reason for so doing"); *see also Yankelevitz v. Cornell University*, 1997 WL 115651, *5 (S.D.N.Y. 1997) (noting the "the general disfavor with which motions to strike are generally viewed"). Here, to the extent the allegations of discussions between the parties in paragraphs 19, 20, and 21 of the Counterclaim even refer to settlement negotiations – a point OE Plus certainly does not concede – the allegations may nevertheless be admissible on other grounds, and should thus not be dismissed at this early stage of the proceedings. *See Eskofot A/S v. E.I. Du Pont De Nemours & Co.*, 872 F. Supp. 81, 94 (S.D.N.Y. 1995) ("When confronted with a motion to strike a portion of a pleading, a court should consider whether there is any possibility that the pleading could form the basis for admissible evidence. . . . Although the Court views it as possible that the disputed paragraphs will ultimately be stricken, pursuant to

23

Fed. R. Civ. P. 12(f) and Fed. R. Evid. 408, it finds that it would be improper to do so, on the facts of this case, at the present point in the proceeding."); *see also Lipsky*, 551 F.2d at 893 ("Evidentiary questions, such as the one present in this case, should especially be avoided at such a preliminary stage of the proceedings. Usually the questions of relevancy and admissibility in general require the context of an ongoing and unfolding trial in which to be properly decided. And ordinarily neither a district court nor an appellate court should decide to strike a portion of the complaint on the grounds that the material could not possibly be relevant on the sterile field of the pleadings alone.").

Moreover, not all evidence of settlement negotiations is inadmissible. "Rule 408 states that statements or conduct that relates to the 'furnishing or offering or promising to furnish, or . . . accepting or offering or promising to accept, a valuable consideration in compromising or attempting to compromise a claim' is not admissible 'to prove liability for or invalidity of the claim or its amount.'" *Yankelevitz*, 1997 WL 115651 at *5 (quoting Fed. R. Evid. 408) (denying motion to strike because "it is not clear that any of the discussions related to an offer of consideration in order to settle a claim" or "that evidence relating to the challenged allegations, even if the statements or conduct occurred in the context of a compromise negotiation, would be offered in order to prove liability for or invalidity of the claim that is purportedly being negotiated in the conversations."). Here, the allegations do not provide any details of the discussions whatsoever, including the existence or amount of any settlement proposals from either party. The allegations are included to provide a timeline and background for BWP's filing of its declaratory judgment action in New York to avoid being sued by OE Plus in Massachusetts, and also to show a pattern of BWP misleading OE Plus at a time when OE Plus was dealing with BWP in good faith. As such, BWP's motion to strike pursuant to Federal Rule of Civil Procedure 12(f) should be denied.

24

## IV.    CONCLUSION

For the foregoing reasons, OE Plus respectfully requests that this Court deny BWP's

motion to dismiss its Counterclaim pursuant to Federal Rule of Civil Procedure 12(b)(6) and its

motion to strike pursuant to Federal Rule of Civil Procedure 12(f).

Respectfully submitted,

OE PLUS, LTD.,

By its attorneys,

Kevin J. Lesinski (Admitted *Pro Hac Vice*)
Kent D.B. Sinclair (Bar No. KS4877)
SEYFARTH SHAW LLP
World Trade Center East
Two Seaport Lane
Boston, MA 02210
(617) 946-4800

Dated:  May 7, 2008

25