COMMERCIAL UNION INS. v. SEVEN PROVINCES INS. CO.  33
Cite as 217 F.3d 33 (1st Cir. 2000)

U.S.S.G. § 3A1.2). Two subsidiary factual arguments drive these contentions: (1) the evidence showed "only that defendant intended to escape or, at worst, to frighten" Roate (Defendant's Brief at 12); and (2) defendant's Attention Deficit Hyperactivity Disorder (ADHD) prevented defendant from forming the requisite intent to injure Roate.

We reject the two factual arguments on which defendant's appeal necessarily depends. Taking the latter argument first, we think it suffices simply to say that the record as to defendant's psychological profile in no way compels the conclusion that defendant's ADHD prevented him from forming the *mens rea* necessary to commit an aggravated assault at the relevant point in time. As to the former argument, we think it conclusive that, in *Garcia*, as here, the sentencing judge applied U.S.S.G. § 2A2.2 to circumstances in which the defendant, in order to facilitate a vehicular escape, "merely" drove his car at the official victims in order to facilitate an escape. *See id.* at 9. We held that the application of U.S.S.G. § 2A2.2 was within the court's authority in such a circumstance, even if the court believed that Garcia did not actually want to strike and injure the officers, but simply was prepared to do so if need be. *See id.* at 11 (reproducing a quotation from the judge which tends to suggest that this was the court's belief and then affirming the finding); *see also United States v. Valdez–Torres*, 108 F.3d 385, 388 (D.C.Cir. 1997) (affirming application of U.S.S.G. § 2A2.2 where defendant accelerated his car toward a law enforcement officer and ignored a shouted warning that he stop, and rejecting the argument that this evidence only showed an intent to escape or, at most, frighten); *cf. United States v. Morris*, 131 F.3d 1136, 1138 (5th Cir.1997) (affirming application of U.S.S.G. § 2A2.2 where the defendant swerved his car into a pursuing law enforcement officer's car, and rejecting argument that such evidence was insufficient to show an intent to injure).

[1, 2] Here, there was abundant evidence that defendant saw Roate in front of his car, had reason to appreciate that he was a law enforcement officer, continued to drive at him, and was prepared to strike him with his car if necessary to effectuate his escape. Indeed, the evidence suggested that defendant actually struck Roate with his car, and that Roate might well have sustained serious injuries had he not managed to get everything but his right knee out of the way. Under the circumstances, and in light of precedent, the district court did not clearly err in concluding that defendant committed an aggravated assault upon Roate. And given these same facts, the court did not clearly err in finding that defendant assaulted Roate with reasonable cause to believe that Roate was a law enforcement officer and in a manner creating a substantial risk of serious bodily injury. Defendant's sentence on Count II is thus beyond reproach.

*Affirmed.*



COMMERCIAL UNION INSURANCE COMPANY, as Successor in Interest to Employers' Surplus Lines Insurance Company, Plaintiff, Appellee,

v.

SEVEN PROVINCES INSURANCE COMPANY, LTD., Defendant, Appellant.

No. 99–1258.

United States Court of Appeals, First Circuit.

Heard Feb. 10, 2000.

Decided July 6, 2000.

Insurer sued reinsurer for breach of reinsurance contract and alleged unfair

trade practices. The United States District Court for the District of Massachusetts, 9 F.Supp.2d 49, Nancy Gertner, J., ruled for insurer, and reinsurer appealed. The Court of Appeals, Lipez, Circuit Judge, held that: (1) appeal was timely; (2) district court did not clearly err in crediting views of insurer's expert over reinsurer's expert and finding for insurer on contract issue; and (3) reinsurer was liable for unfair trade practice.

Affirmed.

Stahl, Circuit Judge, concurred in part and dissented in part, and filed opinion.

1. Federal Courts ⚖=654

Although district court's entry of judgment resolved most issues, judgment was not "final decision," triggering time for appeal, where court reserved jurisdiction to decide appropriate date and rate for calculating pre-judgment interest and ordered parties to submit further briefs on these issues. 28 U.S.C.A. § 1291; F.R.A.P.Rule 4, 28 U.S.C.A.

> See publication Words and Phrases for other judicial constructions and definitions.

2. Federal Courts ⚖=776

District court's interpretation of reinsurance agreement requires de novo review.

3. Federal Courts ⚖=763.1
   Insurance ⚖=1812

If insurance policy is ambiguous, Court of Appeals must consider intentions of parties, based on facts as district court found them.

4. Insurance ⚖=3634

Under Massachusetts law, plaintiff insurer had initial burden to prove that it had suffered loss within scope of its reinsurance coverage.

5. Evidence ⚖=461(1)
   Insurance ⚖=1854, 3614

Facultative reinsurance certificate was ambiguous as to whether insurer could use quota share treaty reinsurance to cover its share of risk of loss or whether doing so would violate net retention requirement and entitle reinsurer to concomitant reduction in its coverage obligation, and therefore, under Massachusetts law, district court properly considered extrinsic evidence, consisting of expert testimony on trade usage and industry practice, to determine what parties meant by phrase "general excess loss or excess catastrophe reinsurance."

6. Federal Courts ⚖=633
   Insurance ⚖=3634

In face of ambiguity in facultative reinsurance certificate as to whether insurer could use quota share treaty reinsurance to cover its share of risk of loss or whether doing so would violate net retention requirement and entitle reinsurer to concomitant reduction in its coverage obligation, district court did not commit clear error in crediting views of insurer's expert over reinsurer's expert and finding for insurer.

7. Federal Courts ⚖=851

Where there are two permissible views of evidence, factfinder's choice between them cannot be clearly erroneous.

8. Federal Courts ⚖=776, 850.1

District court's factual findings are reviewed for clear error and its conclusions of law are reviewed de novo.

9. Trade Regulation ⚖=862.1

Mere breach of contract does not constitute unfair or deceptive trade practice under Massachusetts law, unless it rises to level of commercial extortion or similar degree of culpable conduct. M.G.L.A. c. 93A, § 1 et seq.

**10. Consumer Protection ⚖6**
   **Insurance ⚖3336**
   **Trade Regulation ⚖862.1**

Insurance carrier which in good faith denies claim of coverage on basis of plausible interpretation of its insurance policy is unlikely to have committed unfair or deceptive trade practice under Massachusetts law. M.G.L.A. c. 93A, § 1 et seq.

**11. Consumer Protection ⚖4**
   **Trade Regulation ⚖862.1**

Possession of plausible defense does not automatically preclude finding of unfair or deceptive trade practice under Massachusetts law; defense must be clearly articulated and asserted in good faith. M.G.L.A. c. 93A, § 1 et seq.

**12. Consumer Protection ⚖6**
   **Trade Regulation ⚖862.1**

Conduct during litigation can constitute unfair or deceptive trade practice under Massachusetts law. M.G.L.A. c. 93A, § 1 et seq.

**13. Insurance ⚖3625**
   **Trade Regulation ⚖862.1**

Reinsurer's conduct in raising multiple, shifting defenses, many of them insubstantial, in a lengthy pattern of foot-dragging and stringing insurer along, with intent of pressuring insurer to compromise its claim, supported imposition of liability, under Massachusetts law, for unfair trade practice. M.G.L.A. c. 93A, § 2.

**14. Insurance ⚖3608(2)**

Reinsurance relationships are governed by traditional principle of "utmost good faith."

---

Mark V. Dugan, with whom H. Fred Northcraft, Blackwell Sanders Peper Martin LLP, Jason W. Morgan, and Day, Berry & Howard were on brief, for appellant.

Bruce M. Friedman, with whom Lori M. Meyers, Kroll, Rubin & Fiorella LLP, Rodney S. Dowell, and Berman & Dowell were on brief, for appellee.

Before SELYA, STAHL and LIPEZ, Circuit Judges.

LIPEZ, Circuit Judge.

Seven Provinces Insurance Company, Ltd., appeals from a judgment in favor of the Commercial Union Insurance Company. The district court found for Commercial Union on its claims that Seven Provinces breached a reinsurance contract and committed an unfair trade practice in violation of Massachusetts General Laws Chapter 93A ("93A"). See *Commercial Union Ins. Co. v. Seven Provinces Ins. Co.*, 9 F.Supp.2d 49 (D.Mass.1998). We affirm.

I

In the 1960s, Employers' Surplus Lines Insurance Company ("ESLIC") issued several insurance policies to Teledyne, Inc. ("Teledyne"), a California manufacturing company. ESLIC covered a portion of the risk that it faced from one of those policies ("the semiconductor policy") by purchasing a facultative reinsurance certificate from Seven Provinces.[1]

Although the particulars are somewhat more complicated, the facultative reinsurance certificate essentially provided that if Teledyne filed a valid claim with ESLIC under the semiconductor policy for up to $450,000 in excess of the first $50,000 of loss, Seven Provinces would reimburse ESLIC for half of the covered amount, up to $225,000. The policy also contained a

---

1. "Reinsurance is a contractual arrangement whereby one insurer ... transfers all or a portion of the risk it underwrites ... to another insurer...." Barry R. Ostrager & Thomas R. Newman, *Handbook on Ins. Coverage Disputes* § 15.01[a], at 776 (9th ed.1998). Whereas facultative reinsurance covers the risk that an insurer bears with respect to a specific policy, treaty reinsurance cedes the risks that an insurer carries on any number of policies within a designated line of its underwriting business. *See id.* § 15.03[a], at 780–81.

"net retention" provision that restricted ESLIC's ability to purchase additional reinsurance to cover the other half of the potential exposure—that is, the remaining $225,000 of a $450,000 loss:

> Being a reinsurance of and warranted same NETT rate, terms and conditions as and to follow the settlements of the EMPLOYERS' SURPLUS LINES INSURANCE COMPANY and that the local office of the said Company retains during the currency of this insurance at least $225,000.00 BEING 50% OF $450,000.00 EXCESS $50,000.00 COMBINED SINGLE LIMIT (subject to reduction by any general excess loss or excess catastrophe reinsurance whether effected by the head office or local office of the Company) on the identical subject matter and risk and in identically the same proportion on each separate part thereof, but in the event of the retained line being less than as above, [ESLIC's] lines to be proportionally reduced.

In 1982, Teledyne discovered environmental contamination at several of its plants and filed claims with its insurers to cover the resulting liability. In 1993, ESLIC's successor in interest, Commercial Union, settled its share of these claims for $2.2 million.[2] After concluding that $843,000 of the $2.2 million settlement pertained to environmental contamination at the site that was covered by the semiconductor policy, Commercial Union billed Seven Provinces for $225,000 as its half of the first $450,000 of the loss in excess of $50,000. Of the remaining $225,000 of the $450,000 portion of the loss, Commercial Union billed $180,000 to a pool of reinsurers from whom it had purchased quota share treaty reinsurance.

Because Commercial Union could not produce a copy of the reinsurance certificate, Seven Provinces initially questioned whether a reinsurance agreement existed between them at all. Once proof of a reinsurance relationship was discovered, Seven Provinces raised other defenses to coverage, including the argument that by ceding $180,000 of its potential exposure through quota share treaty reinsurance rather than retaining its entire share of the risk, Commercial Union violated the net retention provision in the policy.

Frustrated at its inability to obtain redress, Commercial Union filed this lawsuit in May 1995, alleging that Seven Provinces was obligated to provide $225,000 in reinsurance coverage and that its conduct constituted an unfair or deceptive business practice under Chapter 93A. After a bench trial, the district court ruled in Commercial Union's favor, finding (1) that Seven Provinces should have provided coverage; and (2) that its bad-faith conduct in failing to do so violated 93A and warranted the imposition of double damages and attorneys' fees. See 9 F.Supp.2d at 66, 70. This appeal followed.

II

Before reaching the merits, we must consider Commercial Union's claim that Seven Provinces' appeal is untimely.

Under Rule 4 of the Federal Rules of Appellate Procedure, "a notice of appeal in a civil case must be filed within thirty days of entry of the judgment or order from which the appeal is taken." See Piazza v. Aponte Roque, 909 F.2d 35, 38 (1st Cir. 1990). Commercial Union contends that we lack jurisdiction to hear this case because the district court ruled in its favor on June 15, 1998, and Seven Provinces failed to note its appeal until February 24, 1999. See Scola v. Beaulieu Wielsbeke, N.V., 131 F.3d 1073, 1074 (1st Cir.1997) (observing that the "30–day time limit is mandatory and jurisdictional" (internal quotation marks omitted)).

Generally speaking, appellate review is available only for "final decisions" from the

---

2. As a matter of convenience, we will refer to Commercial Union instead of to its predecessor in interest, ESLIC.

COMMERCIAL UNION INS. v. SEVEN PROVINCES INS. CO.   37
Cite as 217 F.3d 33 (1st Cir. 2000)

lower federal courts. 28 U.S.C. § 1291. In all but a few situations, *see, e.g., id.* § 1292 (granting limited jurisdiction to hear interlocutory appeals); Fed.R.Civ.P. 23(f) (authorizing discretionary appeals of class certification orders), a party cannot initiate an appeal until a "final decision" has been rendered—that is, " 'one which ends the litigation on the merits and leaves nothing for the court to do but execute the judgment.' " *Budinich v. Becton Dickinson & Co.*, 486 U.S. 196, 199, 108 S.Ct. 1717, 100 L.Ed.2d 178 (1988) (quoting *Catlin v. United States*, 324 U.S. 229, 233, 65 S.Ct. 631, 89 L.Ed. 911 (1945)). The timeliness of the instant appeal, therefore, turns on whether the district court's entry of judgment on June 15, 1998, constituted a "final decision" within the meaning of § 1291. We conclude that it did not.

[1] Although the district court's entry of judgment resolved most of the issues in the case, its opinion and order specified that there was more to be done before the lawsuit was over. The court reserved jurisdiction to decide "the appropriate date and rate for calculating pre-judgment interest" and ordered the parties to submit further briefs on these issues. Unlike a collateral calculation of costs or attorneys' fees at the end of a case,[3] the determination of when pre-judgment interest began to run required the court to determine when Seven Provinces should have recognized its contractual obligation to provide Commercial Union with reinsurance coverage. Because "[t]hese considerations [were] intertwined in a significant way with the merits of [Commercial Union's] primary case as well as the extent of [its] damages," the district court's June 15, 1998 decision to rule in Commercial Union's favor could not be considered a "final decision," and an appeal could not be filed, until pre-judgment interest had been decided. *Osterneck*, 489 U.S. at 176, 109 S.Ct. 987.

It was not until October 16, 1998, that the district court ruled on the question of pre-judgment interest and issued an amended judgment that conclusively resolved the merits of the case. Seven Provinces responded by filing a timely motion for reconsideration pursuant to Rules 52(b) and 59(e) of the Federal Rules of Civil Procedure. The court denied that motion on January 26, 1999, and Seven Provinces noted its appeal within thirty days thereafter, on February 24, 1999. As such, the case is properly before us.

III

[2, 3] On the merits, we must first address the district court's conclusion that Seven Provinces should have provided Commercial Union with reinsurance coverage. The district court's interpretation of the reinsurance agreement requires de novo review. *See Ferrara & DiMercurio, Inc. v. St. Paul Mercury Ins. Co.*, 169 F.3d 43, 49 (1st Cir.1999). If the policy is ambiguous, we must consider the intentions of the parties, *see Marston v. American Employers Ins. Co.*, 439 F.2d 1035, 1040 (1st Cir.1971), based on the facts as the district court found them, *see United States Liab. Ins. Co. v. Selman*, 70 F.3d 684, 687 (1st Cir.1995). We will defer to those factual findings unless they were clearly erroneous. *See id.*

---

3. In an earlier case, we likened the determination of pre-judgment interest to the taxation of costs, the award of attorneys' fees, and other collateral orders that do not affect the finality of a judgment for the purposes of appeal. *See Alman v. Taunton Sportswear Mfg. Corp.*, 857 F.2d 840, 844 n. 4 (1st Cir. 1988). Since then, the Supreme Court has indicated that pre-judgment interest actually "serves to 'remedy the injury giving rise to the [underlying] action,' . . . and in that sense is part of the merits of the district court's decision." *Osterneck v. Ernst & Whinney*, 489 U.S. 169, 176 n. 3, 109 S.Ct. 987, 103 L.Ed.2d 146 (1989) (quoting *Budinich*, 486 U.S. at 200, 108 S.Ct. 1717) (alteration in original). Even if our opinion in *Alman* remains valid in other respects, the *Osterneck* decision more closely controls the issue at hand and makes clear that the district court's June 15, 1998, ruling was not a "final decision" within the meaning of 28 U.S.C. § 1291.

38    217 FEDERAL REPORTER, 3d SERIES

[4] Under Massachusetts law, Commercial Union had the initial burden to prove that it had suffered a loss within the scope of its reinsurance coverage. *See id.* at 688. This prima facie case was easily established because (1) Commercial Union paid Teledyne $2.2 million to settle environmental contamination claims under a number of different insurance policies; and (2) at least a portion of the settlement covered losses under the semiconductor policy that Seven Provinces had agreed to reinsure. Under these circumstances, a threshold basis for reinsurance coverage was sufficiently clear. As a result, Seven Provinces had to raise a valid defense to coverage by, for example, showing that an exclusion in the reinsurance agreement applied or that Commercial Union had failed to fulfill a condition precedent to its recovery under the terms of the policy. *See id.*

Seven Provinces claimed that its obligation to provide coverage should have been reduced because Commercial Union violated the net retention provision in the reinsurance agreement by ceding part of its share of the potential exposure to quota share treaty reinsurers.[4] More specifically, because Commercial Union had obtained additional reinsurance to cover $180,000 of its $225,000 share of the risk from the Teledyne semiconductor policy, Seven Provinces sought to have its own liability lowered by the same amount, for a resulting obligation of $45,000.

[5] As the district court observed, however, *see* 9 F.Supp.2d at 53–54, the meaning of the net retention provision in the facultative reinsurance certificate was far from clear. Although the policy called for Seven Provinces' liability to be "proportionally reduced" to the extent that Commercial Union's "local office" retained less than "$225,000.00 [of risk] BEING 50% OF $450,000.00 EXCESS $50,000.00 COMBINED SINGLE LIMIT," it permitted Commercial Union to obtain "general excess loss or excess catastrophe reinsurance whether effected by the head office or local office of the Company" without violating the net retention requirement. In other words, while the policy restricted Commercial Union from using *some* forms of reinsurance to cover its residual share of the risk of loss, *other* forms of additional reinsurance were permissible.

The policy attempted to define the types of additional reinsurance that Commercial Union could have without violating the net retention provision—that is, "general excess loss or excess catastrophe reinsurance." Although "excess of loss reinsurance" was a term of art that referred to a particular kind of coverage, the parties acknowledged that "general excess loss or excess catastrophe reinsurance" apparently was not a common term in the industry. *See, e.g.,* Ostrager & Newman, *supra,* § 15.02–03, at 777–83 (describing various classes and subclasses of reinsurance, including "excess of loss" coverage, without mentioning "general excess loss or excess catastrophe" policies). Under these circumstances, the facultative reinsurance certificate was ambiguous as to whether Commercial Union could use quota share treaty reinsurance to cover its share of the risk of loss or whether doing so would violate the net retention requirement and entitle Seven Provinces to a concomitant reduction in its coverage obligation.

[6] In the face of this ambiguity, the district court properly considered extrinsic evidence to determine what the parties meant by the phrase "general excess loss or excess catastrophe reinsurance." *See Affiliated FM Ins. Co. v. Constitution Reins. Corp.,* 416 Mass. 839, 626 N.E.2d 878, 881 (1994) ("[T]he primary objective [is] that a contract is to be construed to reflect the intention of the parties."). Because the policy was several decades old, evidence of the parties' actual intent was

---

4. Although Seven Provinces raised other defenses to coverage before the district court, as we explain below in connection with the 93A claim, it only presses the net retention issue on appeal.

COMMERCIAL UNION INS. v. SEVEN PROVINCES INS. CO.  39
Cite as 217 F.3d 33 (1st Cir. 2000)

unavailable, but each side proffered an expert who worked in the insurance business and could testify to what the terms in the policy must have meant in light of industry practice. *See id.* ("Where, as here, the contract language is ambiguous, evidence of trade usage is admissible to determine the meaning of the agreement."); *cf. Samuel Hazard's Adm'r v. New England Marine Ins. Co.*, 33 U.S. (8 Pet.) 557, 586, 8 L.Ed. 1043 (1834) ("[T]he terms of the application are to be understood according to the ordinary sense and usage of those terms ... unless the underwriter knows that a different sense and usage prevail ... [or] that the [insured] uses the words in a different sense and usage....").

Seven Provinces' expert, Austin Thornton, argued that the phrase "general excess loss or excess catastrophe reinsurance" probably was meant to prohibit Commercial Union from using quota share treaty reinsurance and to permit only the use of additional "excess loss" or "excess catastrophe" coverage. Thornton admitted, however, that reasonable minds could differ on this issue, and Commercial Union's expert, George Gottheimer, took the opposite view of the policy language. Gottheimer explained (1) that industry custom long has permitted treaty reinsurance on a risk insured by a facultative certificate absent unequivocal language to the contrary; (2) that because the facultative certificate only imposed a net retention requirement "on the identical subject matter and risk and in identically the same proportion," it did not preclude the use of a qualitatively different kind of additional coverage such as quota share treaty insurance; and (3) that while the contract was ambiguous, it probably was meant to authorize "general" as well as "excess of loss" reinsurance—in which case the use of quota share treaty reinsurance would have been permissible without triggering a reduction in coverage.

Although the district court acknowledged that Seven Provinces' expert had presented a plausible explanation of what the net retention requirement meant, it found that Commercial Union's expert had provided a more credible interpretation of the relevant language. *See* 9 F.Supp.2d at 56. In support of this finding, the court emphasized that Gottheimer had more extensive experience in the reinsurance industry than Thornton, that his testimony remained consistent on direct and cross-examination, and that Gottheimer explained his reasoning more comprehensively in light of the language of the policy, the principles behind underwriting, and the practices of the industry. *See id.* The court also explained that Thornton had been involved in this dispute long before it came to court and therefore might have developed a bias in favor of Seven Provinces, while Gottheimer was an outside expert whose relationship with Commercial Union was less entrenched. *See id.*

[7] In other words, after recognizing the ambiguous language of the facultative reinsurance certificate, and after considering two plausible explanations of what that language meant, the court chose one explanation over another based on its assessment of the credibility of the witnesses. Although Seven Provinces disputes that assessment and has attempted to clarify what its insurance expert was trying to say, we cannot say, after a careful review of the record, that the district court committed clear error in crediting Gottheimer's views over Thornton's and consequently finding for Commercial Union on the issue of coverage. "[W]hen the district court's [interpretation of an ambiguous contractual provision] rest[s] not on plain meaning but on ... extrinsic evidence as to the parties' intent ... appellate review proceeds under the 'clearly erroneous' standard," *United States Liab.*, 70 F.3d at 687, and "[w]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous," *Anderson v. City of Bessemer City*, 470 U.S. 564, 574, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985).

### IV

[8] We must also determine whether the district court erred in concluding that Seven Provinces's conduct constituted an unfair trade practice under Massachusetts law. See Mass. Gen. Laws ch. 93A, §§ 2, 11. The district court's factual findings are reviewed for clear error and its conclusions of law are reviewed de novo. See Arthur D. Little, Inc. v. Dooyang Corp., 147 F.3d 47, 54 (1st Cir.1998). "Although whether a particular set of acts, in their factual setting, is unfair or deceptive is a question of fact, the boundaries of what may qualify for consideration as a c. 93A violation is a question of law." Schwanbeck v. Federal–Mogul Corp., 31 Mass. App.Ct. 390, 578 N.E.2d 789, 803–04 (1991) (internal citation omitted), rev'd on other grounds, 412 Mass. 703, 592 N.E.2d 1289 (1992).

Chapter 93A proscribes those engaged in trade or commerce from employing "[u]nfair methods of competition and unfair or deceptive acts or practices" in business transactions. Mass. Gen. Laws ch. 93A, § 2. It was "designed to encourage more equitable behavior in the marketplace." Arthur D. Little, 147 F.3d at 55. Even so, it "does not contemplate an overly precise standard of ethical or moral behavior. It is the standard of the commercial marketplace." Ahern v. Scholz, 85 F.3d 774, 798 (1st Cir.1996). To trigger liability under 93A, courts have said that the conduct in question "must attain a level of rascality that would raise an eyebrow of someone inured to the rough and tumble of the world of commerce," Quaker State Oil Ref. Corp. v. Garrity Oil Co., 884 F.2d 1510, 1513 (1st Cir.1989); have "an extortionate quality that gives it the rancid flavor of unfairness," Atkinson v. Rosenthal, 33 Mass.App.Ct. 219, 598 N.E.2d 666, 670 (1992); or fall " 'within at least the penumbra of some common-law, statutory, or other established concept of unfairness' or [be] 'immoral, unethical, oppressive or unscrupulous,' " Cambridge Plating Co. v. Napco, Inc., 85 F.3d 752, 769 (1st Cir.1996) (quoting PMP Assocs., Inc. v. Globe Newspaper Co., 366 Mass. 593, 321 N.E.2d 915, 917 (1975)). These traditional formulations of the standard for 93A liability are notably imprecise. Indeed, the Massachusetts Supreme Judicial Court has now said that "[w]e view as uninstructive phrases such as 'level of rascality' and 'rancid flavor of unfairness' in deciding questions of unfairness under G.L. c. 93A. We focus on the nature of challenged conduct and on the purpose and effect of that conduct as the crucial factors in making a G.L. 93A fairness determination." Massachusetts Employers Ins. Exch. v. Propac–Mass, Inc., 420 Mass. 39, 648 N.E.2d 435, 438 (1995) (internal citations omitted).

[9] A mere breach of contract does not constitute an unfair or deceptive trade practice under 93A, see Ahern, 85 F.3d at 798, unless it rises to the level of "commercial extortion" or a similar degree of culpable conduct, Anthony's Pier Four, Inc. v. HBC Assocs., 411 Mass. 451, 583 N.E.2d 806, 821 (1991). For example, we upheld a finding that a defendant violated 93A by withholding payment and "stringing out the process" with the intent to "force [the plaintiff] into an unfavorable settlement." Arthur D. Little, 147 F.3d at 55–56. Similarly, the Massachusetts Appeals Court upheld a finding of 93A liability for extortionate conduct when a defendant raised "specious defenses" to payment and engaged in "foot dragging" and "a pattern of stringing [the plaintiff] along." Community Builders, Inc. v. Indian Motorcycle Assocs., 44 Mass.App.Ct. 537, 692 N.E.2d 964, 978–79 (1998).

[10, 11] An insurance carrier "which in good faith denies a claim of coverage on the basis of a plausible interpretation of its insurance policy is unlikely to have committed a violation of G.L. c. 93A." Gulezian v. Lincoln Ins. Co., 399 Mass. 606, 506 N.E.2d 123, 127 (1987). But "unlikely" does not mean "never." The possession of a plausible defense does not automatically preclude a finding of a 93A violation; the defense must be clearly articulated and

COMMERCIAL UNION INS. v. SEVEN PROVINCES INS. CO.     **41**
Cite as 217 F.3d 33 (1st Cir. 2000)

asserted in good faith. *See Arthur D. Little*, 147 F.3d at 56.

[12] Commercial Union claimed that Seven Provinces violated 93A by its overall pattern of conduct during the period from the submission of the $225,000 Teledyne reinsurance bill in August 1993 to the trial in January 1998. The district court concluded that "[a]lthough Seven Provinces' objections to payment bore the hallmarks of bad faith almost from the outset," 9 F.Supp.2d at 70, its conduct was only egregious enough to warrant 93A liability in the period after the facultative reinsurance certificate was discovered in August 1995. On appeal, Seven Provinces argues that it did not violate 93A at any time. Its principal argument is that its interpretation of the net retention provision, discussed above, was plausible, and that this plausible defense shields it from 93A liability.[5] If Seven Provinces had asserted the net retention defense in good faith as the basis for the denial of coverage, it might be right. The detailed factual findings of the district court, however, tell a different story.

[13] In the post-August 1995 period, the court found that Seven Provinces never communicated to Commercial Union a decision to deny coverage. Instead, it engaged in a pattern of "evasiveness and obstructionism," *id.* at 63, without ever refusing to pay. This finding is amply supported by the record, especially the testimony of Seven Provinces's Martin Rebisz, who was in charge of handling Commercial Union's claim. The court specifically found that it "did not find credible Rebisz's denial that Seven Provinces had deliberately avoided coming to a decision on whether to pay CU's bill." *Id.* at 64. This avoidance continued through the trial: "Rebisz evaded the direct issues of whether he believed Seven Provinces was obligated to CU and, if so, for how much." *Id.* Instead, Rebisz said that Commercial Union could be owed "anything from $225,000 to nothing," an answer the court justifiably found exasperating because "Seven Provinces had at no time since the fac. cert. had been found offered any argument that there was a valid defense to the entire bill." *Id.* The court also found that "the length of time that has elapsed without Seven Provinces coming to a decision on whether to pay"—almost two and a half years from the discovery of the facultative certificate to the trial—"is far outside normal industry practice," *id.* at 65, which Rebisz admitted is to pay reinsurance claims within ninety days.

The court further found that Seven Provinces pursued its deliberate avoidance strategy by raising a series of "constantly shifting defenses and objections to payment." *Id.* at 64. One of these defenses was Seven Provinces's interpretation of the net retention provision, an interpretation that the court found "plausible." *Id.* at 56. Even under this interpretation, however, Seven Provinces would have owed Commercial Union $45,000—an amount that it never paid. Moreover, instead of being asserted as a reason to refuse coverage, this plausible defense was raised along with three others which were not plausible. Foremost among these was a challenge to Commercial Union's allocation of the Teledyne settlement among various sites and policies. Seven Provinces repeatedly demanded explanations of Commercial Union's allocation decisions even though Commercial Union had provided a full and convincing explanation from the start and repeated it consistently. At trial, Seven Provinces devoted much effort to offering alternative allocations of

---

5. Seven Provinces also argues that it cannot be held liable under 93A because the case was in litigation from May 1995 onwards, i.e., for the entire period after the facultative certificate was discovered in August 1995. This contention is without merit. It is settled law that conduct during litigation can constitute a 93A violation. *See Schubach v. Household Finance Corp.*, 375 Mass. 133, 376 N.E.2d 140, 141–42 (1978); *see also Refuse & Envtl. Sys., Inc. v. Industrial Servs. of America, Inc.*, 932 F.2d 37, 43 (1st Cir.1991) (stating that "bringing [a] lawsuit in spite of the evidence" can be a 93A violation).

the settlement. The court supportably called this effort "disingenuous," *id.* at 64, noting that under the law of reinsurance the allocation could only be challenged on grounds of bad faith or unreasonableness. Seven Provinces presented "no evidence" of such grounds. *Id.* at 60. In the absence of such evidence, the fact that alternative allocations were "possible," *id.* at 59, was legally irrelevant.

In a variant on its spurious allocation defense, Seven Provinces challenged Commercial Union's failure to allocate any of the settlement to a "difference in conditions" policy it had issued to Teledyne, even though Teledyne had never made a claim on this policy and it was generally understood to be inapplicable to hazardous waste claims. Seven Provinces raised this argument as early as 1995. Despite Commercial Union's clear explanations, Rebisz continued to raise it up to and including the time of trial—not, the court's findings suggest, with any prospect of success (Seven Provinces's own expert dismissed the argument), but as one more aspect of the "moving target" strategy. *Id.* at 64.

Perhaps the most egregious manifestation of this obstructionist strategy occurred when Seven Provinces claimed for the first time at trial that coverage for the underlying hazardous waste claim was barred by the "owned property" exclusion in the Teledyne policy. This argument was plainly barred by the "follow the settlements" doctrine that was written into the facultative certificate. Its use at trial was further confirmation of Seven Provinces's bad-faith pattern of constantly shifting objections to payment. On this point, as on all aspects of the moving target strategy, the district court's factual findings are well-supported by the record, including the testimony at trial and the voluminous correspondence between the parties.[6]

The district court further found that Seven Provinces's strategy of constantly shifting defenses was intended to pressure Commercial Union into a settlement. "I find that Seven Provinces' intent in its dealings with CU was to delay and object to payment so that CU would compromise the Teledyne bill and agree to a global commutation of all the business between the parties." *Id.* at 65. Since the "global commutation" was only pressed before August 1995, it could not be a substantive basis for 93A liability because of the court's determination that 93A liability was only warranted for Seven Provinces's conduct after the discovery of the facultative reinsurance certificate. Nevertheless, the court was entitled to rely on evidence of Seven Provinces's bad faith in the period before the facultative certificate was found in assessing its intentions thereafter. Moreover, Seven Provinces's attempts to force a settlement of the Teledyne bill continued after August 1995, even to the time of trial. The court's findings about Seven Provinces's intent were based in large part on the testimony of its own witnesses. "Thornton testified that the purpose of presenting the alternative allocations to CU was strategic: to lead to a negotiated compromise." *Id.* at 59–60. "Rebisz maintained that Seven Provinces was not refusing to pay, but merely would prefer to mediate or arbitrate in an attempt to compromise the bill." *Id.* at 64.[7]

---

6. Nor are the court's findings regarding Seven Provinces's shifting defenses undermined by the fact that its expert, Austin Thornton, testified in support of some of those defenses. As the court pointed out, Thornton's credibility was suspect because he was involved in the case since early 1995 and hardly qualified as impartial. *See* 9 F.Supp.2d at 56. It is one thing to rely in good faith on the advice of outside consultants; it is quite another to suggest that an insurer insulates itself from 93A liability merely because a hired expert maps its battle plan.

7. To be sure, we understand that negotiations are part and parcel of the settlement of insurance claims. In most instances, negotiations—even hard-line negotiations—will not subject a party to 93A liability. There is a line, however, that divides run-of-the-mill negotiating tactics from those that border upon the extortionate. The evidence of a pattern of evasiveness and the district court's well-docu-

COMMERCIAL UNION INS. v. SEVEN PROVINCES INS. CO.    43
Cite as 217 F.3d 33 (1st Cir. 2000)

Having concluded that the district court's 93A findings are not clearly erroneous, we must next determine if those findings are legally sufficient to support the imposition of 93A liability. As noted, a 93A fairness determination focuses on the nature, purpose, and effect of the challenged conduct. *See Mass. Employers Ins. Exch.*, 648 N.E.2d at 438. Seven Provinces's conduct was unfair in nature—raising a series of constantly shifting defenses while never coming to a decision about coverage; in purpose—to force a settlement of Commercial Union's claim regardless of its merits; and in effect—causing, at great expense to Commercial Union, a delay of over three years from discovery of the facultative certificate to final judgment (and over five years from the initial billing).[8]

"We emphasize that this case did not involve a good faith dispute over billing or a simple breach of contract, each of which is an insufficient basis for 93A liability." *Arthur D. Little*, 147 F.3d at 55. We emphasize, too, that this case did not involve a party whose only miscue was to decide (incorrectly, as matters turned out) to let the courts resolve a good faith disagreement or to rely mistakenly on faulty legal argumentation. Instead, Seven Provinces's conduct—raising multiple, shifting defenses (many of them insubstantial) in a lengthy pattern of foot-dragging and stringing Commercial Union along, with the intent (as its own witnesses admitted) of pressuring Commercial Union to compromise its claim—had the extortionate quality that marks a 93A violation.[9]

[14] Importantly, Seven Provinces's actions also fell within an "established concept of unfairness." *Cambridge Plating Co.*, 85 F.3d at 769. As the district court explained, reinsurance relationships are governed by the traditional principle of "utmost good faith" ("uberrima fides"). *See* 9 F.Supp.2d at 69; *see also Compagnie De Reassurance D'Ile De France v. New England Reins. Corp.*, 57 F.3d 56, 72 (1st Cir.1995). "Utmost good faith ... requires a reinsurer to indemnify its cedent for losses that are even arguably within the scope of the coverage reinsured, and not to refuse to pay merely because there may be another reasonable interpretation of the parties' obligations under which the reinsurer could avoid payment." *United Fire & Cas. Co. v. Arkwright Mut. Ins. Co.*, 53 F.Supp.2d 632, 642 (S.D.N.Y. 1999) (citing *Christiania Gen. Ins. v. Great Am. Ins. Co.*, 979 F.2d 268, 280–81 (2d Cir.1992)); *see also White v. Western Title Ins. Co.*, 40 Cal.3d 870, 221 Cal.Rptr. 509, 710 P.2d 309, 316–17 (1985) (holding that fiduciary relationship between insurer and insured does not terminate when litigation commences). The court noted that Commercial Union's expert "testified to the traditional mores of the industry: that reinsurance is 'an honorable engagement,' in which 'gentlemen's agreements' were secured by a handshake. Under this view, the reinsurer and the reinsured are 'partners,' who owe each other a duty of 'utmost good faith.'" 9 F.Supp.2d at 69. Viewed in light of the exacting standard of uberrima fides, Seven Provinces's bad faith tactics were wholly alien to the usual

---

8. Commercial Union's attorneys' fees of $234,702.08, as awarded by the district court under 93A, exceeded its $225,000 reinsurance claim. If 93A recovery were denied, therefore, Commercial Union would suffer a net loss from having brought a meritorious claim.

9. From this discussion it should be clear that we do not suggest, as the dissent says we do, that Seven Provinces was obligated to pay mented findings place Seven Provinces's tactics on the "wrong" side of this line.

Commercial Union's claim in full as soon as the facultative certificate was found. Seven Provinces *was* obligated, however, to deal with Commercial Union in good faith. The district court supportably found, as detailed above, that Seven Provinces's course of conduct after August 1995 was marked by bad faith. It is only by ignoring these findings—in particular, the finding that Seven Provinces *never* communicated to Commercial Union a decision to deny coverage—that the dissent can conclude that the court erred in imposing 93A liability.

course of dealings between an insurer and a reinsurer, and thus were even more clearly removed from an ordinary breach of contract. The district court did not err in concluding that these tactics to avoid reinsurance liability were "unfair" within the meaning of 93A.

**Affirmed.**

STAHL, Circuit Judge, concurring in part and dissenting in part.

Although I agree with the majority that this appeal is properly before us, see ante Part II, and that Seven Provinces should have provided Commercial Union with reinsurance coverage, see ante Part III, I believe that the district court erred in finding that Seven Provinces' conduct warranted liability under 93A. Thus, with respect to Part IV of the majority opinion, I respectfully dissent.

Massachusetts courts have held, without fail, that Chapter 93A does not apply to a mere breach of contract. See Ahern v. Scholz, 85 F.3d 774, 798 (1st Cir.1996) (citing Pepsi–Cola Metro. Bottling Co. v. Checkers, Inc., 754 F.2d 10, 18 (1st Cir. 1985)). In the context of insurance, while a carrier may not stubbornly refuse to pay a claim once liability has become "reasonably clear," it can continue to deny coverage based upon a "plausible interpretation" of a policy without violating 93A. Ferrara & DiMercurio, Inc. v. St. Paul Mercury Ins. Co., 169 F.3d 43, 56 & n. 23 (1st Cir.1999). The assertion of a reasonable defense to coverage does not constitute an unfair settlement practice even if the basis for that defense turns out to be wrong. See Premier Ins. Co. v. Furtado, 428 Mass. 507, 703 N.E.2d 208, 210 (1998).

With these considerations in mind, let us examine the facts as the district court found them. The court predicated the imposition of 93A liability on Seven Provinces' purported pattern of delay in handling Commercial Union's claim for coverage. The court observed, for example, that upon receiving an initial demand for coverage in August, 1993, a "pattern quickly developed by which [Commercial Union] would seek payment ... and Seven Provinces would respond only after some delay, and then by requesting further information." Commercial Union Ins. Co. v. Seven Provinces Ins. Co., 9 F.Supp.2d 49, 60 (D.Mass.1998). But then, after criticizing Seven Provinces' conduct since August, 1993, the district court concluded that 93A liability was unwarranted until after August, 1995. This inconsistency—between the period of time for which the court assailed the company's conduct, see id. at 65 ("Seven Provinces has delayed payment for over *four years* after receiving the bill, and over two years since locating the [facultative reinsurance certificate]." (emphasis added)), and the period of time for which the court actually found a 93A violation to have occurred—requires us to scrutinize the 93A ruling.

Between August, 1993 and August, 1995, Seven Provinces was entitled to question its obligation to provide reinsurance coverage because the very existence of a reinsurance relationship was unclear. As the district court acknowledged, Seven Provinces had "legitimate reasons" to doubt whether a reinsurance relationship actually existed at all. Id. at 70. By the time the facultative reinsurance certificate was found, litigation already was underway and Seven Provinces was entitled to raise any reasonable defenses to coverage that emerged from the terms of the policy. Among these defenses, Seven Provinces argued (1) that Commercial Union's allocation of liability among its Teledyne policies inflated the amount of loss that this particular reinsurance agreement covered, and (2) that Commercial Union's use of quota share treaty reinsurance violated the net retention requirement in the facultative reinsurance certificate. The district court conceded that these defenses were, respectively, "possible," see id. at 59, and "plausible," see id. at 56.

COMMERCIAL UNION INS. v. SEVEN PROVINCES INS. CO.   45
Cite as 217 F.3d 33 (1st Cir. 2000)

While it is true that Seven Provinces' attorney asked about another defense to coverage for the first time at trial, he did so only in the form of a single question about an "owned property" exclusion in one of the insurance policies. This question did not delay the proceedings because the court curtailed the inquiry. When the issue briefly resurfaced later on in the trial, Commercial Union did not object and the court did not intervene. There may be litigation strategies that are so abusive as to warrant 93A liability, but there is no authority for grounding 93A liability on an attorney's decision "to test the waters" briefly when a new issue emerges during the six-day trial of a complicated case.

In any event, Seven Provinces' insurance expert, Austin Thornton, was prepared to testify and in fact did testify in support of the company's defenses to coverage. Armed with that expert advice, the company proceeded on the reasonable belief that its liability genuinely was unclear. *See Ferrara & DiMercurio, Inc.*, 169 F.3d at 56 ("Insurers are both encouraged and entitled to rely ... on the advice of expert consultants in evaluating liability [on a demand for coverage]."); *see also Van Dyke v. St. Paul Fire & Marine Ins. Co.*, 388 Mass. 671, 448 N.E.2d 357, 361–62 (1983). Although these defenses to coverage may have taken time to litigate, and although none of these defenses ultimately prevailed, the record simply does not suggest that Seven Provinces acted with the kind of culpability that 93A requires. *See Cambridge Plating Co. v. Napco, Inc.*, 85 F.3d 752, 769 (1st Cir.1996).

The majority takes a different view, suggesting that as soon as the facultative reinsurance certificate was found, Seven Provinces should have paid Commercial Union's claim in full rather than continuing to raise new issues and questions. In particular, the majority contends that it was normatively unfair for Seven Provinces to demand additional documentation and to ask for further explanations once the existence of a reinsurance relationship was established. But if anything, the discovery of the facultative reinsurance certificate reasonably *justified* some delay on Seven Provinces' part because once the certificate was found, the company was entitled to pause in order to determine whether any other defenses to coverage appeared from the language of the certificate or from the factual circumstances surrounding the claim.

The majority cites no authority—and I know of none—to support the proposition that a reinsurer must provide coverage in full, without delay, and without limitation, simply because some kind of policy has been found. If that were the law, an insurer could face 93A liability whenever it assumed coverage pursuant to a "reservation of rights" letter rather than waiving its defenses from the onset. But that is not the law. Although the reinsurance industry holds itself to high standards of conduct that weigh in favor of *coverage under the policy* in a doubtful case, those standards do not justify *liability under 93A* simply because a reinsurer pauses to uncover and to raise a variety of "plausible" and "possible" defenses to coverage. Moreover, while it is true that Massachusetts courts might permit 93A liability when a plaintiff initiates litigation solely to burden another, *see Schubach v. Household Fin. Corp.*, 375 Mass. 133, 376 N.E.2d 140, 142 (1978) (suggesting that a finance company might violate 93A by suing debtors in distant jurisdictions so that they would be more likely to default), they have stopped short of saying that a defendant risks 93A liability simply because it raises a vigorous defense that fails to succeed on the merits. The district court erred in imposing liability under 93A.

Setting aside the facts of this particular case, what troubles me most about the majority's approach is that it truly has no bounds. Although the majority opinion says that "[t]here is a line ... that divides run-of-the-mill negotiating tactics from those that border upon the extortionate," it offers no indication of where the line

**46**  217 FEDERAL REPORTER, 3d SERIES

should be drawn when imposing 93A liability for conduct during litigation. Every commercial litigant appearing in federal court in Massachusetts must now fear that if it raises plausible defenses against a debatable claim rather than agreeing to pay the claim at the outset, it will risk 93A liability simply because it chose to fight and lost. Massachusetts law has never reached that far.

For the foregoing reasons, I respectfully dissent with respect to Part IV of the majority opinion.



Nilsa SANTIAGO–RAMOS,
Plaintiff, Appellant,

v.

CENTENNIAL P.R. WIRELESS
CORP.; ABC Insurance Co.,
Defendants, Appellees.

No. 99–1789.

United States Court of Appeals,
First Circuit.

Heard Nov. 5, 1999.

Decided July 6, 2000.

Former employee brought sex discrimination and retaliation claims under Title VII, and claim for vacation pay under Puerto Rico Law 80, against former employer. The United States District Court for the District of Puerto Rico, Salvador E. Casellas, J., and Jesús A. Castellanos, United States Magistrate Judge, entered summary judgment in favor of former employer on Title VII claims and denied former employee's motion for summary judgment on Law 80 claim. Former employee appealed. The Court of Appeals, Wallace, Circuit Judge, held that: (1) fact issues existed as to whether employer's proffered nondiscriminatory reasons for terminating employee were pretextual and as to whether actual reason was discriminatory; (2) employee failed to establish prima facie case of retaliation; and (3) probationary contract stating it was 90–calendar day contract, but also stating that it commenced July 1 and ended September 30, which period covered 92 days, was void under Law 80.

Affirmed in part, reversed in part, and remanded.

1. Federal Courts ⚖752

In reviewing grant of summary judgment for employer on Title VII claim, Court of Appeals was required to consider affidavit that employee produced after receiving summary judgment motion, even if affidavit was self-serving, inasmuch as affidavit contained more than allegations made in complaint, in that it provided specific factual information based upon personal knowledge. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.; Fed.Rules Civ.Proc.Rule 56(e), 28 U.S.C.A.

2. Federal Civil Procedure ⚖2539

To the extent that affidavits submitted in opposition to a motion for summary judgment merely reiterate allegations made in the complaint, without providing specific factual information made on the basis of personal knowledge, they are insufficient to defeat summary judgment. Fed.Rules Civ.Proc.Rule 56(e), 28 U.S.C.A.

3. Federal Civil Procedure ⚖2539

A party's own affidavit, containing relevant information of which he or she has first-hand knowledge, may be self-serving, but it is nonetheless competent to support or defeat summary judgment. Fed.Rules Civ.Proc.Rule 56(e), 28 U.S.C.A.

4. Civil Rights ⚖387

A Title VII sex discrimination claim may be proven with direct evidence of discrimination, such as an admission by