393 Mass. 666

**DELANO GROWERS' COOPERATIVE WINERY**

**v.**

**SUPREME WINE CO., INC.**

Supreme Judicial Court of Massachusetts, Suffolk.

Argued Sept. 13, 1984.

Decided Jan. 21, 1985.

Seller brought action seeking payment for wine sold and delivered. Buyer counterclaimed for breach of contract alleging that earlier shipments of wine for which payment had been made and all of the wine for which no payment had been made had been spoiled due to the presence of Fresno mold. Subsequent to a master's report, the Superior Court, Suffolk County, Francis J. Larkin, J. dismissed seller's complaint and awarded damages to buyer on its counterclaim including loss of goodwill damages, and seller appealed. The case was transferred to the Supreme Judicial Court. The Supreme Judicial Court, Nolan, J., held that: (1) judge concluded properly that facts not final master report was admissible only as prima facie evidence; (2) seller breached implied warranty of merchantability; (3) although buyer had accepted the wine, it later properly revoked that acceptance by informing seller that it did not wish to keep the wine containing Fresno mold which substantially impaired the value of the wine to buyer and thus, seller was not entitled to the contract price and its complaint was properly dismissed; and (4) evidence was sufficient to warrant recovery of consequential damages of lost goodwill in the amount of $100,000.

Judgment affirmed.

**1. Reference ⚷99(6)**

Judge properly concluded that "facts not final" report of master was admissible only as prima facie evidence.

**2. Reference ⚷100(6)**

Objecting party had the burden of demonstrating that any asserted error appeared on the face of the master's report.

**3. Sales ⚷284(1)**

Seller of California sweet wine breached implied warranty of merchantability where although all such wines contained Fresno mold, the mold could have been but was not controlled such that the finished wine delivered to buyer for bottling could be bottled but not drunk and, in view of long-standing course of dealing between the parties in which buyer consistently followed same procedure in bottling seller's wine which was normally ready for bottling and drinking, buyer's failure to follow alleged industry standard of adding sulfur dioxide to the wine to inhibit further growth of the bacteria did not prevent recovery for unmerchantability. M.G.L.A. c. 106, §§ 1–205(4), 2–314, 2–314(2)(a).

**4. Contracts ⚷170(1)**

A course of dealing between parties controls the interpretation of usage of trade. M.G.L.A. c. 106, § 1–205(4).

**5. Sales ⚷439**

Once buyer initially accepted seller's wine it had the burden of establishing that there was a breach of the warranty of merchantability. M.G.L.A. c. 106, § 2–314.

**6. Sales ⚷152**

Notice of breach is sufficient if it informs the seller of a breach thereby allowing for settlement through negotiation and promoting good faith in commercial dealings and if it allows the seller to infer that the buyer is asserting its legal rights. M.G.L.A. c. 106, § 2–607.

**7. Sales ⚷152**

Buyer's oral notice to seller soon after defective wine was returned by its customers and buyer's ongoing complaints to and negotiations with seller were timely and sufficient notice of breach. M.G.L.A. c. 106, §§ 2–607, 2–607(3)(a).

**8. Sales ⚩152**

Oral notice which indicates the nature of the problem and that this particular seller sold the goods in question is sufficient notice of breach in most instances. M.G.L.A. c. 106, § 2–607.

**9. Sales ⚩152**

In order for a notice of breach to be sufficient, the seller must be able to infer which sales are involved and that an identified buyer is asserting legal rights. M.G.L.A. c. 106, § 2–607.

**10. Sales ⚩152**

Adequacy and timeliness of notice of breach depends on the reasonableness of the buyer's behavior in the circumstances. M.G.L.A. c. 106, § 2–607.

**11. Trial ⚩384**

In granting a motion to dismiss at the close of evidence in a nonjury trial, a judge is entitled to weigh the evidence and resolve all questions of credibility, ambiguity and contradiction in reaching a decision. Rules Civ.Proc., Rule 41(b)(2), 43A M.G.L.A.

**12. Appeal and Error ⚩866(1)**

When no grounds are stated for dismissal, Supreme Judicial Court reviews to determine whether there were any grounds sufficient to warrant dismissal.

**13. Sales ⚩127**

Although buyer had accepted California sweet wine, it later properly revoked that acceptance by informing seller that it did not wish to keep the wine containing Fresno mold, which substantially impaired the value of the wine to buyer and thus, seller was not entitled to the contract price and its complaint was properly dismissed. M.G.L.A. c. 106, §§ 2–703, 2–709(3).

**14. Sales ⚩418(1)**

Remedies under the Uniform Commercial Code are to be administered liberally so as to put the aggrieved party in as good a position as if the other party had fully performed. M.G.L.A. c. 106, § 1–106.

**15. Sales ⚩418(8)**

Consequential damages include any loss of prospective profits and incidental damages to permit recovery of buyer's reasonable expenses incurred in handling the defective goods. M.G.L.A. c. 106, § 2–715.

**16. Damages ⚩22, 23**

"Consequential damages" are those that cannot be reasonably prevented and arise naturally from the breach, or which are reasonably contemplated by the parties. M.G.L.A. c. 106, § 2–715.

See publication Words and Phrases for other judicial constructions and definitions.

**17. Sales ⚩418(1)**

Calculation of damages for breach of sales contract must not overcompensate the buyer.

**18. Sales ⚩442(6)**

Buyer's damages for seller's breach of implied warranty of merchantability of California sweet wine were correctly calculated by multiplying the number of cases of defective wine which buyer claimed by the per case price which included buyer's cost of the wine, its processing and buyer's usual profit, adding transportation cost for the wine returned from customers, the direct cost for reprocessing the wine, and a reasonable profit for the reprocessing, and deducting the amount received from the sale of the reprocessed wine and the unpaid invoice for the last shipment of wine. M.G.L.A. c. 106, § 2–603(1, 2).

**19. Evidence ⚩571(7)**
**Sales ⚩442(5)**

Master's finding that the primary reason for buyer's decline in sales after 1973 was seller's defective wine, testimony of former officers of buyer, and buyer's expert testimony valuing buyer's business at $593,700 including assets and goodwill and assets alone at $237,092 warranted a causal connection between buyer's loss of business reputation and seller's breach of implied warranty of merchantability and recovery of consequential damages of lost goodwill in sum of $100,000.

**20. Evidence ⚩543(4)**

Judge's finding that buyer's expert witness possessed sufficient knowledge, skill and expertise to render an opinion on valuation of buyer's goodwill, which was lost as a result of seller's breach of implied warranty of merchantability was neither an abuse of discretion nor erroneous as a matter of law. M.G.L.A. c. 106, § 2–314.

**21. Evidence ⚩555.6(1)**

Business records as well as other facts elicited in response to a hypothetical question were a sufficient basis for buyer's expert's valuation of buyer's goodwill which was lost as a result of seller's breach of implied warranty of merchantability. M.G.L.A. c. 106, § 2–314.

**22. Evidence ⚩571(7)**

In determining the value of buyer's goodwill which was lost as a result of seller's breach of implied warranty of merchantability, the judge was not bound by buyer's expert testimony.

**23. Good Will ⚩7**

Loss of goodwill damages are not required to be proved with mathematical certainty.

**24. Sales ⚩418(19)**

When a seller of goods reasonably knows that substantially impaired goods provided for resale could affect continued operations and established goodwill, the buyer's loss of goodwill caused by seller's breach is properly recoverable as consequential damages unless the loss could have been prevented by cover or otherwise. M.G.L.A. c. 106, § 2–715(2)(a).

**25. Damages ⚩62(4)**

Wine buyer's failure to take reasonable action to prevent loss resulting from worthless labels precluded recovery for such loss which resulted from wine seller's breach of implied warranty of merchantability. M.G.L.A. c. 106, § 2–314.

---

Richard L. Neumeier, Boston (Leonard Zandrow, Boston, with him), for plaintiff.

Morris Michelson, Brookline, for defendant.

Before HENNESSEY, C.J., and LIACOS, NOLAN, LYNCH and O'CONNOR, JJ.

NOLAN, Justice.

The plaintiff, Delano Growers' Cooperative Winery (Delano), appeals from a final judgment dismissing its complaint and awarding $160,634, with interest, to the defendant, Supreme Wine Co., Inc. (Supreme), on its counterclaim. Supreme appeals from that portion of the judgment which granted Delano an "offset" of $25,823.25 to Supreme's damages under the counterclaim. For the reasons stated below, we affirm the judgment.

Delano filed a complaint in Suffolk County Superior Court seeking $25,823.25 for wine sold and delivered. Supreme admitted receipt of the wine and filed a counterclaim for breach of contract alleging that earlier shipments of wine for which payment had been made and all of the wine for which no payment had been made had spoiled due to the presence of lactobacillus trichodes (Fresno mold). As a defense, Supreme asserted that it did not owe Delano $25,823.25 because the wine was not merchantable. Supreme also sought incidental and consequential damages alleging that the "sick wine" destroyed its reputation and market thereby forcing the company into liquidation.[1]

1. Supreme purchased all of its sweet wine and some of its nonsweet wine from Delano. Fresno mold only damaged the sweet wine. Supreme's customers began returning defective Delano wine prior to the shipment for which Delano claims in its complaint that it is owed $25,823.25 (the unpaid shipment). Supreme paid for all prior shipments. Supreme's customers continued to return defective Delano wine after Supreme received and bottled the wine in the unpaid shipment. One-half of the unpaid shipment consisted of sweet wine. The record does not indicate what portion of the unpaid shipment or total shipments consisted of damaged wine. However, we need not resolve this question to affirm the judgment in this case. Supreme proved that 8,000 cases of wine were defective. Supreme normally sold this wine to its retail customers for $13 per case. This per case price included the amount Supreme paid

The case was referred, facts not final, to a master. The master found Delano responsible for the presence of Fresno mold in the wine and awarded damages. Although the master found that the spoiled wine caused Supreme's liquidation, he declined to award damages for lost good will. His view was that Supreme failed to carry its burden of proof as to the fair market value of the good will lost by Supreme.

The case was then tried to a judge without a jury.[2] The master's report and additional testimony were introduced. In a memorandum of decision and order, the judge made findings of fact and rulings of law coinciding with the master's report. Additionally, the judge found that Supreme could recover for its loss of good will and assessed additional damages of $100,000 for such good will. Judgment was entered dismissing Delano's complaint and awarding $160,634 on Supreme's counterclaim. Delano appealed to the Appeals Court and we transferred the case to this court on our own motion.

Delano argues on appeal that: (1) its motion to strike the master's report should have been granted; (2) the judge applied an erroneous standard in reviewing the master's findings; (3) Delano should have been awarded judgment for the contract price not paid plus interest and costs; (4) it did not violate the warranty of merchantability; (5) Supreme failed to provide timely and sufficient notice of breach; (6) the judge erred in awarding damages for lost good will and other incidental and consequential damages.

On cross-appeal, Supreme argues that: (1) the contract price should not have been deducted from its damages; (2) the judge erred in eliminating the master's award of damages for labels rendered worthless.

The facts as found by the master and accepted by the judge may be summarized as follows. Supreme operated a wine bottling plant in Boston from 1935 to November, 1978. It purchased finished wine, ready for bottling and consumption, from California, selling it to retailers after bottling under Supreme's label.

In 1968, Supreme began buying sweet wine from Delano, a California winery. By the spring of 1973, Supreme was purchasing all its sweet wine from Delano. Delano shipped this wine to Supreme's bottling plant in Boston in tank cars. When the wine arrived, Supreme took samples from each compartment of the tank cars. The samples were labeled, dated, sealed, and kept in Supreme's safe. Supreme then pumped the wine into redwood vats in its building. The wine was pumped through a filter into storage tanks from which it was later filtered into bottles for delivery.

Until April or May, 1973, Supreme did not experience any difficulty with Delano wine. Supreme then began receiving widespread returns of certain sweet wine from its customers. The wine was producing sediment, was cloudy, and contained a cottony or hairy substance. Supreme could identify the defective sweet wine as Delano wine because it purchased all its sweet wine from Delano. Supreme also matched the returned defective wine with the samples taken from the Delano wine on delivery. This identification was corroborated somewhat by shipment records, the dates of bottling and the color to which the Delano wine was blended.

Delano for the wine, Supreme's other costs, and its profits. The judge calculated damages by multiplying the number of cases proved as damaged (8,000) by the per case price ($13). The resultant amount includes all of Supreme's cost for wine including the amount remaining unpaid on the last shipment. The judge then deducted the amount that Supreme had not paid for wine ($25,823.25) and made other adjustments as discussed below. This prevents overcompensating Supreme because the per case price ($13) included Supreme's cost for the wine as if it were actually paid. The $25,823.25 represents a portion of this cost that was not paid. This calculation also factors out any need to determine the amount of undamaged wine Supreme received as damages are based solely on the actual amount of defective wine.

2. We cannot let pass without comment the inexplicable delay of over two years between the close of the trial and the issuance of the judge's memorandum of decision and order. This is regrettable.

Supreme made oral reports and complaints about the problem to Delano. It also sent Delano samples from the Delano shipment. When the help promised by Harold Roland, Delano's manager, did not materialize, Supreme purchased wine from another California grower in June, July, and August, 1973. Supreme bottled and sold that wine and received no complaints or returns on it. Roland, with renewed promises of assistance, induced Supreme to recommence purchasing from Delano in September, 1973.

Delano made four shipments of sweet wine to Supreme between September 28 and December 20, 1973. Each shipment invoice stated that payment was due forty-five days from the invoice date. Supreme paid all but the last invoice, which was in the amount of $25,823.25. It withheld payment for that amount as customers continued to return defective wine which was identified as Delano wine. When oral reports and complaints evoked no tangible help, Vito Bracciale, assistant to Supreme's president, wrote to Roland on April 9, 1974. This letter requested assistance and explained Supreme's crisis caused by the defective wine. The letter also indicated the high number of returns caused by this defective wine.

In response to this letter, Delano sent James Lunt, an assistant winemaker, to Supreme's bottling plant. His microscopic examination of the defective wine and a microscopic examination by Delano's chemist in California showed that the wine contained Fresno mold. Lunt had earlier observed the mold in the samples returned to Delano by Supreme. These were samples from the tank cars taken on arrival at Supreme and samples from wine returned by Supreme's customers.

While Lunt was at Supreme, customers returned a number of cases of Delano wine containing Fresno mold. After examining these returns, Lunt told Supreme to pasteurize, refilter, rebottle, and resell the defective wine. Supreme followed Lunt's directions and reprocessed 8,000 cases of spoiled wine (5,000 cases returned from customers and 3,000 cases still on hand). During this process, 1,000 cases were lost through breakage, spillage, and shrinkage. Supreme sold the remaining cases of reprocessed wine at a reduced rate.

[1] 1. *The master's report.* Delano asserts that the judge applied the wrong standard in reviewing the master's report and improperly denied its motion to strike that report.[3] Delano's argument is based on disassembling the judge's examination of the effect of the master's report. Taken out of context, certain statements in his memorandum might suggest that the judge took an erroneous view. However, the judge concluded properly that a "facts not final" report is admissible only as prima facie evidence. *Levings v. Forbes & Wallace, Inc.*, 8 Mass.App.Ct. 498, 500, 396 N.E.2d 149 (1979). The judge considered additional evidence.

Delano argues that the judge's clear statement of the standard is contradicted by a footnote in his memorandum of decision. It contends that this indicates the judge applied the more restrictive "clearly erroneous" standard for "facts final" reports. This argument is not supported by a contextual reading of the memorandum of decision and order. The particular discussion alluded to concerned Delano's failure to conform to Rule 49(8) of the Superior Court (1978). This rule governed the procedure for asserting that a master's findings are not supported by the evidence. There are strict procedural requirements of the rule. *Miller v. Winshall*, 9 Mass. App.Ct. 312, 315–317, 400 N.E.2d 1306 (1980). Delano failed to meet these requirements. Therefore, the judge correctly refused to order the master to file a summary of the evidence. See rule 49(8); *Miller*, *supra* at 315–317, 400 N.E.2d 1306.

3. We note that the order of reference to the master in this case was issued prior to the extensive amendment of Mass.R.Civ.P. 53 in 1982, 386 Mass. 1236 (1982). Our discussion of the earlier rules which were effective for this case do not necessarily instruct on the interpretation of the present rules.

[2] Delano, as the objecting party, had the burden of demonstrating that any asserted error appeared on the face of the master's report. *Bills v. Nunno*, 4 Mass. App.Ct. 279, 282–283 n. 3, 346 N.E.2d 718 (1976). Delano failed to meet its burden. *Id.* Therefore, the judge properly reviewed the master's report on its face. See *Ball v. Williamson*, 336 Mass. 547, 551, 146 N.E.2d 659 (1957). In reviewing the master's findings upon their face, the judge explicitly delimited these findings to the status of prima facie evidence. He did not treat the report as if the reference had been "facts final."

[3] 2. *Delano's breach of the implied warranty of merchantability.* This sale of wine by Delano is governed by the Uniform Commercial Code, G.L. c. 106. Delano impliedly warranted that the goods were of merchantable quality. G.L. c. 106, § 2–314. See *Regina Grape Prods. Co. v. Supreme Wine Co.*, 357 Mass. 631, 635, 260 N.E.2d 219 (1970). This warranty required the wine to "pass without objection in the trade under the contract description" and be reasonably suited for ordinary uses for which goods of that kind are sold. G.L. c. 106, § 2–314(2)(*a*). See *Vincent v. Nicholas E. Tsiknas Co.*, 337 Mass. 726, 729, 151 N.E.2d 263 (1958); *Gilbert & Bennett Mfg. Co. v. Westinghouse Elec. Corp.*, 445 F.Supp. 537, 548 (D.Mass.1977).

The contract in this case required Delano to deliver "finished wine" to Supreme. Delano contends that, when it delivered wine that appeared good and which could be bottled, its obligation was satisfied. In support, Delano argues that all California sweet wine contained Fresno mold. Therefore, the presence of Fresno mold could not cause a wine to be unmerchantable. Furthermore, Delano states that an alleged trade usage required Supreme to add sulfur dioxide to the wine to inhibit further growth of these bacteria. Delano's arguments fail to persuade us.

Delano argues that uncontroverted testimony indicated that all California sweet wine contained Fresno mold. The judge acknowledged this testimony. However, the judge found that Supreme never experienced any trouble with bacteria until the 1973 problem with Delano wine. The sweet wine which Supreme bought from other California growers in 1973 did not present any bacterial problems. None of this wine was returned with Fresno mold. Furthermore, the judge found that the bacterial problem could have been prevented and controlled by Delano. Although Fresno mold may have been present in all California sweet wine, there is no indication that it was allowed to go unchecked and thereby destroy the merchantability of finished wine. Supreme's prior experience with Delano and its experience with other California sweet wine in 1973 indicate that the mold could be controlled. The presence of Fresno mold, as it was in the Delano wines, caused those wines to be unmarketable.

[4] Delano argues that Supreme's failure to follow minimum industry standards prevents it from recovering for the unmerchantable wine. The judge specifically ruled that Delano had failed to meet its burden of establishing such standards as a usage of trade applicable to Supreme. Even if Delano had met its burden, its argument would fail. A course of dealing between parties controls the interpretation of usage of trade. G.L. c. 106, § 1–205(4). In this case, Supreme consistently followed the same procedure in processing Delano wine since 1968. This clearly established a course of dealing between Delano and Supreme. Any usage of trade followed in areas outside of Massachusetts cannot control this long-standing course of dealing between the parties.

[5] Once Supreme initially accepted Delano wine it had the burden of establishing that there was a breach of the warranty of merchantability. *Axion Corp. v. G.D.C. Leasing Corp.*, 359 Mass. 474, 479, 269 N.E.2d 664 (1971). Supreme has met that burden. Supreme identified all the returned wine as Delano wine. Delano's chemist also found traces of Fresno mold in the samples "from the compartments of the tank cars in which Delano wine arrived

in Boston and wine from the bottles returned by customers." The wine in its returned state was neither merchantable nor fit for bottling or consumption. Only through extensive reprocessing could Supreme mitigate the loss from this wine. The course of dealing between the parties supports the conclusion that the finished wine shipped by Delano normally was ready for bottling and drinking. Although the Delano sweet wine could be bottled shortly thereafter, it could not be drunk.

Delano was required to anticipate the environment in which it was reasonable for its product to be used. *Back v. Wickes Corp.*, 375 Mass. 633, 640–641, 378 N.E.2d 964 (1978). It was reasonably foreseeable that the unchecked presence of Fresno mold would substantially impair the value of the wine. That result occurred. The Delano wine could not pass in the trade as finished wine without objection, was not fit for the ordinary purposes for which finished wine was used, and therefore, was unmerchantable. See G.L. c. 106, § 2–314.

**[6]** 3. *Sufficiency of notice of the breach.* Delano contends that the notice given by Supreme's oral communications in 1973, and letter dated April 9, 1974, were, as matter of law, insufficient and untimely. We disagree. The sufficiency of notice must be determined in light of its purpose. One purpose of the notice requirement in G.L. c. 106, § 2–607, is to inform the seller of a breach and thereby allow for settlement through negotiation. See *Nugent v. Popular Mkts., Inc.*, 353 Mass. 45, 49, 228 N.E.2d 91 (1967); J. White & R. Summers, Uniform Commercial Code 421, 422 (2d ed. 1980). Following these principles encourages the parties to seek compromise and promotes good faith in commercial dealings. See *United Cal. Bank v. Eastern Mountain Sports, Inc.*, 546 F.Supp. 945, 958 (D.Mass.1982), aff'd mem., 705 F.2d 439 (1st Cir.1983). Notice is sufficient if it fulfils these purposes and allows the seller to infer that the buyer is asserting its legal rights. *Lieberman v. W.M. Gulliksen Mfg. Co.*, 332 Mass. 439, 443, 125 N.E.2d 396 (1955) (interpreting a similar, prior provision in G.L. [Ter.Ed.] c. 106, § 38).

**[7]** Supreme's notice, in this case, was particularly suited to and did fulfill the goals of G.L. c. 106, § 2–607(3)(*a*). The record indicates that Supreme made oral complaints to Delano. Supreme made repeated telephone calls complaining to Delano that all of its sweet wine was being returned. Supreme stopped buying wine from Delano during the spring of 1973. Delano's manager negotiated with Supreme's president. The judge found that renewed promises of assistance from Delano's manager induced Supreme to recommence purchasing from Delano. However, when the assistance was not forthcoming, and wine continued to go bad, Supreme withheld payment on the last invoice of December 20, 1973. When oral communications proved fruitless, Supreme's assistant to the president wrote Delano's manager emphasizing the seriousness of the problem. In response, Delano sent an assistant winemaker to Supreme in an attempt to solve the problem.

**[8, 9]** This activity is consistent with the object which the notice under § 2–607 is intended to accomplish. Oral notice which indicates the nature of the problem and that this particular seller sold the goods in question is sufficient in most instances. The seller must be able to infer which sales are involved and that an identified buyer is asserting legal rights. *Lieberman, supra.* See *Ford v. Barnard, Sumner & Putnam Co.*, 1 Mass.App.Ct. 192, 195, 294 N.E.2d 467 (1973) (where buyer failed to identify self, notice held insufficient). The fact finder could have found that Supreme's notice to Delano met these requirements.

**[10]** "[W]hether the notice requirement has been complied with is a question which is particularly within the province of the [fact finder]." *City Welding & Mfg. Co. v. Gidley-Eschenheimer Corp.*, 16 Mass. App.Ct. 372, 373, 451 N.E.2d 734 (1983), quoting from *Eastern Air Lines, Inc. v. McDonnell Douglas Corp.*, 532 F.2d 957, 973 (5th Cir.1976). The adequacy and time-

liness of the notice depends on the reasonableness of the buyer's behavior in the circumstances. *City Welding & Mfg. Co.*, *supra.* Supreme gave notice to Delano soon after the wine was returned by its customers. The judge was warranted in finding that Supreme's ongoing complaints to and negotiations with Delano were timely and sufficient notice. *Id.* at 374, 451 N.E.2d 734.

4. *Dismissal of Delano's complaint with costs.* Delano argues that the judge erred by dismissing its complaint and in not awarding it a separate judgment for the contract price. The judge ruled that Supreme had accepted the wine and therefore, must pay the contract price of $25,823.25. This amount was deducted from Supreme's damages because in assessing Supreme's damages the fact that Supreme never paid this amount must be recognized.

[11-13] In granting a motion to dismiss at the close of evidence in a nonjury trial, a judge is entitled to "weigh the evidence and resolve all questions of credibility, ambiguity, and contradiction in reaching a decision." *Ryan, Elliott & Co. v. Leggat, McCall & Werner, Inc.*, 8 Mass.App.Ct. 686, 689, 396 N.E.2d 1009 (1979). Mass.R.Civ.P. 41(b)(2), 365 Mass. 803 (1974). Where no grounds are stated for dismissal, we review to determine whether there were any grounds sufficient to warrant dismissal. See *Whitinsville Plaza, Inc. v. Kotseas*, 378 Mass. 85, 101, 390 N.E.2d 243 (1979). We conclude that, although Supreme had accepted the wine, it later properly revoked that acceptance. Delano, therefore, was not entitled to the contract price. In drawing this conclusion, we may reach our own ultimate conclusions based on the judge's findings. *Jones v. Wayland*, 374 Mass. 249, 255, 373 N.E.2d 199 (1978).

We have determined that Supreme's notice of the breach of the warranty of merchantability was timely and sufficient. In order to revoke properly its acceptance of the wine, Supreme was required to inform Delano that it did not wish to keep the goods. *Connecticut Inc. Casting Corp. v. Made-Rite Tool Co.*, 382 Mass. 603, 608, 416 N.E.2d 966 (1981). Furthermore, the defect in the wine must have substantially impaired the value of the wine to Supreme. Both requirements are met in this case.

The testimony of Supreme's assistant to the president indicates that he told Delano's manager that the wine was not good, could not be used, and that Delano should take the wine back. Delano's manager told this assistant to send them a sample. Supreme complied.

After a period in which oral complaints were made without results, Supreme wrote Delano emphasizing the seriousness of the problem. Delano, in response, sent an assistant winemaker in an attempt to solve the problem. After examining Supreme's procedures and making certain recommendations, this representative told Supreme to pasteurize and reprocess the spoiled wine. Supreme did so and then sold this wine at a reduced rate. Later, Supreme wrote Delano informing it of an estimate of Supreme's damages. Delano's written response indicated that it assumed that Supreme still had the wine to ship back to Delano for credit. However, Supreme had already sold this wine at a reduced rate as instructed by Delano's representative.

The defective "finished wine" could not be sold without further processing. One-half of the unpaid shipment was comprised of sweet wine. Fresno mold caused the sweet wine to be defective. Where one-half of the unpaid shipment was of the sweet wine type found to be defective, its value to Supreme, therefore, was substantially impaired. This is especially so where Supreme had recommenced buying from Delano based on Delano's assertion that the problem would be resolved. The interaction between the parties indicates that Supreme informed Delano, and Delano understood, that Supreme did not wish to keep this wine. "[E]ffective revocation of acceptance may be accomplished by oral notice . . . or by conduct which unequivocally manifests a desire to revoke the sale" judged in light of all of the circumstances. *Jeffco Fibres, Inc. v. Dario Diesel Serv.*,

*Inc.*, 13 Mass.App.Ct. 1029, 1030, 433 N.E.2d 918 (1982). The facts exhibited in the record warrant a finding that Supreme revoked its acceptance of the wine.[4] Where Supreme justifiably revoked its acceptance, Delano was not entitled to the contract price. See G.L. c. 106, §§ 2–703, 2–709(3) (seller can recover price only if buyer wrongfully rejects or revokes); *Akron Brick & Block Co. v. Moniz Eng'g Co.*, 365 Mass. 92, 95, 310 N.E.2d 128 (1974); 11 S. Williston, Contracts § 1364B, at 356 (3d ed. 1968). Therefore, the judge properly dismissed Delano's complaint. The judge did not abuse his discretion in awarding costs to Supreme, the prevailing party. See *Creed v. Apog*, 377 Mass. 522, 524–525, 386 N.E.2d 1273 (1979).

5. *Calculation of damages, other than good will.*

The judge calculated Supreme's damages by multiplying 8,000 (the number of cases of defective wine which Supreme claimed) by the $13 per case price (Supreme's price to its customers). The per case price included Supreme's cost for the wine, its processing, and Supreme's usual profit. The judge added transportation costs for the wine returned from customers, the direct cost for reprocessing the wine, and a reasonable profit for the reprocessing. The judge characterized this as a "[r]easonable commercial charge for mitigation process."[5] From this he deducted the amount received from sale of the reprocessed wine and $25,823.25 for the unpaid invoice.[6]

4. Having revoked acceptance, Supreme had the same rights and duties with regard to the wine as if it had rejected it. G.L. c. 106, § 2–608(3). Supreme fulfilled its obligation when it followed Delano's instructions to reprocess and resell the wine. G.L. c. 106, § 2–603(1). Delano was entitled to offset the proceeds of this sale against Supreme's damages less Supreme's reprocessing and resale expenses. G.L. c. 106, § 2–603(1), (2). The judge's computations were correct.

5. Delano argues that these costs are not proper incidental damages and consequential damages under G.L. c. 106, § 2–714. This section concerns remedies for a breach of warranty without a revocation. The remedy in this case is properly determined under the sections dealing with revocation of acceptance. However, had we examined this as a breach of warranty, the judge's assessment of damages was reasonable. The wine's value to Supreme as finished wine was negligible because it could not be sold without extensive reprocessing. This is also a case where incidental and consequential damages were proper because these costs assessed as damages were incurred in an attempt to mitigate the loss. Damages were not increased by Supreme's actions. We reject the restrictive definition of damages argued by Delano. Remedies under the Uniform Commercial Code are to be construed liberally so that the aggrieved party is placed in the same position as if the contract was performed. *Jericho Sash & Door Co. v. Building Erectors, Inc.*, 362 Mass. 871, 872, 286 N.E.2d 343 (1972).

Delano's other arguments on incidental and consequential damages are based on its own view of the facts. We shall not upset the judge's view of the evidence, especially where based on his view of oral testimony. See *Felton v. Felton*, 383 Mass. 232, 239, 418 N.E.2d 606 (1981). The judge's findings that these costs were proved were not clearly erroneous. *Jones v. Wayland*, 374 Mass. 249, 255, 373 N.E.2d 199 (1978).

6. The calculation of damages other than good will may be summarized as follows:

| | |
|---|---|
| *a.* 8,000 cases of wine that Supreme proved as damaged at $13 per case, the price Supreme normally charged its customers. | $104,000.00 |
| *b.* Transportation cost for 5,000 cases returned by customers to Supreme as found by the judge. | 6,250.00 |
| *c.* Supreme's direct cost for mitigation of damages by refiltering, pasteurizing, rebottling, recapping, relabeling, repackaging, and reselling the defective wine at Delano's request. | 25,207.25 |
| *d.* Reasonable profit for mitigation process. (Supreme usually added $3 to its direct costs for rebottling without pasteurization. Therefore, the judge properly assessed this amount. See note 5 *supra*). | |
| Subtotal | $156,457.25 |
| From this the judge deducted: | |
| *e.* The amount received from the sale of the reprocessed wine in mitigation of damages. (Supreme reprocessed the 8,000 damaged cases of wine at Delano's request. In reprocessing, 1,000 cases were unavoidably lost due to breakage, spillage, and shrinkage, a reasonable loss for reprocessing. Supreme sold the remaining 7,000 cases at a reduced rate of $10 per case.) | 70,000.00 |
| *f.* The amount of the unpaid shipment. (The judge initially calculated Supreme's damages as if it had fully paid for all the wine received from Delano. That is, a portion of $13 per case price represents the amount Supreme normally paid Delano for the wine. As we stated in note 1 *supra*, this method eliminates the need to determine what portion of the unpaid shipment was defective as damages are based only on the amount of defective wine actually proved [8,000 cases]. However, to prevent overcompensating Supreme, the amount due | 25,823.25 |

[14-17] In construing Supreme's incidental and consequential damages, we note that remedies under the Uniform Commercial Code are to be administered liberally so as to put the aggrieved party in as good a position as if the other party had fully performed. G.L. c. 106, § 1-106. *Productora e Importadora de Papel, S.A. de C.V. v. Fleming*, 376 Mass. 826, 838, 383 N.E.2d 1129 (1978). The consequential damages include any loss of prospective profits, *Matsushita Elec. Corp. of America v. Sonus Corp.*, 362 Mass. 246, 264, 284 N.E.2d 880 (1972), and incidental damages permit recovery of Supreme's reasonable expenses incurred in handling the defective goods. G.L. c. 106, § 2-715. See Uniform Commercial Code § 2-715, comment 1 1A U.L.A. 446 (1976); J. White & R. Summers, Uniform Commercial Code § 10-3 (2d ed. 1980). See also *Bevel-Fold, Inc. v. Bose Corp.*, 9 Mass.App.Ct. 576, 584, 402 N.E.2d 1104 (1980). Consequential damages are those that cannot be reasonably prevented and arise naturally from the breach, or which are reasonably contemplated by the parties.[7] G.L. c. 106, § 2-715. See J. White & R. Summers, *supra* at § 10-4. Calculation of damages, however, must not overcompensate the buyer. *Id.*

[18] Supreme argues in its cross-appeal that the judge incorrectly deducted $25,823.25. We disagree. This amount was factored into the $13 per case price. The $13 per case price includes the amount Supreme normally paid Delano for the wine and therefore, compensates Supreme for any amount actually paid. However, some of the 8,000 cases may have come from the unpaid shipment. By deducting the amount owed on this shipment, the calculations factor out any cost for damaged wine which came for the unpaid shipment that was included in the $13 per case price multiplied by the 8,000 cases damaged. This is necessary as Supreme did not pay for any wine from the unpaid shipment. Although Delano is not entitled to the contract price, Supreme cannot be overcompensated by adding the unpaid invoice into the per case price and then not deducting it from the damages. This calculation also compensates Delano for any wine in the unpaid shipment that was not among the 8,000 damaged cases. The calculation of damages properly places Supreme in as good a position as it would be in if Delano had properly performed, but does not result in overcompensation.

The reprocessing costs deducted from the $70,000 received in the sale of the reprocessed wine produced a $23,792.75 profit. Delano was entitled either to the return of the defective wine or to have Supreme follow its reasonable instructions regarding the wine. G.L. c. 106, § 2-603(1). Supreme was entitled to its reasonable expenses and a commission on the sale. G.L. c. 106, § 2-603(2). When the judge deducted Supreme's reprocessing costs and a commercially reasonable charge for reprocessing from the amount received on the sale, he accomplished this result. There was no error in this calculation of damages.

[19] 6. *Calculation of damages for lost good will.* Delano argues that there is no basis in the record for the conclusion that it caused injury to Supreme's business reputation. The master found that the primary reason for Supreme's decline in sales after 1973 was the defective Delano wine. This finding was prima facie evidence of the causal connection between Delano's acts and the damage to Supreme's business reputation. At trial, Delano presented the testimony of several former Supreme cus-

on the unpaid shipment must be deducted from the damages. This factors out any portion of that shipment which was not damaged and the cost of any damaged wine in that shipment which was not actually paid. This cost is figured into the damages in item *a* because any portion of the 8,000 damaged cases which came from the unpaid shipment is multiplied by $13 per case which includes the amount Supreme normally paid Delano for the wine, but which Supreme had not paid for damaged wine from the last shipment.)

| | |
|---|---|
| Total damages other than good will. | $ 60,634.00 |

7. Supreme argues that the judge improperly denied it damages for the cost of wine labels left over after it went out of business. These damages are arguably consequential. Whether they

tomers to rebut the evidence of a causal connection. Supreme presented testimony of its former officers to support the evidence that Delano caused the injury to Supreme's business reputation. This record is hardly one, as Delano argues, that is totally devoid of any basis for finding a causal connection between Delano's acts and Supreme's damages. Rather, it exhibits an instance where the judge was required to weigh the credibility of the evidence before him and to determine whether a causal connection existed. The judge's finding that Supreme had proved a causal connection between its loss of business reputation and Delano's breach is not clearly erroneous.

[20] Delano contends that the record contains scant evidence supporting a valuation of Supreme's good will. However, it did not produce any direct evidence at trial before the judge which rebutted Supreme's evidence of the good will value. At trial, Supreme presented the testimony of an expert in business appraising. This expert had over eight years' experience as a business broker engaged in buying and selling businesses in and around Boston. In this connection he was required to appraise a business's value, including the value of its good will. The judge's acceptance of the expert testimony implies that he found this expert sufficiently qualified to render an opinion. *Commonwealth v. Boyd*, 367 Mass. 169, 183, 326 N.E.2d 320 (1975). A finding that this expert possessed sufficient knowledge, skill, and experience to render an opinion was neither an abuse of discretion nor erroneous as matter of law. *Id.* See P.J. Liacos, Massachusetts Evidence 112 (5th ed. 1981).

[21] The expert valued the business at $593,700, including assets and good will. The assets were valued at $237,092. This valuation was based on the business records introduced in evidence and certain other facts.[8] This was a sufficient basis for his opinion. *Uberto v. Kaufman*, 348 Mass. 171, 173, 202 N.E.2d 822 (1964). Supreme's president and its treasurer testified that Supreme's value was $500,000.[9]

[22] The judge found that Supreme's loss of good will attributable to Delano's breach was $100,000. He based this on the evidence in the record and an examination of valuation methods. He rejected Supreme's theories supporting its valuation as lacking factual grounding. In determining the value of Supreme's good will, the judge was not bound by the expert testimony. P.J. Liacos, *supra* at 117, citing *Dodge v. Sawyer*, 288 Mass. 402, 408, 193 N.E. 15 (1934).

[23] Delano argues that the trial judge relied on extraneous materials, not admitted at trial, in determining good will. Specifically, he discussed certain statistics from Business Week, indicating an increased consumption of wine and a growth in the wine industry. This reference occurred in a lengthy discussion of various methods used in valuing good will. This same discussion specifically refers to evidence introduced at trial which sufficiently supported a valuation of the lost good will. There is no clear indication to what degree, if any, the discussion of the extraneous material influenced the good will valuation. The judge found sufficient grounds to reduce the value from that given by Supreme. Where there was sufficient evi-

are appropriate in this case is discussed with the loss of good will as damages.

8. The other facts were elicited in response to a hypothetical question. The facts elicited established the length of time Supreme had been in business, the salaries its principals received, and its entrenched customers prior to the end of 1972. The business records indicated Supreme's financial status. There was evidence of the assumptions used in the hypothetical question.

9. There is no indication that the judge viewed this as expert testimony. However, such a view would be within the judge's discretion and not clearly erroneous. See *Matsushita Elec. Corp. of America v. Sonus Corp.*, 362 Mass. 246, 264, 284 N.E.2d 880 (1972). In the present case, it appears that the judge heavily discounted this valuation in determining lost good will.

dence to warrant a valuation of lost good will and the causal connection of that loss, we will not upset this finding. It was not clearly erroneous and was based on the judge's weighing the credibility of the evidence before him. The weight given this evidence was then used in accepted formulations of good will to determine the damage. We do not require that such damages be proved with mathematical certainty. *Productora e Importadora de Papel, S.A. de C.V. v. Fleming*, 376 Mass. 826, 840, 383 N.E.2d 1129 (1978). The judge did not err in calculating the damages for good will.

**[24]** Neither party has addressed the issue whether lost good will is a proper consequential damage under G.L. c. 106, § 2-715. This court has stated that prospective profits are recoverable in the appropriate case. *Matsushita Elec. Corp. of America v. Sonus Corp.*, 362 Mass. 246, 264, 284 N.E.2d 880 (1972). In examining whether good will is also recoverable, we note that Pennsylvania, in disallowing such recovery, based its decision on the interpretation of its prior law, which did not allow recovery for good will. *Harry Rubin & Sons v. Consolidated Pipe Co. of America*, 396 Pa. 506, 153 A.2d 472 (1959). Other cases in which recovery for good will has been denied are based on the speculative nature of damages in the particular case or on a failure of proof. 96 A.L.R.3d § 18[b], at 396 (1979). Cf. 96 A.L.R.3d § 18[a], at 395 (1979) (loss of good will held recoverable). Under our law as it was before the enactment of the Uniform Commercial Code, "[l]oss of good will [was] recognized as an element of damages flowing from the use of unfit material received from one who warranted it to be fit." *Royal Paper Box Co. v. Munro & Church Co.*, 284 Mass. 446, 452, 188 N.E. 223 (1933) (interpreting G.L. [Ter.Ed.] c. 106, § 17[1]). Where a seller of goods reasonably knows that substantially impaired goods provided for resale could affect continued operations and established good will, the buyer's loss of good will caused by the seller's breach is properly recoverable as consequential damages unless the loss could have been prevented by cover or otherwise. G.L. c. 106, § 2-715(2)(a). This is not a harsh result as the seller may contractually limit this remedy. Uniform Commercial Code § 2-715, comment 3 1A U.L.A. 446 (1976). In this case, Supreme's loss of good will was found to be a direct consequence of Delano's breach. Once sufficiently ascertained, the award of damages for lost good will was properly allowed.

**[25]** We next turn to Supreme's contention that the judge erred in disallowing the master's finding for $12,000 worth of Supreme's labels remaining after it closed its doors. The judge ruled that the loss from these worthless labels was not within the reasonable contemplation of the parties. He also ruled that Supreme could have prevented the loss by reasonable action. We may reach our own ultimate conclusions based on the trial judge's subsidiary findings. *Jones v. Wayland*, 374 Mass. 249, 255, 373 N.E.2d 199 (1978). We see no reason, however, why we should view the judge's conclusions to be clearly erroneous. Even if we were to conclude that damages for lost labels were reasonably in the contemplation of the parties, the judge's ruling that Supreme could have prevented this loss is not clearly erroneous. Failure to take such action precludes recovery. See *In re G.S.F. Corp.*, 6 B.R. 894 (D.Mass. 1980).

*Judgment affirmed.*




393 Mass. 743

**COMMONWEALTH**

**v.**

**Otis C. McGAHEE.**

Supreme Judicial Court of Massachusetts, Suffolk.

Argued Oct. 4, 1984.

Decided Jan. 24, 1985.

Defendant was convicted before the Superior Court, Suffolk County, William H.