

(Hartman Decl. ¶ 51, Fig. 7.)

Aside from the "Cost Differential Report" available to customers online, (*see* PX 219), plaintiffs presented no further evidence that BMS marketed the spread on Rubex.

#### 4. The Schering–Plough Group

The Schering–Plough Group includes Schering–Plough Corporation and Warrick Pharmaceuticals Corporation, its subsidiary.

The Schering products at issue include the branded drugs Temodar, Proventil, and Intron–A. The only Warrick product at issue is generic albuterol sulfate, the same chemical compound as Schering's branded Proventil.

Schering–Plough refers to its list prices as "direct prices" or "net direct prices." (Kane Dep. 34:7–35:21.) Schering–Plough reports AWPs for its branded drugs to the pricing compendia. (Zahn Dep. 173:1–9.) It derives its reported AWPs by marking up the direct prices by 20 percent. (Kane Dep. 34:7–35:21; PX 809 at 315085.)

Warrick also reports its AWPs to the pricing publications. (*See* Weintraub Decl. ¶ 58.) Warrick sets the AWPs for a new generic at a value 10 to 20 percent below the AWPs for the branded counterpart. (Weintraub Decl. ¶ 54; Aug. 25, 2005 Weintraub Dep. 31:2–17; Feb. 2003 Weintraub Dep. 494:17–495:6; PX 425 at 6155.) When competitor generic products are already on the market, Warrick slots the AWP for its product "somewhere in the pack" of the competitor AWP values. (Sept. 2006 Weintraub Dep. 527:6–528:8.) According to Harvey Weintraub, a former Warrick sales and marketing consultant who was responsible for setting the AWP, this was done simply to save the "time and trouble" of calculating its own price. (*Id.* 527:15–23.)

Schering and Warrick never lowered their reported AWPs despite offering significant discounts that reduced the ASPs. (*See* Hartman Decl. Attach. G.4.b.) Schering–Plough and Warrick entered into contracts with pharmacies and other providers, which offered rebates for meeting certain market share targets. (*See* PX

453; PX 455; PX 612.) These rebates often reached 20%–25% of the direct price. (*See id.*) In addition, many customers were provided with free goods that further reduced their average acquisition costs. (*See* PX 505.) Some pharmacies, in order "to keep [their] pricing a secret" bought from a wholesaler at the wholesaler's price and then made a "chargeback" to Warrick or Schering to make up the difference in the contracted price. (PX 433.) These various discounts all resulted in lower ASPs for Schering and Warrick drugs.

Schering and Warrick were well aware of the role that the spread played in driving purchasing decisions for their products. For example, in response to the government's investigation into drug pricing under Medicare, a Schering document notes that "[t]he reduction or elimination of the 'spread' is likely to have a significant effect on choices of Medicare Part B drugs and on utilization in areas of treatment where generic and brand name drugs are available." (PX 713 at 55875.) Similarly, Warrick produced a letter from a pharmacy buying group, indicating that Warrick had been chosen to be an "endorsed generic contract vendor" based on certain "Generic Product Selection Criteria," one of which was "AWP Spread; MAC." (PX 779 at 35102.)

The Schering and Warrick subject drugs are different from the other drugs in this litigation because they are primarily self-administered. Many of the drugs are administered through the use of a nebulizer, and patients are trained to self-administer the drug using a nebulizer at home. (*See* 11/15/06 Tr. 113:11–114:2 (Rosenthal).) These drugs are covered and reimbursed under the durable medical equipment ("DME") provisions of Medicare Part B. (*See* 42 U.S.C. § 1395 et. seq.) Because the drugs are distributed through pharma-

cies, Schering sells principally to chain pharmacies, wholesalers, and other intermediaries, rather than physicians. (12/13/06 Tr. 42:19–43:8 (Kane).) Warrick does not market or sell albuterol sulfate to physicians at all. (Weintraub Decl. ¶ 23.)

Schering–Plough and Warrick emphasize the differences in the market for SADs. First, many TPPs, including both BCBSMA and Sheet Metal Workers, use PBMs to manage their pharmacy dispensed drugs. (*See* 12/12/06 Tr. 88:21–22 (Kolassa); 11/7/06 Tr. 6:2–5 (Faulkner); 11/20/06 Tr. 154:23–25 (Shramek); 12/13/06 Tr. 15:1–15 (Dutch).) PBMs can serve a variety of functions in the administration of pharmacy benefits. (*See* PX 4002, Rosenthal Tutorial 12–17, Exh. 13.) Manufacturers contract with the PBMs, often offering rebates and chargebacks for drug purchases. PBMs then contract with retail pharmacy networks that dispense the drugs to patients. (*See id.; see also* DX 1275, Berndt Report ¶ 15.) PBMs are generally large entities which consolidate market power to negotiate better drug prices for their customers. (*See* 11/28/06 Tr. 88:8–89:18 (Bell); 11/15/06 Tr. 21:25–22:2 (Rosenthal).) Schering and Warrick contend that the PBMs operate in a vigorously competitive market, which ensures that drug reimbursements are kept at a reasonable level.

Second, Schering–Plough argues that it had no incentive to manipulate or market AWPs. For a single-source self-administered drug, the prescribing physician is not being reimbursed for the drug, so there is no pecuniary reason to select drugs based upon the spread. (11/15/06 Tr. 115:1–14 (Rosenthal); *see* DX 1275, Berndt Report ¶ 188.) Furthermore, the pharmacies that are reimbursed for the drugs have "no control over the prescription" and must dispense whichever branded drug is prescribed by the physician.

(11/15/06 Tr. 115:1–14 (Rosenthal); *see* Addanki Am. Decl. ¶ 28.)  For a generic multi-source drug, such as Warrick's albuterol sulfate, pharmacies can choose which version of the drug that they will carry.  (*See* Addanki Am. Decl. ¶ 29; 11/15/06 Tr. 115:15–116:5 (Rosenthal).)  However, as discussed below, all versions of a generic drug are reimbursed based upon the same single measure, such as a median or MAC, so that there is no competitive gain from having a higher AWP. (*See* Addanki Am. Decl. ¶ 30.)

### a.  Temodar

Temodar is a self-administered pill used to treat brain cancer.  (Kolassa Decl. ¶ 22.) Temodar was launched in 1999 and remained single-source throughout the class period.  Throughout this time, 95% of all Temodar sales were within 5% of WAC. (DX 2935.)  The spreads, as calculated by Dr. Hartman,[43] were all less than the 30% yardstick.  (*See* PX 4109; DX 2968.)  Furthermore, plaintiffs presented no evidence that Schering–Plough marketed the spread on Temodar.

### b.  Intron–A

Intron–A is used to treat hepatitis, leukemia, melanoma, follicular lymphoma, condyloma, and AIDS-related Kaposi's Sarcoma.  (Kolassa Decl. ¶ 21.)  Intron–A is generally a pharmacy-dispensed drug, but certain larger dosage sizes are sometimes or always administered by physicians and thus can be reimbursed under Medicare Part B.  (*Id.*)  Dr. Hartman has identified six NDCs that are commonly physician-administered.     (*See* Hartman Decl. ¶ 189 n. 221.)  To be conservative,

Dr. Hartman excluded all other Intron–A NDCs from his damage calculations.  (*See id.*)

Plaintiffs have presented no direct evidence that Schering–Plough was marketing the spread on Intron–A.  However, plaintiffs do offer a 1998 internal memorandum to the oncology sales representatives which emphasized the continuing existence of profit potential to physicians after Medicare's move to reimbursing at 95% of AWP. The message exclaimed:

> Treating bladder patients with Intron is still very profitable!!   One patient on Intron can represent $16,956.36 of incremental sales and $2,373.84 of profit for our physicians just on the drug alone. These figures are based on having your physicians buy Intron–A at Net Direct pricing and treating on high dose of Intron (12 weeks of 100miu weekly then 50miu monthly for 1 year).   As you know this dose is very tolerable when given intravescially.

(PX 394.)  It is unclear whether this information was used to market the spread to physicians, but as Schering–Plough points out, the spread that can be calculated from the numbers in this document is only 14%. Dr. Hartman's spreads for 1998, the year of this memo, were also all under 30%.  In fact, the spreads for the physician administered NDCs of Intron–A were nearly all under the 30% threshold.  (*See* PX 4109; DX 2968.)  In only four instances was the spread above 30%, and the largest of those spreads was merely 32.6%.[44]  (*See id.*)

---

43.  Dr. Hartman's original spreads for Temodar included several over 30%.  He later revised his calculations of ASP to exclude the donation of free goods to a patient assistance program, AmeriCares.  (*See* Hartman Rebuttal ¶¶ 7–8, Attach.  A; Addanki Am. Decl. ¶¶ 69–70.)

44.  As he did with Temodar, Dr. Hartman recalculated the ASPs for Intron–A to exclude free good donations.  These percentages reflect those revised spread calculations.  (*See* Hartman Rebuttal ¶¶ 7–8, Attach.  A; Addanki Am. Decl. ¶¶ 69–70.)

### c. *Proventil*

Proventil is a branded form of albuterol sulfate used to treat the symptoms of asthma, chronic bronchitis, emphysema, and other lung diseases. (Kolassa Decl. ¶ 23.) In its solution form, which is the only form at issue in this case, Proventil is almost exclusively self-administered and dispensed by pharmacies. (*See id.* ¶¶ 20, 23; 11/15/06 Tr. 114:3–5 (Rosenthal).) Proventil was subject to competition from brand or generic forms of albuterol sulfate since the beginning of the class period. (Hartman Decl. ¶ 62.)

Schering set the AWP for Proventil at 20 percent above its WAC. As a multi-source drug, however, Proventil's (and generic albuterol sulfate's) reimbursement under Medicare is not usually based upon the brand AWP. Instead, it is determined by the lower of the median of generic AWPs and the lowest branded version of the drug. (*Id.*) As a practical matter, though, the branded AWPs were generally much higher than the generic AWPs and thus the median generic was generally used for Medicare reimbursement. (Hartman Decl. ¶ 31 n. 47.) For liability purposes, Dr. Hartman still calculates the spread as the difference between the Proventil brand AWP and Proventil's ASP. (*See* 12/13/06 Tr. 88:7–19 (Addanki).) Dr. Hartman then uses the median generic AWP for his damage calculations.[45] (*See id.*) Dr. Addanki, however, notes that when calculating the spread using the median generic that is actually used for reimbursement, most of the spreads are below 30% and many are, in fact, negative because Proventil's ASPs are higher than the median generic AWP. (*See* DX 2967.)

Schering argues that there was no incentive for them to market or manipulate the spread on Proventil, because on average, "pharmacists would have *lost money* had they dispensed Proventil to a Medicare patient." (Schering and Warrick's Post–Trial Br. 16 (emphasis in original).) Consistent with this observation, plaintiffs produced no evidence that Schering was marketing the spread on Proventil.

Despite facing generic competition, Schering increased both the Proventil AWP and ASP throughout the period. It appears that this strategy was possible because of the introduction of Warrick's generic albuterol sulfate which allowed Schering–Plough to segment the market; sophisticated, price sensitive customers could purchase Warrick's generic albuterol, and the less powerful or brand loyal customers would continue to pay higher prices for the branded Proventil. (*See* PX 409; PX 418.) An internal Schering–Plough memorandum responds to a customer's demand for lower prices on albuterol by stating, "[r]ather than lowering our Proventil contract prices, I recommend we offer a 2–year Warrick Solution and syrup market driven contract addendum to their existing GeriMed contract" because it would allow Schering to "maintain existing Proventil sales." (PX 418 at 44924.) Given this segmentation, Schering–Plough maintained 83% of its sales within 5% of WAC. The spreads, as calculated by Dr. Hartman using the brand AWP and illustrated for one NDC in the chart below, exceeded 30% in every year from 1991 to 1997 and later for one NDC in 2002. (*See* Hartman Decl. Attach G.4.c.)

---

45. This method of calculating liability and damages also applies to the BMS multi-source drugs.



(Hartman Decl. ¶ 63, Fig. 10.)

#### d. *Generic albuterol sulfate*

Like the branded Proventil solution, Warrick's generic albuterol sulfate solution is used to treat asthma, chronic bronchitis, emphysema, and other lung diseases. (Weintraub Decl. ¶ 22.) In fact, the two products, Proventil and generic albuterol, were identical and manufactured in the same facility, but had different NDCs. (Aug. 2005 Weintraub Dep. 63:9–64:16.) The generic albuterol sulfate is thus also primarily dispensed by pharmacies for patients to self-administer at home with a nebulizer. (Weintraub Decl. ¶ 23.) Both Warrick's 0.5% albuterol solution and the 0.083% albuterol solution were launched in the early 1990's, shortly after Warrick was formed in 1993. (*Id.* ¶¶ 14, 24.) At that time, other manufacturers' versions of albuterol were already in the market. (*Id.* ¶ 24.) Albuterol sulfate was a multi-source drug for the remainder of the class period, facing competition from over 25 different

manufacturers. (*See* PX 4007 at 4; *see also* DX 2919; DX 2920.)

Warrick set the AWP for albuterol sulfate between 10% and 20% below the AWPs of the branded versions of the drugs. (Weintraub Decl. ¶ 52.) According to Dr. Hartman, "[i]t is generally true that once the generic manufacturers set their AWPs, most manufacturers maintain them at constant levels." (Hartman Decl. ¶ 32(c).) Warrick, however, did change the AWP on three occasions. First, in 1993 Warrick lowered the AWP on one size of the 0.083% solution in order to make the AWPs the same for all forms of the product on a per unit basis. (Weintraub Decl. ¶ 58.) Then, in 1995, Warrick raised the AWP for its 20 mL albuterol solution twice, from $12.50 to $13.95, and later to $14.99. (*See* Sept. 2006 Weintraub Dep. 462:17–463:4; Hartman Decl. Attach. G.4.b.) At that time, Warrick was the only producer of the solution because a competitor was having manufacturing problems. (Weintraub Decl. ¶ 59.) The increases in AWP were matched by an identical per-

centage increase in the direct sales price to customers, (*see* PX 4079), such that the average sales price for the 20 mL solution also increased in 1995. (*See* Hartman Decl. Attach. G.4.a.)

After 1995, no changes were made to AWP. (Weintraub Decl. ¶ 59.) However, Warrick's selling prices for all NDCs of albuterol sulfate declined substantially over time as Warrick sought to match the price of its generic competitors. (*See id.*; Weintraub Decl. ¶ 31.) The spreads for every NDC in every year were all over 100%, *reaching over 800% in 2003.* (*See* Hartman Decl. Attach. G.4.c.)

As explained above for Proventil, Medicare reimbursed for albuterol sulfate based on the median AWP of all generics. Plaintiffs allege that generic manufacturers engaged in tacit collusion to set a high AWP and then marketed the resulting spread. When Warrick announced its price increases in 1995, it did send out memos to its customers that featured the AWP and the direct price for albuterol sulfate next to each other for easy comparison. (*See, e.g.,* PX 437; PX 445; PX 4080; PX 4082.) A 1993 advertisement for albuterol sulfate similarly quotes the AWP and direct price, but markets the product on the basis of "Quality," "Service," "Reliability," and "Trust." (PX 719 at 1836.) Plaintiffs offered no further evidence that Warrick marketed the spread on albuterol sulfate. As noted before, defendants contend that there was no economic incentive to market the spread on generic albuterol.

Warrick did, however, provide at trial detailed information regarding the AWP for each branded and generic form of albuterol sulfate during each year of the class period. (*See* DX 2919; DX 2920.) According to these charts, Warrick's AWPs were almost always below the median. There are a few exceptions. For the 0.5% solution, Warrick's AWP was at or above

the median from 1996 through 1999. (*See* DX 2920.) The significance, as explained later, is that if Warrick had reported a true AWP then the median would have shifted downward and a lower price would have been used for Medicare reimbursement.

## II.  *CONCLUSIONS OF LAW*

The parties raise five threshold cross-cutting issues that must be addressed before the Court reaches the merits of the claims against each drug manufacturer. First, defendants argue that the claims are time-barred. Second, they argue that plaintiffs can only bring a claim under Mass. Gen. L. ch. 93A, § 11. Third, plaintiffs assert that there is per se liability under Chapter 93A because AWP is not a true average of wholesale prices. Fourth, defendants raise a Daubert challenge to the admissibility of Dr. Hartman's testimony. Finally, the Court must address difficult issues of liability and causation for multi-source drugs.

### A.  *Statute of Limitations*

The defendants assert that the plaintiffs' claims are barred by the four-year statute of limitations for consumer protection claims. *See* Mass. Gen. Laws ch. 260, § 5A. "Ordinarily, actions in tort accrue at the time the plaintiff is injured." *Taygeta Corp. v. Varian Assoc., Inc.,* 436 Mass. 217, 763 N.E.2d 1053, 1063 (2002) (citation omitted). In this case, because the plaintiffs filed their first complaint in December 2001, the statute of limitations would ordinarily bar all claims for damages prior to December 1997. However, the plaintiffs seek to toll the statute of limitations for injuries prior to December 1997 by invoking the discovery rule or fraudulent concealment doctrine. The burden is on the plaintiffs to show that the limitations period should be tolled. *Saenger Org., Inc. v.*

*Nationwide Ins. Licensing Assocs., Inc.,* 119 F.3d 55, 65 (1st Cir.1997).

[1, 2] Massachusetts has recognized that the general rule that accrues time from the date of injury is unfair "in actions where the wrong is 'inherently unknowable.' " *Taygeta,* 763 N.E.2d at 1063. Under the discovery rule, "a cause of action ... does not accrue until the plaintiff knew, or in the exercise of reasonable diligence should have known of the factual basis for his cause of action." *Wolinetz v. Berkshire Life Ins. Co.,* 361 F.3d 44, 47–48 (1st Cir.2004). The appropriate test for determining whether plaintiffs should have known about facts giving rise to their claims is an objective one. *McIntyre v. United States,* 367 F.3d 38, 52 (1st Cir. 2004). The first question is "whether sufficient facts were available to provoke a reasonable person in the plaintiff's circumstances to inquire or investigate further." *Id.* If so, then the plaintiff is charged with the knowledge of "what he or she would have uncovered through a reasonably diligent investigation." *Id.* The court must then determine if that information is sufficient "to permit a reasonable person to believe that she had been injured" and that the defendants caused that injury. *Id.*

Plaintiffs argue that until quite recently class members were unaware of the real prices being paid for oncology and other Medicare Part B drugs in the marketplace. Even if class members knew of the existence of some discounting prior to 1997, in plaintiffs' view, that information would still be insufficient to put plaintiffs on notice of the systematic super-sized inflation of AWP and of the marketing of the spread. Defendants retort that by 1996, TPPs knew or should have known, through the exercise of reasonable diligence, that AWP did not equal ASP and that there was no predictable relationship between AWP and acquisition costs. Defendants have produced a variety of articles and government publications that they claim should have put plaintiffs on notice that AWP was not related to acquisition costs. Therefore, defendants contend that all of the plaintiffs' claims prior to December 1997 are barred because they were filed over four years later.

By the early 1990's, the more sophisticated payors generally understood that AWP was a 20 to 25 percent markup over WAC, and that some discounting off of WAC was generally available. However, payors, even the most savvy, were not typically aware that mega-spreads were available to physicians and that drug manufacturers were marketing those spreads. Furthermore, plaintiffs were not typically aware of the publicly available reports and articles that began surfacing about the AWP abuse early in the class period. Thus, plaintiffs typically had no actual knowledge of the abuse of the AWP system for PADs prior to December 1997.

The difficult question, then, is when the amount of publicly available information in the marketplace was sufficient to provoke a reasonable TPP to investigate further. Defendants' expert, Dr. Bell, testified about the articles and reports that were published between the beginning of the class period and 1998, which defendants assert disclosed the existence of significant spreads. The Court must determine whether, despite Bell, the statute of limitations tolls.

In 1992, the OIG studied 13 chemotherapy drugs, using a sample of patients and physicians in New York state, and reported to HCFA that "AWP is not a reliable indicator of the cost of a drug to physicians." (DX 1053 at 5.) The OIG showed that Doxorubicin (Rubex) could be purchased at a discount of 59% off of AWP (a Hartman spread of 144%). (*Id.* at 6.) In

1993, a GAO survey examined the impact of the Medicaid rebates on prices offered to HMOs and hospital group purchasing organizations ("GPOs"), finding that the groups were able to purchase drugs at discounts of 34% to 38% off of list prices. (Bell T1 Aff. Attach. A, ¶ 16.) From 1990 to 1993, news outlets discussed pharmaceutical discounts in connection with the Congressional hearings on the federal Medicaid Best Prices legislation. The Los Angeles Times, New York Times, Seattle Times, and Drug Topics reported the levels of discounts, some as high as 70%, available to different classes of trade and the federal government. (Id. Attach. B, ¶ 6.) In 1993, the Los Angeles Times and the Chicago Sun–Times reported that retail drugstores stated that they paid up to 1,200% or 1,245% higher prices for drugs than did HMOs and mail order pharmacies. (Id. ¶ 8.) These were primarily self-administered drugs.

In 1996, the OIG focused on the pricing of nebulizer drugs, and albuterol sulfate (at issue in this ligation) in particular. A February 1996 report concluded that Medicare, reimbursing based on AWP, was paying higher prices than Medicaid for two of three nebulizer drugs, resulting in costs of over $11.7 million. (Id. Attach. A, ¶ 18.) A June OIG report concluded, "Medicare's allowances for albuterol sulfate substantially exceed suppliers' acquisition costs for the drug." (DX 1065 at I.) In May of that year, the OIG reported that Medicare could have saved $122 million if it used the Medicaid reimbursement standard, rather than AWP, to calculate drug allowances. (DX 1062 at 7.) Later in 1996, the New York Times and the Chicago Tribune reported the large discounts available to HMOs, (Bell T1 Aff. Attach. B, ¶ 9), and the Washington Post reported that AWP is a "price that is used as a baseline to negotiate prices and reimbursement rates." (Id.)

In June 1996, Barron's published an article entitled *Hooked on Drugs: Why Do Insurers Pay Such Outrageous Prices for Pharmaceuticals?* (DX 2641.) The article reported the pricing for "the top 20 Medicare drugs (which account for about 75% of the program's drug spending), as well as for various intravenous solutions." (Id. at 15.) The analysis showed that the manufacturer's prices were 10%–20% below AWP for single-source drugs and 60%–85% below AWP for generic drugs. (Id.) The article concluded that manufacturers are producing drugs "that cost far less than the published Average Wholesale Price that Medicare and other insurers pay on claims." (Id. at 16.) The article also addressed current investigations by the DOJ and the possible filing of suits under the False Claims Act. (Id. at 18.)

In January of 1997, the Washington Post printed an article entitled *Battling the High Prices Medicare Pays for Drugs*, which reported that "doctors can buy drugs from a supplier at less than the AWP, then bill Medicare for the full AWP price." (DX 1726 at 2.) The article also explained that HCFA was proposing a change to reimburse doctors only for the amount they actually pay for drugs. (Id.) In June of 1997, leading up to the passage of the BBA, the Committee on the Budget of the House of Representatives issued a report that stated:

The Inspector General for the Department of Health and Human Services has found evidence that over the past several years Medicare has paid significantly more for drugs and biologicals than physicians and pharmacists pay to acquire such pharmaceuticals. For example, the Office of Inspector General reports that Medicare reimbursement for the top 10 oncology drugs ranges from 20 percent

**78**           **491 FEDERAL SUPPLEMENT, 2d SERIES**

to nearly 1000 percent per dosage more than acquisition costs. (DX 1071 at 1354.)

Of great significance here, in August of 1997, Congress passed the BBA which changed reimbursement to 95% of AWP. *See* BBA of 1997, Pub.L. 105–33, 111 Stat. 251. In December 1997, the OIG issued another report noting that "published AWPs ... bear little or no resemblance to actual wholesale prices that are available to the physician and supplier communities that bill for these drugs." (DX 1075 at ii.) The OIG stated its belief that the 5 percent discount off of AWP "is not a large enough decrease" given the existence of spreads from 11% to 900%. (*Id.* at ii-iii.)

[3, 4]  Under the discovery rule, the question is when there was sufficient information such that a reasonable TPP in the plaintiffs' position would have been on notice to investigate the possibility that AWP had become unhinged from acquisition costs causing plaintiffs to overpay for drugs. *See Taygeta*, 763 N.E.2d at 1063. "Where events receive ... widespread publicity, plaintiffs may be charged with knowledge of their occurrence." *McIntyre*, 367 F.3d at 60 (quoting *United Klans of Am. v. McGovern*, 621 F.2d 152, 154 (5th Cir.1980)). The relevant factors include the geographical scope of the coverage vis-a-vis the plaintiffs, the content of the stories, and the degree of press and media saturation. *Cascone v. United States*, 370 F.3d 95, 99 (1st Cir.2004). This

is a "fact-intensive inquiry into the pervasiveness and content of the publicity and the particular circumstances of the relevant plaintiff(s)." *In re Mass. Diet Drug Litig.*, 338 F.Supp.2d 198, 208 (D.Mass. 2004). I begin by looking at the most sophisticated named plaintiff, BCBSMA.

The plaintiffs cite to several cases, which they claim stand for the proposition that tens of articles in major news outlets and coverage on the national news may not constitute widespread publicity such that plaintiffs should have discovered their claims.[46]  They argue that this case involves only a few articles and government reports, well below the threshold for constructive notice. However, BCBSMA is fundamentally a different plaintiff than the individual consumers in the cases cited by plaintiffs. BCBSMA is a sophisticated non-profit entity in the business of providing health care. Reimbursing for drugs was a substantial part of this mission. From 1991 to 1997, the period discussed here, BCBSMA was also the Medicare carrier for Massachusetts. (11/08/06 Tr. 18:2–11 (Mulrey).)

A reasonable plaintiff in BCBSMA's situation would be closely following any information that reported on drug reimbursement under Medicare. Although staff at BCBSMA might not have read the scattered national news articles or the handful of OIG reports, a reasonable TPP in the position of BCBSMA, as a major insurer, would have monitored major Congression-

---

46.  *See In re Mass. Diet Drug Litig.*, 338 F.Supp.2d at 205–10 (deferring until trial the issue of whether wide-spread publicity over several years regarding the potential danger of diet drugs was sufficient to put plaintiff consumers on notice of their claims); *Thompson v. Metropolitan Life Ins. Co.*, 149 F.Supp.2d 38, 50–53 (S.D.N.Y.2001) (denying summary judgment because twenty-four articles over a sixty year period and a segment telecast on 60 Minutes was insufficient to find

that a class action of African-American insureds had constructive notice of discriminatory overcharges by defendant insurer); *Sawyer v. Indevus Pharms., Inc.*, 2004 WL 1739405, *12–16, 2004 Mass.Super. LEXIS 274, *36–49 (Mass.Super.Ct. July 26, 2004) (denying summary judgment because widespread coverage of problems with diet drugs was not sufficient as a matter of law to put plaintiffs on notice of their injuries).

al actions regarding Medicare reimburse-ment policies. In August of 1997 when the BBA was signed into law, reducing Medicare Part B reimbursement to 95% of AWP, BCBSMA should have been alerted to the fact that it could have been overpaying for drugs using AWP. At that time, a reasonable investigation would have uncovered the OIG reports finding that spreads on certain oncology drugs reached nearly 1,000% and the Barron's article highlighting the spreads and the recent investigations into AWP fraud. At the least, BCBSMA could have conducted the reasonable investigation undertaken by the Barron's staff to uncover the fact that physician costs were well below AWP.

Plaintiffs' appeal to the "importance of being unimportant" is not persuasive here. While the relative insignificance of Medicare Part B drugs may be a reason for not changing their reimbursement system, it does not negate the fact that they were on notice of the problems with AWP and could have taken legal action.

I find that in August of 1997 (the date of passage of the BBA) sufficient facts were available for BCBSMA and any similarly situated large TPP to discern the basis for both the Class 2 and Class 3 claims.[47]

[5, 6] It is a much more difficult question as to whether the other class representatives, Pipefitters and Sheet Metal Workers, should have been put on notice of their claims at this time. At trial, it was clear that these Taft–Hartley funds were much less sophisticated organizations than

BCBSMA. However, as less sophisticated entities, both organizations hired third parties to handle their medical benefits, including drug reimbursement. Under standard agency principles, "[w]hen an agent acquires knowledge in the scope of [his] employment, the principal ... is held to have constructive knowledge of that information." *Sunrise Props., Inc. v. Bacon, Wilson, Ratner, Cohen, Salvage, Fialky & Fitzgerald, P.C.* 425 Mass. 63, 679 N.E.2d 540, 543 (1997) (citing *DeVaux v. Am. Home Assurance Co.*, 387 Mass. 814, 444 N.E.2d 355 (1983)). As the Taft–Hartley funds stated at trial, a key reason for hiring outside consultants and administrators was to obtain experience and expertise in the provision of health benefits.

Pipefitters, a Class 3 representative, contracted with BCBSMA and thus was put on notice at the same time as BCBSMA. Sheet Metal Workers, a Class 2 representative, hired Southern Benefits Administrators ("SBA") to handle its health benefits, including the Medicare Part B payments. SBA, like BCBSMA, is actively engaged in the health care and insurance industries, and should reasonably have been on inquiry notice at the same time as BCBSMA. Because Sheet Metal Workers relied on SBA as its agent to provide expertise on health care matters, Sheet Metal Workers also should have been on inquiry notice at that time.

Therefore, Plaintiffs cannot bring claims for any damages arising before December

---

47. A much debated issue at trial was whether the knowledge of the staff model HMOs, Medical West and Medical East, should be attributed to BCBSMA. Due to the fact that BCBSMA was on inquiry notice of its claims, triggering the statute of limitations bar in 1997, the dispute is inconsequential for purposes of determining when the statute of limitations was triggered. Furthermore, because BCBSMA sold the staff model HMO in 1997, any possible agency relationship or knowledge about drug prices learned through intercompany communications would not affect the knowledge of BCBSMA regarding drug prices available to physicians (as opposed to HMOs) after that point. To the extent that defendants have argued that BCBSMA is an atypical plaintiff because it had to face a unique statute of limitations defense, that argument is rejected.

**80**                    **491 FEDERAL SUPPLEMENT, 2d SERIES**

1997.[48]

### B. *Liability Under Section 9 or 11 of Chapter 93A*

Defendants argue that the class representatives, BCBSMA, Pipefitters, and Sheet Metal Workers, although technically nonprofit entities, were acting in a business context and therefore can only proceed under § 11 of Chapter 93A.[49] The significance of this challenge is that defendants contend plaintiffs cannot satisfy additional requirements imposed by § 11. Plaintiffs respond that their claims are properly brought under § 9 because the class representatives are not-for-profit entities, acting in furtherance of their core missions.

The Massachusetts Consumer Protection Act, Mass. Gen. Laws ch. 93A, § 2, protects against unfair or deceptive acts or practices in the conduct of any trade or commerce. Chapter 93A distinguishes between claims actionable under § 9 and "business" claims actionable under § 11. *Frullo v. Landenberger*, 61 Mass.App.Ct. 814, 814 N.E.2d 1105, 1111 (2004) (citing *Lantner v. Carson*, 374 Mass. 606, 373 N.E.2d 973, 976 (1978)). Section 11 provides a cause of action to "individuals acting in a business context," *Lantner*, 373 N.E.2d at 976, while § 9 grants a cause of action to "[a]ny person, other than a person entitled to bring action under section

eleven of this chapter." Mass. Gen. Laws ch. 93A, § 9. The two sections are mutually exclusive and plaintiffs' claims can proceed under only one section. *See Frullo*, 814 N.E.2d at 1112 ("[A] plaintiff who acts in a business context has a cause of action exclusively under § 11."); *see also Continental Ins. Co. v. Bahnan*, 216 F.3d 150, 156 (1st Cir.2000) ("By their terms, however, [sections 9 and 11] of chapter 93A . . . are mutually exclusive.").

The dividing line between a claim under § 9 and a business claim under § 11 is as clear as mud. *See Frullo*, 814 N.E.2d at 1112. By its text, § 11 applies to any "person [50] who engages in the conduct of any trade or commerce." Mass. Gen. Laws ch. 93A, § 11. Trade and commerce include "the sale, rent, lease or distribution of any services and any property." *Id.* § 1. Given this capacious definition, Massachusetts courts look to the circumstances of each individual case, to see whether the case arose in a "business context." *Linkage Corp. v. Trs. of Boston Univ.*, 425 Mass. 1, 679 N.E.2d 191, 207 (1997). Relevant factors include the nature of the transaction, the character of the parties involved, and "whether the transaction is motivated by business or personal reasons." *Id.* (citing *Begelfer v. Najarian*, 381 Mass. 177, 409 N.E.2d 167, 176 (1980)).

Plaintiffs rely on two cases to support their contention that their claims fall un-

---

48. Massachusetts also tolls the statute of limitations to "the discovery of [the] cause of action" if "a person liable in a personal action fraudulently conceals the cause of such action from the knowledge of the person entitled to bring it." Mass. Gen. Laws ch. 260, § 12. Plaintiffs argue that defendants engaged in fraudulent concealment primarily by keeping pricing information confidential and using confidentiality clauses in all of their contracts with physicians. Defendants argue that confidentiality clauses are a normal business practice for manufacturers in a competitive market. It is not necessary to resolve

whether confidentiality clauses amount to fraudulent concealment because the secret was out by August of 1997 when the BBA was signed into law.

49. Class 3 consumers who made co-payments clearly have a claim under § 9.

50. "Person" is defined to include "natural persons, corporations, trusts, partnerships, incorporated or unincorporated associations, and any other legal entity." Mass. Gen. Laws ch. 93A, § 1.

der § 9 of Chapter 93A. While the cases were both decided by federal courts outside of Massachusetts, the cases involve the same plaintiff, BCBSMA, and factual circumstances that are quite similar to this case. In *In re Lorazepam & Clorazepate Antitrust Litig.,* 295 F.Supp.2d 30, 33 (D.D.C.2003), BCBSMA brought Chapter 93A claims against Mylan Laboratories, Inc. for unlawfully raising prices on generic drugs that were reimbursed by BCBSMA. In addressing this threshold issue of whether plaintiffs could sue under § 9 or § 11 of Chapter 93A, the Court held that BCBSMA "is a charitable institution not engaged in trade or commerce when it undertakes activities in furtherance of its core mission.... [P]ayment[s] for members' prescription drug claims ... are clearly at the core of BCBS Massachusetts's charitable mission." *Id.* at 45. The court gave considerable weight to the fact that BCBSMA "is a creation of statutory law," specifically prohibited from operating for profit. *Id.* at 46.

Similarly, in *In re Cardizem CD Antitrust Litig.,* No. 99–md1278, slip. op. (E.D.Mich. May 27, 2003), BCBSMA brought a Chapter 93A claim against certain pharmaceutical companies alleging unlawful, anti-competitive acts that caused BCBSMA to pay millions of dollars in overcharges on drug reimbursement. The Court held that:

> BCBS Massachusetts has pled facts showing that it is a nonprofit corporation created by statute and regulated by the Commonwealth of Massachusetts, and that the activity in question—its customary payment or reimbursement for its members' prescription drug benefits—falls within its charitable mission as set forth by statute and case law.

*Id.* at *7–8.

Defendants contend that these cases were wrongly decided because the Massa-

chusetts case law discussing whether non-profits are engaged in trade or commerce for the purposes of Chapter 93A involves entities being sued as defendants, rather than entities suing as plaintiffs. It is true that the same entity can sue as a plaintiff under § 11 in one case, and be immune to suit under § 11 in a different case. *See Boston Hous. Auth. v. Howard,* 427 Mass. 537, 695 N.E.2d 192, 194 (1998) (refusing to impose § 11 liability on the Boston Housing Authority while recognizing that it had been allowed to sue as a plaintiff under § 11 in prior cases). However, the determination of whether the entity is engaged in a business context must focus on the transaction at issue in the particular case. *See Begelfer,* 409 N.E.2d at 176 ("[B]usiness context must be determined from the circumstances of each case.").

[7]  Although not dispositive, a party's status as a non-profit influences this analysis. *Boston Hous. Auth.,* 695 N.E.2d at 193. "In most circumstances, a charitable institution will not be engaged in trade or commerce when it undertakes activities in furtherance of its core mission." *Linkage Corp.,* 679 N.E.2d at 209; *see also Trs. of Boston Univ. v. ASM Communs. Inc.,* 33 F.Supp.2d 66, 77 (D.Mass.1998) ("A nonprofit or charitable corporation, however, is not engaged in trade or commerce 'if, in the transaction in question, the non-profit is merely engaged in the customary business necessary to meet its charitable purpose.' ") (citation omitted); *Shin v. Mass. Inst. of Tech.,* 2005 WL 1869101, at *14, 2005 Mass.Super. LEXIS 333, at *22 (Mass.Super. Ct. June 27, 2005) ("Federal courts interpreting Massachusetts law have held that colleges and universities, as charitable corporations, are not engaged in 'trade or commerce' for purposes of c. 93A 'when [they] undertake[ ] activities in fur-

therance of [their] core mission.'") (citation omitted). This Court has specifically applied that test to a non-profit plaintiff that, like BCBSMA here, was attempting to sue under § 11. *See Trs. of Boston Univ.,* 33 F.Supp.2d at 77 (finding that Boston University, a nonprofit entity, was not engaged in trade or commerce when it purchased term papers from a corporation because investigating cheating was "central to a university's educational mission" and therefore could not bring a claim under § 11 of Chapter 93A).

[8] Based on this caselaw and the record, I conclude that BCBSMA is a nonprofit organization acting pursuant to its legislative mandate,[51] and that the reimbursement for prescription drugs is a key part of its core mission. There is no evidence that BCBSMA profited from its reimbursement for those over-priced drugs during the non-time-barred portion of the class period.[52] A fortiori, the Taft–Hartley funds may bring their claims under § 9 of Chapter 93A because they were not motivated by the desire to make money from the drugs and were acting within their core mission. Class 3 consumers who made co-payments have a claim under § 9. Plaintiffs are, therefore, not engaged in trade or commerce for the purposes of this case and their claims are properly brought under § 9 of Chapter 93A.[53]

### C. *Per Se Unfair or Deceptive Conduct Under Chapter 93A*

Plaintiffs advance the theory that the defendants' acts and practices are per se unfair or deceptive in violation of Chapter 93A. Plaintiffs base this contention on three sources of law: the Federal Trade Commission Act, Massachusetts Attorney General Regulations, and the federal Medicare statute.

Chapter 93A protects against "unfair or deceptive acts or practices in the conduct of any trade or commerce." Acting in accordance with authority granted in Chapter 93A, § 2(c),[54] the Massachusetts Attorney General enacted 940 Mass.Code Regs. 3.16, which states:

An act or practice is a violation of M.G.L. c. 93A, § 2 if:

(1) It is oppressive or otherwise unconscionable in any respect; or

(2) Any person or other legal entity subject to this act fails to disclose to a buyer or prospective buyer any fact, the disclosure of which may have influenced the buyer or prospective buyer not to enter into the transaction; or

(3) It fails to comply with existing statutes, rules, regulations or laws, meant for the protection of the public's health, safety, or welfare promulgated by the Commonwealth or any political subdivision thereof intended to provide the consumers of this Commonwealth protection; or

(4) It violates the Federal Trade Commission Act, the Federal Consumer Credit Protection Act or other Federal

---

**51.** *See* Arruda Aff. ¶ 14 (testifying to "BCBSMA's status as a not-for-profit organization organized under M.G.L. c. 176A and B").

**52.** There is a reasonable inference, though, that the staff model HMO may have profited from the inflated reimbursement for Medicare drugs prior to 1997.

**53.** After reviewing the relevant law, plaintiffs also satisfy the requirements necessary to bring an action under § 11. Given the finding that § 9 is appropriate, I decline to fully address those issues.

**54.** "The attorney general may make rules and regulations interpreting the provisions of subsection 2(a) of this chapter." Mass. Gen. Laws ch. 93A, § 2(c).

consumer protection statutes within the purview of [Mass.] G.L. c. 93A, § 2.

Courts have been hesitant to find that a violation of any statute is a per se violation of Chapter 93A, but instead take into account all the facts and circumstances to determine whether the statutory violation involves unfair or deceptive conduct. *Darviris v. Petros*, 59 Mass.App.Ct. 323, 795 N.E.2d 1196, 1201 (2003).[55] However, where a consumer protection statute falls within the heartland of 940 Mass.Code Regs. 3.16, conduct that violates that statute may be per se unfair and deceptive. *See, e.g., Barnes v. Fleet Nat'l Bank, N.A.*, 370 F.3d 164, 176 (1st Cir.2004) (holding that a violation of the Truth in Savings Act, a federal consumer protection statute, constitutes a per se violation of Chapter 93A); *In re Tavares*, 298 B.R. 195, 203 (Bankr.D.Mass.2003) (holding that a violation of the criminal usury statute constitutes a per se violation of Chapter 93A because the usury statute is a public policy statute covered by 940 Mass.Code Regs. 3.16).

[9] Plaintiffs first argue that defendants violated 940 Mass.Code Regs. 3.16(4) by contravening the Federal Trade Commission Act, 15 U.S.C. § 45(a)(1) ("FTCA"). To support this claim, plaintiffs reference a section of the FTC's 1967 "Guides Against Deceptive Pricing," which states that "if the list price is significantly in excess of the highest price at which substantial sales in the trade area are made, there is a clear and serious danger of the consumer being misled by an advertised reduction from this price." 16 C.F.R. § 233.3. Plaintiffs contend that because the defendants refer to AWP as a list price and no defendant made any sales at AWP, then these list prices were in violation of this regulatory guideline.

The FTC Guidelines, though supportive of plaintiffs' allegations in this case, do not establish that defendants' acts were per se deceptive.[56] As defendants point out, the factual circumstances of this case do not squarely fit within the context of these Guidelines. Section 233.3 is titled "Advertising retail prices which have been established or suggested by manufacturers (or other nonretail distributors)." 16 C.F.R.

---

55.  *See, e.g., Swenson v. Yellow Transp., Inc.*, 317 F.Supp.2d 51, 55 (D.Mass.2004) (finding that the violation of federal and state motor carrier regulations, which were not directed to the protection of consumers, could not constitute a per se unfair or deceptive act); *United States ex rel. Metric Elec., Inc. v. Enviroserve, Inc.*, 301 F.Supp.2d 56, 71 (D.Mass. 2003) (holding that conduct violating a state statute prohibiting unfair acts by insurers is not a per se violation of Chapter 93A as an unfair or deceptive act); *Darviris*, 795 N.E.2d at 1201 (finding that a violation of the patient's bill of rights is not a per se violation of Chapter 93A); *Reiter Oldsmobile, Inc. v. General Motors Corp.*, 378 Mass. 707, 393 N.E.2d 376, 378 (1979) ("Not every act made unlawful by statute is unfair or deceptive within the meaning of [Chapter] 93A.").

56.  Moreover, guidelines have unclear precedential weight. *See Federal Trade Comm'n v. Mary Carter Paint Co.*, 382 U.S. 46, 47–48, 86

S.Ct. 219, 15 L.Ed.2d 128 (1965) ("These, of course, were guides, not fixed rules as such, and were designed to inform businessmen of the factors which would guide Commission decision."); *B. Sanfield, Inc. v. Finlay Fine Jewelry Corp.*, 168 F.3d 967, 973 n. 4 (7th Cir.1999) ("We recognize that the federal guideline is merely that, and as such it does not have the same force as the Illinois regulation."); *In re John Surrey, Ltd., et al.*, 67 F.T.C. 299, 1965 WL 92786, 1965 FTC LEXIS 42, at *69–70 (Mar. 16, 1965) ("The Guides are not designed to be an encyclopedic restatement of the law regarding deceptive pricing, as it has been developed in Commission and court decisions under Section 5 of the Federal Trade Commission Act.... They are to be considered as *guides*, and not as fixed rules of 'do's' and 'don'ts,' or detailed statements of the Commission's enforcement policies.") (emphasis in original).

§ 233.3. The Deceptive Pricing Guides are directed toward the advertising and promotion of misleading prices to the "consuming public." 16 C.F.R. § 233.3(b). Here, manufacturers are not advertising prices to the consuming public, but to doctors and pharmacies, and the manufacturers are not involved in the offering of discounts off of those prices to consumers. In these circumstances, the Guidelines do not create per se liability under Chapter 93A.

Plaintiffs make a brief argument that defendants violate Chapter 93A pursuant to the Attorney General's Regulation, 940 Mass.Code Regs. 3.16(4), by running afoul of two Massachusetts health and welfare regulations, 940 Mass.Code Regs. 3.04,[57] 3.05(1).[58] These regulations seem to be intended to protect "buyers" of a product. Again, the purchasers are primarily the doctors or pharmacists; the plaintiffs are TPPs who do not buy a product, but rather reimburse for it. Arguably, however, the regulations could apply to consumers who make co-payments when they purchase PADs, but plaintiffs make no effort to carve out these claims as distinct from the claims of TPPs in Class 3.

Finally, Plaintiffs argue that the Medicare Act is a federal consumer protection statute within the meaning of the Attorney General's regulations, 940 Mass. Regs. Code 3.16(4). The types of federal statutes that courts have found to be consumer protection statutes under section 3.16(4) include: the Truth in Savings Act (TISA), Fair Debt Collection Practices Act (FDCPA), and Truth in Lending Act (TILA).[59] Notably, these statutes all focus on the conduct of buyers and sellers in the marketplace, and specifically reference the protection of consumers in these transactions. For example, by the text of the statute, it is the purpose of TISA "to require [ ] clear and uniform disclosure . . . so that consumers can make a meaningful comparison between the competing claims of depository institutions." 12 U.S.C. § 4301. Similarly, the purpose of the FDCPA is "to promote consistent State action to protect consumers against debt collection abuses."[60] 15 U.S.C. § 1692. Finally, one of the enumerated purposes of TILA is "to protect the consumer against inaccurate and unfair credit billing and credit card practices." 15 U.S.C. § 1601.

To be sure, the purpose of the Medicare statute is to provide quality health care and insurance to those in need, mainly the elderly and the disabled. *See, e.g., Fischer v. United States*, 529 U.S. 667, 680, 120

---

57. Section 3.04 provides:

No claim or representation shall be made by any means which *has the capacity or tendency or effect of deceiving buyers* or prospective buyers as to the value or the past, present, common or usual price of a product, or as to any reduction in price of a product, or any saving relating to a product.
940 Mass.Code Regs. 3.04 (emphasis added).

58. Section 3.05(1) provides:

No claim or representation shall be made by any means concerning a product which directly, or by implication, or by failure to adequately disclose additional relevant in-

formation, has the capacity or tendency or effect of deceiving buyers or prospective buyers in any material respect.
940 Mass.Code Regs. 3.05(1).

59. *See, e.g., Barnes*, 370 F.3d at 176 (TISA); *Dean v. Compass Receivables Mgmt. Corp.*, 148 F.Supp.2d 116, 119 (D.Mass.2001) (FDCPA); *Martin v. Sands*, 62 F.Supp.2d 196, 201 (D.Mass.1999) (FDCPA); *Fidler v. Cent. Co-op. Bank*, 210 B.R. 411, 430 (Bankr. D.Mass.1997) (TILA), *rev'd on other grounds*, 226 B.R. 734 (Bankr.D.Mass.1998).

60. The FDCPA is also a part of Federal Consumer Credit Protection Act, which is specifically listed in section 3.16(4). *See Martin*, 62 F.Supp.2d at 201.

S.Ct. 1780, 146 L.Ed.2d 707 (2000) ("The structure and operation of the Medicare program reveal a comprehensive federal assistance enterprise aimed at ensuring the availability of quality health care for the broader community."); *Furlong v. Shalala,* 156 F.3d 384, 392 (2d Cir.1998) ("The underlying purpose of the Medicare statute is to provide affordable medical insurance for the aged and disabled...."). While defendants frustrate the purpose of the Medicare Act when they make health care less affordable, it does not necessarily follow that the Medicare Act is essentially a consumer protection statute of the same genre as, for example, the Truth in Lending Act. Specifically, the provision in the Medicare statute setting government reimbursement at 95% of AWP (42 U.S.C. § 1395u(o)) does not appear to have consumer protection as its primary focus. As such, it is not an "other Federal consumer protection statute[ ] within the purview of G.L. c. 93A, § 2." 940 Mass.Code Regs. 3.16(4).

Consequently, defendants' acts are not per se unfair or deceptive. Nevertheless, these statutes and regulations can be examined among the several factors used to determine whether defendants' acts or practices were unfair or deceptive. *See Billingham v. Dornemann,* 55 Mass.App. Ct. 166, 771 N.E.2d 166, 176 (2002).

**D.  *The Daubert Challenge***

Fed.R.Evid. 702 allows an expert witness to testify "if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." Before according weight to the expert testimony, the trial court must first perform a gatekeeping function to determine whether the expert is qualified and whether the expert's testi-

mony is sufficiently reliable and "relevant to the task at hand." *Daubert v. Merrell Dow Pharms.,* 509 U.S. 579, 597, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). The trial judge must make this requisite gatekeeping determination for all proffered expert testimony that reflects "specialized knowledge," whether "scientific" or not. *See Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 147–48, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999) (citing Fed.R.Evid. 702). The critical inquiry is whether the expert "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id.* at 152, 119 S.Ct. 1167.

If the court finds the expert to be qualified, it must then turn to the proffered expert testimony to determine its relevance, i.e., "whether those principles and methods have been properly applied to the facts of the case." *United States v. Monteiro,* 407 F.Supp.2d 351, 357–58 (D.Mass. 2006) (quoting Fed.R.Evid. 702 advisory committee's note). Beyond the normal requirement of relevance for all evidence, "expert testimony must be relevant ... in the incremental sense that ... if admitted, [it] likely would assist the trier of fact to understand or determine a fact in issue." *Ruiz–Troche v. Pepsi Cola of P.R. Bottling Co.,* 161 F.3d 77, 81 (1st Cir.1998); *see also* Fed.R.Evid. 702. The party offering the expert testimony need not prove the testimony is correct, but rather that it rests upon "good grounds, based on what is known." *Id.* at 85 (quoting *Daubert,* 509 U.S. at 590, 113 S.Ct. 2786) (internal citations omitted).

[10]  "[A]n expert must vouchsafe the reliability of the data on which he relies and explain how the cumulation of that data was consistent with standards of the expert's profession." *SMS Sys. Maint. Servs. v. Digital Equip. Corp.,* 188 F.3d 11, 25 (1st Cir.1999). However, the court

may reject testimony for which the data relied upon is flawed or the methodology used is "internally inconsistent or unreliable." *Ed Peters Jewelry Co., Inc. v. C & J Jewelry Co., Inc.,* 124 F.3d 252, 260 (1st Cir.1997); *see also Coastal Fuels of P.R., Inc. v. Caribbean Petroleum Corp.,* 175 F.3d 18, 34 (1st Cir.1999) (affirming district court's rejection of damages expert's testimony because of "considerable and unjustified variance" between testimony and Rule 26 report and because expert "unintentionally misled [court to believe] that he had performed certain crucial calculations" he had not actually done).

An economist's failure to consider certain data is not fatal to admissibility if the expert sufficiently explains her choice of data for her analysis. *See Cummings v. Std. Register Co.,* 265 F.3d 56, 65 (1st Cir.2001). Such shortcomings in an expert's analysis go "to the weight, not the admissibility, of the testimony," and the opposing party is free to argue at trial that the trier of fact should discredit it. *Id.* at 65; *accord McMillan v. Mass. Soc. for the Prevention of Cruelty to Animals,* 140 F.3d 288, 303 (1st Cir.1998).

### 1. The Hartman Speed Limit

A key dispute at trial was the validity and reliability of the expert opinion of Dr. Raymond S. Hartman, a health care economist who rendered opinions on liability and damages for Class 2 and Class 3. Dr. Hartman is an economist specializing in microeconomics and econometrics and holds a Ph.D. from the Massachusetts Institute of Technology. He has spent over thirty years teaching, consulting, and publishing in the field of applied economics. Over the last five to ten years, he has focused his work almost exclusively on health care economics. In the course of that work, he has testified as an expert in several other pharmaceutical pricing cases. I find that Dr. Hartman is qualified.

A key assertion of Dr. Hartman's testimony is that drug prices exceeded the expectations of Class 3 TPPs as to the difference between the published AWP and the provider's acquisition cost. Dr. Hartman starts with the premise that TPPs typically reimburse at AWP minus x% for physician-administered drugs based on expectations in the marketplace about the provider's acquisition costs. He explains:

> What have Class 3 TPPs come to understand x% is and should be, so that physicians can cover their costs and perhaps earn a "reasonable margin" rather than "egregious profit" on the drugs they administer? This would be the rule of thumb that they would use when bargaining with providers. If manufacturers then secretly increased spreads such that reimbursement rates negotiated by TPPs with the expectation of an average spread of x% led in reality to "egregious" overcharges and profits unbeknownst to TPPs, by a rule of reason approach, it would seem that those secret spreads constitute fraud injuring the Class members.

(Hartman Decl. ¶ 92.) Because of the "prohibitive costs of acquiring and acting upon information gathered by NDC, TPPs reasonably look to these rules of thumb to simplify reimbursement across all physician-administered drugs within standard computerizable algorithms based upon discounts off AWP." (*Id.* ¶ 150(b).) To determine TPP expectations of the average spread between ASP and AWP in the physician-administered context, Hartman uses three approaches.

Hartman begins by examining the actual pricing history of certain single-source drugs that did not face competition to determine *manufacturer* expectations as to

the margin which must be given to providers to ensure them reasonable profit and cover administrative fees. He explains: "Successful break-through innovator drugs serve as reasonable yardsticks for 'but-for' spreads or baseline spreads, precisely because they reflect the manufacturer's understanding that AWP Inflation (or Spread Inflation or increased Return to Practice) was unnecessary to move market share for single-source branded drugs reimbursed by Class 3." (*Id.* ¶ 138.) This baseline spread in the "but for" world, where there is no fraud, is called the "Yardstick Threshold Spread." To determine the expected spreads, Dr. Hartman calculated the ASP by NDC for each single-source, physician-administered drug and compared it to the AWP. The Hartman "spread" is measured by the percentage markup over ASP, equaling (AWP–ASP)/ASP.[61] He concluded that a reasonable range of spreads expected in the market, negotiated into contracts between manufacturers and doctors, and untainted by the AWP scheme is 18%–22% using First DataBank; and 18%–27% using Red Book. (*Id.* ¶ 143(d).) "To be conservative", he chose 30% as his Threshold Yardstick Spread for single-source drugs, and uses the same yardstick for six months after the first generic launch, after which he assumes competition in the multi-source world controls pricing.[62] (*Id.* ¶ 155.) Outside of Medicare, multi-source PADs are typically reimbursed by TPPs based on a MAC benchmark, which generally does not rely on AWP. That is why there are no viable class allegations involving multi-source drugs for Class 3.

If a manufacturer raises its AWP and/or lowers its ASP, such that the realized spread exceeds the 30% Threshold Yardstick Spread for a particular NDC for a given year, Hartman concludes that the manufacturer has increased the spread on that NDC in that year to move market share. (Hartman Decl. ¶ 148.) At the trial, the parties referred to this 30% spread as the Hartman "speed limit." Hartman concluded there was liability and causation whenever the spread between AWP and ASP exceeded 30%, and he calculated damages for Class 3 using that empirical yardstick. (*Id.* ¶¶ 148, 154.)

As a first cross-check on the reliability of this theory, Hartman reviewed publicly available sources providing market-wide information concerning the relationship between AWP and ASP for branded and generic PADs, including the OIG reports. According to Hartman, this review revealed "reasonably anticipated spreads" of 11%–25%. (*Id.* ¶ 144; *see also* Hartman Rebuttal ¶¶ 46–47 ("The preponderance of

61. Therefore, to use a hypothetical example, if the AWP of a drug is $100 and the ASP is $75, there is a spread of 33% = ($100–$75)/$75. Some publications, including the OIG, calculate the spread as a discount off of AWP (rather than a markup above ASP) equal to (AWP–ASP)/AWP. In the hypothetical I created, Hartman's spread of 33% is thus equal to a discount of 25% off of AWP [ ($100–$75)/ $100]. This can create some confusion, since the parties variously use percentages to refer to either a discount or off of AWP or a spread. To use a real example, a November 1992 OIG report found that Doxorubicin (Rubex) could be purchased at discounts of 56% to 59% off of AWP (DX 1053 at App. III) which is equivalent to a markup or spread of 127% to 144% above ASP. *See* Hartman Decl. ¶ 77(c) n. 123 (explaining the calculation used to convert from a discount to a spread).

62. Hartman notes that although he is not aware of any survey information that has "documented systematic spreads on generic physician-administered pharmaceuticals," he finds "no compelling reason that pricing expectations ... would be more educated (i.e., different) than the observed relationship for single-source physician-administered drugs." (Hartman Decl. ¶ 147 n. 184.) He therefore uses the same 30% yardstick for all PADs.

spreads for single-source drugs reported through 2003 was 20%.").)

As a second check, he used the "revealed preferences method," which is predicated on the theory that "economic agents reveal their preferences, and implicitly the information they relied on, by their actual market decisions and behavior." (Hartman Decl. ¶ 137.) Defendants have not challenged the "revealed preferences method" as unreliable. Using this method, Hartman calculated the average spread expected by TPPs by examining the contracts between TPPs and providers to determine what the parties expected the spread between AWP and ASP to be.[63] Based on a review of contracts, Dr. Hartman found that TPPs have negotiated to reimburse PADs in the range of AWP minus 16% to AWP plus 15%. This contractual range is consistent with the literature in the field that discusses a range of AWP ± 15%.[64] (*Id.* ¶ 123.) According to Hartman, it is also consistent with the range of contractual reimbursement for self-administered drugs (SADs). Hartman states that TPPs reimburse SADs at AWP minus x%, where x% = (13%–18%). (*Id.* ¶ 91.)

Dr. Hartman believes that the x% discount in the contracts between providers and TPPs is reflective of information in the marketplace about provider acquisition costs. According to Dr. Hartman, the "better informed" TPPs believed that the WAC represented the average acquisition cost of providers, and "would believe therefore that the average spread earned by providers reimbursed at AWP would be a 20 to 25 percent markup above acquisition cost." (*Id.* ¶ 129(b)-(c).) Remember that the standard formulaic mark up between WAC and AWP (with the sole exception of J & J's Remicade) is 20 to 25 percent, and this markup is widely published in the commercial compendia and (all agree) was well known in the industry. (*See* 11/15/06 Tr. 71:6–22; 94:3–20 (Rosenthal).)

Dr. Hartman also believes that the range of TPP contractual reimbursement is consistent with Medicare's reimbursement, stating: "Given the herd behavior revealed among TPPs, reliance upon Medicare reimbursement is common, which has reimbursed up to 15% off AWP (implying spreads reflected in negotiating positions of TPPs of 18%)." (Hartman Decl. ¶ 150(b).) Medicare reimbursement rates for single-source Part B drugs were not decreased from AWP–5% to AWP–15% until 2003. However, Medicare did try to reimburse at AWP–15% in 1991 and to go to a cost-based system in 2000. According to Dr. Hartman, the industry understood that Medicare did not believe that AWP reflected true acquisition costs.

---

**63.** Recall that ASP is the actual average acquisition cost of providers, taking into account rebates, discounts, chargebacks, free samples, and the like. Hartman's definition is generally consistent with the definition in the MMA. (*Compare* Hartman Decl. ¶ 3, *with* 42 U.S.C. § 1395w–3a (defining ASP as the manufacturer's total sales divided by the total number of units sold, and including "volume discounts, prompt pay discounts, cash discounts, free goods that are contingent on any purchase requirement, chargebacks, and rebates").)

**64.** The Dyckman survey, which reported on surveys of 33 large private health plans in the MedPAC report, found typical spreads of AWP plus or minus 15%; other independent studies in the MedPAC report found that private payors reimbursed from a low of AWP minus 20% to a high of AWP plus 10%. (*See* Hartman Decl. ¶ 123(b)-(c).) According to Hartman, some less informed TPPs reimbursed providers at prices greater than the AWPs because they believed that AWP was an actual average, as stated by publications like First DataBank. (*See id.* ¶¶ 105–06.)

Based on all this marketplace data (the contracts themselves, the literature, and the range of actual and proposed Medicare Reimbursement rates over the period from 1989 to the present), Dr. Hartman concludes that it is reasonable to infer that TPPs generally believed that spreads between AWP and provider drug acquisition cost were on the order of 0%–25% over the class period. (*Id.* ¶ 129(d).)

Hartman has calculated total damages for Class 2 based on the plaintiffs' legal position that any spread violated Chapter 93A in the Medicare program. He determined damages for Class 3 from 1991 to 2003 using his 30 percent yardstick.

### 2. *Defendants' Critique*

[11] Defendants challenge four hypotheses articulated by Dr. Hartman: (*l*) the pharmaceutical market is structured such that expectations by payors about acquisition costs affect reimbursement rates; (2) payors expected that spreads were 30% or less for every NDC in every year; (3) changes in payor expectations would lead to dollar-for-dollar changes in reimbursement; and (4) in the "but for" world, AWPs would drop to within 30% of ASPs. (11/27/07 Tr. 108:10–109:1 (McFadden).) Defendants rely on the expert testimony of Dr. Bell, Dr. Gaier, and Dr. Daniel L. McFadden.[65]

#### a. *Payors' expectations*

Defendants challenge the hypothesis that payors' expectations about provider acquisition costs affect reimbursement rates. They highlight the fact that Dr. Hartman did not conduct a survey of payors to determine what they believe but rather relied on three surrogates to determine payor expectations: (1) comparator drugs; (2) publicly available information on spreads; and (3) contracts. Dr. McFadden believes that TPPs adjust rates to attract and retain providers and that reimbursement rates do not depend on expectations about providers' acquisition costs. He contends that three indicators that might measure the value of providers' costs to TPPs are inconsistent with the Hartman hypothesis and consistent with his alternative: TPPs did not attempt to acquire information about acquisition costs; TPPs did not negotiate prices individually with every provider; and most payors, including BCBSMA, have not changed their reimbursement structures in response to new information about acquisition costs. (McFadden Dir. ¶ 16(a).) Based on the record in this trial, I disagree that these factors undercut Dr. Hartman's theory of liability.

First, as the plaintiffs have proven, TPPs do not seek cost data because, with respect to most of the drugs at issue in the litigation, there was no readily available market data providing physicians' costs that could be gleaned from commercial services.[66] Entities like PBMs or consultants did not collect such data. The pric-

---

65. Defendants repeatedly point out that Dr. McFadden is a Nobel prize-winner. Plaintiffs repeatedly point out that he has no background in healthcare economics. Unfortunately, because of a family emergency, his oral testimony was truncated, and defendants have not relied much on his opinion in their briefs.

66. AstraZeneca points out that the prices paid by physicians for Zoladex were available in the reports of IMS Health, which collects private pharmaceutical data that is available for purchase. Professor Gould, an economist, provided a chart comparing the IMS data on Zoladex sales prices to the ASPs calculated by Dr. Hartman. (*See* Gould Decl. ¶ 20, Fig. 6.) According to the chart, the IMS data follows the WAC more closely than the ASP up until 1999. It is, therefore, likely misleading concerning the true prices that doctors were actually paying for Zoladex. From 1999 to 2003, the IMS data and Dr. Hartman's calculations are nearly identical. This chart high-

ing of specialty drugs was complex, opaque, and confusing. Accordingly, to procure accurate pricing data, a TPP would have to individually collate invoice data doctor-by-doctor, NDC–by–NDC, on a quarterly basis. Even Medicare did not do this until it had a statutory mandate. Indeed, providers were under a contractual obligation not to disclose discounts and rebates. There is nothing in the record to indicate that providers divulged information about acquisition costs to TPPs, and they would have been contractually precluded from doing so.

Second, the fact that TPPs don't negotiate prices drug-by-drug with every provider does not mean that TPPs did not care about cost data. With the thousands of drugs and thousands of transactions, a TPP would reasonably choose to contract with providers based on a benchmark like AWP with the general expectation that the price would reflect acquisition costs as well as the margin necessary to cover a provider's administration costs while providing a reasonable profit. Thus, as both Dr. Gaier and Dr. Bell testified, payors and providers could not, and did not, consider reimbursement on a drug-by-drug basis; rather, they focused on reimbursement levels overall. (Bell T1 Aff. ¶ 71; 11/29/06 Tr. 41:13–42:5 (Gaier).)

Dr. McFadden argues that TPPs failed to react to data about providers' acquisition costs once they became available because reimbursement rates are driven by the recruitment of providers by drug profitability and the establishment of competitive prices to attract customers, not on expectations about acquisition costs. (McFadden Dir. ¶¶ 45–48.) As an illustration, McFadden uses the market for meals in restaurants and the market for new cars. (*See id.* ¶ 27.) But these comparisons are not apt. The record established

that there was no competitive market with normal supply and demand forces setting the drug reimbursement rates because AWP was embedded in the Medicare statute. Moreover, the AWP for branded drugs was a fictitious price effectively controlled by the drug manufacturers.

Dr. Bell argues that TPPs did not consider knowledge of actual acquisition costs to providers to be important. For example, he highlights the following quote from Robert Farias, Director of Planning and Administration for Harvard Pilgrim Health Care:

Q: And indeed, if Harvard Pilgrim were to learn more information about what providers paid to acquire drugs, that would not change the amount that Harvard Pilgrim is reimbursing for drugs. Is that a fair statement?

A: That's a fair statement.

(Farias Dep. 43:10–16 (objection omitted).) Moreover, Dr. Bell points out that TPPs had no expectation as to what the margin was. For example, he quotes Kelly Ellston, assistant vice president for claims and care management for Union Labor Life:

Q: It would be impossible to say that Union Labor Life expects that they'll make a percentage profit of 5 percent, 10 percent, 20 percent, 30 percent, 40 percent?

A: That's not in our calculations.

Q: That's something that is entirely irrelevant to Union Labor Life's calculations of the amounts that it's going to reimburse. Is that correct?

A: Correct.

(Ellston Dep. 89:18–90:5.)

Plaintiffs point to testimony which states the opposite. For example, Joanne Ro-

lights the difficulty in gaining accurate infor-                mation for PADs.

masko of Blue Cross Blue Shield Montana testified at her deposition:

Q: Is it important to Blue Cross Blue Shield of Montana that AWP prices be as accurate as possible?

A: Absolutely.

Q. And why is it important that AWP be accurate and 135 reliable?

A. So we're compensating the physicians appropriately for the drug they're administering.

Q. Does Blue Cross Blue Shield of Montana consider AWP prices to be an accurate, reliable pricing benchmark?

A. Yes, that's what we use today.

(Romasko Dep. 94–95.)

The TPPs' failure to react when they received true data about actual acquisition costs is better explained by the insurmountable barrier to devising an alternative system. Even after it became clear by the mid-to-late 1990's that there were mega-spreads for oncology drugs and other Medicare Part B drugs, it was not feasible for each TPP to devise its own ASP system either by doing its own survey of drug pricing, or by developing a pragmatic pricing methodology to handle the millions of annual drug transactions when there were different prices per NDC and per dose. Significantly, it took three years for Medicare to devise an alternative pricing structure, because of the complexity of simultaneously increasing the prices paid for physician services.

TPPs were also concerned that a unilateral decrease in reimbursement rates would drive doctors away or would induce providers to move their patients into the more expensive hospital setting. As Dr. Rosenthal testified, shifting the pricing paradigm from AWP to another approach

is like turning the *RMS* Queen Elizabeth.[67] Thus, the evidence that TPPs did not nimbly react to new pricing information does not support Dr. McFadden's alternative hypothesis that reimbursement rates for providers are determined primarily by competition for providers rather than expectations as to provider costs. I find that TPP knowledge about physician acquisition costs was material to the establishment of reimbursement rates.

**b.  *Spreads of thirty percent***

McFadden also challenges Hartman's second hypothesis that buyers expected that spreads were 30% or less for every NDC for physician-administered and pharmacy-dispensed drugs with and without therapeutic competition. He argues that TPPs would expect that prices would drop and spreads would rise in response to increased competition between manufacturers for drugs with therapeutic equivalency and that drug prices would differ by distribution channel and customer. (See McFadden Dir. ¶ 32.)

As a threshold matter, it is undisputed that the market understood and expected a 20 to 25 percent formulaic markup from WAC to AWP. Thus, the dispute hinges on Dr. Hartman's premise that the market understood and expected rebates or discounts no greater than 3.8% below WAC, resulting in a spread at or below 30%. (See 11/27/06 Tr. 135:7–136:3 (Hartman).) However, Dr. McFadden overstates Dr. Hartman's hypothesis. TPPs surely should have expected that price competition between therapeutic equivalents would prompt manufacturers to give entities that can move market share rebates and discounts, thereby increasing the spread. Still, TPPs did not know the degree of the

---

67. Defendants made a very perfunctory argument that plaintiffs had a duty to mitigate their damages. Since this issue was not well-briefed by defendants, I will not address it any further.

spread because there was little available pricing information. There is no evidence that the TPPs had any knowledge about the existence of the huge spreads between AWP and ASP for the drugs on trial until the late 1990's.

#### c.  Changes in reimbursement

Dr. McFadden attacks Hartman's third hypothesis that changes in expectations would lead to dollar-for-dollar changes in reimbursement. Disagreeing, McFadden states that reimbursement rates are a function of competitive conditions, business objectives, and provider demands. (See McFadden Dir. ¶¶ 34–39.) This seems to be an attack on the plaintiffs' strategy for calculating damages for all spreads above the speed limit. The BCBSMA scenario demonstrates that Dr. McFadden is correct that market factors other than cost, like the relative power of the TPPs and physicians, will also affect pricing, even with a full understanding of cost. Nonetheless, I find that expectations are a substantial factor in setting reimbursement rates and reject the argument that payors, like Medicare, knowingly permitted providers to retain mega-spreads to achieve other objectives.[68]

#### d.  Living in the "but for" world

Finally, defendants challenge the fourth hypothesis that in the "but-for" world, to-

tal reimbursements would have been lower. Dr. McFadden argues that drug prices would be higher than in the "as-is" world because manufacturers would not achieve greater market share by discounting, and providers would have an incentive to choose the product with the highest AWP (i.e., 95% of $100 is greater than 95% of $90). However, the proof is in the pudding. Dr. Rosenthal's testimony demonstrates that the MMA resulted in lower drug costs, even with the increase in administration fees. Moreover, if there were transparent and accurate pricing, AWPs would have likely been much lower because they would have been related to true market prices.

Defendants also launched numerous challenges to the accuracy of Dr. Hartman's data, but these criticisms affect the weight of his testimony but not its admissibility. Sometimes those disagreements were valid, and I took them into account in calculations.[69] I conclude, however, that the 30% yardstick methodology used by Dr. Hartman was reliable and admissible under Fed.R.Evid. 702. The yardstick is consistent with the undisputed evidence in the market establishing an industry-wide markup between WAC and AWP of 20% to 25%.

---

68.  Defendants do challenge Dr. Hartman's failure to give significance to publicly available reports documenting spreads exceeding 30% on some multi-source PADs. (See Defs.' Mem. in Support of their Renewed Motion to Strike the Expert Test. of Dr. Hartman 4–5.) Dr. Hartman concluded that this information was "sufficiently idiosyncratic or limited so as to be insufficient for market participants to draw any conclusions regarding Defendants' systematic abuse of the AWP system through spreads for Defendants' multi-source drugs." (Hartman Decl. ¶ 6 (emphasis in original).) Hartman says that the awareness of large spreads began to reach public awareness in 1996 primarily with respect to the generic

drug albuterol. (Id. ¶ 77(d).) While this is a fair dispute as to what weight to give public reports, it does not undermine the reliability of Dr. Hartman's methodology, but rather reflects a disagreement over the weight to be given to certain data.

69.  For example, Dr. Hartman included free goods in his calculation of ASP, picked certain dates for calculating a spread, or predicted certain data about ASPs in 2003 from past "trends." The Court found defendants' challenges persuasive in undermining the weight of Dr. Hartman's testimony on these and other points.

Given my adoption of Dr. Hartman's basic methodology for determining liability and damages, I further find that his calculation of aggregate damages for the class is sufficiently reliable and reject defendants' argument that aggregate damages are inappropriate on this record. *See* 3 Alba Conte & Herbert Newberg, *Newberg on Class Actions* § 10.2 (4th ed. 2002) ("The evidentiary standard for proof of monetary relief on a classwide basis is simple—the proof submitted must be sufficiently reliable to permit a just determination of the defendant's liability within recognized standards of admissible and probative evidence.... Individual damage issues should not, except in extraordinary situations, have any adverse effect on the propriety of aggregate class judgments as a proper means for determining the defendant's liability to the class.").

### E. The Merits: Chapter 93A Unfair or Deceptive Acts

#### 1. The Standard

Massachusetts Gen. Laws Ch. 93A, § 2 prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce." While a practice may be both unfair and deceptive, a finding need only be made that the practice was unfair to constitute a violation of Chapter 93A. *See, e.g.,* Serv. Publ'ns, Inc. v. Goverman, 396 Mass. 567, 487 N.E.2d 520, 527 (1986). One difference between unfair conduct and deceptive conduct may turn on whether the plaintiff had knowledge of the conduct. *See Commonwealth v. DeCotis*, 366 Mass. 234, 316 N.E.2d 748, 753–55 (1974). In *DeCotis*, the Attorney General brought a Chapter 93A claim against the proprietors of a mobile home park for charging a "resale fee" for any tenant who moved out of the park and sold their home to another buyer. The court held that there were two groups of injured home owners: those

that knew of the resale charge when they committed to living in the park, and those that had no such knowledge. *Id.* 316 N.E.2d at 753–54. As to the first group, the court noted:

> Although deception may not have been involved where the disclosure by the defendants to the prospective tenant was timely and complete, we believe that the practice of charging a fee for no service whatsoever was an unfair act or practice within the intent of § 2(a) of G.L. c. 93A and that it was therefore unlawful.

*Id.* at 754. The court explained that the prospective tenants were in a vulnerable situation because they were still better off selling the home than trying to relocate it. *Id.* at 755. "The willingness of tenants to pay resale fees, and even to contract knowingly to pay those fees, does not make the collection of such a fee fair. It merely demonstrates the extent to which the defendants had their tenants at their mercy." *Id.*

Chapter 93A gives no definition of "unfairness," and Massachusetts courts have refrained from establishing such a definition. Instead, "whether an act is unfair or deceptive is best discerned from the circumstances of each case." *Buster v. George W. Moore, Inc.,* 438 Mass. 635, 783 N.E.2d 399, 413–14 (2003) (internal quotations and citation omitted). The Massachusetts courts have, however, enumerated several factors to be considered when determining whether a practice is unfair: "(1) whether the practice . . . is within at least the penumbra of some common-law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; [and] (3) whether it causes substantial injury to consumers (or competitors or other businessmen)." *Mass. Eye & Ear Infirmary v. QLT Phototherapeutics, Inc.,* 412 F.3d