Westlaw.

Slip Copy                                                                                    Page 1
Slip Copy, 2008 WL 245217 (D.Mass.)
**(Cite as: Slip Copy, 2008 WL 245217)**

Mear v. Sun Life Assur. Co. of Canada
(U.S.)/Keyport Life Ins. Co.
D.Mass.,2008.
Only the Westlaw citation is currently available.
    United States District Court,D. Massachusetts.
Marie Katherine MEAR, individually and on behalf
    of herself and all others similarly situated
                         v.
    SUN LIFE ASSURANCE COMPANY OF
CANADA (U.S.)/KEYPORT LIFE INSURANCE
                    COMPANY.
        **Civil Action No. 06-12143-RWZ.**

                    Jan. 24, 2008.

Andrew S. Friedman, Kimberly C. Page, Michael
C. McKay, Bonnett Fairbourn, Friedman & Balint,
P.C., Phoenix, AZ, Garrett J. Bradley, Thornton &
Naumes, LLP, Boston, MA, John J. Stoia, Jr.,
Phong L. Tran, Rachel L. Jensen, Steven M. Jod-
lowski, Thomas J. O'Reardon, II, Coughlin Stoia
Geller Rudman Robbins LLP, San Diego, CA, Peter
J. Mougey, Beggs & Lane, RLLP, Pensacola, FL,
for Marie Katherine Mear.
Andrea J. Robinson, Joan A. Lukey, John J. Butts,
Timothy J. Perla, Wilmerhale LLP, Boston, MA,
for Sun Life Assurance Company of Canada
(U.S.)/Keyport Life Insurance Company.

              ***MEMORANDUM AND ORDER***

ZOBEL, District Judge.

**I. Introduction**

**\*1** Defendant Sun Life Assurance Company of
Canada (U.S.) ("Sun Life") [FN1] moves to dismiss
the complaint of plaintiff Marie Katherine Mear
("Mear") in which she alleges that Sun Life decept-
ively sold equity-indexed annuities ("EIAs") to
Mear and other persons aged sixty-five and older.
For the reasons below, defendant's motion is al-
lowed.

        FN1. Keyport Life Insurance Company,
        also named as a defendant, merged into
        Sun Life in December 2003 and dissolved.
        References herein to Sun Life refer to ac-
        tions by both entities.

**II. Factual [FN2] and Procedural Background**

        FN2. These facts are taken from Plaintiff's
        First Amended Class Action Complaint
        and Jury Demand ("Amended Complaint"
        (Docket # 2)) supplemented by the docu-
        ments associated with Mear's purchase of
        the EIA from Sun Life (*see* Docket # 35,
        Exs. A-C). In deciding a motion to dismiss
        under Rule 12(b)(6), the court must accept
        all well-pleaded factual allegations as true.
        *Beddall v. State St. Bank and Trust Co.,*
        137 F.3d 12, 16 (1st Cir.1998). Where the
        factual allegations are dependent upon a
        document, the authenticity of which is not
        disputed by the other party, "that document
        effectively merges into the pleadings and
        the trial court can review it in deciding a
        motion to dismiss under Rule 12(b)(6)."*Id.*

**A. Details of the Sun Life Annuity Purchased by
Plaintiff**

Sun Life has its principal place of business in Mas-
sachusetts. Mear, a citizen and resident of Arizona,
purchased an EIA (the "Annuity") from Sun Life's
Arizona-based salesman, Karl R. Powell ("Powell")
on December 12, 2003, for a premium of
$50,125.65. Mear was 75 years old and selected a
contract term of ten years. At the time, she was re-
ceiving a retirement income of $750 per month in
social security and the premium amount represented
her "entire liquid net worth." (Am.Compl.¶ 41.)
The latter was invested within her Individual Re-
tirement Account ("IRA") which "already ha[d] the
benefit of favorable tax treatment."(*Id.*)

The Annuity was structured to accumulate income

Slip Copy, 2008 WL 245217 (D.Mass.)
**(Cite as: Slip Copy, 2008 WL 245217)**

on a tax-deferred basis, with no payout until the end of the term. At the end of the term, however, Mear was guaranteed to receive her entire investment amount plus 3% interest. She would also receive a return calculated as 70% of any increase in the value of the Standard and Poors ("S & P") 500 Index over the period. While the return calculated on the S & P 500 Index (the "Index") increase could be as low as zero, it could never be negative.

Mear could withdraw up to 90% of her investment, less $4,000, at any time without being subject to a penalty. However, if she took a full distribution before the end of the term she would be subject to a surrender penalty of 10% of her initial investment.FN3The amount she could withdraw without penalty increased each year as the 3% interest and interest from any Index appreciation was credited to her account balance. In the worst case, in which she received no gain attributable to the Index, she would not be able to surrender the entire Annuity and recover a minimum of her investment amount until the end of the fourth year.

> FN3. Mear could also withdraw her entire investment without penalty during the "free-look" period, *i.e.,* within 45 days from the issue date.

At the end of the ten-year term, Mear could withdraw the total of her principal and accumulated interest without penalty as a lump sum, roll the total over into a new term, or elect to receive a monthly payment for the rest of her life. The Annuity also provided a death benefit if Mear died before the end of the term; she named her sons as her beneficiaries. There is no surrender penalty if the beneficiaries take a full distribution within 90 days of the date of death of the Annuity holder.

**B. Plaintiff Alleges that Sun Life's Salesman Failed to Disclose the Risks and Shortfalls of the Annuity**

Plaintiff alleges that Sun Life's salesman, Powell,

only focused on the benefits of the Annuity and failed to advise her of the risks and shortcomings of the product, particularly for a woman of her age .FN4In particular, she claims that he did not disclose that: (1) she could not begin receiving income without "incurring substantial surrender charges" until she was 85 years old; (2) the benefit of tax deferral on accumulated income was illusory for an EIA purchased within an already tax-deferred IRA; (3) undisclosed sales charges and "excessive" commissions would result in diminution of her principal investment; and (4) her principal would not be invested in equity investments. (Am.Compl.¶ 41.) In addition, plaintiff alleges that the benefit summary "deceptively described, and in effect misrepresented, the existence of surrender charges associated with withdrawals in excess of 10% of the initial premium" by failing to explain that "substantial surrender charges would be in effect" during the term of the policy and that she would not "earn interest on money withdrawn during any given year."(*Id.* ¶ 42.)Finally, plaintiff alleges that Powell used "misleading standardized marketing forms and policies, and deceptive sales tactics" provided by Sun Life to induce her to purchase the Annuity. (*Id.* ¶ 43.)

> FN4. The court is disturbed by the factual errors, hyperbole and irrelevant material contained within plaintiffs complaint. More than three pages of the Amended Complaint and over 100 pages of attached exhibits are devoted to a discussion of shortfalls of deferred annuities in general, unrelated to the defendant and the specific investment product at issue in this case. (*See* Am. Compl. ¶¶ 14-18; *id.,* Exs. A-D.) In addition, the Amended Complaint alleges that "Plaintiff Mear will be almost ninety years old, almost ten years beyond her life expectancy, before the surrender charges expire."(*Id.* ¶ 39.)This statement is both misleading and false. First, Mear will be 85 years old at the end of the Annuity term in 2013. Therefore, the Amended

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Complaint inflates the 10-year term of the Annuity at issue by 50% with the word "almost." Second, according to Social Security Actuarial Publications, of which the court takes judicial notice (*see S. Pac. Co. v. De Valle Da Costa,* 190 F. 689, 698 (1st Cir.1911)), Mear's life expectancy in 2003, when she purchased the 10-year Annuity, was 12.04 years. *See Social Security Online,* Period Life Table, updated July 9, 2007.

ht-tp://www.ssa.gov/OACT/STATS/table4c6.html. Thus, in actuality, Mear will be eighty-five years old, more than two years *prior* to her life expectancy, not "almost ten years beyond," when the surrender charges expire. (*Cf. also* Am. Compl. ¶ 41 ("... until she was 85 years old-*a date past her life expectancy*") (emphasis added).) Plaintiff also makes numerous generalizations that are unsupported by the factual allegations. For example, she alleges that "Defendants have engaged in a flagrant common course of conduct to deceive Plaintiff and class members into purchasing an annuity product that *has only led to financial loss and detriment.*" (*Id.* ¶ 99 (emphasis added).) As discussed *infra,* the Amended Complaint fails to identify any actual financial injury to Mear or any other individual. Indeed, given the lack of factual detail in the Amended Complaint, it is difficult to see how the statement: "[a]s a result of Defendant's common course of conduct *vast numbers* of senior citizens have been duped into purchasing equity-indexed annuities with needed retirement funds, resulting in the loss of use thereof for the very years in which the funds are needed most, and *in many cases the permanent loss of funds in the form of surrender charges, for-*

*feited income accruals and unanticipated taxes* " meets the requirement that allegations have evidentiary support. (Am. Compl. ¶ 37 (emphasis added)); *see also*Fed.R.Civ.P. 11(b)(3) (requiring allegations without evidentiary support to be "specifically so identified").

**C. Plaintiff Accuses Sun Life of a Deceptive Scheme to Sell Inappropriate EIAs to Senior Citizens**

**\*2** In addition to the specific allegations pertaining to the purchase of her Annuity, plaintiff alleges a general scheme by Sun Life to sell inappropriate EIAs to senior citizens. Mear asserts that EIAs are an "inherently complex investment" that are "beyond the capacity of even the most sophisticated investor to understand."(*Id.* ¶ 19.)Because of this complexity, senior citizens are unable to understand the "true essence of the product" unless the company trains and supervises its sales agents. (*Id.*) Plaintiff alleges, however, that Sun Life neither adequately trains nor supervises its agents and it requires those agents to rely on "uniform sales materials, which deceptively describe the product and omit crucial policy terms."(*Id.* ¶ 20.)

Mear asserts that these omissions and "half-truths" are the result of deliberate decisions by Sun Life to sell inappropriate investments. (*Id.*) Sun Life offers its agents "exorbitantly high commissions" which are not disclosed to the purchaser to "foster the use of high pressure and deceptive sales tactics."(*Id.* ¶ 30.)Agents are encouraged to establish "a relationship of trust and confidence" with an elderly prospective purchaser.(*Id.* ¶ 27.)Once this relationship of trust is established, the agents function "merely [as] conduits of information" to dispense Sun Life's sales materials that "tout its ... products as the answer to a variety of retirement financial needs."(*Id.* ¶¶ 26, 29.)

Through its "standardized sales presentation, the disclosure statement and other sales materials," Sun Life leads the sales prospect to incorrectly believe

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2008 WL 245217 (D.Mass.)
**(Cite as: Slip Copy, 2008 WL 245217)**

that:(1) "[t]he invested funds will be easily access-ible, and withdrawals will be virtually without pen-alty;" (2) "[t]he invested funds will enable the an-nuitant to participate in market returns;" (3) Sun Life maintains an individual account for each in-vestor's funds and those funds *are* invested in a "true market index;" and (4) "[t]hat customers will benefit from a more favorable tax treatment."(*Id.* ¶ 32.)In addition, the sales materials do not disclose commissions paid to "the battery of sales agents" or the existence of a "market value adjustment." (*Id.* ¶ 33.)Plaintiff alleges that the purpose of these omis-sions is "to ensure that the agents will not under-stand the details of what they are selling and in-stead will engage in whatever sales techniques are necessary to make a sale regardless of the financial needs of the customer."(*Id.* ¶ 34.)In addition, she alleges that "[d]efendants affirmatively and fraudu-lently concealed their unlawful scheme, conspiracy and course of conduct," thus tolling any statute of limitations applicable *to* her claims. (*Id.* ¶ 45-50.)

**D. Damages Alleged**

As a result of purchasing inappropriate EIAs, plaintiff claims that she and other senior citizens have been harmed by the resulting: (1) loss of li-quidity and deferral of present income in the amount of premiums paid; (2) "[s]urrender charges, forfeitures and penalties incurred as a result of cashing in existing policies or other retirement in-vestments in order to purchase equity-indexed an-nuities;" (3) commission charges and costs associ-ated with the purchase of EIAs; (4) "[i]ncome ac-crual automatically forfeited on any 10% annual withdrawal;" and (5) "other financial hardship losses and detriment," including adverse tax con-sequences due to the surrender of existing assets to purchase EIAs. (*Id.* ¶ 44.)

**E. The Instant Suit**

**\*3** On November 29, 2006, Mear filed a complaint against Sun Life on behalf of herself and a putative

class of persons similarly situated. She amended her complaint on January 23, 2007 (Docket # 2). The Amended Complaint seeks certification of a class consisting of:

> All persons, ages 65 and above, residing in the United States of America who have purchased equity-indexed annuities from either of the De-fendants within the applicable period of limita-tions (the "Class Period").

(Am.Compl.¶ 51.) Plaintiff seeks damages on a number of theories including: Fraudulent Misrep-resentation (Count I); Negligent Misrepresentation (Count II); Negligence (Count III); Restitution/Un-just Enrichment (Count IV); Violation of Mass. Gen. Laws ch. 93A (Count V); and violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO")[FN5] (Count VI[FN6]). Defendant has moved to dismiss the Amended Complaint. (Docket # 11.)

> FN5. In particular, she alleges that Sun Life and its "Affiliated Agents" violated provisions of the Act prohibiting any per-son from conducting the affairs of an en-terprise through a pattern of racketeering activity and from conspiring to so conduct the affairs of the enterprise. (*See* Am. Compl. ¶¶ 104-30.) The pattern of "racketeering activity" she alleges is the use of the mails and wires by Sun Life and its agents "in furtherance of their scheme to defraud" in violation of 18 U.S.C. §§ 1341, 1343. (*Id.* ¶¶ 127, 130.)

> FN6. This count is mislabeled as a duplic-ate "Count IV" in the Amended Complaint.

**III. Legal and Pleading Standards**

**A. Legal Standard for a Motion to Dismiss**

A motion to dismiss appraises the legal sufficiency of the complaint, not whether a plaintiff will ulti-mately prevail. *Scheuer v. Rhodes,* 416 U.S. 232,236 (1974)."In order to survive a motion to dis-

Slip Copy                                                                                                  Page 5
Slip Copy, 2008 WL 245217 (D.Mass.)
**(Cite as: Slip Copy, 2008 WL 245217)**

miss, plaintiffs must set forth factual allegations, either direct or inferential, regarding each material element necessary to sustain recovery."*Doyle v. Hasbro, Inc.,* 103 F.3d 186, 190 (1st Cir.1996) (internal quotation marks and citation omitted). While this standard is very generous to the plaintiff, "[t]he complaint must at least set forth minimal facts as to who did what to whom, when, where, and why."*Ruiz-Rosa v. Rullan,* 485 F.3d 150, 154 (1st Cir.2007) (internal quotation marks and citations omitted); *see also Bell Atlantic Corp. v. Twombly,* --- U.S. ----, ----, 127 S.Ct. 1955, 1965, 167 L.Ed.2d 929 (2007) ( "Factual allegations must be enough to raise a right to relief above the speculative level.").

In deciding a motion to dismiss under Rule 12(b)(6), the court must accept all well-pleaded factual allegations in the complaint as true. *Beddall v. State St. Bank and Trust Co.,* 137 F.3d 12, 16 (1st Cir.1998). However, "bald assertions" and "unsupportable conclusions" need not be credited. *Aulson v. Blanchard,* 83 F.3d 1, 3 (1st Cir.1996); *accord Jeneski v. City of Worcester,* 476 F.3d 14, 16 (1st Cir.2007) (explaining that the court will not credit "rhetorical flourishes"). The court may also consider documents central to plaintiffs contentions as part of the pleadings on a motion to dismiss without converting it into a motion for summary judgment. *Beddall,* 137 F.3d at 17.

**B. Heightened Standard For Pleading Fraud**

Rule 9 provides that "in all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity."Fed.R.Civ.P. 9(b). The heightened pleading standard of Rule 9 applies to Count I (Fraudulent Misrepresentation), Count V (ch. 93A) and, as discussed *infra.*Count VI (RICO).[FN7] The First Circuit requires plaintiffs to "specif[y] the time, place, and content of an alleged false representation" to meet the requirements of this rule. *Greebel v. FTP Software, Inc.,* 194 F.3d 185,193 (1st Cir.1999) (quoting *McGinty v. Beranger Volk-*

*swagen, Inc.,* 633 F.2d 226, 228 (1st Cir .1980), *superseded by statute on other grounds.*Private Securities Litigation Reform Act of 1995, Pub.L. No. 104-67, 109 Stat. 737). Plaintiffs are required to allege facts that give rise to a "strong inference of fraudulent intent." *Suna v. Bailey Corp.,* 107 F.3d 64, 68 (1st Cir.1997)."[M]ere allegations of fraud, corruption or conspiracy, averments to conditions of mind, or referrals to plans and schemes are too conclusional to satisfy the particularity requirement, no matter how many times such accusations are repeated."*Hayduk v. Lanna,* 775 F.2d 441, 444 (1st Cir.1985).

> FN7. The First Circuit does not require that Count II (Negligent Misrepresentation) meet the pleading standard of Rule 9(b).*See Mass, Sch. of Law v. Am. Bar Ass'n,* 142 F.3d 26, 41 (1st Cir.1998) (interpreting a claim which was not pled "with sufficient particularity to support a charge of fraud" instead as a claim for negligent misrepresentation).

*4 The heightened pleading requirements of Rule 9(b) also apply to Count VI, Mear's RICO claim, because the predicate acts allege fraud. *See, e.g., Cordero-Hernandez v. Hernandez-Ballesteros,* 449 F.3d 240, 244 (1st Cir.2006) ("[U]nder Rule 9 the [RICO] pleader is required to go beyond a showing of fraud and state the time, place and content of the alleged mail and wire communications perpetrating that fraud.") (internal quotation marks and citations omitted); *New England Data Servs. Inc. v. Becher,* 829 F.2d 286, 290 (1st Cir.1987) ("We hold that Rule 9(b) requires specificity in the pleading of RICO mail and wire fraud. This degree of specificity is no more nor less than we have required in general fraud and securities fraud cases.").

**IV. Discussion**

**A. Choice of Law**

The parties disagree whether the state law claims

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                     Page 6
Slip Copy, 2008 WL 245217 (D.Mass.)
**(Cite as: Slip Copy, 2008 WL 245217)**

are governed by Arizona or Massachusetts law. A federal court in a diversity action applies the choice of law rules of the forum state. *See Spurlin v. Merchants Ins. Co.,* 57 F.3d 9, 10 (1st Cir.1995). The first step is to determine if there is a difference in the substantive laws of the two jurisdictions. *Reicher v. Berkshire Life Ins. Co. of Am.,* 360 F.3d 1, 29 (1st Cir.2004). Defendant lists a number of significant differences between the consumer protection statutes of Arizona and Massachusetts, including differences in limitations periods, statutory damages for violations of the statutes, award of attorney's fees and the right to a jury trial. Plaintiff does not dispute that these differences exist, but asserts that they are not material to the outcome. For example, she argues that while Arizona does not provide for an award of attorney's fees, she would receive attorney's fees on her RICO claim, so the result is the same under either state's laws. Massachusetts, however, examines the differences between the jurisdictions on a claim-by-claim basis, not on an analysis of the potential total recovery assuming the plaintiff wins on all claims. *See Bushkin Assoc., Inc. v. Raytheon Co.,* 393 Mass. 622, 473 N.E.2d 662, 666-67, 671 (Mass.1985) (examining the differences between Massachusetts and New York law separately for a contract claim and a consumer protection claim). This makes sense. Each claim stands on its own, and neither party can know in advance whether plaintiff will prevail on her RICO claim, and thus be indifferent to Massachusetts' award of attorney's fees on the consumer protection claim. The differences between Massachusetts and Arizona consumer protection laws are, therefore, material.

Once substantive differences are identified that could affect the outcome, Massachusetts applies a "functional" approach "that responds to the interests of the parties" to determine which law applies. *Buskin,* 473 N.E.2d at 668 (adopting the general principals advanced in the Restatement (Second) of Conflict of Laws (1971)). Here, the transaction occurred in Arizona, plaintiff is a citizen and resident of Arizona, Powell is located in

Arizona, Arizona law controls the regulation of her insurance contract, the alleged fraud consists of failure by Powell to disclose "the risks and shortfalls" in "offering and selling Plaintiff Mear" the Annuity in Arizona and Mear will likely receive the benefits of the Annuity in Arizona. (Am.Compl.¶¶ 40, 43.) The only link to Massachusetts, other than that it is the location of the defendant corporation, is, according to plaintiff, the Commonwealth's "interest in regulating the actions of its resident corporation."(Pl.'s Mem. in Opp. to Def.'s Mot. to Dismiss First Am. Compl. (Docket # 21), 18.) This interest, however, is secondary to Arizona's interest in protecting its citizens from fraud and in regulating the sale of insurance products in the state. In addition, a citizen of Arizona purchasing a product in her own home state from a local agent would expect to be protected by the laws of her state, not a far distant state with which she has had no contact. *See Reicher,* 360 F.3d at 6 (noting that the "justified expectations of Maryland insured and insurers alike ... are supported here by application of Maryland law"). Finally, if Mear and other citizens of Arizona are unhappy with the protections afforded them by Arizona law, they can attempt to change them legislatively, an option not available to them in Massachusetts. Therefore, I hold that Arizona substantive law applies to the state law claims.

**B. Mear's Standing to Bring Her Claim**

**\*5** In order to have standing to bring her claim in federal court, Mear must establish in her pleadings, *inter alia,* an "injury-in-fact," that is, a "concrete and particularized" invasion of a legally protected interest, not one that is "conjectural or hypothetical." *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992); *see also Sedima.S.P.R.L. v. Imrex Co., Inc.,* 473 U.S. 479, 496 (1985) (explaining that even if a defendant commits a RICO violation under section 1962, he is not liable to those who have not been injured). Her Amended Complaint, however, describes a series of potential economic losses that Mear or other pur-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                Page 7
Slip Copy, 2008 WL 245217 (D.Mass.)
**(Cite as: Slip Copy, 2008 WL 245217)**

chases of defendant's EIAs *could* suffer, but fails to allege that Mear, the only named plaintiff, did suffer any *actual* economic harm. The short section of the Amended Complaint titled "Facts Relating to Marie K. Mear" (Am.Compl.¶¶ 38-40), only alleges that certain "shortfalls" of the Annuity were not disclosed to her, and as a result, *"[s]hould* [she] need immediate access to her life savings she would be subject to massive surrender charges and lose accrued interest."[FN8](*Id.* ¶ 39 (emphasis added).) Indeed, it appears that Mear has not removed any funds from her Annuity. (*See* Docket # 21, 4 ("Plaintiff will be 85 years of age before her annuity reaches maturity, allowing her to withdraw the funds within the account penalty free.").) The Amended Complaint contains no allegation that she actually removed funds from her account, that she suffered a loss as a result, that she ever needed immediate access to her funds, or even that she would not have made the investment had the allegedly omitted information been provided to her. *Cf. Moore v. PaineWebber, Inc.,* 189 F.3d 165,168 (2d Cir.1999) (finding defendant's misrepresentation caused an economic loss because "the plaintiffs state that they would not have bought into the Provider if they had realized that all they were buying was a universal life insurance policy").[FN9]

> FN8. As discussed *infra* n. 4, this statement also is factually incorrect. The policy certificate allows partial surrenders with "no surrender charges" as long as the remaining surrender value is at least $4,000. (Docket # 35, Ex. A, 8.) The current surrender value of Mear's Annuity is at least $50,775. 17, so she has access to more than $46,000 of her investment with no penalty. (*Id.* at 4.)

> FN9. Also relevant to the court's decision in *Moore* was an allegation by plaintiffs that the value of the alternative investments in which they would have placed their funds "would, at all relevant times, have been higher than the cash value of the

Provider."*Moore,* 189 F.3d at 172.

In response to defendant's contention that plaintiff fails to allege a cognizable injury, Mear's points to a section of her Amended Complaint which claims injury for:

> Other financial hardship losses and detriment, including adverse tax implications and consequences due to the nature of annuity purchases generally, and the surrender of existing assets to make such purchases.

(Am.Compl.¶ 44(e).) Here, the reference to adverse tax consequences "due to the nature of annuity purchases generally," refers to the taxation of gains at "ordinary income rates *and not* [the] lower capital gains rates" applicable to capital gains realized from a non-tax sheltered investment. (Am. Compl. ¶ 13 (emphasis in original).) However, Mear purchased the Annuity "within her IRA, which already has the benefit of favorable tax treatment," so the tax treatment of gains from the Annuity is identical to the tax treatment of gains from any other investments previously or currently held in her IRA.[FN10]Similarly, she would not have suffered any adverse tax consequence from the liquidation of appreciated assets within her IRA to purchase the Annuity, as any gain would be deferred.[FN11](*Id.* ¶ 41.)While the court must generally accept plaintiffs factual allegations as true, it need not accept "unsupportable conclusions." *Aulson,* 83 F.3d at 3. The claim that Mear suffered adverse tax consequences when she purchased the Annuity within her tax-deferred IRA is unsupportable.

> FN10. Taxes on all gains accumulating within an IRA are deferred until they are withdrawn from the IRA, and then they are always taxed at ordinary income rates or not at all, depending on the type of IRA. *See* Individual Retirement Arrangements (IRAs) 4-5 (Internal Revenue Service Publication 590, Cat. No. 15160X, For use in preparing 2006 Returns) ("Generally,

Slip Copy                                                                                          Page 8
Slip Copy, 2008 WL 245217 (D.Mass.)
**(Cite as: Slip Copy, 2008 WL 245217)**

amounts in your IRA (including earnings and gains) are not taxed until distributed,""Distributions from a traditional IRA are taxed as ordinary income.""Distributions from a Roth IRA are not taxed as long as you meet certain criteria."), *available at* http://www.irs.Qov/pub/irs-pdf/p590.pdf.

FN11. Plaintiff does not allege that she, in fact, liquidated any other investment to purchase the Annuity, nor that the return on it is inferior to that of her prior investments. *Cf. Moore*, 189 F.3d at 172.

**\*6** Plaintiff's reliance on *Reiter v. Sonotone Corp.*, 442 U.S. 330, 334, 337, 99 S.Ct. 2326, 60 L.Ed.2d 931 (1979), is unavailing. There, petitioner and class members paid a higher price for hearing aids because of respondents' antitrust violations. The Court held that "[c]onsumers who pay a higher price for goods purchased for personal use as a result of antitrust violations sustain an injury" adequate to meet the requirements of the Clayton Act. Here, Mear does not allege that the Annuity is worth less than she paid or that she has out-of-pocket losses from her purchase of it. Rather, she alleges that she was not told of certain of its limitations-limitations which *might* make it an unsuitable investment for *some* senior citizens. Nowhere does the Amended Complaint allege that the Annuity was *actually* unsuitable for Mear nor does it contain any factual allegations to support her broad assertion that she has suffered "penalties, forfeitures and other loses" from her purchase of it. (Am.Compl.¶ 59.) *See Munoz-Mendoza v. Pierce*, 711 F.2d 421, 425 (1st Cir.1983) ("Where 'injury' and 'cause' are not obvious, the plaintiff must plead their existence in his complaint with a fair degree of specificity."). Without a cognizable injury, Mear lacks standing to bring a claim in federal court. *Cf. Maio v. Aetna, Inc.*, 221 F.3d 472, 487 (3d Cir.2000) (holding appellants had not shown economic harm under RICO by enrolling in the appellee's "inferior" HMO plan in the absence of allegations that each appellant had actually suffered negative medical consequences).

## C. Fraud Claims-Counts I, V and VI

Plaintiff's claims based on fraud, misrepresentation and false statements, including Counts I, V and VI, are deficient because they fail to plead with the specificity required by Fed.R.Civ.P. 9(b). The Amended Complaint is completely bereft of the "specification of the time, place, and content" of any alleged false representation. *Greebel*, 194 F.3d at 193. Indeed, the *only* temporal specification in the *entire* document is the statement that Mear's "contract was issued on or about December 12, 2003."(Am.Compl.¶ 38.) The class period is equivocally defined as "the applicable period of limitations." (*Id.* ¶ 51.)

Plaintiff argues that because Sun Life committed fraud by omission, it is impossible for her to pinpoint when those omissions took place and therefore the pleading standards should be relaxed. (*See* Docket # 21, 24.) Plaintiff's protest is unavailing. Certainly, the omissions vis-a-vis Mear could only have occurred during her interactions with Powell. Even in the few pages of the Amended Complaint devoted to "facts relating to Marie K. Mear," there is no description of the dates Mear met with Powell, where those meetings took place, or what transpired at those meetings. (*See* Am. Compl. ¶¶ 38-43.)

In addition, the Amended Complaint makes multiple general references to Sun Life "company-approved materials and forms," which it alleges are misleading, but fails to specify even a single document by name, description or when or where plaintiff encountered it.[FN12] (*Id.* ¶ 31;*accord Id.* ¶¶ 32-36.)Rather, there is a list of information that Powell allegedly failed to disclose to Mear. Some of this information is factually incorrect, *e.g.,*"until she was 85 years old-a date past her life expectancy" and "the existence of surrender charges associated with withdrawals in excess of

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                        Page 9
Slip Copy, 2008 WL 245217 (D.Mass.)
(Cite as: Slip Copy, 2008 WL 245217)

10% of the initial premium."(*Id.* ¶¶ 41(a); 42; Docket # 25, Ex. A, 4, 8.)

> FN12. The Amended Complaint quotes multiple words it alleges are used "repeatedly" by Sun Life in its "disclosure statement and other sales materials" to mislead potential investors, without providing any indication of where those quotations originate. (*See* Am. Compl. ¶ 32(b).)

**\*7** Other allegations are contradicted by the disclosures of the one-page Benefits Summary ("Summary" (Docket # 35, Ex. C)) signed by plaintiff on November 14, 2003 to indicate that she had "read and underst[ood] the following items."(*Id.*)[FN13] For example, she alleges that Powell failed to disclose that she could not begin receiving income until she was 85 years old without incurring "substantial surrender charges." (Am.Compl.¶ 41(a).) First, even if Powell did not tell her the correct information concerning the surrender fee, that Mear could receive a partial surrender of up to 90% of her investment, less $4,000, as an annuity with no penalty, this information is disclosed in the Insurance Certificate. (*See* Docket # 35, Ex. A, 8.) Second, the Benefits Summary clearly discloses the penalty for an early total surrender of the certificate: "[T]he maximum contract penalty for early termination is 10% of the initial premium."(Summary.) It further warns the applicant, "[The Annuity] is designed for building long-term wealth for retirement purposes, not for short-term liquidity needs."(*Id.*)

> FN13. Plaintiff insists it is improper for the court to "travel beyond the four corners of the Complaint" and consider her signed application (Docket # 35, Ex. B), signed Summary (*id.* at Ex. C) and Insurance Certificate (*id.* at Ex. A). (*See* Docket # 21, 26.) The court, however, declines her exhortation to "[p]ay no attention to that man behind the curtain" (THE WIZARD OF OZ (Metro-Goldwyn-Mayer 1939)) when

plaintiff's allegations are directly contradicted by the very "company-approved materials and forms, including applications and disclosures" she claims were designed to "misrepresent and conceal critical information." (Am.Compl.¶ 31); *see also Beddall*, 137 F.3d at 16 ("A district court's central task in evaluating a motion to dismiss is to determine whether the complaint alleges facts sufficient to state a cause of action [T]he court's inquiry into the viability of those allegations should not be hamstrung simply because the plaintiff fails to append to the complaint the very document upon which *by her own admission* the allegations rest.") (emphasis in original).

Mear's allegation that she was not told that "undisclosed sales charges and excessive commissions paid to sales agents would result in diminution" of her principal investment is similarly incorrect. (Am.Compl.¶ 41(c).) The Summary apprises Mear that she would *only* lose a portion of her principal (10%) if she withdrew her entire investment *before* the end of the term. Whether Powell received an excessive commission or no commission at all, Mear was assured "an 'end-of-term' *guarantee of principal* by [Sun Life] (less any prior withdrawals), plus Index Increases credited annually...." (Summary (emphasis added).) Thus, the Summary disclosed the terms that affected the integrity of her investment and what she needed to do, *i.e.,* wait until the end of term, to ensure no loss of principal. The agent's commissions play no part in guaranteeing her return of principal, and thus Mear's allegations concerning disclosure of the agent's commission are irrelevant.

Plaintiff's contention that she was not told that her "premiums would not be invested in equity investments" or that the "market gains used to determine returns do not include dividends" (Am.Compl.¶¶ 41(d), 11) is also contradicted by the Summary:

> [The Annuity] is not a substitute for an S & P 500® linked mutual fund or any other equity in-

Slip Copy
Slip Copy, 2008 WL 245217 (D.Mass.)
**(Cite as: Slip Copy, 2008 WL 245217)**

vestment....*The S & P 500® Growth [index] does not reflect any stock dividend income since the S & P 500® only measures stock price performance.*

(Summary (emphasis in original).) Similarly, the Summary describes the "interest growth or 'build-up' with the contract" as not taxable "until the funds are withdrawn." (*id.*) Thus, many of the alleged omissions are clearly disclosed in the single-page Summary, whose purpose is to succinctly inform the purchaser of the most important terms of the Annuity, and which is signed by plaintiff to acknowledge that she has "read and underst[ood]" those terms.(*Id.*)

**\*8** To the extent any alleged omissions remain undisclosed, plaintiff fails to explain her belief that they were part of a deliberate and fraudulent scheme to induce her into purchasing a product that Sun Life knew was unsuitable for her. "Where allegations of fraud are explicitly or, as in this case, implicitly, based only on information and belief, the complaint must set forth the source of the information and the reasons for the belief."*Romani v. Shearson Lehman Hutton,* 929 F.2d 875, 878 (1st Cir.1991). The Amended Complaint provides no source for Mear's assertion that Sun Life sold inappropriate EIAs to seniors to reap the benefit of "massive surrender charges." (Am.Compl.¶ 12.) Therefore, plaintiff has not provided the specificity required by Rule 9(b) to support her allegations of fraud. *Compare Doyle,* 103 F.3d at 194 (conclusory allegations such as "defendants worked together to shut down H.P. Leasing" are insufficient to meet the requirements of Rule 9), *with Serabian v. Amoskeag Bank Shares,* 24 F.3d 357, 365 (1st Cir.1994) (Rule 9 requirements met where "plaintiffs specifically identify the internal reports and the public statements underlying their claims, providing names and dates."). This lack of specificity dooms plaintiffs claims for fraudulent misrepresentation, violations of Mass. Gen. Laws ch. 93A and RICO.

**1. RICO-Count VI**

Count VI, the RICO claim is deficient for the additional reason that it fails to comply with the RICO statute, 18 U.S.C. § 1962(c).[FN14] It is well settled that "to establish liability under § 1962(c) one must allege and prove the existence of two distinct entities: (1) a 'person'; and (2) an 'enterprise' that is not simply the same 'person' referred to by a different name."*Cedric Kushner Promotions, Ltd. v. King,* 533 U.S. 158, 161, 121 S.Ct. 2087, 150 L.Ed.2d 198 (2001); *accord Bessette v. Avco Fin. Servs.,* 230 F.3d 439, 448 (1st Cir.2000); *Schofield v. First Commodity Corp.,* 793 F.2d 28, 29 (1st Cir.1986).

> FN14. The relevant subsections of 18 U.S.C. § 1962 proscribe the following:
>
> > (c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.
>
> > (d) It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.

The Amended Complaint identifies the "Racketeering Enterprise" as the "Defendants and their Affiliated Agents." (Am.Compl.¶¶ 107-18) FN15 The term "Affiliated Agents" is not defined, however, Powell is included within its definition.FN16(*See id.* ¶ 107.)In describing the conduct she alleges meets the requirements of a RICO claim, Mear uses the terms "Affiliated Agents" and "sales agents" interchangeably. (*See id.* ¶¶ 114-24.)From this, the court concludes that Affiliated Agents refers to the activities of defendant's sales agents as described in the Amended Complaint.[FN17]Therefore, Sun Life as a corporation must be sufficiently distinct from its sales agents in order for Mear to have stated a proper

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                           Page 11
Slip Copy, 2008 WL 245217 (D.Mass.)
**(Cite as: Slip Copy, 2008 WL 245217)**

RICO claim.

> FN15. Paragraph 107 of the Amended Complaint, which purports to define "Racketeering Enterprise," is unclear and appears to be incomplete. However, in her opposition to the motion to dismiss, Mear asserts that the Amended Complaint alleges that the enterprise consists of Sun Life and its Affiliated Agents. (*See* Docket # 21, 11.) The allegations in the Amended Complaint are not inconsistent with this definition. (*See, e.g.,* Am.Compl. ¶¶ 109,113.)

> FN16. Elsewhere in the complaint, Powell is described as a "salesman." (*Id.* ¶ 38.)

> FN17. Plaintiff confirms this understanding in her opposition memorandum. (*See* Docket # 21, 11 n. 4.)

The Amended Complaint contains conclusory assertions that Sun Life and its agents form an association-in-fact with the "common or shared purpose of selling, promoting and/or marketing" EIAs to senior citizens "through deceptive and misleading sales tactics" and "have a separate and distinct existence" from each other. (Am.Compl.¶¶ 108, 113.) However, the factual basis for her claim, which the court must accept as true, describes Sun Life's agents as acting as puppets under its control, without autonomous decision making power. For example, in describing "the deceptive scheme" Mear alleges:

**\*9** Since the agents are merely conduits of information, they are unable to dispense an appropriate level of information about the product ... (Am.Compl.¶ 29)

Keyport's and Sun Life's agents [are contractually obligated] to use only sales materials that have been pre-approved by Keyport and Sun Life. (*id.* ¶ 26)

Defendants' failure to train agents and the prom-

ise of high commissions ... are designed to ensure the agents will not understand the details of what they are selling ...(*id.* ¶ 34)

Because Keyport and Sun Life fail to train their agents adequately, the agents are ill-equipped to explain all essential aspects ...(*id.* ¶ 20)

Keyport and Sun Life had therefore virtually guaranteed that neither its agents nor its customers will understand anything ...(*id.*)

[S]trong financial incentives predictably bring sales recruits into the market [who] are sent into the field to do whatever is necessary to make a sale ...(*id.* ¶ 21)

Defendants have uniformly trained its sales staff and other representatives not to disclose its fraudulent practices described herein ...(*id.* ¶ 47)

[Common questions include w]hether Defendants breached their duty to existing and/or prospective customers by permitting its agents to sell ...(*id.* ¶ 55(m))

Throughout the Class period, Defendants, through its agents, owed Plaintiff Mear and Class Members a duty of loyalty and fiduciary care ...(*id.* ¶ 74)

Defendants and the Affiliated Agents owed a duty of care [to Mear and Class Members t]o ensure that its sales agents did not breach duties of loyalty, fiduciary care and ethical obligations ...(*id.* ¶ 89(f))

Defendants and the Affiliated Agents breached these duties ... by failing to train its network of appointed sales agents .... by failing to supervise its network of appointed sales agents .... by failing to prevent, discourage or halt fraudulent and/or improper sales practices by its appointed sales agents. (*id.* ¶ 90).

Thus, the Amended Complaint describes Sun Life's sales agents not as a separate and distinct group of

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

individuals associated with it in furtherance of a common scheme, but rather as acting for it in a traditional principal-agent relationship. *See Esmond Mills v. Comm'r of Internal Revenue,* 132 F.2d 753, 755 (1st Cir.1943) (describing the relationship of agency as resting on contract between the parties and involving, *"inter alia,* the power of the agent to bind his principal as to third persons; the existence of a fiduciary relationship between principal and agent; and the right of the principal to control the conduct of the agent with respect to matters entrusted to him."). As alleged in the Amended Complaint, Sun Life controlled its sales agents by contract, it closely monitored the conduct of its sales agents in presentations of the company's products to prospective customers, and its agents were able to bind the company to third persons. (*See* Docket # 35, Ex. B (application for Keyport annuity signed by Mear and Powell), Ex. C (Keyport benefits summary signed by Mear and Powell).) Because Sun Life, a corporation, can only act through its employees, officers, subsidiaries and agents, the former is not distinct from the latter for the purpose of distinguishing a RICO person from a RICO enterprise, and thus Mear's complaint fails because it does not allege separate and distinct entities. *See Rodriguez v. Banco Cent.,* 777 F.Supp. 1043, 1054 (D.P.R.1991) ("The distinction requirement is not satisfied by merely naming a corporation and its employees, affiliates, and agents as an association-in-fact, since a corporation acts through its employees, subsidiaries and agents, and would thereby be merely associating with itself."); *Bessette,* 230 F.3d at 449 ("[E]mployees acting solely in the interest of their employer, carrying on the regular affairs of the corporate enterprise, are not distinct from that enterprise."); *see also Odishelidze v. Aetna Life & Cas. Co.,* 853 F.2d 21, 23-24 (1st Cir.1988) (upholding dismissal of RICO complaint naming "the Aetna companies and their officers or employees" as defendants conducting the affairs of an enterprise comprised of Aetna and its subsidiaries and employees); *Schofield,* 793 F.2d at 29 (collecting cases).[FN18]

FN18. Plaintiff's reliance on *Cedric Kushner Promotions, Ltd. v. King* is misplaced. 533 U.S. 158, 161, 121 S.Ct. 2087, 150 L.Ed.2d 198 (2001). In *Cedric,* King, the identified RICO defendant, was the individual who was also the president and sole shareholder of the RICO corporate enterprise. The Court held that King, a natural person, was distinct from the corporate entity, and therefore met RICO's requirement that the "person" be distinct from the "enterprise." *Id.* at 164 ("[W]e hold simply that the need for two distinct entities is satisfied; hence, the RICO provision before us applies when a corporate employee unlawfully conducts the affairs of the corporation of which he is the sole owner."). The Court distinguished the case of a natural person and corporate enterprise from the case claiming "that a corporation was the 'person' and the corporation, together with all its employees and agents, were the 'enterprise.' " *Id.* Indeed, the Court noted that "[i]t is less natural to speak of a corporation as 'employed by' or 'associated with' this latter oddly constructed entity." *Id.*

*10 Finally, Mear's 18 U.S.C.1962(d) claim alleging conspiracy to violate subsection (c) fails also because she has not adequately alleged a violation of that subsection. *See Miranda v. Ponce Federal Bank,* 948 F.2d 41, 45 n. 4 (1st Cir.1991).

**2. Massachusetts 93A Claim-Count V**

Plaintiff's claim under Mass. Gen. Laws ch. 93A fails for the added reason that Arizona law governs plaintiff's claims. Arizona consumer law provides for different damages, limitations periods and right to a jury than Mass. Gen. Laws ch. 93A. *Id.* Therefore, Mear cannot bring an action under the Massachusetts statute. *See Reicher,* 360 F.3d at 6-7.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**D. Negligence Claims-Counts II and III**

Counts II (Negligent Misrepresentation) and III (Negligence) allege that Sun Life breached its duty of care to plaintiff by failing to train and supervise its sales agents and by supplying sales materials that "omit or deceptively describe the material terms of the equity indexed annuities," knowing that plaintiff would rely on the agent's presentations and on the written materials in deciding to purchase the Annuity. (Am.Compl.¶¶ 79-92.) Defendant argues that these claims are precluded by the economic loss rule, which "bars a party from recovering economic damages in tort unless accompanied by physical harm, either in the form of personal injury or secondary property damage."*Carstens v. City of Phoenix,* 206 Ariz. 123, 75 P.3d 1081, 1083 (Ariz.Ct.App.2003). Rather, the aggrieved party must recover under contract law. *Id.* at 1084.The economic loss rule exists to prevent tort principles from intruding on and replacing contract remedies. *Id.* Plaintiff responds that her negligence claims are "based on wrongs which are separate and apart" from the subject matter of her contract with Sun Life, *i.e.,* the omission of material information in inducing the sale of the Annuity and the failure to train its agents. (Docket # 21, 28.)

In a number of cases, federal courts interpreting Arizona law have found negligence and negligent misrepresentation claims barred by the economic loss rule. *See Apollo Group, Inc. v. Avnet, Inc.,* 58 F.3d 477, 480 (9th Cir.1995) (negligent misrepresentation claim barred by economic loss rule in sale of goods governed by the UCC); *In re Jackson Nat. Life Ins. Co., Premium Litig.,* 107 F.Supp.2d 841, 862 (W.D.Mich.2000) (plaintiffs, who claimed they were induced to purchase interest sensitive whole-life insurance policies by false, incomplete and misleading sales representations and information, were barred by economic loss rule from asserting claims for negligent misrepresentation and negligent supervision); *Southwest Pet Prods., Inc. v. Koch Indus., Inc.,* 89 F.Supp.2d 1115, 1129 (D.Ariz.2000), *remanded on other grounds.*32 Fed. Appx. 213 (9th

Cir.2002) (describing the economic loss rule as barring claims for negligent misrepresentation unless the parties are not in contractual privity); *Wojtunik v. Kealy,* 394 F.Supp.2d 1149, 1171 (D.Ariz.2005) (negligent misrepresentation claim against company director for alleged misrepresentations concerning financial condition of closely-held corporation sold to plaintiff barred by economic loss doctrine).

**\*11** Other federal courts, however, have come to the opposite conclusion. *See Aventis Techs. Corp. v. JP Morgan Chase Bank,* 2004 U.S. Dist. LEXIS 8302, at \*10, 2004 WL 5137578 (D.Ariz. Jan. 26, 2004) (concluding that claims in Arizona cases "seeking to recover purely pecuniary losses based on negligent misrepresentation are not foreclosed by the economic loss rule"); *Evans v. Singer,* 2007 U.S. Dist. LEXIS 78806, at \*39, 2007 WL 2967109 (D.Ariz. Sept. 28, 2007) (comprehensively reviewing cases and refusing to expand the economic loss doctrine beyond contracts involving products liability and construction and allowing a claim for negligence to proceed against realtors for misrepresentations made in sale of property); *see also Moshir v. Patchlink Corp.,* 2007 U.S. Dist. LEXIS 10240, at \*15-\*16, 2007 WL 505344 (D.Ariz. Feb. 12, 2007) (noting that federal courts applying Arizona law have extended the rule to bar negligent misrepresentation claims beyond the state court subject matter of products and construction liability, but refusing to apply the rule to a case alleging fraud); *Aspect Sys., Inc. v. Lam Research Corp.,* 2006 WL 2683642, at \*4 (D.Ariz. Sept.16, 2006) (slip copy) ("The economic loss rule does not bar all tort claims that are accompanied by exclusively economic damages regardless of the legal relationship between the parties, ... but it does bar claims among contracting parties for loss of benefit of the bargain, inadequate value, and loss of profit.").

The Arizona Court of Appeals, in one of the few state cases dealing with the issue, broadly concluded that the rule barred plaintiffs from suing third parties, even those not party to the contract at issue and against whom plaintiff had no other cause

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                          Page 14
Slip Copy, 2008 WL 245217 (D.Mass.)
**(Cite as: Slip Copy, 2008 WL 245217)**

of action. *Carstens,* 75 P.3d at 1085 (applying the rule to bar suit alleging gross negligence against city housing inspectors for failing to uncover severe structural defects in their home under construction). In *Carstens,* the court noted that the economic loss rule distinguishes between actual harm in the form of personal injury or secondary property damage and "failure to receive the benefit of the bargain," a "core concern of contract." *Id.* at 1084.Thus, where the plaintiff seeks damages based on the subject matter of the contract, the rule bars the plaintiff from recovering economic damages in tort. Given this broad application of the economic loss rule by the state court, Mear must look to contract remedies where her negligence claims arise out of circumstances dependent on their contractual relationship.FN19*See In re Jackson,* 107 F.Supp.2d at 862;*see also Apollo Group,* 58 F.3d at 480 (describing the Arizona Supreme Court as reading the economic loss rule "broadly").

> FN19. In addition, Arizona requires, as an element of negligent misrepresentation, injury or harm to the claimant. *See Arizona Title Ins. & Trust Co. v. O'Malley Lumber Co.,* 14 Ariz.App. 486, 484 P.2d 639, 644 (Ariz.Ct.App.1971) (quoting Restatement of Torts § 552 (1938)). As discussed *supra.*Mear has not alleged that she has suffered any injury as a result of Sun Life's alleged negligent supervision of, or misrepresentations by, its agents.

**E. Unjust Enrichment-Count IV**

Mear cannot maintain a claim for unjust enrichment in the instant case because a specific contract governs the relationship of the parties. *See, e.g., Brooks v. Valley Nat. Bank,* 113 Ariz. 169, 548 P.2d 1166, 1171 (Ariz.1976) ( "[W]here there is a specific contract which governs the relationship of the parties, the doctrine of unjust enrichment has no application."); *USLife Title Co. v. Gutkin,* 152 Ariz. 349, 732 P.2d 579, 584 (Ariz.Ct.App.1986) (explaining that "the doctrine of unjust enrichment has no application to express contractual situations" because

it is "a form of restitutionary relief available upon either 'implied in fact' contract or quasi-contractual grounds.").

**V. Conclusion**

**\*12** Accordingly, defendant's motion to dismiss the complaint (Docket # 11) is ALLOWED.

Judgment may be entered dismissing the complaint.

D.Mass.,2008.
Mear v. Sun Life Assur. Co. of Canada (U.S.)/Keyport Life Ins. Co.
Slip Copy, 2008 WL 245217 (D.Mass.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.