*The judgment of the district court is affirmed.*[12]



---

**PEPSI-COLA METROPOLITAN BOTTLING COMPANY, INC.,**
Plaintiff, Appellee,

v.

**CHECKERS, INC., et al.,**
Defendants, Appellants.

No. 83–1422.

United States Court of Appeals,
First Circuit.

Argued Sept. 10, 1984.

Decided Jan. 28, 1985.

In suit by a bottling company on account, and for, inter alia, alleged violation by several corporate and individual defendants of Massachusetts fair practices statutes, the bottling company prevailed in the United States District Court for the District of Massachusetts, A. David Mazzone, J. The defendants appealed. The Court of Appeals, Levin H. Campbell, Chief Judge, held that: (1) evidence warranted the jury in piercing the corporate veil; (2) summaries of checks issued by debtor, tending to show that after July 1980 certain funds of corporations were used interchangeably for personal benefit of the individuals, were admissible though debt to plaintiff had been incurred in June 1980 before the payments in question were made; and (3) evidence permitted trial court to believe that defendants, which had withheld payments of sum due on contract as a "wedge" to enhance the corporate defendant's bargaining power for more product, had simply withheld moneys which they legally owed as a form of extortion to force producer to do what otherwise it would not be legally required to do, and finding of violation of Massachusetts fair practices statutes was not clearly erroneous.

Affirmed.

**1. Corporations** ⚖=1.7(2)

Evidence in suit upon contract, including fact that defendant husband and wife, and their children, were the sole directors and officers of defendant debtor corporation and two other closely held corporations named as defendants sustained jury's verdict holding husband and wife and all the corporations jointly and severally liable, there being sufficient evidence for jury to determine that the three corporations were run as a single enterprise, with funds being used interchangeably and for personal benefit of the husband and wife.

**2. Corporations** ⚖=1.7(2)

In suit on a corporate debt, evidence from which jury could find that an individual defendant failed to observe corporate formalities, siphoned funds, kept no records, and used corporation for his own personal transactions sustained piercing of the corporate veil.

**3. Corporations** ⚖=1.7(2)

In suit on a corporate debt, evidence that corporation paid an individual defendant's personal obligations and evidence of her close and informal relationship with corporate defendants, most of whose checks she signed, constituted sufficient evidence of her direct participation in affairs of the corporate defendants, her disregard of their separate personalities, and her personal use of them with little or no regard for their separate existence to support jury's verdict against her.

**4. Corporations** ⚖=1.4(1)

Where principal shareholders of close corporation fail to observe with care the

---

12. We need not address the government of Puerto Rico's amicus brief defending the constitutionality of P.R.Laws Ann. tit. 10, §§ 278 *et seq.* This issue has not been raised by any of the parties in this appeal.

corporation's existence, a court will not later heed their request to do so.

### 5. Federal Courts ⟨⟩630, 631

In suit upon contract, individual and corporate defendants were barred, by their own failure to lodge timely objection, from complaining on appeal about court's jury instructions, or lack thereof, concerning need to assess liability of each defendant separately.

### 6. Corporations ⟨⟩1.7(2)

In suit upon contract against various corporate and individual defendants, where gravamen of corporate disregard count was that certain individuals conducted corporations in manner inconsistent with their separate legal identities so as to make it unjust to require plaintiff to look only to assets of insolvent corporate debtor to satisfy debt to plaintiff, summaries of checks issued by defendant tending to show that after July 1980 certain funds of corporations were used interchangeably for personal benefit of the individuals were admissible, though debt to plaintiff had been incurred in June 1980, before the payments in question were made.

### 7. Trade Regulation ⟨⟩864

In suit under Massachusetts fair practices statutes evidence permitted trial court to believe that defendants, which had withheld payments of sum due on contract as a "wedge" to enhance the corporate defendant's bargaining power for more product, had simply withheld moneys which they legally owed as a form of extortion to force producer to do what otherwise it would not be legally required to do, and finding of violation of Massachusetts fair practices statutes was not clearly erroneous. M.G.L.A. c. 93A, §§ 1 et seq., 2, 11.

### 8. Trade Regulation ⟨⟩864

In a suit under Massachusetts fair practices statutes wherein it was found that corporate defendant had incurred legal debt and thereafter, acting through individual defendant, had refused to pay, attempting to leverage plaintiff into acquiescence with certain demands, trial court properly granted single award for treble damages for which all defendants, including individual's wife and two other corporations, would be jointly and severally liable, rather than separate awards which each defendant would be required to pay regardless of whether same or greater amount was collected from the others, where the other defendants were liable because they were chargeable for debtor corporation's debts, not as independent wrongdoers. M.G.L.A. c. 93A, §§ 1 et seq., 2, 11.

### 9. Evidence ⟨⟩589

In view of contradiction in testimony, trial court was plainly entitled to accept plaintiff's evidence and to refuse to credit testimony of the defendant.

### 10. Trade Regulation ⟨⟩862.1

There was no duty on part of bottling company to have informed high-volume discount seller in advance of any intention to limit sales, particularly where it could have been inferred that such corporate seller and its alter ego were not unaware of bottling company's policies in such regard.

---

C. Deborah Phillips, Boston, Mass., with whom Steven J. Marullo, William F. Coyne, Jr., and Marullo & Barnes, Boston, Mass., were on brief, for defendants, appellants.

Toni G. Wolfman, Boston, Mass., with whom Loyd M. Starrett, and Foley, Hoag & Eliot, Boston, Mass., were on brief, for plaintiff, appellee.

Before CAMPBELL, Chief Judge, COWEN,* Senior Circuit Judge, and BOWNES, Circuit Judge.

LEVIN H. CAMPBELL, Chief Judge.

This case, instituted in the district court by Pepsi-Cola Metropolitan Bottling Co., Inc. ("Metropolitan") against a customer, Checkers, Inc. ("Checkers"), to collect an indebtedness of $61,603.21, indicates that collecting a virtually undisputed debt may not be easy.

---

* Of the Federal Circuit, sitting by designation.

Thwarted by Checkers's insolvency, Metropolitan amended its complaint to include Checkers's principal, one Randolph L. White ("Randolph"); his wife, Patricia; and two closely held corporations of the Whites, Bentley-Royce Associates, Inc. ("Bentley") and Professor Chips, Inc. ("Chips"). The defendants retaliated with counterclaims alleging antitrust violations and similar practices. After a jury trial and verdict supplemented by bench findings, Pepsi-Cola emerged with a judgment against all defendants jointly and severally for three times the amount of Checker's indebtedness, as well as for attorneys' fees and costs. This appeal followed.

I. FACTS

Metropolitan bottles Pepsi-Cola products and distributes them in Rhode Island and parts of Massachusetts and Connecticut under license from Pepsi Cola, Inc. Within this territory, for which it is the exclusive licensee, Metropolitan distributes both to retail outlets and to businesses servicing canteens and vending machines (so-called third-party operators), but has had a long-standing policy not to sell to wholesalers or to persons engaged in reselling outside of Metropolitan's sales territory, a practice known as "transshipping." As a general rule, Metropolitan charges third-party operators less than retailers, though the price to retailers is sometimes reduced during various promotions.

Metropolitan's rule against transshipping has been intended to promote the "store door delivery system" of Pepsi Cola, Inc., the manufacturer of Pepsi syrups. Under this system, bottlers such as Metropolitan to whom Pepsi granted an exclusive territorial franchise were forbidden to sell to "wholesalers," that is, "any account which does not sell soft drinks directly to the consumer either through a retail outlet, food service outlet or vending machine." To enforce this policy, bottlers like Metropolitan limited its sales to a particular customer to amounts that the customer could reasonably sell to consumers or third-party operators or both.

In February 1978, Randolph, with Marvin Freund of Polar Corporation, organized Checkers. Initially, Randolph and Polar Corporation each held half of Checkers's outstanding stock. The initial capital of $38,000 was provided by Polar Corporation, and only Freund had authority to sign checks for Checkers. The original officers of Checkers were Randolph, Patricia, and Marvin Freund; the original directors were Randolph and Freund. For most of the three years of its existence, Checkers operated the Woburn Beverage Center in Woburn, Massachusetts.

In April 1979, Randolph purchased Polar Corporation's interest in Checkers for $1,000 cash and an agreement by Randolph to make certain payments to reduce the $38,000 supplied by Polar Corporation at Checkers's formation. At that time, Randolph obtained control over Checkers's purse.

From its inception, Checkers was engaged in selling soda in high volume at a discount, and it was a customer of Metropolitan's Wakefield distribution warehouse. Because Checkers had various canteen trucks as customers, it received the benefit of Metropolitan's third-party operator prices, which were generally lower than the prices Metropolitan charged to its retail accounts. Checkers could afford to resell soda procured at such discount prices for less than Metropolitan's own retail prices.

In May 1979, Randolph and Patricia incorporated Bentley. Prior to that date Randolph had engaged in brokering various commodities, particularly soda, under the name of Bentley-Royce Associates. At the time of Bentley's organization, Patricia was the only shareholder, and she and Randolph its only directors. As of the time of the trial, April 1983, Bentley was an ongoing concern involved in obtaining second mortgages and brokering.

Randolph and Patricia organized Chips in March 1980 to provide the Whites' children, Randy and Cheryl, with summer experience in business, and did apparently engage in the retail sale of chocolate chip cookies for some time. Patricia and the children were

the officers and directors; Randolph, the children, and one Warren Markerian were its shareholders.

The roots of the present suit go back to 1979. Following a dispute with Coca-Cola in mid-1979 over the quantity of product Checkers would be allowed to purchase, Randolph left the discount soda business, leasing the Woburn facility to one Kenneth Miller. Because Miller fell behind in his payments to Metropolitan, a meeting was arranged in January 1980 between Miller, Randolph, and the credit manager, route manager, and sales manager of Metropolitan assigned to the Checkers account. Randolph testified that he told the Metropolitan representatives that, in light of a dispute he had with Coca-Cola, he would not agree to resume managing Checkers unless he received assurances that he could obtain all the Pepsi product he wanted, and that they agreed. The route manager, Frank Murphy, and the credit manager, Tom Ivers, denied having any recollection of a discussion of insuring Checkers's supply of product; in their view, the meeting simply concerned assuring Metropolitan that it would continue to receive payments. The district court found Randolph's testimony generally to be "unworthy of belief."

In April, May and early June 1980, Checkers succeeded in obtaining 1,000 to 2,000 cases of Pepsi products per week despite the limitations imposed by Metropolitan designed to forestall transshipping. Checkers had also been able to purchase similar quantities of Pepsi product the previous spring. Checkers was able to circumvent Metropolitan's policy by getting its route salesman, Danny Flood, to make stops at the end of his work day to sell it soda; Flood's incentive for doing so was his desire to meet his daily sales quotas. Apparently, Metropolitan's monitoring of Checkers's purchases was somewhat lax.

According to William Wilson, then vice-president of sales for the New England Pepsi-Cola Bottling Group, he had received complaints from bottlers in surrounding territories that product from Metropolitan had been shipped into their franchises. They also reported that they had information that product from Metropolitan had surfaced in Florida.

Wilson visited the Woburn Beverage Center on June 19, 1980 and discovered product made by bottlers other than Metropolitan, some of which was produced according to an outdated formula. Wilson inquired of Randolph where he had obtained the product. Here their accounts of events differ. Randolph (whose testimony the court generally discredited) testified that he told Wilson that it was none of his business where he had obtained the product. Wilson then accused Randolph of transshipping, informed him that he was forbidden to do so, and, again according to Randolph, threatened to put Checkers out of business. Wilson denied having made this threat and testified that he informed Randolph that he would continue to supply Checkers with sufficient product for his third-party and retail trade.

Thereafter, Wilson issued memoranda that required special authorization for purchases of more than 500 cases per week or 200 cases in one day. Metropolitan did not honor an outstanding order by Checkers for 1,000 cases for June 20, and did not respond to three Checkers mailgrams requesting an explanation for that failure. Checkers withheld payment of $61,603.21 owed to Pepsi for product already delivered as a "wedge" to induce Pepsi to resume large deliveries. Metropolitan continued to deliver to Checkers, but never delivered more than 100 cases in one day. In July, Checkers sublet the Woburn Beverage Center to one Robert Babine and discontinued its volume soda business.

Other facts will be mentioned in our discussion of individual issues below.

II. PROCEEDINGS BELOW

On October 9, 1980, Metropolitan initiated the present action. Metropolitan obtained partial summary judgment as to Checkers's liability for the $61,603.21 in 1981; that judgment has not been appealed from. The remaining counts in the original complaint went to trial in April 1983.

**14**  **754 FEDERAL REPORTER, 2d SERIES**

Count 2 sought to recover assets allegedly fraudulently conveyed to Randolph by Checkers. Count 3 sought to recover assets allegedly transferred to Randolph and Babine in violation of Mass.Gen.Laws ch. 106, §§ 6–105, 6–106. After it was amended, Metropolitan's complaint added Patricia, Bentley, and Chips as defendants and sought to recover the amount owed from each defendant for unlawful transfers of assets, fraudulent conduct, and conduct of the three corporations in a manner inconsistent with their existence as entities distinct from each other and from the Whites. The amended complaint also sought to recover treble damages and attorneys' fees and costs from each defendant for unfair and deceptive practices in violation of Mass.Gen.Laws ch. 93A, §§ 2, 11. The action against Babine was later dismissed.

For their part, Checkers and Randolph asserted counterclaims under the Sherman Act, for unfair practices under Mass.Gen. Laws ch. 93A, and for malicious prosecution.

With the exception of Count 3 against Babine, Count 1, and the various chapter 93A claims, the case was tried to a jury in April 1983. The chapter 93A claims were tried to the court, since Massachusetts law does not entitle chapter 93A claimants to a jury trial. *See Nei v. Burley,* 388 Mass. 307, 446 N.E.2d 674, 679 (1983). The jury held that Randolph, Patricia, Bentley, and Chips were all liable for Checkers's debt to Metropolitan, and that Metropolitan was not liable to the defendants for violating the antitrust laws or for malicious prosecution. The court then found that Metropolitan did not violate chapter 93A, but that Checkers, through Randolph, knowingly and willfully engaged in an unfair practice by withholding payment for product that it had already received. The court found all defendants jointly and severally liable for treble damages, attorneys' fees, and costs under section 11 of chapter 93A.

### III. INSIDER LOANS, FRAUDULENT TRANSFERS, PIERCING THE CORPORATE VEIL

[1] Appellants contend that the district court erred in denying their motion for judgment notwithstanding the jury's verdict holding all defendants jointly and severally liable for Checkers's debt to Metropolitan. While the jury's verdict did not disclose the precise theory on which the jury held the defendants other than Checkers liable, we conclude there was sufficient evidence for the jury to have determined that Checkers, Bentley, and Chips were run as a single enterprise for the personal benefit of Patricia and Randolph. We therefore affirm the denial of appellants' motion for judgment n.o.v.

In reviewing the evidence, we of course make all reasonable inferences in appellee's favor. At all times since April 1979, Randolph, Patricia, and their children were the sole directors and officers of Bentley, Checkers, and Chips, and owned all the stock of Bentley and Checkers and 85 percent of the stock of Chips. After April 1979, when Marvin Freund sold his 50 percent interest in Checkers to Randolph and resigned as an officer and director of Checkers, Checkers began to make expenditures on behalf of Randolph and Patricia, including paying for Randolph's accumulated expenses since the formation of Checkers, paying for health and life insurance for Randolph, paying dental bills for both Whites, and paying for telephone service at their residence. Patricia, Chips, and Bentley made similar payments for the same expenses and insurance plans. Though the insurance was purportedly an employee benefit rendered to Randolph by Checkers, no written evidence of such a benefit plan exists, and no deductions for such a plan were ever claimed by Checkers on its tax returns. None of the corporations had its own telephone listing. Prior to July 1, 1980, Checkers and Chips shared the same business address, while Bentley's business address was the Whites' home address; after July 1, 1980, all three operated out of the Whites' home. No records of shareholders' meetings, loans, expense accounts, or major corporate transactions such as a purported lease between Checkers and Chips, were ever produced. Although Pa-

tricia was nominally no longer an officer or employee of Checkers after the summer of 1979, she continued to sign most of Checkers's checks. Bentley's line of business during the time of the events giving rise to the present action consisted largely of brokering soda, which involved Bentley's purchasing from the same suppliers as Checkers and in some cases making sales on the premises of the Woburn Beverage Center.

During 1979, Checkers became embroiled in a dispute with Coca-Cola similar to the present one over the quantity of product that Checkers would be allowed to purchase. Checkers responded to Coca-Cola's refusal to sell it unlimited quantities of product by stopping payment on a check for $110,000 issued on May 21, 1979 for product already delivered. The next day, Randolph and Patricia incorporated Bentley and transferred to it $100,000. Eventually, Checkers's unpaid bills to Coca-Cola totaled $212,000, and the amount of funds transferred to Bentley $163,000. Randolph testified that the funds were transferred to Bentley for investment purposes, since Bentley's line of business included investments, and Patricia, who was soon to be the sole officer and director of Bentley, had investment expertise; when interrogated on the subject of her expertise, however, Randolph admitted that she had only "dabbled on and off" in the stock market. Bentley invested the funds in commodities futures accounts managed first by E.F. Hutton and then by Dean Witter and suffered substantial losses from doing so. Eventually, Coca-Cola sued Checkers for the $212,000 it was owed, against which Checkers brought an antitrust counterclaim for $75,000. That suit was pending during the time the dispute with Pepsi arose. It was settled by a payment from Checkers of $30,503.64, the amount remaining in its investment account with Bentley.

These and various other facts were sufficient for the jury to disregard the corporate personalities under standards enunciated in the leading Massachusetts case of *My Bread Baking Co. v. Cumberland Farms, Inc.*, 353 Mass. 614, 233 N.E.2d 748 (1968). In *My Bread* the Massachusetts Supreme Judicial Court enunciated inter alia the following general criteria for ignoring the separate corporate existences of a group of corporations under common ownership and control:

> [W]hen there is a confused intermingling of activity of two or more corporations engaged in a common enterprise with substantial disregard of the separate nature of the corporate entities, or serious ambiguity about the manner and capacity in which the various corporations and their respective representatives are acting[,] ... in imposing liability upon one or more of a group of "closely identified" corporations, a court "need not consider with nicety which of them" ought to be held liable for the act of one corporation "for which the plaintiff deserves payment."

*My Bread*, 233 N.E.2d at 752 (citations omitted).

The evidence here falls within this standard. Checkers, Bentley, and Chips were under common ownership and control. Their funds were used interchangeably, and the jury was entitled to conclude that the choice of which corporation would make a given payment was made at random. Funds from all three corporations were used for the personal benefit of the Whites, particularly Randolph. Sufficient evidence was introduced to support the conclusion that Bentley was in the soda business as well as Checkers, and it is questionable whether Chips was ever in business at all.

Slightly different is the question of Patricia's and Randolph's liability for the debt of Checkers. *My Bread* contains dicta that a "corporation or other person controlling a corporation and directing, or participating actively in its operations may become subject to civil or criminal liability on principles of agency or of causation." *My Bread*, 233 N.E.2d at 751 (citation omitted). Cases cited with approval in *My Bread* as stating appropriate standards for imposing liability on shareholders, *e.g.*, *Consolidated Sun Ray, Inc. v. Oppenstein*, 335 F.2d 801,

806–08 (8th Cir.1964); *G.E.J. Corp. v. Uranium Aire, Inc.*, 311 F.2d 749, 756–57 (9th Cir.1962), *cited in My Bread*, 233 N.E.2d at 752 n. 7, stand generally for the rule that shareholders may be held liable where they control the operation of the corporation and run it for their personal benefit, and where justice requires that the separate existence of the corporation be ignored. While we have been directed to no Massachusetts case treating the question of disregard of the separate existence of a close corporation in greater depth, courts in other jurisdictions usually weigh a list of factors, including insufficient capitalization for purposes of the corporate undertaking, nonobservance of corporate formalities, nonpayment of dividends, insolvency of the corporation at the time of the litigated transaction, siphoning of corporate funds by the dominant shareholders, nonfunctioning of officers and directors other than the shareholders, absence of corporate records, use of the corporation for transactions of the dominant shareholders, and use of the corporation in promoting fraud. *See, e.g., Ramsey v. Adams*, 4 Kan.App.2d 184, 603 P.2d 1025 (1979); *Victoria Elevator Co. v. Meridian Grain Co.*, 283 N.W.2d 509 (Minn.1979).

[2–4] The jury could have found here that Randolph failed to observe corporate formalities, siphoned funds, kept no records, and used Checkers, Chips, and Bentley for his own personal transactions. While the evidence of Patricia's involvement is less substantial, evidence that Checkers paid her personal obligations and vice versa, and of Patricia's close and informal relationship with the corporate defendants (she signed most of their checks), constituted sufficient evidence of her direct participation in the affairs of the corporate defendants, her disregard of their separate personalities, and her personal use of them with little or no regard for their separate existence, to support the jury's verdict against her. Where the principal shareholders of a close corporation fail to observe with care the corporation's existence, a court will not later heed their requests to do so. *See Mayo v. Pioneer Bank & Trust Co.*, 270 F.2d 823, 830 (5th Cir.1959), *cert. denied*, 362 U.S. 962, 80 S.Ct. 878, 4 L.Ed.2d 877 (1960); H. Henn & J. Alexander, *Laws of Corporations and Other Business Enterprises* 362 (1983).

[5] We reject two other objections to the verdict which appellants make. First, appellants are barred, by their own failure to lodge a timely objection, from complaining about the court's jury instructions, or lack thereof, concerning the need to assess the liability of each defendant separately. *Gay v. P.K. Lindsay Co.*, 666 F.2d 710, 712 (1st Cir.1981), *cert. denied*, 456 U.S. 975, 102 S.Ct. 2240, 72 L.Ed.2d 849 (1982).

[6] Second, appellants contend that the district court improperly admitted evidence, chiefly summaries of checks issued by defendants, that tends to show that after July 1980 funds of Checkers, Bentley, and Chips were used interchangeably for the Whites' personal benefit. As the debt to Metropolitan was incurred in June 1980 before the payments in question were made, appellants argue the evidence was irrelevant. However, the gravamen of the corporate disregard count is that Patricia and Randolph conducted Chips, Bentley, and Checkers in a manner inconsistent with their separate legal identities so as to make it unjust to require Metropolitan to look only to the assets of Checkers to satisfy Checkers's debt to it. The challenged records bear on this allegation.

The case appellants cite, *CM Corp. v. Oberer Development Co.*, 631 F.2d 536 (7th Cir.1980), is not helpful to them. The plaintiff there was seeking to hold a parent corporation liable for damages inflicted by a subsidiary. The damages, however, arose from a breach of warranty on construction performed by the subsidiary *before* it was acquired by its future parent. Thus the court's holding, that conduct inconsistent with a corporation's separate identity that occurs after the period that the party seeking to pierce the corporate veil dealt with it, is factually inapposite. In the present case the conduct covered by the admitted records occurred during the

PEPSI–COLA METRO. BOTTLING CO. v. CHECKERS, INC.  17
Cite as 754 F.2d 10 (1985)

period that Checkers owed Metropolitan money. The fact that, in *Oberer*, the parent did not acquire the subsidiary until after the breach of warranty rendered irrelevant the question of the relationship between the two entities. In the present case, the plaintiff seeks to hold Checkers's sister corporations and the Whites liable because the Whites so intermingled their personal affairs and the affairs of the corporate defendants that limiting the plaintiff's recovery to the assets of Checkers would be unjust. It is clearly relevant that, after the dispute arose, funds of Checkers that might have been available to Metropolitan were commingled with those of the other defendants. (Interestingly, the *Oberer* court suggested that if the parent were accused of raiding the subsidiary's assets after it acquired the subsidiary, an action to pierce the corporate veil might have been justified. *Id.* at 541.)

### IV. METROPOLITAN'S UNFAIR PRACTICES CLAIM

[7] In finding defendants liable for treble damages under Mass.Gen.Laws ch. 93A, the district court found their acts and practices "were unfair and deceptive." The court stated:

> Having been warned by the previous Coca-Cola litigation, Checkers, through Randolph White, nonetheless withheld money which it had and was able to pay for goods it had received and sold. This constituted unethical, oppressive and unscrupulous conduct, which caused substantial injury to Pepsi....

Appellants deny that their conduct violated Mass.Gen.Laws ch. 93A, which provides in part as follows:

§ 2. Unfair practices; legislative intent; rules and regulations

(a) Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful.

(b) It is the intent of the legislature that in construing paragraph (a) of this section in actions brought under section[ ] ... eleven, the courts will be guided by the interpretations given by the Federal Trade Commission and the Federal Courts to section 5(a)(1) of the Federal Trade Commission Act (15 U.S.C. 45(a)(1)), as from time to time amended.

§ 11. Persons engaged in business; action for unfair trade practices; class actions; damages; injunctions; costs

....

If the court finds for the petitioner, recovery shall be in the amount of the actual damages; or up to three, but not less than two, times such amount if the court finds that the use or employment of the method of competition or the act or practice was a willful or knowing violation of said section two....

If the court finds in any action commenced hereunder, that there has been a violation of section two, the petitioner shall, in addition to other relief provided for by this section and irrespective of the amount in controversy, be awarded reasonable attorneys' fees and costs incurred in said action.

Despite the fact that section 2 incorporates by reference both the opinions of the federal courts and the regulations and opinions of the Federal Trade Commission in construing section 5 of the Federal Trade Commission Act, precedent bearing on the unfairness of Checkers's withholding of payment on the debt is scant. The Federal Trade Commission has described the factors it considers in determining whether a practice that is neither in violation of the antitrust laws nor deceptive is unfair as follows:

> (1) whether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise—whether, in other words, it is within at least the penumbra of some common-law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers (or competitors or other businessmen).

754 F.2d—3

Statement of Basis and Purpose of Trade Regulation Rule 408, Unfair or Deceptive Advertising and Labeling of Cigarettes in Relation to the Health Hazards of Smoking, 29 Fed.Reg. 8355 (1964), *cited in FTC v. Sperry & Hutchinson Co.*, 405 U.S. 233, 244 n. 5, 92 S.Ct. 898, 905, 31 L.Ed.2d 170 (1972), *and Levings v. Forbes & Wallace, Inc.*, 8 Mass.App. 498, 396 N.E.2d 149, 153 (1979). The Massachusetts Attorney General has promulgated similarly broad regulations prohibiting trade practices that are "oppressive or unconscionable in any respect." 940 C.M.R. § 3.16(2).

Perhaps the closest Massachusetts case is *Frank J. Linhares Co. v. Reliance Insurance Co.*, 4 Mass.App. 617, 357 N.E.2d 313 (1976). There, plaintiff Linhares hired defendant Blanchard to install a hoist on one of his trucks. Blanchard subcontracted to defendant Jannell. After installing the hoist, Jannell instructed J & S, a subsidiary, to return the truck to Blanchard, in the course of which the truck was extensively damaged. Linhares alleged that Jannell, after having the truck repaired, refused to return it to Linhares unless Linhares would agree to release Jannell from warranties on the repairs. The Massachusetts Appeals Court stated that this allegation fell "within the definition of 'unfair or deceptive trade practices,' adopted by the Federal Trade Commission and applicable to suits under [Mass.] G.L. c. 93A." *Linhares*, 357 N.E.2d at 318.

On the other hand, it has been held that mere breaches of contract, without more, do not violate chapter 93A. *Whitinsville Plaza, Inc. v. Kotseas*, 378 Mass. 85, 390 N.E.2d 243, 251 (1979).

In the present case, Checkers did not withhold the $61,000 owed to Metropolitan because it disputed owing that sum. Nor did defendants contend an inability to pay. The court concluded that Randolph had simply withheld payment as a "wedge" against Pepsi "to enhance Checkers' bargaining power for more product." While Randolph asserted that Metropolitan reneged on a promise to meet Checkers's full requirements, the court discredited Randolph's testimony.

The court was not clearly erroneous in this view of the facts, and while the case is close we think the evidence is sufficient to support its determination that Randolph and Checkers were guilty of a willful violation of Mass.Gen.Laws ch. 93A. The court was entitled to believe that Randolph and Checkers had withheld monies which they legally owed as a form of extortion—to force Pepsi to do what otherwise it could not be legally required to do. *See Linhares*, 357 N.E.2d at 318. There was no relation between Pepsi's fully liquidated claim for product it had delivered in the past, and Randolph's desire to persuade Pepsi to sell more product to Checkers.

To be sure, Randolph asserts in mitigation of his conduct that Pepsi and Metropolitan were themselves guilty of unfair and wrongful conduct in refusing to sell to his company all the product it desired. Defendants contend that since appellee engaged in questionable practices with respect to defendants, defendants' retaliatory refusal to pay a preexisting debt was not immoral, unethical, oppressive or unscrupulous. However, to the extent there was any question whether Pepsi-Cola, Inc. and Metropolitan were entitled to limit sales so as to maintain Pepsi's system of exclusive territorial dealerships, their right to do so was bolstered by the Soft Drink Interbrand Competition Act, 15 U.S.C. § 3501, which became effective July 9, 1980, less than three weeks after Randolph first refused to pay. *See Coca-Cola v. FTC*, 642 F.2d 1387 (D.C.Cir.1981). By the time Randolph deliberately withheld payment, the handwriting was on the wall in this regard. The jury, moreover, found against Randolph and Checkers on their antitrust claim; that judgment has not been appealed from. Taking into account the court's finding that White's own version of events was "totally self-serving, incomplete, uncorroborated, and inconsistent" and that he was "unworthy of belief as to any of the critical events in issue," we cannot say, as we would be required to if we were to reverse, *see Pavlidis v. New England Patriots Football*

PEPSI–COLA METRO. BOTTLING CO. v. CHECKERS, INC.  19
Cite as 754 F.2d 10 (1985)

*Club, Inc.*, 737 F.2d 1227, 1231 (1st Cir. 1984) (clear error standard for mixed questions of law and fact), that the court committed clear error in finding that under all the circumstances of this case Randolph's calculated refusal to pay a clearly owed indebtedness violated sections two and eleven of Mass.Gen.Laws ch. 93A.

[8] In upholding the finding of a willful violation of Mass.Gen.Laws ch. 93A, we are faced with the further problem whether, consistent with the teaching of *International Fidelity Co. v. Wilson*, 387 Mass. 841, 443 N.E.2d 1308 (1983), it was proper for the district court to assess a single award of treble damages against all defendants, jointly and severally. The Massachusetts Supreme Judicial Court has held that when there is more than one wrongdoer, each must be assessed a penalty in accordance with his degree of culpability, and that collection of the penalty from any one defendant does not absolve the others. 443 N.E.2d at 1315, *et seq.*

We do not think, however, that the present defendants can be analogized to those in *International Fidelity*. The party that committed the underlying wrong was Checkers. It received the soda, thereby incurring a legal duty to pay for it. Later, acting through Randolph, Checkers refused to pay, attempting to leverage Metropolitan into acquiescence with certain demands. By so doing it violated Mass.Gen. Laws ch. 93A, and the district court was entitled under section 11 to levy treble damages. Randolph was the chief actor in all the wrongdoing, but since he acted in Checkers's name, we cannot see levying separate penalties against both Randolph and his alter ego, Checkers. By the same token, the other defendants are liable because they are chargeable for Checkers's debts, not because of their role as independent wrongdoers vis-a-vis Metropolitan. Accordingly it made sense for the court to grant a single award for treble damages for which all defendants are jointly and severally liable, rather than separate awards which each defendant must pay in full regardless of whether the same or a greater amount is collected from the others. Given the rationale on which the various defendants were liable here, we believe the district court's approach was not inconsistent with *International Fidelity* nor with controlling Massachusetts law.

V. CHECKERS'S UNFAIR PRACTICES CLAIM

Checkers excepts to the district court's finding that Metropolitan did not violate Mass.Gen.Laws ch. 93A, § 2 when it refused to sell Checkers the quantity of Pepsi product Checkers requested. Checkers raises several objections to the judgment: (1) that it ignores the testimony of Randolph that representatives of Metropolitan promised him in January 1980 that he would get all the product he wanted and that Checkers resumed operating the Woburn Beverage Center in reliance on that promise; (2) that even if Randolph's contradicted testimony regarding the January meeting is not credited, it was still the case that Metropolitan had an affirmative duty to inform Checkers that it would limit the quantity of product that Checkers could purchase and that Randolph may have relied on Metropolitan's silence; and (3) that the district court applied an erroneous legal standard when it held that the jury's finding that Metropolitan did not violate the Sherman Act precluded it from finding that Metropolitan violated chapter 93A, section 2. None of these grounds has merit.

[9] First, Randolph's testimony regarding the January 1980 meeting was contradicted by the Metropolitan representatives in attendance. The court was plainly entitled, as it did, to accept the plaintiff's evidence and refuse to credit Randolph's testimony.

[10] Second, there is little support for any duty on the part of Metropolitan to have informed Checkers in January of any intention to limit sales. The two cases cited by appellants, *Nei v. Burley*, 388 Mass. 307, 446 N.E.2d 674 (1983), and *Grossman v. Waltham Chemical Co.*, 14 Mass.App. 932, 436 N.E.2d 1243 (1982), are

20  754 FEDERAL REPORTER, 2d SERIES

factually dissimilar and provide little or no support for this argument. The court, moreover, could have inferred that Randolph and Checkers, who had had experience in the soft drink industry and had been engaged in a lengthy dispute with Coca Cola over a similar issue, were not unaware of Metropolitan's policies in this regard.

Finally, the district court never stated that the jury's finding that Metropolitan did not violate the Sherman Act precluded it from finding that Metropolitan had violated chapter 93A, section 2.

We have considered appellants' remaining arguments and find them likewise to be without merit.

*Affirmed.*



Susan E. JOHNSON,
Plaintiff, Appellant,

v.

EDUCATIONAL TESTING SERVICE,
Defendant, Appellee.

No. 84–1597.

United States Court of Appeals,
First Circuit.

Argued Dec. 6, 1984.

Decided Jan. 31, 1985.

An appeal was taken from summary judgment entered by the United States District Court for the District of Massachusetts, Rya W. Zobel, J., in favor of testing service which administered admission tests for law school in test taker's suit for denial of due process, breach of certain warranties, breach of contract, wrongful interference with contractual relationship, and defamation, all arising out of testing service's cancellation of test score. The Court of Appeals, Maletz, Senior Judge, sitting by designation, held that: (1) testing service was not a "state actor" for purpose of deprivation of due process claim; (2) testing service went beyond letter of its contractual promise to test taker before it cancelled score, so that it was not liable to test taker on claims for breach of warranty, breach of contract, and interference with contractual relationship; (3) where testing service's cancellation of score was not undertaken in bad faith, testing service's communications to law schools notifying them of cancellation were protected by qualified privilege; (4) test taker could not recover on claim of intentional infliction of emotional distress, even if claim were seasonably and explicitly asserted; and (5) district court did not abuse its discretion in denying test taker leave to amend her complaint after more than a dozen years had passed since its filing.

Affirmed.

1. Constitutional Law ⚖=254(2)

To succeed on claim of deprivation of due process, it must be shown that alleged wrongdoer is a state actor and that its conduct was state action. U.S.C.A. Const. Amend. 14.

2. Constitutional Law ⚖=254(2)

State action inquiry in a suit claiming deprivation of due process involves the two questions of whether the deprivation was caused by exercise of some right or privilege created by state or by a rule of conduct imposed by state or by a person for whom state is responsible, and whether party charged with deprivation was a person who may fairly be said to be a state actor. U.S.C.A. Const.Amend. 14.

3. Constitutional Law ⚖=254(4)

In view of fact that formulation, grading, and reporting of standardized tests is not an exclusive public function, and in light of failure to offer any proof that public institutions belonging to testing service administering admission tests for law schools took lead in instigating conduct of