Westlaw.

Not Reported in F.Supp.2d                                                                                    Page 1
Not Reported in F.Supp.2d, 2003 WL 22220375 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2003 WL 22220375)**

C

Primedia Enthusiast Publication Inc. v. Ashton Intern. Media, Inc.

S.D.N.Y.,2003.

Only the Westlaw citation is currently available.

United States District Court,S.D. New York.

PRIMEDIA ENTHUSIAST PUBLICATION INC.,
Plaintiff,

v.

ASHTON INTERNATIONAL MEDIA, INC., Defendant.

**No. 02 Civ. 9997(HB).**

Sept. 25, 2003.

Seller of magazine businesses sued buyer, seeking to recover purchase price. Buyer counterclaimed, alleging it was fraudulently induced to enter into agreement. Seller moved for summary judgment. The District Court, Baer, Jr., J., held that: (1) buyer could not rely upon alleged oral guarantee that cash flow from magazines would be sufficient to cover costs of loans incurred to acquire business; (2) fact issues precluded summary judgment whether seller breached provision of sales agreement warranting nonexistence of claims relating to business being sold; and (3) buyer was not required to pay triple damages under Massachusetts Deceptive Practices Act.

Motion granted in part, denied in part.

West Headnotes

**[1] Sales 343 ☜38(1)**

343 Sales
    343I Requisites and Validity of Contract
            343k37 Misrepresentation and Fraud by
Seller
            343k38 In General
                343k38(1) k. In General. Most Cited
Cases
Buyer of magazine businesses could not assert that it was fraudulently induced to make purchase by seller's oral representation that cash flow from magazines would be sufficient to cover cost of loans buyer would be incurring to finance acquisition; in view of contractual provision specifying that magazine assets were being acquired "as is where is," and an entire agreement provision, buyer was required to and had not insisted upon contractual cash flow guarantee provision.

**[2] Federal Civil Procedure 170A ☜2510**

170A Federal Civil Procedure
    170AXVII Judgment
        170AXVII(C) Summary Judgment
            170AXVII(C)2 Particular Cases
                170Ak2510 k. Sales Cases in General.
Most Cited Cases
Material issues of fact, as to whether seller of magazine business knew or should have known that photographer working for magazine would claim that he owned rights to allegedly key group of pictures, precluded summary judgment that seller breached provision of sales agreement warranting nonexistence of claims relating to proposed sale.

**[3] Antitrust and Trade Regulation 29T ☜393**

29T Antitrust and Trade Regulation
    29TIII Statutory Unfair Trade Practices and
Consumer Protection
        29TIII(E) Enforcement and Remedies
            29TIII(E)7 Relief
                29Tk387 Monetary Relief; Damages
                    29Tk393 k. Enhanced Damages;
Double or Treble Damages. Most Cited Cases
    (Formerly 92Hk40 Consumer Protection)
Buyer of magazine businesses was not required to pay triple damages to seller, under Massachusetts Deceptive Practices Act, following failure to pay amounts due under sales contract, when buyer withheld payment based on colorable claim that seller misrepresented that magazines would generate sufficient revenue to pay off loan incurred to finance acquisition. M.G.L.A. c. 93A, § 1.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 2
Not Reported in F.Supp.2d, 2003 WL 22220375 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2003 WL 22220375)**

*OPINION & ORDER*

BAER, J.[FN1]

> FN1. Michelle Abruzzo, an intern in my Chambers during the fall of 2003 and a third-year law student at New York Law School, provided substantial assistance in the research and drafting of this opinion.

**\*1** Plaintiff Primedia Enthusiast Publications, Inc. ("Primedia") moves for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure to collect damages for breach of contract against defendant Ashton International Media, Inc. ("Ashton") and to dismiss Ashton's counterclaims. Plaintiff further moves for leave to file a second amended complaint, pursuant to Rule 15(a) of the Federal Rules of Civil Procedure, to add claims for relief for breach of the asset purchase agreement dated September 30, 2002 and the secured promissory note dated September 30, 2002, executed in connection with Ashton's acquisition of the assets of a publication entitled *Volleyball.* Defendant cross-moves for partial summary judgment on its counterclaim to rescind the contract for the purchase of *Volleyball* and for leave to amend its counterclaims with respect to *Doll Reader* and *Teddy Bear and Friends,* sometimes styled as "the Collectibles." Defendant further moves for a temporary restraining order and preliminary injunction preventing Primedia from contacting Ashton's account debtors in an effort to enforce Primedia's UCC security interest against the receivables of *Doll Reader* and *Teddy Bear and Friends* unless and until a judgment is issued on Primedia's UCC claim. For the following reasons, plaintiff's motion for summary judgment is granted-in-part and denied-in-part, and defendant's motion for partial summary judgment is denied. Further, plaintiff's motion for leave to file a second amended complaint in the manner specified above is granted and defendant's cross-motion to amend its counterclaims is mooted. Defendant's motion for a temporary restraining order and a preliminary injunction is also mooted by this decision.

**I. BACKGROUND**

On or about July 31, 2002 the parties entered into an asset purchase agreement ("Collectibles Purchase Agreement") relating to the purchase of two Primedia magazines, *Doll Reader* and *Teddy Bear and Friends.* At the time they executed the contract, the parties also entered into a transitional services and facilities agreement ("Collectibles Transition Agreement"), whereby Primedia agreed to provide Ashton certain services and facilities during a specified ownership transition period. At the time the parties executed the Collectibles Purchase and Transition Agreements, Ashton paid Primedia $100,000 as down payment for the purchase price of $3.2 million. The parties also signed a promissory note (the "Collectibles Note") for the balance of the purchase price. After the parties executed the transaction documents, Primedia executed a bill of sale, effectively transferring ownership of the assets to Ashton. Since the execution on July 31, 2002 of the transaction documents, Ashton has failed to make payments to Primedia as required under the Collectibles Note. Additionally, Ashton has failed to reimburse Primedia for costs and expenses incurred, pursuant to the transition agreement. Despite Ashton's failure to honor its obligations, it has continued to publish the magazines and presumably derive revenue therefrom.

**\*2** On or about September 30, 2002, the parties entered into a second purchase agreement (*"Volleyball* Purchase Agreement") for Ashton to purchase the assets of another of Primedia's magazines, entitled *Volleyball.* As in the previous transaction between the parties, they entered into a second Transition Agreement (*"Volleyball* Transition Agreement") when they executed the *Volleyball* Purchase Agreement. The terms of the *Volleyball* transaction were substantially similar to the transaction between the parties for the purchase of *Doll Reader* and *Teddy Bear and Friends.* Ashton paid Primedia $50,000 as down payment for the *Volleyball* purchase price of $800,000. The parties also signed a promissory note for the balance of the

Not Reported in F.Supp.2d                                                                 Page 3
Not Reported in F.Supp.2d, 2003 WL 22220375 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2003 WL 22220375)**

purchase price (the *"Volleyball* Note"). After the parties executed the Purchase Agreement and Transition Agreement for *Volleyball* on September 30, 2002, Primedia executed a bill of sale, effectively transferring ownership of the assets to Ashton. Again, Ashton made no further payments towards the agreed upon purchase price of *Volleyball,* nor has it reimbursed Primedia for costs and expenses incurred during the ownership transition period. Nonetheless, Ashton has continued to publish the magazine and presumably derive revenue therefrom.

Because Ashton failed to meet its obligations under the governing agreements for both of the aforementioned transactions, Ashton is in default under the Collectibles Note and likely will soon be in default under the *Volleyball* Note.[FN2] With respect to the *Volleyball* agreement, Primedia also claims that Ashton breached its obligation to offer Peter Brouillet, the photography editor of *Volleyball,* full-time employment on essentially the same terms under which he was employed by Primedia.

> FN2. Primedia agreed to subordinate its security interest under both purchase agreements to the security interest that Ashton granted to the lender that gave Ashton a loan to undertake the purchase. Primedia is required to give the lender 100 days advance notice before a default can occur. In the event of a default, the acceleration clause in the notes requires payment of the full amount due.

In its defense, Ashton claims that Primedia misrepresented the financial information relating to the Collectibles Purchase Agreement, thereby fraudulently inducing Ashton to enter into that agreement. Ashton counterclaimed to rescind the Collectibles Purchase Agreement on the basis of the alleged fraudulent inducement. Further, Ashton counterclaimed to rescind the *Volleyball* Purchase Agreement, claiming that Primedia fraudulently and intentionally concealed the copyright ownership of certain photographs taken by Peter Brouillet, and

had this been revealed, Ashton would never have entered into the *Volleyball* Purchase Agreement.

II. DISCUSSION

A. Standard For Summary Judgment

Evidence in support of a motion for summary judgment must be reviewed in a light most favorable to the non-movant. FRCP 56(c), *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). If, when "[v]iewing the evidence produced in the light most favorable to the non-movant ... a rational trier could not find for the non-movant, then there is no genuine issue of material fact and entry of summary judgment is appropriate."*Binder v. Long Island Lighting Co.,* 933 F.2d 187, 191 (2d Cir.1991). While the burden to demonstrate that there is no genuine issue of material fact rests solely with the moving party, *FDIC v. Giammetti,* 34 F.3d 51, 54 (2d Cir.1994), once the moving party has provided sufficient evidence to support a motion for summary judgment, the opposing party must "set forth specific facts showing that there is a genuine issue for trial" and cannot rest on "mere allegations or denials." Rule 56(e); *see Rexnord Holdings, Inc. v. Biderman,* 21 F.3d 522, 525-26 (2d Cir.1994). The "mere existence of a scintilla of evidence in support of the plaintiff's position" is insufficient to defeat a motion for summary judgment. *Anderson,* 477 U.S. at 252. An "opponent must do more than simply show that there is some metaphysical doubt as to the material facts."*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). With this standard in mind, I will review each party's motion or cross-motion for summary judgment.

B. Collectibles Purchase Agreement

*3 [1] The parties agree that Ashton failed to make quarterly payments under the Collectibles Purchase Agreement and failed to reimburse Primedia under the Collectibles Service Agreement. *See* Def. Coun-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                   Page 4
Not Reported in F.Supp.2d, 2003 WL 22220375 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2003 WL 22220375)**

terstatment ¶¶ 3, 26. The principle issue that must be resolved is whether genuine issues of material fact remain as to Ashton's claim that it was fraudulently induced to enter the transaction for the Collectibles magazines. Since this is a fraud claim, Ashton must prove the following four elements by clear and convincing evidence: (1) a misrepresentation of material facts; (2) scienter; (3) justifiable reliance; and (4) injury or damages. *See Sokolow, Dunaud, Mercadier & Carreras, LLP v. Lacher,* 299 A.D.2d 64 (1 Dep't.2002); *McGovern v. T.J. Best Bldg. and Remodeling, Inc.,* 245 A.D.2d 925, 926, 666 N.Y.S.2d 854 (3d Dep't 1997); *Computerized Radiological Servs. v. Syntex Corp.,* 786 F.2d 72, 76 (2d Cir.1986). With respect to the Collectibles Purchase Agreement, Ashton asserts that Primedia failed to produce cash flow statements and claims that Ann Griffin, internal business manager for Primedia, falsely represented to it that "revenue streams documented in [Primedia's] financial statements were not materially different than the cash receipts of the Collectibles Publications over the same time period."Lee Affid. Exh. V; Lund Aug. 13 Decl. at ¶¶ 5,6. Ashton contends that this alleged representation placated its concern in regard to whether the Collectibles magazines generated sufficient monthly cash flow to cover the loan payments for the purchase of the Collectibles magazines, and that it would never have gone forward with the transaction but for Griffin's representation, or in Ashton's view, misrepresentation.

According to Mark Lund, president and founder of Ashton, he repeatedly sought to obtain information as to the Collectibles' daily or monthly cash flow, because he intended to support financing of the purchase loan through the magazines' cash flow. Lund Aug. 13 Decl. ¶ 6. After negotiations stalled, Mark Sucheki, Primedia's broker for the deal, eventually forwarded to Lund "financial documentation setting forth actual monthly revenues for the Collectibles Magazines through May 2002."*Id.* ¶ 7. Lund concluded from the declining revenues that such revenue would not provide adequate support to make the periodic payments required for the size of loan

needed to pay the proposed sale price. *Id.* Lund suggested the price would need to be "adjusted." *Id.* A few weeks later, he received an email from Sucheki, enclosing Primedia's "5+7 forecast" (5 months of actual revenues and 7 months of forecasted revenues). According to Sucheki, the revenues forecasted for the entire year, adjusting for corporate overhead, would amount to about $758,000, which Lund felt might suffice to make the deal viable. *Id.* ¶ 9, Exh. D. According to Lund, however, he "remained *determined not to proceed* with the transaction unless [he] could ensure that these new numbers were based on actual cash being received by the Collectibles Magazines."Accordingly, he wrote Sucheki and asked, *inter alia:*

**\*4** Please provide a statement of cash flows for each month for each publication. While the 5+7 indicates what revenue can be expected, exactly how and when is this revenue received?

The major situation here is to establish how much cash the titles actually take in. Presently, it appears that from all areas of revenue[, the magazines will take in] a grand total of $1,459,346 after the takeover. Will this be the actual cash received by Ashton after August 1?

*Id.* ¶ 10, Exh. E (emphasis added). During his second due diligence trip to Primedia, Lund allegedly spoke to Ann Griffin, and she purportedly represented that "Ashton could expect to receive sufficient cash from operations to service the [loan payments]."*Id.* ¶ 11.When he raised concerns about obtaining supporting documents in regard to the Collectibles' cash flow, she allegedly told him that none were needed because "the revenue numbers in the '5+7' forecast ... fairly represented the cash coming into the titles."*Id.* At Griffin's deposition, however, she stated that she had no recollection of ever speaking with Lund. Kissane Decl. Exh. D at 63-64. According to Griffin, "all of [her] information flowed through Michael Behringer" and therefore, she "never had a conversation with Mr. Lund during the period that Ashton was interested in [the Collectibles] titles."*Id.* Given the contradictory

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 5
Not Reported in F.Supp.2d, 2003 WL 22220375 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2003 WL 22220375)**

testimony, it would appear that resolving the apparent inconsistent recollections must entail a credibility determination, which cannot be accomplished by summary judgment. *Anderson,* 477 U.S. at 255 ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict."). Primedia contends that the "AS IS WHERE IS" disclaimer and integration clause in the Collectibles Purchase Agreement bars consideration of the alleged representation made by Griffin, which, if made, appears to have been the deciding factor in convincing Ashton and its president to complete the transaction.

The crux of whether there exists a genuine issues of material fact centers on what effect, if any, do the disclaimer and integration clause have on Ashton's reliance on Griffin's alleged representation. Section 4.07 of the Collectibles Agreement, entitled "Future Operations or Prospects," provides:

*Purchaser's Examination.*Except as expressly set forth in Article III of this Agreement, (a) Purchaser acknowledges and agrees that (i) it is purchasing the Assets hereunder AS IS WHERE IS, (ii) it is not relying on any *forecasted operating results or budgets* prepared by or on behalf of Seller and (b) Purchaser acknowledges and agrees that, no representation or warranty has been or is being made by Seller *as to the future operations or prospects* of the publication.

Lee Aug. 6 Affid. Exh. D (emphasis in original). Section 8.01 of the Collectibles Agreement, entitled "General Merger Clause," states:
**\*5** *Entire Agreement.*This agreement (together with the Schedules hereto and documents referred to herein) contains, and is intended as, a complete statement of all of the terms of the arrangements between the parties with respect to the matters provided for herein, and supercedes any previous agreements and understanding between the parties with respect to those matters.

Plainly, the "AS IS WHERE IS" clause applies to forecasted operating results and to future operations or prospects of the publications. Accordingly, any reliance by Lund as to the cash flow that he could expect from the forecasted revenues for the rest of the year may not be considered. *Emergent Capital Investment Mgmt., LLC v. Stonepath Group, Inc.,* 195 F.Supp.2d 551, 562 (S.D.N.Y.2002) ("[W]here a party specifically disclaims reliance upon a particular representation in a contract, that party cannot, in a subsequent action for common law fraud, claim it was fraudulently induced to enter the contract by the very representation it has disclaimed reliance upon.").

Primedia contends that the "AS IS WHERE IS" clause coupled with the general merger clause, in view of *Consolidated Edison, Inc. v. Northeast Utilities,* 249 F.Supp.2d 387 (S.D.N.Y.2003), mandates that I must find unreasonable Lund's reliance on Griffin's alleged statement that the reported revenues for the first five months of the year fairly represented the magazines' cash flow. Primedia notes that courts, in some situations, have granted summary judgment to parties seeking to enforce a contract, despite allegations of fraudulent inducement and the absence of a specific disclaimer expressly disavowing liability as to the subject matter of the alleged fraudulent representation. In *Consolidated Edison v. Northeast Utilities,* for instance, a court in this District found that the agreement-at-issue contained both a general integration clause and a specific disclaimer of "evaluation materials" supplied "during due diligence." 249 F.Supp.2d at 401. The defendant purportedly made oral misrepresentations that the plaintiff allegedly relied on during the due diligence period. The court ruled that the subject matter of the alleged oral misrepresentations, although not specifically mentioned in the specific disclaimer, constituted "evaluation material" that was subject to that disclaimer, and thus it would not serve to vitiate the contract. In *Harsco Corp. v. Segui,* the merger agreement-at-issue did not mention anything about a Russian manufacturing plant. 91 F.3d 337, 345 (2d Cir.1996). Nonethe-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 22220375 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d, 2003 WL 22220375)

less, the Second Circuit held that the parties should be made to honor the agreement, despite the alleged misrepresentation as to when the plant might be operational, based on the sophistication of the transaction and the parties.*Id.* In reaching their conclusions in *Consolidated Edison* and *Harsco*, both courts placed great weight on the sophistication of the plaintiffs. *See Harsco*, 91 F.3d at 346;*Consolidated Edison,* 249 F.Supp.2d at 405;*see also Emergent Capital Investment Mgmt., LLC v. Stonepath Group, Inc.,* 165 F.Supp.2d 615, 623 (S.D.N.Y.2001) ("In evaluating justifiable reliance, the plaintiff's sophistication and expertise is a principal consideration.").

*6 Notwithstanding the lack of an explicit disclaimer of representations that form the basis of a fraud-in-the inducement claim, courts may disregard a fraudulent inducement claim and give effect to a [FN] contract when the parties have negotiated at arms lengths and they are sufficiently sophisticated that they could have easily protected themselves either through obtaining readily available information or alternatively including a protective clause in the agreement. *See Consolidated Edison,* 249 F.Supp.2d at 405;*Emergent Capital,* 165 F.Supp.2d at 622. As explained by the Second Circuit, when a party is sophisticated and is "on notice of the existence of material facts which have not been documented and he nevertheless proceeds with a transaction without securing the available documentation or inserting appropriate language in the agreement for his protection, he may be truly said to have willingly assumed the business risk that the facts may be not as represented."*Lazard Freres & Co. v. Protective Life Ins. Co.,* 108 F.3d 1531, 1543 (2d Cir.1997); *see also Banque Arabe et Internationale D'Investissement v. Maryland Nat'l Bank,* 57 F.3d 146, 157 (2d Cir.1995) (dismissing fraud claim because plaintiff could not prove reasonable reliance on a known and disclosed risk that was readily determinable). The court in *Consolidated Edison* found the plaintiff's sophistication and decision to include numerous representations and warranties particularly persuasive in holding that

the disclaimer and integration clause should supercede all other understandings that were previously represented by the defendants. 249 F.Supp.2d at 403.

To perform the due diligence, Ashton assembled a team of people that worked for it, including Lund FN3 (president and chief executive officer), Lois Elfman (chief operating officer), Marcus Gemma (Art Director), Barry Bachrach (legal counsel) and Gerald Kashuk (CPA). Lund Aug. 13 Decl. Exh. A. at 2. Accordingly, Ashton had at its disposal a team of people with legal expertise, accounting expertise, and magazine industry expertise to make an informed decision and to assist in negotiating the purchase price and terms of the magazine titles from Primedia. During the course of its due diligence, Ashton became fully aware of the declining financial condition of the publications that it agreed to purchase. *See, e.g.,* Behringer Aug. 21 Affid. Exh. A. Indeed, the Offering Memorandum relating to the sale of assets of Primedia's magazines warned that due to current economic conditions and the lack of investment by Primedia, the publications that were the subject of the Collectibles Purchase Agreement were suffering financially. Lee Affid. Exh. O. Additionally, Ashton commented several times, during its own due diligence, on the deteriorating financial conditions of the publications it was preparing to purchase. Lee Affid. Exh. I (Lund Tr.) at 170:2-171:8;  190:13-191:19;  193:14-194:25; 235:22-236:14. Accordingly, Ashton cannot justifiably claim ignorance of the financial direction of the magazines it purchased. Understandably, Ashton placed great importance on understanding the "actual cash operations of the titles, rather than on numbers distorted by Primedia's internal accounting or bookkeeping practices ."Def. Br. at 4. According to Ashton's counsel, in fact, "Lund was *determined* not to close without assurance on the question of what cash was actually being received by the Collectibles magazines."Kissane Aug. 13 Decl. ¶ 2. Furthermore, Lund considered it *"critical for debt service"* to know how and when the revenue is received and the actual cash flow for each

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                          Page 7
Not Reported in F.Supp.2d, 2003 WL 22220375 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2003 WL 22220375)**

month. *Id.* ¶ 4. If Ashton believed the alleged statement from Griffin were significant, as it now claims, it could and should have made that a basis for a specific representation and warranty in the agreement, but it failed to do so. *Cf. Consolidated Edison,* 249 F.Supp.2d at 402. Without protection of a specific representation or warranty, Ashton may be said to have willingly assumed the business risk that the correspondence of the reported revenue to actual cash flow may not be as represented, *Lazard Freres,* 108 F.3d at 1543, but rather "numbers distorted by Primedia's internal accounting or bookkeeping practices," as originally feared by Lund when Ashton received the revenue figures from Primedia. Ironically, despite Ashton's great concerns about the Collectibles magazine cash flow and Lund's own professed lack of formal training in accounting and finance, Ashton inexplicably never bothered to use the CPA it designated to assist in the due diligence! *See* Lee Aug. 21 Affid. ¶ 5, Exh. D (Kashuk Depo.) at 50. In light of the expertise assembled, which included a CPA (who Ashton failed to use), the paramount importance that Ashton placed on receiving sufficient cash from the monthly revenues of the magazine titles, and the failure to include a representation or warranty in regard to the relationship between past revenues and cash flow despite the numerous other representations and warranties the parties negotiated, *see* Kissane Decl. Exh. D at 5-6, no juror could reasonably conclude that Ashton justifiably relied on the alleged oral misrepresentation by Griffin to consummate the purchase of the Collectibles magazines. *Harsco,* 91 F.3d at 343-48;*Consolidated Edison,* 249 F.Supp.2d at 401-408;*Emergent Capital,* 195 F.Supp.2d at 562. Accordingly, Ashton cannot sustain its fraudulent inducement claim.

> FN3. Lund states that he has worked in the publishing industry since 1994 and that he has a "broad understanding of the customary practices in the publishing industry."Lund. Aug. 6 Decl. ¶ 2. I construe this as an indication of his expertise in the publishing industry.

**\*7** Ashton further claims that summary judgment may not be granted in regard to the Collectibles transaction because Primedia purportedly failed to provide its historical financial statements beyond revenues from its magazine subscriptions. Such information, however, is not relevant to the issue of Ashton's justifiable reliance on Griffin's representation, and accordingly save Ashton from Primedia's summary judgment motion. Primedia's motion for summary judgment in connection with the Collectibles transaction is granted. As a result, both Ashton's cross-motion to amend its counterclaims with respect to the Collectibles transaction and Ashton's motion for a temporary restraining order and preliminary injunction with respect to the Collectibles transaction are mooted.

C. *Volleyball* Purchase Agreement

[2] Primedia also moves for summary judgment in regard to the breach of the *Volleyball* Purchase Agreement.[FN4] Ashton cross-moves to rescind the Agreement on the basis of fraudulent inducement. As in the Collectibles Purchase and Transitional Agreements, the parties do not appear to dispute that Ashton has failed to pay any money other than its downpayment in regard to the *Volleyball* transaction. Accordingly, the main issue that must be resolved is whether there are genuine issues of material fact in regard to Ashton's fraudulent inducement.

> FN4. I should note Primedia cannot have it both ways, as it seeks to do here, and argue that no genuine issues of material fact remains in regard to whether it is entitled to damages under the *Volleyball* Purchase Agreement, but then claim genuine issues of material fact abound as to whether the Agreement should be rescinded.

Ashton asserts that Primedia failed to reveal that Primedia's title to the photographic "library," held by Peter Brouillet, *Volleyball'* s photography editor, was in dispute. Ashton contends that *Volleyball'* s right to use the photographs in the photo library is

Not Reported in F.Supp.2d                                                                                    Page 8
Not Reported in F.Supp.2d, 2003 WL 22220375 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2003 WL 22220375)**

one of the "most valuable" tangible asset conveyed under the *Volleyball* Purchase Agreement because it allowed *Volleyball* to reduce its editorial costs and increased earning potential. Apparently Brouillet kept the bulk of the magazine's photographs at his home, where he worked, and he now claims ownership to most, if not all, of the photographs. Brouillet has refused to turn over the photographs, particularly now that Ashton has refused to hire him as *Volleyball's* full time photographer.

To demonstrate that the *Volleyball* transaction should be rescinded on the basis of fraudulent inducement, Ashton must prove, *inter alia,* that (1) Brouillet had asserted a "claim," as it would be understood in the Agreement, concerning the photographs that he now holds, (2) Primedia knew and intentionally failed to disclose that claim to Ashton, and (3) the breach was material. As to the first issue, Primedia notes that Brouillet has yet to file an action to resolve his alleged copyright ownership claim,[FN5] and therefore Ashton has no basis to assert that Primedia acted in bad faith when it warranted that "[t]here are no actions, suits, inquiries, proceedings or investigations pending, or, to the best of [Primedia's] knowledge, threatened before any court or governmental or administrative body or agency relating to the Publication or to the transactions contemplated by this Agreement or [Ashton's] Additional Agreements."Lee Affid. Exh. F at 5, ¶ 3.06. From the record, the import of paragraph 3.06 remains unclear to me whether in fact Brouillet's potential belief may serve as sufficient basis to prevent Primedia from having provided the warranty and representation it made.

> FN5. The argument, it seems to me, is somewhat specious given that Brouillet maintains possession of the photographs, and has no incentive to seek a declaratory judgment against any other claimants.

**\*8** As to the second issue, Michael Behringer, Primedia's lead negotiator, submits that he "was totally unaware that Brouillet believed that he had any rights in photographs he took," Behringer Aug.

14 Affid. ¶ 6, which would be consistent with portions of his deposition testimony in which he stated that by September 24, he believed "there was no claim that was out there. There was nothing to disclose, [and] there was no claim of ownership [by anyone else]." Kissane Aug. 6 Decl. Exh. B at 176-77. Elsewhere, however, Behringer admits receiving an email from Jon Hastings, *Volleyball'* editor, which stated that "the photographer mentality' grandfathered in by Western Empire publications (which actually started [*Volleyball* ] Magazine) has *[Brouillet] believing he owns the photos....* It's something that will need to be addressed initially during the transition ownership by Ashton." Lund Decl. Exh. E; Kissane Aug. 6 Decl. Exh. B at 176-77. Given this information, Behringer admittedly remained through September 24 unsure whether Brouillet would claim ownership of *Volleyball's* photographs. Kissane Aug. 6 Decl. Exh. B at 176-77 ("We still had follow-up to do."). Although portions of Behringer's testimony is internally inconsistent, I must nonetheless credit the testimony to which plaintiff points in opposition to Ashton's motion to rescind. *Arnstein v. Porter,* 154 F.2d 464, 469 (2d Cir.1946) ("Although part of plaintiff's testimony on deposition (as to 'stooges' and the like) does seem 'fantastic,' yet plaintiff's credibility, even as to those improbabilities, should be left to the jury."); *Kass v. A.L .U.F. Plastics, Inc.,* 1999 WL 961780, at \*1 n. 1 (S.D.N.Y. Oct.20, 1999). Behringer's credibility as to whether he, as the representative for Primedia, knowingly withheld information of Brouillet's possible claim, in order to mislead and induce Ashton to enter the purchase agreement, is a question for the jury to decide.

Lastly, although Ashton contends that the photographs were a material element of the transfer agreement, I agree that whether in fact the photographs were a material element of the transaction such that Ashton would not have agreed to the transaction but for the alleged claim presents a genuine question of material fact. Lund admits that Ashton has no specific inventory of Brouillet's pho-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                          Page 9
Not Reported in F.Supp.2d, 2003 WL 22220375 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2003 WL 22220375)**

tographs that allegedly belong to *Volleyball,* nor does he even have knowledge of the number of photographs involved. Lund Aug. 6, 2003 Affid. ¶ 15. Arguably, if these photographs were so materially important to Ashton, it could have obtained a warranty or representation to ensure the physical photographs would be returned by Brouillet should he depart from the magazine's employment. According to Hastings, *Volleyball* generally used photographs taken only within the last six months and would only once in a while go back for a historical photo. Lee Aug. 13 Affid. Exh. A (Hastings Tr.) at 60. Consistent with this practice, Lund and Ashton's expert, Donald Mazzella, agree that "a photograph's value is greatest in the months immediately after it [is] taken," particularly in the case of a sports publication. Mazzella Decl. ¶ 9; Lund Aug. 6 Affid. ¶ 15. Given that Don Leibig, a freelance photographer, "did most of the shooting" recently, Lee Aug. 13 Affid. Exh. B (Brouillet Tr.) at 50, I am not convinced that the photographs taken by Brouillet are as material as Ashton claims. Nevertheless, it is clear that Ashton understood a certain portion of the photographs held by Brouillet belonged to *Volleyball* magazine, and that it sought to transport them to San Luis Obispo to place them under its control. Lund Aug. 6 Affid. at ¶ 9 & Exh. A. I find insufficient facts here to resolve the materiality of the photographs that Ashton seeks to obtain. I agree with Primedia's admission that genuine issues of material fact abound, Pl. Opp. to Ashton's Motion at 15-17, and accordingly, Primedia's motion for summary judgment and Ashton's cross-motion for partial summary judgment as to the *Volleyball* transaction is denied.

D. Massachusetts' Deceptive Practices Act

**\*9** [3] Primedia further moves, pursuant to Massachusetts' Deceptive Practices Act, to "at least double, if not triple, the amount of actual damages, and attorney's fees" against Ashton. G.L. c. 93A. Primedia asserts that Ashton's counterclaims and defenses are without merit and wholly unsupported, and that its refusal to pay under a contractual ar-

rangement may constitute an unfair act or practice for purposes of c. 93 A purposes. I am not convinced, in view of the record as a whole, that Primedia has been as forthcoming as it should have been in regard to its dealings with Ashton. It strains credulity, for instance, to observe Behringer acknowledge in a deposition that he received an email from the editor of *Volleyball* stating that Brouillet believes he owns the photographs, and then claim it never occurred to him that this claim might be pertinent to Ashton, who had recently sent him an e-mail seeking to transport those photographs-at-issue to a location under its control. Although I agree that Ashton foolishly assumed the business risk that the cash flow from the Collectibles magazines might not be commensurate with the revenues reported by failing to include a representation or warranty in the Collectibles Purchase Agreement, I must pause to wonder whether Griffin indeed made the representation alleged to overcome Lund's adamancy not to go through with the deal until Ashton received sufficient information to confirm adequate cash flow. I am unpersuaded that no reasonable jury could conclude that Ashton did not have a colorable claim of fraudulent inducement, which would seem to preclude finding its conduct so unscrupulous and unethical as to warrant enhanced damages and attorney's fees. Primedia's motion for such additional damages and attorney's fees under Massachusetts' Deceptive Practices Act is denied.

III. CONCLUSION

Primedia's motion for summary judgment is granted in part and denied in part. Primedia is awarded damages in the amount of 3,191,002.63, plus prejudgment interest from the date of the default for breach of the Collectibles Purchase Agreement and Collectibles Transition Agreement. As a result, Ashton's motion for a temporary restraining order and preliminary injunction with respect to the Collectibles transaction, in addition to its cross-motion to amend its counterclaims with respect to the Collectibles transaction are now moot. Ashton's motion for partial summary judgment with respect to the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 22220375 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2003 WL 22220375)**

*Volleyball* transaction is denied. That facet of Primedia's motion for summary judgment, with respect to the *Volleyball* transaction, is denied; however, Primedia's motion for leave to file a second amended complaint for the limited purpose of adding claims for relief for breach of the asset purchase agreement dated September 30, 2002 and the secured promissory note dated September 30, 2002, executed upon Ashton's acquisition of the assets of *Volleyball,* is granted. The jury trial for the claims remaining will commence October 20, 2003 and the joint pre-trial order, motions *in limine, voir dire,* and jury charges are due October 10, 2003.

**\*10** SO ORDERED

S.D.N.Y.,2003.
Primedia Enthusiast Publication Inc. v. Ashton Intern. Media, Inc.
Not Reported in F.Supp.2d, 2003 WL 22220375 (S.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.