**Westlaw.**

Not Reported in F.Supp.2d  Page 1
Not Reported in F.Supp.2d, 2004 WL 2914093 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2004 WL 2914093)**

C
Southwick Clothing LLC v. GFT (USA) Corp.
S.D.N.Y.,2004.
Only the Westlaw citation is currently available.
United States District Court,S.D. New York.
SOUTHWICK CLOTHING LLC as assignee of certain assets of Grieco Bros., Inc., Richard Grieco and Sarah Grieco, Plaintiffs,
v.
GFT (USA) CORP. and Ronald Frasch, Defendants.
No. 99 CV 10452(GBD).

Dec. 15, 2004.

MEMORANDUM DECISION AND ORDER

DANIELS, J.
*1 In an action for, *interalia,* breach of contract and fraud, defendants GFT (USA) Corp. ("GFT") and Ronald Frasch moved for summary judgment dismissing plaintiffs' amended complaint. Plaintiffs cross-moved for leave to amend the caption of this case to reflect the parties' stipulation that the claims against Mr. Frasch are dismissed with prejudice. The cross-motion is granted.[FN1] The motion for summary judgment made by the remaining defendant GFT is also granted.

> FN1. The parties entered into a stipulation providing that all claims against defendant Ronald Frasch are discontinued with prejudice, and he is no longer a party to the action. The stipulation further provided that plaintiffs' fourth and seventh causes of action are discontinued with prejudice.

The gravamen of the complaint is that GFT breached a December 4, 1998 letter agreement with plaintiff Grieco Bros., Inc. ("GBI"),[FN2] to establish a joint venture. Both GBI and GFT manufacture clothing, and each has a facility in Massachusetts. GBI was a family-owned business with most of its stock owned by plaintiff Richard Grieco, GBI's president, and a small amount of stock held by his daughter, plaintiff Sarah Grieco.[FN3] Congress Financial Corporation ("Congress Financial") was GBI's primary lender and it provided it with a line of credit that was secured by GBI's assets. Pursuant to Congress Financial's suggestion, GBI retained the services of Gordon Lewis, a principal for a "turnaround consulting firm." (Lewis Dep. at 6,8). His firm generally works with companies who are experiencing financial difficulties in an attempt to help restructure the "business and bring it back to profitability."(*Id.* at 8). Mr. Lewis recommended to Mr. Grieco that GBI be sold because, without a significant capital infusion, the company would continue to financially struggle.

> FN2. GBI is dissolved, and certain of its assets were purchased by plaintiff Southwick Clothing LLC.
>
> FN3. Of the twelve remaining causes of action, only one claim, for breach of fiduciary duty, is brought on behalf of plaintiffs Richard and Sarah Grieco individually.

In 1998, GFT was seeking additional manufacturing capacity, and began discussions with GBI to address both companies' needs. Early on in the negotiations, GFT advised GBI that any propose transaction would have to be approved by its corporate parents.[FN4] GFT did not accept the offer to purchase GBI outright, but instead suggested the creation of a joint venture. The parties are in agreement that GFT's proposal included the following terms: GBI would contribute its manufacturing facility to a new company ("Newco") in exchange for 100% of the common stock of Newco; GBI employees would become Newco employees; GFT would pay GBI an up-front cash payment for a portion of Newco stock and operational control of Newco, with a call option to purchase the balance of the stock; GFT would make capital investments in Newco to modernize the manufacturing facility

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 7:07-cv-09588-KMK   Document 17-29   Filed 06/02/2008   Page 2 of 16

Not Reported in F.Supp.2d                                                          Page 2
Not Reported in F.Supp.2d, 2004 WL 2914093 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2004 WL 2914093)**

and retain its employees and provide working capital; and Newco would produce garments for a new marketing company owned by Mr. Grieco ("Grieco Corporation") for resale to Brooks Brothers. Plaintiffs contend that GFT's proposal also provided that GFT would assume all of GBI's debts including the unfunded pension liability. (Pls.' Rule 56.1 Statement ¶ 4). Negotiations ensued regarding the size of the up-front payment and the option price.

> FN4. Pursuant to the parties' stipulation, plaintiffs withdrew all allegations in the amended complaint that state GFT failed to disclose to them that any transaction was subject to the approval by GFT's corporate parent.

GFT sent GBI a letter of intent, dated November 2, 1998, outlining the terms of the proposed joint venture. The letter of intent "was created in response to Congress Financial['s] request to [GBI] to obtain a written commitment from GFT." (Pls.' Mem. Opp'n Summ. J. at 15 (citing Lewis Decl. ¶ 12; R. Grieco Decl. ¶ 13; Nelson Decl. ¶ 9; Frasch Aff. ¶ 8)). The November 2nd letter of intent provided for an up-front payment of $1 million and an option price of $500,000. Additionally, it provided that Newco would assume the sinking fund liability associated with the employee pension fund. The November letter agreement was signed by Mr. Frasch, on behalf of GFT, and was transmitted to Mr. Grieco for his signature on behalf of GBI. Mr. Grieco did not execute the agreement.

*2 In defendant's Rule 56.1 Statement, GFT claims that GBI rejected that proposal. (Def.'s Rule 56.1 Statement ¶ 15). Plaintiffs contest this assertion claiming GBI "accepted all the terms of the November 2nd letter of intent with the exception that [GBI] objected to the price terms of $1,000,000.00 up front and a $500,000 .00 call option; those were not the terms which were agreed upon by the parties. Therefore [GBI] did not reject the November 2nd Letter of Intent."(Pls.' Rule 56.1 Statement ¶ 5). Plaintiffs' current position is, however, contrary to their attorney's $^{FN5}$ earlier statement at Mr. Grieco's deposition. When Mr. Grieco expressed, at his deposition, a lack of understanding of the terms of the November 2nd letter of intent, plaintiffs' counsel stated, "This is a proposal he rejected that was never signed."(R. Grieco Dep. at 118). Mr. Grieco was then asked why he rejected the proposal, and he merely indicated that the $1 million would be insufficient given his financial condition, and he once again expressed a lack of full comprehension as to the meaning of the proposed agreement. (*Id.* at 119). Gordon Lewis testified that, after reviewing the November 2nd document, he told Mr. Grieco that "certain things weren't acceptable ... the total consideration was not adequate, ... this deal just wasn't going to fly." (Lewis Dep. at 61). He contacted a GFT's representative "to discuss what they had put in writing was not adequate to get the deal done."(*Id.* at 62). He further informed GFT that $2 million was necessary to close the deal. (*Id.* at 63).

> FN5. Plaintiffs' attorney, who was present at Mr. Grieco's deposition, is not the lawyer who represented GBI with regard to the joint venture proposal.

The parties conducted further negotiations, and ultimately reached agreement on a $2 million up-front payment and a $300,000 option price, which terms were incorporated in a December 4, 1998 letter of intent. This document provided that GFT would pay $2 million for 40% of Newco's common stock with an option to purchase the balance for $300,000, and that Newco would assume GBI's unfunded pension liability. The letter agreement also included a five year projection of monies the Grieco Corporation would generate from a purchase and sale agreement to be negotiated with Brooks Brothers. Specifically, GFT projected that the Grieco Corporation could pay Mr. Grieco a salary of $175,000 per year and generate pre-tax profits of $1.5 million during the following five years. The letter of intent further provided that GFT's obligation to proceed with the transaction would be subject to a number of spe-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 7:07-cv-09588-KMK   Document 17-29   Filed 06/02/2008   Page 3 of 16

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 2914093 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d, 2004 WL 2914093)

Page 3

cified conditions being satisfied including:

"The negotiation, execution and delivery of definitive agreements in form and substance satisfactory to GFT and its counsel ..."

"[GFT] will have completed to its satisfaction a due diligence review of [GBI's business and financial records]."

"The formation by Richard Grieco of a new corporation (in which Newco and GFT will have no financial interest) to provide marketing services ("Grieco Corporation")."

*3 "The receipt of a tax and financial incentive package from the State of Massachusetts ..."

The letter of intent, which was signed by Mr. Frasch, concluded by instructing Mr. Grieco that if the instrument "accurately reflects [the parties'] understanding," he should "indicate [his] intent to proceed with the Transactions by signing ... this letter ... and returning it to [Mr. Frasch. The parties'] attorneys and accountants will then proceed to review [GBI's] legal and financial records and to draft definitive agreements to effectuate the Transactions." On December 4, 1998, Mr. Frasch sent Mr. Grieco two copies of the letter of intent with a cover letter stating, "Enclosed are two copies of the final contract. Please sign both and return one to my office."

GBI's outside counsel [FN6] testified that, after speaking with Mr. Grieco and Mr. Lewis, he fine tuned the copy of the letter of intent provided to him to make it more accurate and complete. (Zimble Dep. at 20-21). Mr. Lewis testified that he had raised certain issues regarding the December 4th agreement with GBI's attorney expecting counsel to negotiate those points with GFT. (Lewis Dep. at 91-100). By letter dated December 9, 1998, GBI's lawyer submitted to GFT's outside counsel a "redlined document incorporating changes" to the December 4th instrument consistent with their discussions of the prior day. Counsel's letter listed additional issues that were not reflected "in the revised document." Some of the changes set forth in the redlined document and accompanying letter were: (1) Newco would not commit to charge Grieco Corporation a transfer price for the Brooks Brothers garments which would ensure that Grieco Corporation would be able to pay Mr. Grieco a salary of $175,000 per year and generate a pre-tax profit of $1.5 million; (2) GFT would guarantee payment of such salary and profit for that five year period in the event of either Brooks Brothers' breach of its purchase agreement with Grieco Corporation or an early termination of the relationship between GFT and GBI; (3) GFT would commit to exercise the call option within five years; and (4) GFT would eliminate as a condition to its obligation to proceed with the transactions the receipt of the tax and financial package. GBI's attorney ended his cover letter by requesting that he be notified as soon as GBI's counsel reviewed the redline document with GFT "so that our clients can execute this letter of intent this week."

> FN6. Mr. Grieco testified that GBI's outside counsel also sat on the GBI board of directors until November of 1998. (R. Grieco Dep. at 8, 245).

Mr. Grieco's testified that he did not instruct either Mr. Lewis or GBI's attorney to seek substantive changes to the December 4th document, and he denied knowing counsel was attempting to negotiate changes to the agreement. (R. Grieco Dep. at 129, 243-44). Mr. Grieco testified that the attorney, and his law firm, was the only legal counsel representing GBI in connection with the proposed transaction (not the ancillary labor union issues), and that such representation spanned from December of 1998 through March of 1999, when negotiations ended. (Id. at 119-21). Although Mr. Grieco and Mr. Lewis contend, in their respective declarations in opposition to the motion, that neither one of them authorized GBI's counsel to reject the deal, neither party asserts that the lawyer did not possess the requisite authority to submit a counteroffer on

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 7:07-cv-09588-KMK    Document 17-29    Filed 06/02/2008    Page 4 of 16

Not Reported in F.Supp.2d                                                                                                    Page 4
Not Reported in F.Supp.2d, 2004 WL 2914093 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d, 2004 WL 2914093)

behalf of GBI. (R. Grieco Decl. ¶ 25; Lewis Decl. ¶ 21).

*4 Mr. Grieco further testified that "it was a week or two or three or a month," after he received the December 4th agreement, that he signed it and then mailed it to Mr. Frasch. (R. Grieco Dep. at 125). He testified that in late 1998, he understood that in order to make the letter of intent a binding contract, he had to sign it. (*Id.* at 122). He explained that he did not perceive any urgency in executing and returning the letter of intent because he "assumed that we had a deal, it was signed by GFT and Ron Frasch, he called to congratulate me the next day, or whatever we were going forward with people making plans ..."(*Id.* at 128). In opposing the motion, Mr. Grieco maintains "[t]hat the fact that [he] cannot remember when [he] actually signed and mailed the letter of intent is an indication of how little the written agreement meant to [him]: it was Congress Financial who needed it."(R. Grieco Decl. ¶ 25). Mr. Grieco contends that he was relying on Mr. Frasch's word that they were partners, as well as witnessing the deal itself moving forward.(*Id.*). Although there is evidence in the record contradicting Mr. Grieco's claim that he executed and mailed the letter agreement, and GFT denies ever receiving an executed agreement, Mr. Grieco's factual assertions will be accepted as true for purposes of this motion as it has no bearing on the outcome of the motion. Thus, no factual issue exists in this regard.

On December 21, 1998, GBI's attorney sent a memorandum to GFT's counsel outlining "the remaining open issues on the GBI/GFT Letter of Intent."One of the issues was that the "Pension Fund liabilities must be assumed by Newco and Richard Grieco and GBI must be indemnified by Newco and GFT for the payment of these obligations ."In his affidavit, GFT's lawyer states that, in accordance with GFT's directions, he advised GBI's attorney that the changes regarding the Brooks Brothers agreement and the pension fund indemnification were unacceptable. (LaGueux Aff. ¶ 17). Prior to sending Mr. Grieco the December 4th letter of intent, GFT was aware that GBI was a party to an agreement with the Pension Benefit Guaranty Corporations ("PBGC"), a federal agency regulating pension funds, and that GBI had a large unfunded pension liability. (Deft.' Rule 56.1 Statement ¶¶ 24-25; Pls.' Rule 56.1 Statement ¶ 8; Forlenza Aff. Ex. C; R. Grieco Aff. Ex. 2). In an effort to resolve the open issues raised by GBI, GFT drafted a revised letter of intent which included a provision by which GFT would pay GBI $299,000 for an option to extend the call option if GFT had not exercised the call after five years. In late December of 1998, GFT sent copies of this revised letter of intent to its corporate parent seeking its approval.

GFT continued on parallel tracks. It continued negotiations with GBI (and seeking approval from its corporate parent), while simultaneously conducting due diligence and putting in place a joint-venture implementation plan. GFT engaged Ernst & Young ("E & Y") to perform due diligence. Following up on a December 30, 1998 meeting with E & Y, GFT noted in a January 4, 1999 memo that "prior to signing a final purchase agreement," GFT had to resolve various "open points," including: "Pension Issues-confirm and completely understand the unfunded pension plan liability."GFT's counsel was to handle a pension fund evaluation. On January 13, 1999, GFT's attorney spoke with GBI's employee benefit counsel who explained his understanding of the PBGC agreement and its impact on the proposed transaction. GBT's lawyer's notes of this conversation conclude with the statement, "Can't insulate this just to Newco."On January 21, 1999, GFT's counsel met with GFT management and expressed the complexity of the pension plan liability issue. GFT concluded that it had "to establish a new strategy for the acquisition ... based on the pension fund liability which [GFT] clearly cannot absorb."Mr. Grieco testified that at a January 25, 1999 meeting, attended by Frasch, Grieco, Lewis, GFT's attorney, and others, Mr. Frasch stated that if the pension liability problem could not be resolved, the deal would have to be restructured. (R. Grieco Dep. at 184; *seealso,* Deft.' Rule 56.1 Statement ¶

Case 7:07-cv-09588-KMK    Document 17-29    Filed 06/02/2008    Page 5 of 16

Not Reported in F.Supp.2d                                                                                           Page 5
Not Reported in F.Supp.2d, 2004 WL 2914093 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2004 WL 2914093)**

37; Pls.' Rule 56.1 Statement ¶ 15).

*5 Over the next several weeks, GFT and GBI attempted to reach agreement on a restructured deal, specifically a proposed manufacturing and supply agreement. Mr. Grieco testified that on February 25, 1999, Mr. Frasch informed him that "everything was on track" and that instead of sending the agreement to the parent company to be "rubber stamped," he was personally going to Italy to have the parent company approve it. (R. Grieco Dep. at 194-95). GFT's internal documents, dated February of 1999, reveal that GFT was concerned that the newest proposal exposed GFT to the risk that GBI, newly modernized at GFT's expense, might be subsequently sold to an entity that would not honor the parties' agreement. (Frasch Aff. Ex. R). On March 9, 1999, GFT's parent corporation indicated that the GBI "project has not been approved." Mr. Frasch alleges that the reason given by the parent company for its decision was the unfunded pension liability issue, as well as recent developments alleviating GFT's need for additional manufacturing capacity. (Frasch Aff. ¶ 36). Mr. Frasch immediately notified Mr. Grieco that the requisite approval was not obtained, and negotiations ceased.

Mr. Grieco testified that he believed Mr. Frasch acted in good faith in trying to devise a different approach and conclude the deal. (R. Grieco Dep. at 186-87). His opinion changed only because he was never given an explanation when he asked Mr. Frasch why the deal fell through. (*Id.* at 187). However, he further testified that Mr. Frasch called him to tell him that the transaction would not be consummated because the corporate parent did not wish to proceed.(*Id.*). Mr. Grieco's explained that his belief regarding the lack of good faith negotiations was based on his speculation that the pension fund liability was not the true issue precluding the finalization of the deal. (*Id.* at 188). He did not know whether the fault lied with Mr. Frasch or the parent company, but noted that Mr. Frasch "may have had all the right intentions."(*Id.*).

The following month after GFT ended negotiations, GBI was acquired by the Bayer Company. (*Id.* at 31). As part of that deal, a new company was formed, plaintiff Southwick Clothing LLC, which took over the business that GBI previously performed. (*Id.* at 31-32). Mr. Grieco serves as president of Southwick Clothing LLC, and he receives the same compensation as he earned when he was president of GBI. (*Id.* at 42).

SUMMARY JUDGMENT STANDARD

Summary judgment, pursuant to Rule 56, is warranted where there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). A genuine issue for trial exists if, based on the record as a whole, a reasonable trier of fact could return a verdict for the non-moving parties. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986). The Court must view the record in the light most favorable to the non-movants by resolving all ambiguities and drawing all reasonable inferences in their favor. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986); *Anderson*, 477 U.S. at 255;*Tomka v. Seiler Corp.*, 66 F.3d 1295, 1304 (2d Cir.1995). The burden to show that there are no genuine issues of fact rests with the party seeking summary judgment. *Anderson*, 477 U.S. at 256;*Tomka*, 66 F.3d at 1304. Nevertheless, the parties opposing the motion bears the ultimate burden of proof to demonstrate that there is some evidence which would create a genuine issue of material fact. *Twin Laboratories, Inc. v. Weider Health & Fitness*, 900 F.2d 566, 568 (2d Cir.1990). The non-movants cannot meet this burden by simply relying on mere conclusory allegations, speculation or conjecture. *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir.1986).

BREACH OF CONTRACT CLAIM

*6 The first cause of action is for breach of contract. The amended complaint states that "[o]n or about December 4, 1998, Grieco Bros., Inc. re-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                            Page 6
Not Reported in F.Supp.2d, 2004 WL 2914093 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2004 WL 2914093)**

ceived the final version of the contract," and that "[t]he terms of the contract dated December 4, 1998 (the 'Joint Venture Agreement') were those agreed by the parties prior to November 1998 ..." (Am.Compl.¶¶ 32, 33). It further alleges that "[a] valid and enforceable contract ... was formed on or about December 4, 1998" and that "Grieco Bros., Inc. never agreed to vary the terms of the Joint Venture Agreement."(Am.Compl.¶¶ 46, 59). Moreover, plaintiffs allege that "Grieco Bros., Inc. and GFT USA were joint venturers."(Am.Compl.¶ 64). At the initial pretrial conference, when this action was pending before another judge, plaintiffs' counsel represented that "There was a signed document with a cover letter from the president of the defendant company saying here is the final contract, executed by all parties, which sells my client's business ... to the defendant."(Tr. at 2). The lawyer explained "that the main dispute with the case is about whether the document in question constituted a binding contract or constituted simply a letter of intent, ... [as the defense] refer[s] to it as."(*Id.* at 3).

In opposing summary judgment, plaintiffs attempt to re-plead this cause of action by claiming the existence of other written or oral agreements, and contending that the agreement at issue, whichever one that may be, was not a joint venture agreement but rather a preliminary agreement to negotiate in good faith toward achieving a final joint venture contract. Plaintiffs note that GFT and GBI cooperated extensively with each other between August of 1998 through March of 1999. Plaintiffs, therefore, argue that "[w]hether a valid and enforceable contract came to exist between them at any point in that seven month period, through the execution of written agreements, or oral agreements or modifications or through the course of conduct of the parties, is an issue of fact which precludes summary judgment ..." (Pls.' Mem. Opp'n Summ. J. at 8).[FN7]

> FN7. At oral argument, plaintiffs' attorney represented that beginning in October of 1998, there was a verbal agreement between the parties, and counsel made no reference to the existence of any agreement prior to October. (Tr. at 77).

Plaintiffs expressly identified, in the amended complaint, that the December 4th letter of intent was the contract at issue, and described that contract as a joint venture agreement. Those factual allegations are judicial admissions that bind plaintiffs throughout the course of the litigation. *Official Comm. of the Unsecured Creditors of Colortile, Inc. v. Cooper & Lybrand, LLP.*, 322 F.3d 147, 167 (2d Cir.2003) (citations omitted); *Bellefonte Re Ins. Co. v. Argonaut Ins. Co.*, 757 F.2d 523, 528 (2d Cir.1985). Plaintiffs cannot survive a summary judgment motion by contradicting their own pleadings in an effort to raise a genuine issue of fact. *Bellefonte,* 757 F.2d at 528-29. A complaint cannot be amended merely by raising new facts and theories in plaintiffs' opposition papers, and hence such new allegations and claims should not be considered in resolving the motion. *See,Heletsi v. Lufthansa German Airlines, Inc.*, 2001 WL 1646518, at *1 n. 1 (E.D.N.Y. Dec. 18, 2001). Knowledge as to which written document or oral agreement constitutes the parties' contract, as well as the nature of that contract, does not lie exclusively within the hands of the defendant. Plaintiffs possess personal knowledge of such information. Thus, plaintiffs are precluded from now alleging the existence of other written and oral binding contracts. *See,Peckham Materials Corp. v. Raima Corp.*, 1995 WL 422158 (S.D.N.Y. July 18, 1995). Similarly, since the amended complaint is silent as to the existence of a preliminary agreement or the breach of any duty to negotiate in good faith, such a claim is not properly before the Court. *Adjustrite Sys., Inc. v. GAB Bus. Servs., Inc.*, 145 F.3d 543, 549 n. 5 (2d Cir.1998); *Rappaport v. Buske,* 2000 WL 1224828, at *5 n. 6 (S.D.N.Y. Aug. 29, 2000).

*7 Hence, the inquiry is limited to whether a genuine issue of fact exists as to whether the December 4th letter of intent constitutes a binding joint venture agreement. It is not necessary to determine whether the laws of New York or Massachusetts are

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 7:07-cv-09588-KMK   Document 17-29   Filed 06/02/2008   Page 7 of 16

Not Reported in F.Supp.2d                                                      Page 7
Not Reported in F.Supp.2d, 2004 WL 2914093 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d, 2004 WL 2914093)

applicable in resolving the motion with regard to the breach of contract cause of action. The parties rely exclusively on New York law, and there is no claim that Massachusetts law differs in any appreciable manner.[FN8]

> FN8. Plaintiffs acknowledge that most of the overall legal issues raised herein are black letter law and that the law of both jurisdictions have near identical standards and apply very similar tests. Where Massachusetts and New York law differ, however, plaintiffs contend that they are entitled to the benefit of those differences. (Pls.' Mem. Opp'n Summ. J. at 7). Despite seeking any beneficial difference that may exist, plaintiffs' counsel acknowledged, at oral argument, that Massachusetts law applies to all the causes of action with the exception of the breach of contract claim. Since plaintiffs contend that the contract is binding and the since the agreement contains a New York choice of law provision, plaintiffs maintain New York law is applicable to the contract claim. (Tr. at 102-103). In their opposition papers, plaintiffs rely exclusively on Massachusetts law with regard to their other claims. The Court finds that the remaining causes of action are conduct-regulating tort claims in which Massachusetts has the greatest interest as this is where plaintiffs' injuries allegedly occurred, as well as where most of the acts and omissions giving rise to the lawsuit happened. *Klaxton Co. v. Stemcor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941); *Cooney v. Osgood Mach., Inc.*, 595 N.Y.S.2d 919, 922 (N.Y.1993); *Istim, Inc. v. Chemical Bank*, 575 N.Y.S.2d 796, 798 (N.Y.1991); *Schultz v. Boy Scouts of America, Inc.*, 491 N.Y.S.2d 90, 94 (N.Y.1985). Accordingly, other than the breach of contract claim, Massachusetts law governs the resolution of this lawsuit.

In order for a contract to be binding, there must be a manifestation of mutual assent sufficiently definite to assure that the parties are truly in agreement with respect to all material terms. *Express Indus. and Terminal Corp. v. New York State Dept. of Transp.*, 693 N.Y.S.2d 857, 860 (N.Y.1999); *Cobble Hill Nursing Home v. Henry and Warren Corp.*, 548 N.Y.S.2d 920, 923 (N.Y.1989)."Generally, courts look to basic elements of the offer and the acceptance to determine whether there is an objective meeting of the minds sufficient to give rise to a binding and enforceable contract."*Express Indus. and Terminal Corp.*, 693 N.Y.S.2d at 860. Absent an offer, acceptance, consideration, mutual assent and the intent to be bound, a contract is unenforceable.*Register.Com. Inc. v. Verio, Inc.*, 356 F.3d 393, 427-28 (2d Cir.2004) (citations omitted).

To be deemed valid, an acceptance must be "clear, unambiguous and unequivocal," and the acceptance must comply with the terms of the offer.*Krumme v. Westpoint Stevens Inc.*, 143 F.3d 71, 83 (2d Cir.1998) (quoting *King v. King*, 617 N.Y.S.2d 593, 594 (N.Y.App.Div.1994); *seealso,Alentino, Ltd. v. Chenson Enterprises, Inc.*, 938 F.2d 26 (2d Cir.1991) (quoting *Roer v. Cross County Med. Center Corp.*, 441 N.Y.S.2d 844, 845 (N.Y.App.Div.1981). A counteroffer which modifies the offer constitutes an absolute rejection of that offer. *Krumme*, 143 F.3d at 83 (quoting *Poel v. Brunswick-Balke-Collender Co. of New York*, 110 N.E. 619, 622 (1915); *seealso,Kleinberg v. Ambassador Assoc.*, 480 N.Y.S.2d 210, 211 (N.Y.App.Div.1984), *aff'd,*485 N.Y.S.2d 748 (N.Y.1984). If the acceptance is even slightly at variance with the terms of the offer, it constitutes a rejection and termination of the initially offered terms. *Homayouni v. Paribas*, 660 N.Y.S.2d 413, 414 (N.Y.App.Div.1997) (citations omitted). The original party, however, may be deemed to have accepted the counteroffer by his or her subsequent performance under the contract. *See,Ladau v. Hillier Group, Inc.*, 2004 WL 691520, at *4 (S.D.N.Y. Mar. 31, 2004) (citing *Int'l Paper Co. v. Suwyn,*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 7:07-cv-09588-KMK   Document 17-29   Filed 06/02/2008   Page 8 of 16

Not Reported in F.Supp.2d                                                                                                          Page 8
Not Reported in F.Supp.2d, 2004 WL 2914093 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2004 WL 2914093)**

966 F.Supp. 246, 254 (S.D.N.Y.1997)).

Four days after the letter agreement was sent to Mr. Grieco, GBI's attorney advised GFT's counsel that he sought, on behalf of his client, changes to the proposed agreement. The following day, GBI's counsel submitted a revised draft of the agreement incorporating those change and set forth a separate list of additional issues in his cover letter. Thus, GBI's counsel proffered a counteroffer on behalf of GBI, thereby rejecting the original offer. *See, Metro. Steel Indus., Inc. v. Citnalta Constr. Corp .,* 754 N.Y.S.2d 278, 279 (N.Y.App.Div.2003) (citation omitted). GBI's counsel's understanding that no binding agreement was in effect can be gleaned from his request, in his cover letter, that GFT review the redline document so that GBI and GFT could execute the revised letter of intent within the week.

**\*8** A rejection of an offer renders the offer a nullity provided, however, that the person who rejected the offer was vested with the authority to accept it. Absent such authority, the rejection is of no legal consequence.*Tradeways Inc. v. Chrysler Corp.,* 342 F.2d 350, 354 (2d Cir.1965). Although Mr. Grieco and Mr. Lewis indicate that they never instructed GBI's counsel to withdraw from the deal, neither of them claimed that the lawyer did not have the requisite authority to negotiate the December 4th proposal and to submit a revised agreement with material changes. Both Mr. Grieco and GBI's counsel testified that counsel was representing GBI with regard to the proposed transaction with GFT prior to the letter agreement being sent to Mr. Grieco and for sometime thereafter. Thus, the attorney was cloaked with both actual and apparent authority to act on behalf of the corporation. GBI's counsel's communication with GFT's attorney four days after the letter agreement was sent, as well as his submission of the revised document the following day, constituted a counteroffer thereby nullifying the existence of the offer. Moreover, the record does not indicate that GFT accepted the terms of the counteroffer. Rather, the parties continued negotiating the deal for months thereafter during which time additional proposed agreements were drafted.

Mr. Grieco testified that he signed and mailed the agreement as early as one week after he received the agreement and as late as one month after receipt. The letter agreement, as well as Mr. Frasch's cover letter, indicated that the exclusive means by which to accept the offer was for Mr. Grieco to sign and return it. It did not provide for a particular delivery method as to how the agreement was to be returned. Under such circumstances, acceptance becomes effective when mailed regardless of whether it was ever received by GFT. *See, Wester v. Casein Co. of America,* 100 N.E. 488, 490 (N.Y.1912) ("[T]he contract springs into existence at the time of such mailing ..."); *seealso, Morton's of Chicago/ Great Neck LCC v. Crab House, Inc.,* 746 N.Y.S.2d 317, 319 (N.Y.App.Div.2002) (citations omitted). An offeree who has not yet signed the agreement rejects it by making a counteroffer. *See, Strassburg v. Ricotta,* 480 N.Y.S.2d 649, 650 (N.Y.App.Div.1984). Accordingly, Mr. Grieco's purported execution of the letter agreement, after the counteroffer was already made, could not give rise to a binding agreement. *See, Scheck v. Francis,* 311 N.Y.S.2d 841, 843 (N.Y.1970).

Furthermore, it is of no import that Mr. Frasch, in his cover letter, referred to the December 4th letter of intent as a final contract. The letter agreement clearly and unequivocally provided a number of conditions precedent that had to be satisfied in order to give rise to GFT's obligation to proceed with the joint venture transaction. "There is a strong presumption against finding binding obligation in agreements which include open terms, call for future approvals and expressly anticipate future preparation and execution of contract documents."*See, Teachers Ins. and Annuity Ass'n of America v. Tribune, Co.,* 670 F.Supp. 491, 499 (S.D.N.Y.1987). There is no evidence to suggest that Mr. Grieco was misled to believe that the letter of intent constituted a final joint venture agreement. Mr. Grieco himself acknowledges that the letter

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 7:07-cv-09588-KMK    Document 17-29    Filed 06/02/2008    Page 9 of 16

Not Reported in F.Supp.2d                                                                                     Page 9
Not Reported in F.Supp.2d, 2004 WL 2914093 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2004 WL 2914093)**

agreement meant very little to him as it was drafted in response to the request of GBI's primary lender. Mr. Grieco maintains that he "had Ronald Frasch's word that we were partners and the evidence of my own eyes that the deal was going forward and more than that I didn't need."(R. Grieco Decl. ¶ 25). Hence, Mr. Grieco did not consider the December 4th letter of intent as an instrument binding the parties to the joint venture agreement. Rather, he placed his trust on Mr. Frasch's oral representations in conjunction with his own observations. Such a position further vitiates against a finding that there was a meeting of the minds as to the terms of the December 4th letter agreement. Additionally, reliance on oral representations that GBI and GFT were partners cannot give rise to a binding joint venture agreement. The purported agreement contains provisions that could not be performed within one year, and hence the Statute of Fraud would render any oral agreement unenforceable. N.Y. GEN. OBLIG. Law § 5-701(1) (McKinney Supp.2004); *Chromalloy American Corp. v. Universal Housing Sys. of America,* 495 F.Supp. 544, 550-51 (S.D.N.Y. July 15, 1980), *aff'd,* 697 F.2d 289 (2d Cir.1982); *RTC Prop., Inc. v. Bio Resources, Ltd.,* 744 N.Y.S.2d 173 (N.Y.App.Div.2002).

*9 Furthermore, the fact that there was performance by the parties, which Mr. Grieco claims to have witnessed, did not create a binding contract. *See,Six West Retail Acquisition, Inc. v. Sony Theatre Mgmt. Corp.,* 2004 WL 691680, at *18 (S.D.N.Y. Mar. 31, 2004)."A party may make some partial performance merely to further the likelihood of consummation of a transaction it considers advantageous."*See,Tribune Co.,* 670 F.Supp. at 502. Since the December 4th letter of intent clearly indicates GFT's intent not to be bound until the negotiation, execution and delivery of a final agreement, no binding contract exists until those events occur. *R.G. Group, Inc. v. Horn & Hardart Co.,* 751 F.2d 69, 74 (2d Cir.1984) (citation omitted); *V'Soske v. Barwick,* 404 F.2d 495, 499 (2d Cir.1968)."[I]f either party communicates an intent not to be bound until he [or she] achieves a fully executed document, no amount of negotiation or oral agreement to specific terms will result in the formation of a binding contract."*Winston v. Mediafare Entertainment Corp.,* 777 F.2d 78, 80 (2d Cir.1985) (citation omitted). Given the existence of an explicit intent not to be bound, GFT is not obliged to proceed with the transaction even if there was considerable partial performance. *Arcadian Phosphates, Inc. v. Arcadian Corp.,* 884 F.2d 69, 72-73 (2d Cir.1989). Furthermore, plaintiffs admit that during the negotiations, from June of 1998 through March of 1999, "[GBI] and its representatives were informed that *any* transaction with GFT was subject to approval by GFT's corporate parent."(Pls.' Response to Defts.' First Request for Admission ¶ (A)(1) (emphasis added)). No approval was obtained to enter into a final joint venture agreement. Given the existence of unsatisfied condition precedents, GFT owes no further duties to GBI with regard to the formation of a joint venture.

In light of the foregoing, the breach of contract cause of action is dismissed.

BREACH OF FIDUCIARY DUTY CLAIMS

The second cause of action is brought on behalf of GBI alleging GFT breached its fiduciary duty owing to GBI "in their inducement of and breach of the Joint Venture Agreement."(Am.Compl.¶ 65). The third cause of action is brought on behalf of Richard and Sarah Grieco claiming that, under Massachusetts law, GFT breached a fiduciary duty owing to them as shareholders by GFT's "inducement of and breach of the Joint Venture Agreement and in [GFT's] use of the assets of [GBI] which was acquired and used by the joint venture ."(Am.Compl.¶ 71). Both of these claim allege that GFT owed a fiduciary duty to GBI "[b]y reason of their status as joint venturers""and or by reason of the confidential nature of the relationship between the parties."(Am.Compl.¶¶ 64, 70). Although the amended complaint sets forth only two grounds for the finding of a fiduciary relationship,

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 2914093 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d, 2004 WL 2914093)

Page 10

*i.e.*, the parties status as joint venturers and their confidential relationship, plaintiffs now asserts a third alternative basis, *i.e.*, "the parties' obligation to negotiate in good faith the remaining terms of their binding preliminary commitment and not to refuse to proceed on grounds not contained therein."(Pls.' Mem. Opp'n Summ. J. at 22). As previously noted, plaintiffs cannot rely on an unpled theory of recovery as a means of defeating summary judgment and, in any event, the record does not indicate that GFT failed to negotiate in good faith.

*10 Parties who are joint venturers, or who share a fiduciary or confidential relationship, owe a duty of good faith, utmost loyalty and fair dealing to each other. *Petricca Dev. Ltd., P'ship v. Pioneer Dev. Co.*, 214 F.3d 216, 220 (1st Cir.2000) (citations omitted); *Compagnie de Reassurance d'Ile de France v. New England Reinsurance Corp.*, 944 F.Supp. 986, 995 (D.Mass.1996) (citations omitted); *Halloran v. Ferrara*, 782 N.E.2d 1136, 2003 WL 272083, at *3 (Mass.App.Ct. Feb. 10, 2003) (citing 5 Scott & Fratchers, Trusts § 495 (4th ed.1989)). In *Shain Inv. Co., Inc. v. Cohen*, 443 N.E.2d 126 (Mass.App.Ct.1982), the Court set forth the following factors to consider in determining whether a joint venture exists: "(1) an agreement by the parties manifesting their intention to associate for joint profit not amounting to a partnership or a corporation; (2) a contribution of money, property, effort, knowledge, skill, or other assets to a common undertaking; (3) a joint property interest in all or parts of the subject matter of the venture; (4) a right to participate in the control or management of the enterprise; (5) an expectation of profit; (6) a right to share in profits; (7) an express or implied duty to share in losses; and (8) a limitation to a single undertaking (or possibly a small number of enterprises)."*Shain,* 443 N.E.2d at 130 (citations omitted). The mere fact that the parties anticipated a joint venture would eventually be created is insufficient, under these circumstances, to meet the *Shain* criterion. Here, GFT never exercised any meaningful control over GBI's operations. Moreover, the specified conditions precedent to the formation of the joint venture were not satisfied. Therefore, no joint venture came into existence thereby precluding a fiduciary duty from arising therefrom. *See,Petricca,* 214 F.3d 216,*supra.*

Nor did the parties confidential relationship give rise to a fiduciary relationship. In the commercial context, the First Circuit explained in *Indus. Gen. Corp. v. Sequoia Pacific Sys. Corp.*, 44 F.3d 40 (1st Cir.1995):

Massachusetts courts have stated that, through business transactions conducted at arm's length generally do not give rise to fiduciary relationships, such a relationship can develop where one party reposes its confidence in another. Importantly, however, courts have repeatedly cautioned that the plaintiff alone, by reposing trust and confidence in the defendant, cannot thereby transform a business relationship into one which is fiduciary in nature. In determining whether such a transformation has taken place, courts look to the defendant's knowledge of plaintiff's reliance and consider the relation of the parties, the plaintiff's business capacity contrasted with that of the defendant, and the readiness of the plaintiff to follow the defendant's guidance in complicated transactions wherein defendant has specialized knowledge. *Indus. Gen. Corp.*, 44 F.3d at 44 (internal quotation marks and citations omitted).

*11 The attempt by GBI and GFT to form a joint venture was an arm's length business relationship, not a fiduciary one. The companies were both represented by counsel and their representatives were experienced business persons. Additionally, even though GBI shared confidential information with GFT, its competitor, a fiduciary obligation is not imposed upon GFT unless GFT betrayed GBI's trust and confidence in order to secure a benefit for itself. *Geo Knight & Co., Inc. v. Watson Wyatt & Co.*, 170 F.3d 210, 215 (1st Cir.1999); *Sentinel Prod. Corp. v. Mobil Chemical Co.*, 2001 WL 92272 (D.Mass. Jan. 17, 2001). Plaintiffs fails to identify, nor does the record disclose, any confidential information that GFT used inappropriately in an effort to obtain a personal benefit.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 2914093 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d, 2004 WL 2914093)

Page 11

Accordingly, the second and third causes of action are dismissed.

## FRAUD CLAIMS

The sixth cause of action is for fraud based on GFT's failure to advise GBI that GFT regarded the contract "as contingent upon ... or subject to some [ ] unstated condition or event," such as the existence of the unfunded pension liability. (Am.Compl.¶ 89). The eighth and ninth causes of action are for constructive fraud. In essence, these two claims allege that while GFT and GBI shared a confidential and fiduciary relationship or were joint venturers, GFT knowingly made material misstatements that the final terms of the contract were agreed upon and repeatedly failed to disclose the contingent nature of the contract.

To state a cause of action for fraud by deceit, plaintiffs must demonstrate that defendant made a false statement of a material fact, with knowledge of its falsity, for the purpose of inducing plaintiffs to act thereon, and that plaintiffs relied upon the representation as true to their detriment. *Bond Leather Co., Inc. v. Q.T. Shoe Mfg. Co., Inc.,* 764 F.2d 928, 935 (1st Cir.1985) (quoting *Metro. Life Ins. Co. v. Ditmore,* 729 F.2d 1, 4 (1st Cir.1984)); *Murtha v. Rockwell,* 782 N.E.2d 556, 2003 WL 215023, at *2 (Mass.App.Ct. Jan. 31, 2003) (quoting *Ravosa v. Zais,* 661 N.E.2d 111, 116 (Mass.App.Ct.1996)); *Rood v. Newberg,* 718 N.E.2d 886, 892 (Mass.App.Ct.1999). Fraud by omission, however, requires a showing of both concealment of material fact and the existence of a duty to disclose. *Sahin v. Sahin,* 758 N.E.2d 132, 138 n. 9 (Mass.2001) (citing *Roadmaster Indus., Inc. v. Columbia Mfg. Co.,* 893 F.Supp. 1162, 1179 (D.Mass.1995)). A duty to disclose may exist where defendant has a fiduciary relationship with plaintiff or a similar relationship of trust and confidence that requires disclosure.*Roadmaster,* 893 F.Supp. at 1179;*Rood,* 718 N.E.2d at 892 (quoting Restatement (Second) of Torts § 551(2)(a)).

Constructive fraud does not require a showing that the speaker have actual knowledge of the falsity of the statement in order to impose liability. A constructive fraud is defined as the "damaging reliance by a party on an erroneous, though not purposeful, representation of fact by another who, with reasonable effort, might have obtained and communicated precise and accurate information."*Bernstein v. Gramercy Mills, Inc.,* 452 N.E.2d 231, 236 (Mass.App.Ct.1983) (citing *National Acad. of Sciences v. Cambridge Trust Co.,* 346 N.E.2d 879, 883 (Mass.1976); Restatement (Second) of Torts § 552 (1976)). With regard to an actual misstatement of fact, the parties need not be in a fiduciary relationship. *Kozdras v. Land/Vest Prop., Inc.,* 413 N.E.2d 1105 (Mass.1980). However, an omission of fact can constitute constructive fraud only if a fiduciary relationship exists. *Geo. Knight,* 170 F.3d at 215;*Bernstein,* 452 N.E.2d at 236 (citation omitted).

*12 Since GFT did not owe a fiduciary duty to GBI, the sixth and ninth causes of action, for failure to disclose the contingent nature of the agreement, are not legally viable. Additionally, these claims, as well as the eighth cause of action for misrepresenting that the parties had agreed to the terms of the final contract, are not supported by the evidence. The record is bereft of any evidence that GFT concealed material information or made material misstatements which reasonably led GBI to believe that a binding agreement existed or that the parties were in agreement as to the terms of a final contract. The proposed letter of intent indicates that GFT's obligation to proceed with the transaction was contingent upon it completion, to its satisfaction, of a due diligence review of GBI's legal and financial affairs. Notwithstanding plaintiffs' contentions to the contrary, the assumption of the unfunded pension liability is not excluded from the specified due diligence contingency merely because the proposed agreement states that Newco would assume such liability. The due diligence review revealed that GFT might be held personally responsible for the pension fund liability. No evidence was adduced sug-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 7:07-cv-09588-KMK    Document 17-29    Filed 06/02/2008    Page 12 of 16

Not Reported in F.Supp.2d                                                                                      Page 12
Not Reported in F.Supp.2d, 2004 WL 2914093 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d, 2004 WL 2914093)

gesting that GFT had knowledge that such a risk existed prior to Mr. Frasch's execution of the December 4th draft agreement. Although the letter of intent did not indicate that obtaining approval of GFT's parent company was a condition precedent to GFT's execution of a final contract, plaintiffs acknowledge they were aware of such a condition. The parent company failed to provide the requisite approval to execute a final joint venture contract, and it is immaterial whether that was due to the pension fund liability or some other reason. Since GBI knew of GFT's need for approval from its parent company, it was unreasonable to place any reliance on alleged misstatements that such approval was a mere formality. *Boyle v. Int'l Truck and Engine Corp.*, 369 F.3d 9, 15 (1st Cir.2004). The parties' extensive negotiations and their attempts at redrafting an acceptable agreement renders reliance, on any alleged misstatements, unreasonable. *See, Krock v. Lipsay,* 97 F.3d 640, 646-47 (2d Cir.1996); *Damon v. Sun Co., Inc.,* 87 F.3d 1467, 1480 (1st Cir.1996).

The sixth, eighth, and ninth causes of action are, therefore, dismissed.

## NEGLIGENT MISREPRESENTATION AND TORTIOUS INTERFERENCE CLAIMS

The fifth and thirteenth causes of action are for fraud and negligent misrepresentation, respectively. Both claims are premised on GFT allegedly insisting that GBI exercise its opt-out clause, in a contract it had with clothing designer Joseph Abboud ("JA"), as a condition to GFT signing the agreement. Plaintiffs allege that GBI was assured that GFT would not obtain JA's business, but that GFT fraudulently concealed its true purpose which was to acquire the license for itself, which GFT was successful in doing.

The tenth cause of action asserts a claim for tortious interference with prospective business relations. The complaint states that by GFT insisting that GBI terminate the JA contract and by GFT fraudulently assuring Brooks Brothers that GBI's contractual obligations would be performed by the joint venture, GFT tortiously interfered with GBI's prospective manufacturing contracts with regard to these retailers.

*13 The degree of culpability plaintiff must demonstrate to establish a claim for negligent misrepresentation is less than that needed to prove fraud.*Cummings v. HPG Int'l, Inc.,* 244 F.3d 16, 24-25 (1st Cir.2001). To constitute a fraudulent misstatement, the speaker must know of the falsity of the statement at the time of its utterance. *Id.* at 23." '[M]ere negligence in discovering the falsity before making the representation is not sufficient for an action in tort for deceit, but it is enough for an action in negligence." ' *Id.* at 23 (quoting 37 J. Nolan & L. Sartorio, Massachusetts Practice § 143 at 240-41 (2d ed.1989)). To prove a negligent misrepresentation claim, a plaintiff must establish "that the defendant: (1) in the course of its business, (2) supplied false information for the guidance of others (3) in their business transactions, (4) causing or resulting in pecuniary loss to those others (5) by their justifiable reliance upon the information, and (6) that it failed to exercise reasonable care or competence in obtaining or communicating the information." *Id.* at 24 (citations omitted); *seealso, Rodowicz v. Massachusetts Mut. Life Ins. Co.,* 279 F.3d 36, 42 (1st Cir.2002); *Nota Constr. Corp. v. Keyes Assoc., Inc.,* 694 N.E.2d 401, 405 (Mass.App.Ct.1998); *Fox v. F & J Gattozzi Corp.,* 672 N.E.2d 547, 551 (Mass.App.Ct.1996). Both fraudulent and negligent misrepresentation claims require a showing of plaintiff's reliance on the alleged misrepresentation. *See, Brockton Sav. Bank v. Peat, Marwick, Mitchell & Co.,* 577 F.Supp. 1281, 1287 (D.Mass.1983). That reliance must be reasonable. *Sand v. Ridefilm Corp.,* 212 F.3d 657, 664 (1st Cir.2000) (citations omitted); *Krock,* 97 F.3d at 646-47; *Damon,* 87 F.3d at 1480.

In order to state a cause of action for tortious interference with prospective business relations, a plaintiff must establish "the existence of a business

Case 7:07-cv-09588-KMK    Document 17-29    Filed 06/02/2008    Page 13 of 16

Not Reported in F.Supp.2d                                                                                          Page 13
Not Reported in F.Supp.2d, 2004 WL 2914093 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d, 2004 WL 2914093)

relationship or contemplated contract of economic benefit; (2) defendant's knowledge of such relationship; (3) the defendant's intentional and improper interference with that relationship; and (4) the plaintiff's loss of advantage as a direct result of the defendant's conduct."*See, Mass Cash Register, Inc. v. Comtrex Sys. Corp.*, 901 F.Supp. 404, 421 (D.Mass.1995) (citations omitted). Although a showing of malice is not required, proof of intentional interference will not alone suffice. *Logan Equip. Corp. v. Simon Aerials, Inc.*, 736 F.Supp. 1188, 1198-99 (D.Mass.1990); *United Truck Leasing Corp. v. Geltman*, 551 N.E.2d 20, 23 (Mass.1990). Rather, defendant's interference must be wrongful involving improper means or motives. *United Truck Leasing Corp.*, 551 N.E.2d at 23-24. It is not sufficient to establish defendant's interference was improper merely by showing that it was motivated by its own financial gain. *Trent Partners and Assoc., Inc. v. Digital Equip. Corp.*, 120 F.Supp.2d 84, 112-13 (D.Mass.1999); *Vakil v. Anesthesiology Assoc. of Taunton, Inc.*, 744 N.E.2d 651, 657 (Mass.App.Ct.2001) (citations omitted).

*14 The record fails to disclose any evidence that GFT required GBI to terminate the JA contract; that GBI relied on GFT's alleged misstatements regarding that license; or that GFT interfered with GBI's relationship with JA or Brooks Brothers. At Mr. Grieco's deposition, he testified that toward the beginning of GBI and GFT's negotiations, he was asked by a GFT employee, who also happens to be Mr. Grieco's first cousin, whether Mr. Grieco was willing to "drop the [JA] license" and that the employee expressed his personal opinion that it might negatively affect the joint venture transaction. (R. Grieco Dep. at 99-100; R. Grieco Decl. ¶ 9). Mr. Grieco also testified that another GFT employee inquired as to whether Mr. Grieco would object if the JA line was not part of the deal. (R. Grieco Dep. at 73, 102-103). Mr. Grieco testified that he had no additional conversations with any other GFT representatives requesting that the JA line be dropped. (R. Grieco Dep. at 196). Mr. Grieco further noted that from the inception of the JA contract until GBI opted-out of the agreement, it was not a profitable contract for GBI. (*Id.* at 196). Mr. Lewis testified that he suggested to Mr. Grieco that he try to renegotiate the JA license because that license, like the Brooks Brothers business, was not profitable. (Lewis Dep. at 25, 143-44).

By letter dated March 3, 1999, Mr. Grieco terminated GBI's license with JA stating as follows:

Back in November ... we indicated to you that I was not comfortable to go forward with our license due to the enormous amounts of losses we were experiencing and expect to continue to experience. I expressed to you, at that time, that we should prepare for this eventuality ... * * * The purpose of this letter is to formally advise you in writing and confirm what I expressed to you back in November; due to sales and bookings falling below the threshold amounts, I am electing to terminate this agreement ... (Abboud Aff. Ex. A).

As early as November of 1998, the only reason GBI gave to JA for the termination of their contract was the losses GBI was suffering in performing its contractual obligations. GBI's intention to opt-out of the contract, therefore, existed prior to GFT signing the December 4th letter agreement. Plaintiffs' contend that it terminated the JA contract because GFT required GBI to do so as a condition to GFT's signing of the agreement. Such a claim cannot, however, be reconciled with the fact that GBI did not exercise the opt-out clause until three months after GFT signed the agreement. In January of 1999, GBI was informed that the joint venture deal would have to be restructured and the parties spent the next few weeks attempting to reach a new agreement. Despite the fact that GBI knew that the parties were in the midst of negotiations and had not been able to devise an acceptable alternative proposal, Mr. Grieco chose this point in time to exercise the opt-out provision in the JA contract. The letter to JA is dated six days prior to the date when GFT advised GBI that it was no longer willing to pursue a business venture with GBI. The evidence fails to support plaintiffs' contention that GBI's reli-

Case 7:07-cv-09588-KMK    Document 17-29    Filed 06/02/2008    Page 14 of 16

Not Reported in F.Supp.2d                                                                                                              Page 14
Not Reported in F.Supp.2d, 2004 WL 2914093 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d, 2004 WL 2914093)

ance on GFT's alleged representations was the cause for GBI to exercise the opt-out provision.

*15 Furthermore, no evidentiary support can be found in the record that GFT improperly interfered with GBI's prospective business relations with JA or Brooks Brothers.

PROMISSORY AND EQUITABLE ESTOPPEL CLAIMS

The eleventh and twelfth causes of action are for promissory and equitable [FN9] estoppel, respectively. These claims are generally based on GFT's alleged promises or representations that (1) the final terms of the contract were agreed upon; (2) GFT would not manufacture apparel for JA if GBI exercised its opt-out clause; (3) the joint venture agreement was valid and enforceable; and (4) the joint venture would perform GBI's contractual obligations owing to Brooks Brothers.

> FN9. It should be noted that plaintiffs did not address their equitable estoppel cause of action in their memorandum opposing summary judgment.

To state a claim of promissory estoppel, a plaintiff must establish that an unambiguous promise was made and that the party to whom the promise was made reasonably relied on that promise. *Neuhoff v. Marvin Lumber and Cedar Co.,* 370 F.3d 197 (1st Cir.2004); *Rhode Island Hosp. Trust Nat'l Bank v. Varadian,* 647 N.E.2d 1174, 1178 (Mass.1995) (quoting *Pappas Indus. Parks, Inc. v. Psarros,* 511 N.E.2d 621, 623 (Mass.App.Ct.1987)). A promissory estoppel claim is the equivalent of a contract claim except the element of consideration is absent. *Neuhoff,* 370 F.3d at 203-204. To recover for promissory estoppel, "requires no more than a promise upon which the promisee could reasonably have placed reliance; and attention is to be focused upon the reasonableness of that reliance."*Loranger Constr. Corp. v. E.F. Hauserman Co.,* 374 N.E.2d 306, 310-11 (Mass.App.Ct.1978), *aff'd,*384 N.E.2d 176 (Mass.1978). The doctrines of equitable and promissory estoppel primarily differ in that recovery under equitable estoppel is for reliance upon misrepresentations of past or present facts whereas promissory estoppel concerns reliance on statements of future intent. *Id.* at 308-309.The elements of an equitable estoppel claim are "(1) a representation or conduct amounting to a representation intended to induce a course of conduct on the part of the person to whom the representation is made; (2) an act or omission resulting from the representation, whether actual or by conduct, by the person to whom the representation is made; (3) and detriment to such person as a consequence of the act or omission."*Boylston Development Group v. 22 Boylston St. Corp.,* 591 N.E.2d 157, 163 (Mass.1992) (quoting *Celluci v. Sun Oil Co.,* 320 N.E.2d 919, 923 (Mass.App.Ct.1974), *aff'd,*331 N.E.2d 813 (Mass.1975)). It is appropriate to employ the doctrine of equitable estoppel where to do so will prevent results that are contrary to good conscience and fair dealings, and no showing of defendant's deceit, bad faith, or actual fraud is required. *Edwards v. Sullivan & Cogliano Companies, Inc.,* 2002 WL 441968, at *2-3 (Mass.App.Div. Mar. 15, 2002).

As previously discussed, no unequivocal promises or representations were made regarding the matters upon which these causes of action are based. Even had they been made, GBI's reliance on them would be unreasonable, given the complex commercial venture at issue and the fact that the purported representations and/or promises contradicted the written language of the December 4th letter of intent. *McMahon v. Digital Equip. Corp.,* 162 F.3d 28, 39 (1st Cir.1998); *Sands,* 212 F.3d at 664-65;*Trifiro v. New York Life Ins. Co.,* 845 F.2d 30, 33 (1st Cir.1988); *Rhode Island Hospital Trust Nat'l Bank,* 647 N.E.2d at 1179.

*16 Accordingly neither the promissory or equitable estoppel claims can withstand GFT's motion to dismiss.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                              Page 15
Not Reported in F.Supp.2d, 2004 WL 2914093 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2004 WL 2914093)**

### UNFAIR TRADE PRACTICE CLAIM

The final cause of action is for violation of Chapter 93A of the Massachusetts Unfair Trade Practice Act. This claim is premised solely on an alleged February 25, 1999 conversation wherein Mr. Frasch "never mentioned" to Mr. Grieco that the purported contract between GBI and GFT was "contingent upon ... any [ ] event." (Am.Compl.¶ 133). GFT argues that claim is defective because prior to the date of the subject conversation, GFT advised GBI that it was not going to proceed with the joint venture proposal because of the pension fund liability risk. Additionally, GFT maintains that the undisputed record demonstrates that there was no agreed upon contract, letter of intent or even oral agreement.

To state a cause of action under § 2, plaintiff must allege an unfair or deceptive act or practice that was committed by defendant in the conduct of any trade or commerce, and that the act or practice caused plaintiff to sustain injury. *See, Swenson v. Yellow Transp., Inc.*, 317 F.Supp.2d 51, 54 (D.Mass.2004). An unfair or deceptive act requires a showing of "rascality." Such a showing is particularly difficult to make in a case involving an arm's-length transaction between sophisticated business entities. *Knapp Shoes, Inc. v. Sylvania Shoe Mfg. Corp., Co.*, 72 F.3d 190, 200 (1st Cir.1995). To rise to the requisite level of rascality, the subject conduct must be of such a nature that " 'would raise an eyebrow of someone inured to the rough and tumble of the world of commerce." ' *Quaker State Oil Refining Corp. v. Garrity Oil Co., Inc.*, 884 F.2d 1510, 1513 (1st Cir.1989) (quoting *Levings v. Forbes & Wallace, Inc.*, 396 N.E.2d 149, 153 (Mass.1979)). To do so, it must be established that the objectionable act "falls 'within at least a penumbra of some common-law, statutory, or other established concept of fairness,' or was 'immoral, unethical, oppressive or unscrupulous, and resulted in substantial injury to competitors or other business [persons]." ' *Id.*(quoting *PMP Assocs., Inc. v. Globe Newspapers, C.G.,*, 321 N.E.2d 915, 917 (1975)).

Plaintiffs' claim is premised entirely on Mr. Frasch's alleged failure to inform plaintiffs that the purported contract between the parties was contingent upon the occurrence of some event. As previously noted, plaintiffs were advised that the consummation of the deal between the parties hinged on several conditions being satisfied. Defendant's conduct, in not reiterating this known circumstance to plaintiffs, does not rise to the level of rascality necessary to make out a cause of action for violation of Chapter 93A of the Massachusetts Unfair Trade Practice Act.

Additionally, although not raised by defendant, this cause of action is defective for a much more basic reason. The instant case does not fall within the purview of Chapter 93A or the Regulation of Business Practices for Consumer Protection. Chapter 93A prohibits "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce ... unlawful."MASS. GEN. LAWS. ANN. Ch. 93A § 2(a) (West 1997). It is a consumer protection law intended to protect unfair and deceptive practices in business, not unfair practices in general. *See, L.B. Corp. v. Schweitzer-Mauduit Int'l, Inc.*, 121 F.Supp.2d 147, 152 (D.Mass.2000). The statute is inapplicable to transactions that are principally private in nature and where the undertaking is not in the ordinary course of business or trade. *KPS & Assoc., Inc. v. Designs by FMC, Inc.*, 38 F.3d 1, 23 (1st Cir.2003) (quoting *Linkage Corp. v. Trustees of Boston Univ.*, 679 N.E.2d 191, 207 n .33 (Mass.1997)); *Office One, Inc. v. Lopez*, 769 N.E.2d 749 (Mass.2002); *Zimmerman v. Bogoff*, 524 N.E.2d 849, 856 (Mass.1988). The association between GBI and GFT in the interest of forming a business venture together is not the kind of commercial transaction regulated by the statute. *Petricca*, 214 F.3d at 224;*Szalla v. Locke*, 657 N.E.2d 1267, 1270 (Mass.1995).

*17 Accordingly, this cause of action is incognizable.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                    Page 16
Not Reported in F.Supp.2d, 2004 WL 2914093 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2004 WL 2914093)**

CONCLUSION

Plaintiffs' motion to amend the caption to remove Ronald Frasch as a named defendant is granted. The motion of the remaining defendant, GFT (USA) Corp., for summary judgment dismissing the amended complaint is also granted.

S.D.N.Y.,2004.
Southwick Clothing LLC v. GFT (USA) Corp.
Not Reported in F.Supp.2d, 2004 WL 2914093 (S.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.