**862** Mass. **741 NORTH EASTERN REPORTER, 2d SERIES**

Kirby's objection was sustained, but her request for a curative instruction was denied. Prejudicial statements made in front of the jury should be counteracted, but the trier of fact is accorded great latitude to determine whether a curative instruction should be made at the moment of impropriety, whether the matter should be addressed during the charge to the jury, or whether a mistrial should be declared, and the decision to declare a mistrial remains fully within the discretion of the trial judge. *Rolanti v. Boston Edison Corp.*, 33 Mass.App.Ct. 516, 529, 603 N.E.2d 211 (1992). Having earlier sustained an objection to the comment, the judge's charge to the jury, which contained the usual admonishment that they not treat as evidence statements in the opening, was a sufficient response to the comments complained of. There was no abuse of discretion.

[11, 12] For the first time on appeal, Kirby also claims that the prejudicial comments entitle her to a new trial on the issue of |₇₉₅damages. Whether to allow the motion is discretionary to the trial judge, *Bartley v. Phillips*, 317 Mass. 35, 43, 57 N.E.2d 26 (1944), to whom the request for additur should have been directed in a motion for new trial filed pursuant to Mass.R.Civ.P. 59(a), 365 Mass. 827 (1974). *Freeman v. Wood*, 379 Mass. 777, 786, 401 N.E.2d 108 (1980). *Proctor v. North Shore Community Arts Found.*, 47 Mass. App.Ct. 372, 376, 713 N.E.2d 969 (1999).

*Denial of motion for new trial.* Kirby claims that on the basis of all of the claims of error, her motion for a new trial should have been granted. "Because we find no merit to each of the [plaintiff's] previous assignments of error, we reject [her] claim that their cumulative effect was prejudicial and warrants a new trial." *Commonwealth v. McAfee*, 430 Mass. 483, 496, 722 N.E.2d 1 (1999).

*Judgment affirmed.*

*Order denying motion for new trial affirmed.*



50 Mass.App.Ct. 812

|₈₁₂STAGECOACH TRANSPORTATION, INC.

v.

SHUTTLE, INC.

No. 98–P–1016.

Appeals Court of Massachusetts, Suffolk.

Argued Dec. 6, 1999.

Decided Feb. 6, 2001.

Sedan service provider sued airline, alleging unfair and deceptive trade practices in failing to sign contract, and airline sued sedan service provider's president for unfair and deceptive conduct. The Superior Court Department, Suffolk County, David M. Roseman, J., entered judgment on jury verdict for sedan service provider and against its president, doubled the contract damages award, and denied motions for a new trial. Airline and president appealed. The Appeals Court, Gelinas, J., held that: (1) New York choice of law provision did not encompass claim for tortious conduct; (2) airline was not entitled to a new trial on ground that jury was exposed to extraneous material; (3) evidence supported damages award of $2,750,000 for breach of

"But I think you may be struck with some of the testimony in the first deposition, which I think the evidence will indicate to you that there was something going on, they may have something going on between the former counsel and Mr. Morales' counsel where there was some testimony that I respectfully suggest to you—"
[*Counsel*]: "I would object, your Honor."
*The Court:* "I'm going to sustain the objection."

STAGECOACH TRANSP., INC. v. SHUTTLE, INC.   Mass. 863
Cite as 741 N.E.2d 862 (Mass.App.Ct. 2001)

contract by airline; and (4) evidence supported judgment against president.

Affirmed.

1. Trade Regulation ⟶864

In deciding questions of unfairness for purposes of damages under chapter regulating business practices, courts should rather focus on the nature of the challenged conduct and on the purpose and effect of that conduct, and phrases such as "level of rascality" are deemed uninstructive. M.G.L.A. c. 93A, § 1 et seq.

2. Contracts ⟶206

Even if choice of law provision was agreed to by airline and sedan service provider, provision stating that agreement would be governed by New York law did not encompass airline's tortious conduct in refusing to sign the agreement it had promised to sign, as its conduct in engaging in unfair and deceptive acts that resulted in preventing the contract signing was not a dispute arising out of the agreement but more properly resembled a tort action of deceit, and thus, sedan service provider's claim did not arise under the contract.

3. Contracts ⟶127(4), 129(1)

Choice of law and forum selection provisions are routinely enforced in the Commonwealth, if enforcement is fair and reasonable.

4. Contracts ⟶129(1), 206

New York law gives full effect to choice of law provisions, but looks to the language of the provision to determine the scope of its application.

5. Contracts ⟶206

The choice of law provision ordinarily will apply only to contract claims that arise from the agreement containing the provision, unless the express language of the provision is sufficiently broad so as to encompass the entire relationship of the parties.

6. New Trial ⟶44(3), 56

Defendant was not entitled to a new trial on ground that jury was exposed to extraneous material when jury foreman provided the jury with a synonym, "significantly," for the word "materially," as contained in the phrase "materially breached," as jury did not actively participate in investigating factual issues at trial, there was evidence that jury had already decided the issue before being given the information, and the material did not differ in great respect from the actual law, and thus there was no reasonable likelihood of prejudice.

7. New Trial ⟶56

In considering a motion for a new trial on ground that jury was exposed to extraneous material, trial court properly considered the probable effect the extraneous material would have on a hypothetical jury and did not consider the effect of the matter on the jury's actual decision.

8. New Trial ⟶56

In considering effect of extraneous materials on a hypothetical jury for purposes of motion for a new trial, factors to be considered when that material is definitional and not factual include the importance of the question which the jurors researched, the weight the jury gave to the extraneous material, and the extent to which the materials consulted differed from the actual law governing the case.

9. Aviation ⟶229

Airline could not terminate contract based on contract section providing the right to terminate if a change occurred in sedan service's senior management after sedan service's president was demoted to director of marketing, where airline submitted the draft contracts to sedan service after it was known to airline that not only had former president been demoted but that he had left the company and was committed to federal prison, and there was no evidence that airline sought to amend or terminate negotiations or vitiate pro-

posed agreement based on this change in management.

**10. Damages ⟲140**

Evidence supported damages award of $2,750,000 for breach of contract by airline to provide door to door transportation with sedan service provider, where accountant of sedan service provider provided ample evidence of the company's historical revenues and costs and of the projected profit that sedan service provider might anticipate over the term of the agreement, including the average cost and selling price of the air/ground package.

**11. Trade Regulation ⟲864**

Evidence supported judgment against president of sedan service provider, which had a contract to provide door-to-door transportation with airline, for violations of chapter regulating business practices in light of evidence that president sold airline's tickets to a friend who ran a travel business, those tickets were sold without the ground transportation component and for less than the amount airline charged a walk-up customer for airfare, and airline suffered financial damage as a result of these sales. M.G.L.A. c. 93A, § 1 et seq.

**12. Costs ⟲252**

Sedan service provider was entitled to reasonable attorney's fees incurred in opposing airline's appeal of judgment awarding damages under chapter regulating business practices, but sedan service provider was not entitled to fees arising from its president's unsuccessful cross appeal of judgment against him for violations of that chapter. M.G.L.A. c. 93A, § 1 et seq.

---

Andrew J. Frackman, New York City, for Shuttle, Inc.

Douglas G. Moxham, Boston, for Stagecoach Transportation, Inc., & others.

Present: PERRETTA, GILLERMAN, & GELINAS, JJ.

|₈₁₃GELINAS, J.

We consider in this case whether a claim for damages under G.L. c. 93A, brought in a Massachusetts court, is precluded by a choice of law provision (New York law as the choice) in an unsigned contract. We further consider whether jury misconduct in this case requires a new trial, whether the plaintiff was in breach of the contract, thereby excusing the defendant's breach, and, finally, whether the evidence of damages at trial was sufficient to support the jury's award. We find no error and affirm the judgment and the orders of the Superior Court denying motions for a new trial and other further relief.

A jury in the Superior Court determined that Stagecoach Transportation, Inc. (Stagecoach), and Shuttle, Inc. (Shuttle), had agreed to all the material terms of an unsigned contract and awarded substantial damages to Stagecoach. The jury further determined that Stagecoach had failed to sign the contract in reliance on promises made by Shuttle's then vice-president, Terry V. Hallcom; that Hallcom's conduct in this regard was unfair and deceptive; and that Stagecoach had thereby suffered damage. A Superior Court judge, acting on Stagecoach's claim for punitive damages under G.L. c. 93A, §§ 2 and 11, doubled the jury's contract damage award. The jury further found that Stagecoach had made false representations of material fact to Shuttle regarding tickets purchased or bills rendered to Shuttle, that Shuttle thereby suffered damage, and that Shuttle further suffered damage as a result of the unfair or deceptive conduct of Martin Hoffman, Stagecoach's president. On the issue of jury misconduct, the trial judge, after hearing, determined that a hypothetical jury would not have been influenced by the foreman's bringing to them a definition of "material breach" that he had obtained from his insurance broker during an evening telephone conversation. The trial judge further denied Shuttle's motions for a new trial and other further relief, finding that there was no change in senior man-

STAGECOACH TRANSP., INC. v. SHUTTLE, INC.    Mass. **865**
Cite as 741 N.E.2d 862 (Mass.App.Ct. 2001)

agement that amounted to a breach of contract on Stagecoach's part, and that there was sufficient evidence to support the jury's finding of damages.

*Facts.* We summarize the evidence, reserving certain particulars for our discussion of the issues. Kevin O'Brien, founder and then-president of Stagecoach, initiated a novel airline and sedan service with Trump Shuttle, Inc. (Trump), ₈₁₄predecessor of defendant Shuttle.[1] Under a two-year agreement (1991 contract) originating on September 5, 1991, the parties offered door to door transportation (an air/ground package called the "TicPac") between Boston, New York, and Washington, D.C. Stagecoach provided ground transportation, portal to airport and airport to portal. Shuttle provided air transportation, airport to airport. Stagecoach purchased airline tickets from Shuttle for resale to passengers, at reduced prices as set forth in the 1991 contract; Shuttle had the right to purchase ground transportation vouchers from Stagecoach for resale to passengers, again at reduced prices as set forth in the 1991 contract. The TicPac could also be purchased from a passenger's travel agent. The incentives to customers for purchasing a TicPac were convenience and a reduced cost of transportation.

In the course of working together in negotiating and then implementing the 1991 contract, Shuttle's vice-president of operations, Hallcom, and Stagecoach's then president, Kevin O'Brien, developed a close business and personal relationship. The business side of the relationship waned in May, 1993, when O'Brien, indicted and convicted of Medicare fraud for his activities while an officer of an unrelated company, was sentenced to prison. In 1992, when first indicted on the Medicare fraud charge, O'Brien resigned as president of Stagecoach. He continued to work for Stagecoach as director of sales and marketing until he began serving his sentence in 1993. Upon O'Brien's resignation as president, Martin Hoffman, one of Stagecoach's principal investors, was named as president; Martin's father, Herbert S. Hoffman (Hoffman), was chairman of Stagecoach's board of directors and became chief executive officer.

In May of 1993, prior to the expiration of the 1991 contract, Shuttle invited a proposal from Stagecoach for continuing that contract with a revised pricing structure. Shuttle also invited a like proposal from Boston Coach, Inc., Stagecoach's competitor.

After discussion with both companies regarding the terms of a new agreement, including a new pricing structure, Shuttle sent ₈₁₅notice that it was awarding the new contract to Stagecoach.[2] Signing became a problem. Hallcom met with Hoffman in July, asking Hoffman for a delay in signing. The reason given: Hallcom was about to become president of Shuttle and wanted to reserve the contract signing for himself. Hoffman agreed. In September of 1993 Hallcom in fact became president. Hoffman pressed for a signed contract. Hallcom demurred. The reason: Hallcom was now pressing Stagecoach to enter into a separate arrangement which would provide financial benefit to Hallcom's friend O'Brien, who was still in prison. Stagecoach attempted to comply, offering a variety of suggestions as to how O'Brien might

---

1. Prior to the expiration of the 1991 contract, Trump ceased to do business. Shuttle succeeded to Trump's rights and obligations under the 1991 contract and continued the program with Stagecoach. Shuttle is commonly known as the U.S. Air Shuttle.

2. Stagecoach sent Shuttle a letter accepting all terms and conditions contained in the new pricing approach. Shuttle sent Stagecoach a letter stating that it had elected to stay with Stagecoach for another two years, and that it would be "business as usual" for the week or so that it would take to prepare a written agreement. Shuttle's then president, Gordon Linkon, sent an agreement to Stagecoach with a note that stated, "Here is my draft. If ok, let's sign. If not, let's talk." The new agreement in all respects was satisfactory to Stagecoach; Hoffman requested that the contract be signed.

866  Mass.      741 NORTH EASTERN REPORTER, 2d SERIES

be accommodated upon his release from prison, including a consulting job with Stagecoach. None of the suggestions proved satisfactory to Hallcom and Shuttle. Stagecoach and Shuttle continued to do business, each acting according to the terms of the new, unsigned agreement. Pressure increased on Stagecoach to help O'Brien; the scope of assistance sought now extended to members of O'Brien's family formerly employed by Stagecoach. In the spring of 1994, still not having signed the 1993 contract, Shuttle demanded a change that required Stagecoach to relinquish the exclusive arrangement feature of the agreement.[3] In May, 1994, Shuttle began using the services of another ground transport provider and repeated its ultimatum that Stagecoach relinquish the exclusive rights under the agreement. Stagecoach refused, and Shuttle then refused to provide tickets. On May 13, 1994, Stagecoach filed suit.

*Proceedings.* Stagecoach's complaint sought, in addition to injunctive relief, damages for breach of contract and violation of G.L. c. 93A, §§ 2 and 11, and alleged that Shuttle was estopped from denying the existence of the 1993 agreement. Shuttle, in turn, brought counterclaims against Stagecoach and its principals. The Superior Court denied Stagecoach's request for injunctive relief and also denied the parties' cross motions for summary judgment. In February of 1997, prior to trial, Stagecoach amended its complaint, adding a claim for monies owed and unpaid on certain invoices billed to Shuttle. The matter proceeded to trial before a jury in the Superior Court in May of 1997. The jury returned a verdict in favor of Stagecoach for $2,750,000 and rendered an advisory opinion on the c. 93A claim. The trial judge found a violation, by Shuttle, of c. 93A, adopted the jury's advisory opinion on the c. 93A claim, and awarded Stagecoach an additional $2,750,000 as punitive damages.[4] Twenty-two special questions were submitted to the jury.[5] The jury awarded Stage-

---

3. Clause seven of the 1993 agreement provided:
   "EXCLUSIVITY: During the term of this Agreement, Stagecoach shall not purchase for resell [sic] or offer tickets for air transportation between BOS [Boston—Logan Airport] and LGA [New York—LaGuardia Airport] or between DCA [Washington D.C.—National Airport] and LGA from any air carrier other than Shuttle, without Shuttle's express, written approval in advance. Likewise, during the term of this Agreement, Shuttle shall not sell or provide its tickets for air transportation between BOS and LGA or DCA and LGA to an executive sedan transportation company other than Stagecoach for resale as part of a combination package nor shall Shuttle offer the travel vouchers of any executive sedan transportation company other than Stagecoach as a part of a combination package between BOS and LGA or DCA and LGA without Stagecoach's express, written approval in advance." The 1991 contract contained language to the same effect.

4. The judge had the choice of letting the jury find the facts of the c. 93A claim, reserving to himself all aspects of the c. 93A claim, or asking the jury for non-binding advisory opinion as to whether Shuttle had acted unfairly or deceptively in preventing the contract from being signed. See *Acushnet Fed. Credit Union v. Roderick*, 26 Mass.App.Ct. 604, 606, 530 N.E.2d 1243 (1988), and cases cited.

5. The pertinent special questions and answers were as follows:
   "(1) Did Stagecoach and Shuttle agree on all the material terms of Exhibit 17 [the 1993 agreement]?"  Answer: "Yes."
   "(2) ... If you answered 'yes' to Question 1, what, if any, damage did Stagecoach suffer as a result of Exhibit 17 not being implemented?"  Answer: "Amount: $2,750,000.00."
   "(3) Did Stagecoach fail to sign Exhibit 17 in reliance on promises made by Mr. Hallcom?"  Answer: "Yes."
   "(4) ... If you answered 'yes' to Question 3, what, if any, damage did Stagecoach suffer as a result of its reliance on those promises of Mr. Hallcom?"  Answer:  "Amount: $2,750,000.00."
   "(5) If you answered 'yes' to Question 3, was Mr. Hallcom's conduct unfair or deceptive to Stagecoach?"  Answer: "Yes."
   "(6) ... If you answered 'yes' to Question 5, what amount of damage, if any, did Stagecoach suffer as a result of such conduct ."  Answer: "Amount: $2,750,000.00"
   "(7) If you answered 'yes' to Question 5, do you find Shuttle's conduct to have been wilful or knowing?"  Answer: "Yes."

coach an additional amount of $104,000.00 for actual charges incurred as a result of Shuttle's failure to pay certain invoices. The damages awarded Stagecoach [817]were offset by a jury finding that Stagecoach and Martin Hoffman had not reported to Shuttle the proceeds from the sale of certain tickets. The jury determined the amount of the offset to be $152,330.00, or $88,490.00 against Shuttle and $63,840.00 against Martin Hoffman. The judge awarded attorney's fees of $335,000.00 to Stagecoach. He also awarded attorney's fees and costs to Shuttle in the amount of $21,280.00 against Martin Hoffman.

[1] *Chapter 93A award.* We consider first the judge's award of damages to Stagecoach under G.L. c. 93A, §§ 2 and 11, and Shuttle's claims that (a) New York choice of law controls and that, under New York law, Stagecoach is entitled to neither punitive damages nor attorney's fees, and (b) even if Massachusetts law prevails, Stagecoach is not entitled to G.L. c. 93A damages because there was no injury to Stagecoach, Shuttle's conduct did not rise to a level of "rascality" and egregiousness, see *Spence v. Boston Edison Co.*, 390 Mass. 604, 616, 459 N.E.2d 80 (1983), necessary to support a finding of violation of G.L. c. 93A, and the award itself was erroneous, because based on lost profits as found by the jury.[6]

[2] (a) *Choice of law.* The jury's response to question one stated that the parties had agreed to all the material terms of the contract. Assuming that the choice of law provision was a material term, we consider whether the clause precludes c. 93A recovery here.

The choice of law clause in the unsigned contract provided: "This Agreement shall be governed and interpreted in accordance with the laws of the State of New York. Without limiting in any way the jurisdiction of the courts of any state, nation or province, or Shuttle's right to invoke the jurisdiction of such courts, Stagecoach hereby submits and consents to the jurisdiction of the courts of the United States of America and the State of New York. . . ."

[3] Choice of law and forum selection provisions are routinely enforced in the Commonwealth, if enforcement is fair and [818]reasonable. See *Morris v. Watsco, Inc.*, 385 Mass. 672, 674–675, 433 N.E.2d 886 (1982) (court has acknowledged and given effect to the law reasonably chosen by the parties to govern their rights under contracts); *Jacobson v. Mailboxes Etc. U.S.A., Inc.*, 419 Mass. 572, 575, 646 N.E.2d 741 (1995) (forum selection clauses are to be enforced if it is fair and reasonable to do so).[7]

Shuttle argues that, with regard to the c. 93A claim, Stagecoach should be bound by the choice of law clause designating New York law, which does not recognize, in a commercial transaction, punitive damages or the award of attorney's fees, no matter how malicious or intentional a defendant's wrongful conduct. See *Hooper Assocs., Ltd. v. AGS Computers, Inc.*, 74 N.Y.2d 487, 491, 549 N.Y.S.2d 365, 548 N.E.2d 903 (1989) (attorney's fees not available in absence of contractual or statutory provisions permitting such fees);

---

6. Phrases such as "level of rascality" are deemed uninstructive in deciding questions of unfairness under G.L. c. 93A; courts should rather focus on the nature of the challenged conduct and on the purpose and effect of that conduct. *Massachusetts Employers Ins. Exch. v. Propac–Mass, Inc.*, 420 Mass. 39, 42, 648 N.E.2d 435 (1995).

7. In *Jacobson v. Mailboxes Etc. U.S.A., Inc., supra*, the contract provided both that the agreement was to be construed under and governed by the laws of California *and* that all actions to enforce the agreement were to be brought in California. See *Cambridge Biotech Corp. v. Pasteur Sanofi Diagnostics*, 433 Mass. 122, 130–131, 740 N.E.2d 195 (2000) (upholding forum selection clause). In our case, the agreement does not limit enforcement actions to the New York courts.

**868** Mass.        741 NORTH EASTERN REPORTER, 2d SERIES

*Fischer v. Yaakov,* 176 A.D.2d 655, 655, 575 N.Y.S.2d 310 (1991) (punitive damages not available to corporations in action based on private wrong). Shuttle's argument is misplaced.

[4, 5] New York law gives full effect to choice of law provisions, see *Woodling v. Garrett Corp.,* 813 F.2d 543, 551 (2d Cir. 1987), but looks to the language of the provision to determine the scope of its application. The choice of law provision ordinarily will apply only to contract claims that arise from the agreement, *Knieriemen v. Bache Halsey Stuart Shields, Inc.,* 74 A.D.2d 290, 293–294, 427 N.Y.S.2d 10 (1980), unless the express language of the provision is sufficiently broad so as to encompass the entire relationship of the parties. *Turtur v. Rothschild Registry Intl., Inc.,* 26 F.3d 304, 309–310 (2d Cir. 1994). Shuttle's conduct in engaging in unfair and deceptive acts that resulted in preventing the contract signing is not a dispute arising out of the agreement but more properly resembles a tort action of deceit. We determine that the clause here, as read in the light of New York law, would not be deemed to encompass Shuttle's tortious conduct in refusing to sign the agreement it had promised to ⌊819 sign. Stagecoach's claim did not arise under the contract. See *Krock v. Lipsay,* 97 F.3d 640, 645 (2d Cir.1996) (language that a "[m]ortgage shall be governed by and construed in accordance with the laws of the Commonwealth of Massachusetts" governs actions under the contract only and not those sounding in tort); *Rosenberg v. Pillsbury Co.,* 718 F.Supp. 1146, 1150 (S.D.N.Y.1989) (franchise agreement provided that any performance or breach to be "governed and construed pursuant to the laws of the State of New York," but provision did not apply to fraud claims, sounding in tort). Contrast *Turtur,* 26 F.3d at 309 (clause "to resolve any controversy or claim arising out of or relating to this contract or breach thereof" held to include all actions arising from activity surrounding the transaction).

As in *Jacobson v. Mailboxes Etc. U.S.A., Inc.,* 419 Mass. at 580 n. 9, 646 N.E.2d 741, because the choice of law clause does not purport to declare that the rights of the parties were to be governed by New York law, the application of G.L. c. 93A to the parties' dealings is not barred. The trial court's determination that Shuttle's conduct did not relate to an interpretation of the agreement, and thus was governed by G.L. c. 93A, was correct.

(b) *Additional claims with respect to G.L. c. 93A.* With respect to Shuttle's additional claims that there was no injury, that the conduct did not rise to the "level of rascality" and egregiousness as between business entities, and that the measure of damages was erroneous, we conclude that the trial judge's rulings in this respect are fully supported by the record. See *Linkage Corp. v. Trustees of Boston Univ.,* 425 Mass. 1, 26–27, 679 N.E.2d 191, cert. denied, 522 U.S. 1015, 118 S.Ct. 599, 139 L.Ed.2d 488 (1997).

[6] *Jury misconduct.* Shuttle next contends that the trial judge erred in failing to order a new trial when he discovered that the foreman of the jury provided the jury with a synonym, "significantly," for the word "materially," as contained in the phrase "materially breached."[8] The foreman had contacted an acquaintance who was an insurance agent and who, after having recourse to an insurance law book, reported to the foreman that a "material breach of contract" was a "significant breach of ⌊820 contract."[9] The foreman in

---

8. The discovery was made when, after the verdict was entered, the court clerk received a letter from a juror concerning what the juror perceived to be misconduct.

9. The agent testified that in his evening conversation with the foreman, "[I] gave [the foreman] my opinion after I read the book.... it meant that one party didn't follow through on a contract with another, that there was a knowing—that the party that was breaking the contract knowingly broke it and didn't follow through on the terms and conditions of the contract or the spirit of the con-

STAGECOACH TRANSP., INC. v. SHUTTLE, INC.    Mass.  869
Cite as 741 N.E.2d 862 (Mass.App.Ct. 2001)

turn reported his findings to the jury at the start of deliberations on the next day.[10]

[7, 8] The trial judge held the requisite hearing, see *Commonwealth v. Fidler*, 377 Mass. 192, 200–201, 385 N.E.2d 513 (1979); *Markee v. Biasetti*, 410 Mass. 785, 788, 575 N.E.2d 1083 (1991), and properly considered the probable effect the extraneous material would have on a hypothetical jury. In so doing, he was careful not to consider the effect of the matter on the jury's actual decision. See *Fidler*, *supra* at 201, 385 N.E.2d 513; *Fitzpatrick v. Allen*, 410 Mass. 791, 795–796, 575 N.E.2d 750 (1991). Shuttle established that the jury had been exposed to extraneous matter. The burden then shifted to Stagecoach to demonstrate no reasonable likelihood of prejudice to Shuttle. The trial judge determined that Stagecoach successfully carried its burden in this regard, and we do not disagree. Here the jury did not actively participate in investigating factual issues at trial. Compare *Markee v. Biasetti*, *supra* (jurors visited the scene of an accident to determine field of vision and to measure distances and observe other vehicles rounding curves to determine speed), and *Fitzpatrick v. Allen*, *supra* (during deliberations jurors read from a home medical reference book to determine facts surrounding the causes of cerebral palsy, and the medical reference concluded that the cause of cerebral palsy could not be determined in most cases). While limiting his inquiry to the effect the extraneous materials would have on a hypothetical jury, the judge appropriately considered the circumstances surrounding the use of the extraneous material and the factors to be considered when that material is definitional and not factual. Among these factors are "the importance of the question which the jurors researched, the weight [the jury] gave to the extraneous material and the extent to which the materials consulted differed$_{821}$ from the actual law governing the case." Annot., Prejudicial Effect of Jury's Procurement or Use of Book During Deliberations in Civil Cases, 31 A.L.R.4th 623, 627 (1984). While the definition of material breach was no doubt important to the case, the trial judge found, and the record supports, that a hypothetical jury would give little, if any, weight to the information in circumstances where, as here, there was evidence that the jury had already decided the issue before being given the information. Further, the material did not differ in great respect from the actual law (the judge ruled that, in fact, "substantial" is an appropriate synonym for "material").

Other jurisdictions have come to a similar conclusion where jurors obtain clarifying definitions. See *United States v. Cheyenne*, 855 F.2d 566 (8th Cir.1988) (definition of "callous" and "wanton"); *Franks v. State*, 306 Ark. 75, 811 S.W.2d 301 (1991) (jury obtained definition of "premeditation"); *McGee v. McGee*, 237 S.W.2d 778, 783–784 (Tex.App.1950) (definition of "stock").

Some jurisdictions make a formal distinction whether the extraneous information is factual or definitional. See *People v. Sotelo*, 102 Cal.App. 688, 283 P. 388 (1929) (during deliberations certain jurors consulted law books to discern meaning of the term "malice aforethought," and then asked for and received further instruction on the subject; consulting law books in these circumstances held not to constitute error); *State v. Tinius*, 527 N.W.2d 414 (Iowa Ct.App.1994) (jury use of a dictionary during deliberations constitutes jury

---

tract." The foreman responded: "[T]here's so much that you said, and ... if you had to give me one word on what material breach of contract meant, what would it be?" The agent's response: "I said it was a significant breach of contract."

10. One juror was disturbed by the foreman's actions and suggested that the matter be reported to the judge. At least ten of the jurors rejected this suggestion; the judge found that those jurors "felt that [the foreman] had asked for a 'synonym' and that they did not perceive his action to be wrong," and that the issue was already decided.

**870** Mass.     **741 NORTH EASTERN REPORTER, 2d SERIES**

misconduct because it introduces outside information, but definition of "reasonable" in the dictionary did not conflict with any aspect of the court's instructions; use of dictionary during deliberations viewed as generally harmless); *State v. Sheppard*, 84 Ohio St.3d 230, 703 N.E.2d 286 (1998), cert. denied, 527 U.S. 1026, 119 S.Ct. 2376, 144 L.Ed.2d 779 (1999), and cert. denied, 528 U.S. 1168, 120 S.Ct. 1190, 145 L.Ed.2d 1095 (2000) (deliberating juror contacted a psychologist for a definition of "paranoid schizophrenia" before deliberation on the penalty phase of a capital murder case; the request for information constituted juror misconduct, but the appellant did not establish that any prejudice resulted from this misconduct, because the conversation reinforced the expert defense testimony).[11]

The trial judge here found, and we agree, that the definition sought in the present case would not have prejudiced the $_{822}$defendant in any way. We do not reverse a trial judge's determination in the matter where there is "no reasonable likelihood of prejudice." *Fitzpatrick v. Allen*, 410 Mass. at 795, 575 N.E.2d 750. We discern no such likelihood here.

[9] *Right to terminate.* We find no merit in Shuttle's argument on appeal that the contract should not be enforced because section 17 gave Shuttle the right to terminate if a change occurred in Stagecoach's senior management (president and/or vice-president of sales and marketing), and such a management change did in fact occur (O'Brien was demoted from president to director of marketing). Shuttle submitted the draft contracts of July and August to Stagecoach after it was known to Shuttle that not only had O'Brien been demoted but that he had left the company and was committed to federal prison. All this took place with Shuttle's full knowledge, well before the contemplated effective date of the contract, September 1, 1993. There is no evidence that Shuttle sought to amend or terminate the negotiations or vitiate the proposed agreement based on this change in management. To the contrary, all of the evidence suggests that Shuttle refused to sign the contract in an effort to force Stagecoach to provide in some way for the departed O'Brien and members of his family. Shuttle then began doing business with another transportation company when these efforts did not produce results to Shuttle's liking.

[10] *Evidence of damages.* We also find no merit to the argument that the jury had insufficient evidence to support its award of damages. Brian Beck, who was Stagecoach's accountant, provided ample evidence of the company's historical revenues and costs and of the projected profit that Stagecoach might anticipate over the term of the agreement, including the average cost and selling price of the TicPacs. We uphold the jury's damage award where, as here, it has a "solid basis in the evidence." *Rizika v. Donovan*, 45 Mass.App.Ct. 159, 166, 695 N.E.2d 1097 (1998). See *Linkage Corp. v. Trustees of Boston Univ.*, 425 Mass. at 28 n. 38, 679 N.E.2d 191.

[11] Similarly, Martin Hoffman argues in his cross appeal that the evidence did not support the c. 93A judgment against him. He maintains that, at best, the evidence showed a breach of contract by Martin Hoffman, with no resulting damage to Shuttle. The evidence amply supported the conclusion that Martin Hoffman sold Shuttle tickets to a friend who ran a travel business. These tickets were sold without the Stagecoach ground transportation $_{823}$component and for less than the amount Shuttle charged a walk-up customer for airfare, and Shuttle suffered financial damage as a result of these sales. There was no error.

[12] *Attorney's fees.* Stagecoach has requested reasonable attorney's fees pursuant to c. 93A, § 11, in connection with

---

11. The court held as well that trial courts are given broad discretion in dealing with outside contacts. *Sheppard, supra* at 233–234, 703 N.E.2d 286.

COM. v. RICHE    Mass.  871
Cite as 741 N.E.2d 871 (Mass.App.Ct. 2001)

this appeal. Stagecoach is entitled to reasonable attorney's fees incurred in opposing Shuttle's appeal but not to fees arising from Martin Hoffman's unsuccessful cross appeal. See *Golber v. BayBank Valley Trust Co.*, 46 Mass.App.Ct. 256, 261, 704 N.E.2d 1191 (1999). Stagecoach shall provide to our clerk's office "the necessary back-up materials and details as to hours spent [excluding time spent on Martin Hoffman's cross appeal], the precise nature of the work, and fees requested," *Williams v. B & K Med. Sys., Inc.*, 49 Mass.App.Ct. 563, 578, 732 N.E.2d 300 (2000), quoting from *Yorke Mgmt. v. Castro*, 406 Mass. 17, 20, 546 N.E.2d 342 (1989), within fifteen days of the decision. Shuttle shall have fifteen days to respond.

*Judgment affirmed.*

*Orders denying motions for new trial and for further relief affirmed.*



50 Mass.App.Ct. 830

⌊830COMMONWEALTH

v.

**Barnaby Jack RICHE.**

No. 99-P-1145.

Appeals Court of Massachusetts, Plymouth.

Argued Oct. 6, 2000.

Decided Feb. 7, 2001.

Defendant was convicted in the Superior Court Department, Plymouth County, Patrick F. Brady, and Barbara A. Dortch-Okara, JJ., of trafficking in cocaine in an amount more than 28 but not less than 100 grams, and he appealed. The Appeals Court, Kaplan, J., held that police officer had reasonable suspicion to order driver, defendant, who was a passenger, and another passenger to exit car during lawful investigatory stop.

Affirmed.

1. Automobiles ⟼349(16)

Police officer had reasonable suspicion to order driver, defendant, who was a passenger, and another passenger to exit car during lawful investigatory traffic stop; driver's immediate attempt to exit car suggested a hostile confrontation or possibility that driver intended to run for it, driver's nearly simultaneous mention of a drug offense implicated possibility of guns, and fact that driver gave officer a registration not crediting ownership of car to any of its occupants raised question of whether car was stolen. U.S.C.A. Const.Amend. 4; M.G.L.A. Const. Pt. 1, Art. 14.

2. Arrest ⟼63.5(7)

When an automobile is properly stopped, the police officer may, as a matter of course, order the driver and any passengers to exit the vehicle. U.S.C.A. Const. Amend. 4.

3. Arrest ⟼63.5(8)

After a proper investigatory stop of an automobile, there must be a showing of justification for an exit order, whether addressed to a driver or a passenger. U.S.C.A. Const.Amend. 4; M.G.L.A. Const. Pt. 1, Art. 14.

4. Criminal Law ⟼1139

On a review of the trial judge's decision regarding a motion to suppress evidence, judge's views of the law are subject to independent review by Appeals Court.

5. Automobiles ⟼349(2.1, 5)

Police officer's initial investigatory stop of automobile was lawful, where officer had observed commission of offenses of traveling without a rear license plate light and speeding. M.G.L.A. c. 90, §§ 7, 17.